**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PHYSIOTHERAPY HOLDINGS, INC., *et al.*,[1] | ) | Case No. 13-_____ ( ) |
| | ) | |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

**DISCLOSURE STATEMENT FOR THE JOINT PREPACKAGED**
**PLAN OF REORGANIZATION OF PHYSIOTHERAPY HOLDINGS, INC. AND**
**ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:     (302) 426-1189
Facsimile:     (302) 426-9193

- and -

Morton Branzburg (*pro hac vice* admission pending)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:     (215) 569-2700
Facsimile:     (215) 568-6603

- and -

Jonathan S. Henes, P.C. (*pro hac vice* admission pending)
Nicole L. Greenblatt (*pro hac vice* admission pending)
David S. Meyer (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Dated:  October 10, 2013

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Physiotherapy Holdings, Inc. (5193); Actra Rehabilitation Associates, Inc. (7806); Alexandria Sports, Inc. (7654); Benchmark Acquisition Corp. (3850); Benchmark Medical Management Company (0335); Benchmark O&P Holdings, Inc. (6848); Benchmark Orthotics & Prosthetics, Inc. (7000); Blue Hen Physical Therapy, Inc. (7267); Cape Prosthetics-Orthotics, Inc. (7914); Carrollton Physical Therapy Clinic, Inc. (2832); Integrity Physical Therapy, Inc. (1075); Keystone Rehabilitation Associates of Warren (8341); Keystone Rehabilitation Systems, Inc. (8380); Keystone Rehabilitation Systems of McMurray (6304); Leesburg Sports, Inc. (4190); MATRIX Healthcare Services, LLC (7344); MATRIX Rehabilitation, Inc. (3147); MATRIX Rehabilitation-Delaware, Inc. (2504); MATRIX Rehabilitation-Georgia, Inc. (4073); MATRIX Rehabilitation-Ohio, Inc. (2505); MATRIX Rehabilitation-South Carolina, Inc. (5603); MATRIX Rehabilitation-Texas, Inc. (9542); Morris Area Rehabilitation Association, Inc. (2043); North Dallas Physical Therapy Associates, Inc. (5331); Northstar Health Services, Inc. (7152); NSHS Services, Inc. (6789); Orthopaedic Services of Paducah, Inc. (3143); PhysioLink Corporation (3705); Physiotherapy Associates Holdings, Inc. (3367); Physiotherapy Associates, Inc. (7193); Physiotherapy Associates-Union Rehab, LLC (0041); Physiotherapy Corporation (3816); Physiotherapy-BMHI Holdings, Inc. (3361); Physiotherapy-BMI, Inc. (4107); Potomac Rehabilitation Services, Inc. (2725); Professional Rehab Associates, Inc. (2393); Progressive Therapy Services, Inc. (8449); Rehab Associates, L.L.C. (9381); Rehab Colorado, LLC (5804); Rehab Missouri, LLC (0587); Rehab Xcel, LLC (0586); Rehabilitation Consultants, Inc. (1166); R.S. Network, Inc. (9104); SMR Banyan Tree, Inc. (6933); Swanson Orthotic & Prosthetic Center, Inc. (2308); The Parks Physical Therapy and Work Hardening Center, Inc. (2926); Theraphysics Partners of Colorado, Inc. (2115); Theraphysics Partners of Texas, Inc. (9976); Therapy Associates of Martinsville, Inc. (1394); Trumbull P.T. Corp. (3855); Wisconsin Prosthetics and Orthotics, Inc. (7815). The Debtors' main corporate address is 855 Springdale Drive, Suite 200, Exton, PA 19341.

Physiotherapy Holdings, Inc. ("Holdings"), Physiotherapy Associates Holdings, Inc. ("PAH") and certain of PAH's direct and indirect subsidiaries and affiliates, as proposed chapter 11 debtors and debtors in possession (collectively, the "Company" or the "Debtors") are sending you this document and the accompanying materials (the "Disclosure Statement") because you may be a creditor entitled to vote on the Joint Prepackaged Plan of Reorganization of Physiotherapy Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, as the same may be amended from time to time (the "Plan").[2] The Debtors are commencing the solicitation of your vote to approve the Plan (the "Solicitation") before the Debtors file voluntary cases under Chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code").

The Debtors may file voluntary reorganization cases under Chapter 11 of the Bankruptcy Code to implement the Plan (the "Chapter 11 Cases"). Because the Chapter 11 Cases have not yet been commenced, this Disclosure Statement has not been approved by the Bankruptcy Court as containing "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code. If the Debtors file the Chapter 11 Cases, they will promptly seek an order of the Bankruptcy Court (a) approving this Disclosure Statement as having contained "adequate information," (b) approving the solicitation of votes as having been in compliance with section 1126(b) of the Bankruptcy Code and (c) confirming the Plan. The Bankruptcy Court may order additional disclosures.

### SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

Neither this Disclosure Statement nor the Plan has been filed with or reviewed by the Bankruptcy Court, and the securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the United States Securities and Exchange Commission (the "SEC") under the United States Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under any state securities law ("Blue Sky Laws"). The Debtors are relying on section 3(a)(9) of the Securities Act, and similar Blue Sky Laws provisions to exempt from registration under the Securities Act and Blue Sky Laws the offer to Holders of Senior Notes Claims of new securities prior to the filing of the Chapter 11 Cases, including without limitation in connection with the Solicitation.

After the filing of the Chapter 11 Cases, the Debtors are relying on the exemption from the Securities Act, and equivalent state law registration requirements, provided by section 1145(a) of the Bankruptcy Code or section 3(a)(9) of the Securities Act, and similar Blue Sky Laws provisions to exempt from registration under the Securities Act and Blue Sky Laws the offer and sale of new securities under the Plan.

The Plan has not been approved or disapproved by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of the information contained herein. Any representation to the contrary is a criminal offense. Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

---

[2] Unless otherwise defined in this Disclosure Statement, all capitalized terms used, but not otherwise defined, in this Disclosure Statement will have the meanings ascribed to them in the Plan.

i

**The deadline for Holders of Bridge Loan Credit Agreement Claims and Senior Notes Claims to accept or reject the Plan is _11:59 p.m. (prevailing Eastern Time) on November 8, 2013_ (the "Voting Deadline") unless the Debtors, in their sole discretion, and from time to time, extend the Voting Deadline.  To be counted, the Ballot or Master Ballot indicating acceptance or rejection of the Plan must be received by Kurtzman Carson Consultants LLC, the Debtors' notice, claims, and balloting agent ("KCC" or the "Balloting Agent"), no later than the applicable Voting Deadline.**

**The Debtors cannot assure you that the disclosure statement, including any exhibits thereto, that is ultimately approved by the Bankruptcy Court in the Chapter 11 Cases (a) will contain any of the terms described in this Disclosure Statement or (b) will not contain different, additional, or material terms that do not appear in this Disclosure Statement.  The Debtors urge each Holder of a Claim or Interest (i) to read and consider carefully this entire Disclosure Statement (including the Plan and the matters described under "Risk Factors" below) and (ii) to consult with its own advisors with respect to reviewing this Disclosure Statement, the Plan and each of the proposed transactions contemplated thereby prior to deciding whether to accept or reject the Plan.  You should not rely on this Disclosure Statement for any purpose other than to determine whether to vote to accept or reject the Plan.**

**If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims against, and Holders of Interests in, the Debtors (including, without limitation, those Holders of Claims or Interests who do not submit Ballots to accept or reject the Plan or who are not entitled to vote on the Plan) will be bound by the terms of the Plan and the transactions contemplated thereby.**

KE 27455051

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| I. | **EXECUTIVE SUMMARY** ............................................................................................. | 9 |
| II. | **IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT** ................................. | 11 |
| III. | **QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN** ............................................................................................................ | 12 |
| | A. | What is chapter 11? ............................................................................................... | 12 |
| | B. | Why are the Debtors sending me this Disclosure Statement? ............................... | 13 |
| | C. | What is the financial restructuring contemplated by the Plan? ............................ | 13 |
| | D. | Am I entitled to vote on the Plan and what will I receive from the Debtors if the Plan is consummated? ...................................................................................... | 14 |
| | E. | How do I vote on the plan? ................................................................................... | 15 |
| | F. | What happens to my recovery if the Plan is not confirmed, or does not go effective? ................. | 16 |
| | G. | If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation," "Effective Date" and "Consummation?" ......... | 17 |
| | H. | Will the Debtors be obliged to pay fees and expenses for professionals other than those engaged by the Debtors prior to the Petition Date in connection with the Chapter 11 Cases? ......... | 17 |
| | I. | Will the Reorganized Debtors be obligated to continue to pay statutory fees after the Effective Date? ........ | 17 |
| | J. | What is the Debtors' current financial condition and what is the Debtors' projected Cash balance on the Effective Date? ......... | 17 |
| | K. | What are the terms of the Exit Facility? ............................................................... | 18 |
| | L. | Are there risks to owning an Interest in the Reorganized Debtors upon emergence from chapter 11? ......... | 18 |
| | M. | What rights will Reorganized Debtors' new stockholders have? ........................... | 18 |
| | N. | Is there potential litigation related to the Plan? ................................................... | 18 |
| | O. | Will there be releases granted to parties in interest as part of the Plan? ............. | 18 |
| | P. | Why is the Company Establishing a Litigation Trust and what types of claims and Causes of Action are included in the Trust? ......... | 19 |
| | Q. | Will all Holders of Senior Notes Claims receive an Interest in the Litigation Trust? .......... | 20 |
| | R. | Can I contribute my Contributed Claims to the Litigation Trust? .......................... | 20 |
| | S. | When will the Plan Supplement be filed and what will it include? ........................ | 20 |
| | T. | What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan? ......... | 20 |
| | U. | What are the Debtors' Intercompany Claims and Intercompany Interests? ........... | 21 |
| | V. | What will happen to Holdings on the Effective Date? ........................................... | 21 |

iii

W.   What are the Subordinated Claims and what treatment will they receive under the Plan? .............21

X.   What are the Non-Subordinated Contribution and Reimbursement Claims?................................21

Y.   How many Holders of Non-Subordinated Contribution and Reimbursement Claims are likely to be in Class 8? ....................................................................................................................22

Z.   What kinds of Claims will the Debtors, the Reorganized Debtors or Litigation Trust have and not have authority to settle?....................................................................................................22

AA.  How will Claims asserted with respect to rejection damages affect my recovery under the Plan?..........................................................................................................................................22

BB.  What is the deadline to vote on the Plan? ....................................................................................22

CC.  Can I object to the Plan? ..............................................................................................................22

DD.  Why is the Bankruptcy Court holding a Confirmation Hearing?..................................................23

EE.  When is the Confirmation Hearing set to occur? .........................................................................23

FF.  What is the purpose of the Confirmation Hearing?......................................................................24

GG.  What is the effect of the Plan on the Debtors' ongoing business? ...............................................24

HH.  Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors? ............................................................................................................24

II.  Do the Debtors recommend voting in favor of the Plan?.............................................................24

IV.   THE DEBTORS' BUSINESSES AND CORPORATE AND CAPITAL STRUCTURE ......................24

A.   Overview of the Debtors' Businesses ..........................................................................................24

    (i)    The Debtors' Operations...............................................................................25
    (ii)   Outpatient Rehabilitation Business...............................................................26
    (iii)  Orthotics and Prosthetics Business...............................................................26
    (iv)   Revenue Sources...........................................................................................27

B.   The Debtors' Prepetition Organizational Structure ....................................................................28

C.   The Debtors' Prepetition Capital Structure .................................................................................30

    (i)    Initial Financing.............................................................................................30
    (ii)   2013 Refinancing...........................................................................................31

V.   EVENTS LEADING TO THE COMMENCEMENT OF CHAPTER 11 CASES ...............................31

A.   Corporate History:  The 2012 Transaction and the Overstatement of Revenue and Profitability ...................................................................................................................................31

B.   The Debtors' Restructuring Efforts..............................................................................................32

C.   The Plan Support Agreement .......................................................................................................33

D.   Solicitation ...................................................................................................................................34

VI.   SUMMARY OF THE PLAN...............................................................................................................34

A.   General Basis for the Plan ...........................................................................................................34

B.   Treatment of Unclassified Claims ...............................................................................................35

    (i)    Administrative Claims ...................................................................................35
    (ii)   Priority Tax Claims ........................................................................................36
    (iii)  Statutory Fees ................................................................................................37

C.   Classification and Treatment of Claims and Interests.................................................................37

iv

|  |  | (i) | Classification of Claims and Interests | 37 |
|  |  | (ii) | Treatment of Claims and Interests | 37 |
|  | D. | Means for Implementation of the Plan | | 40 |
|  |  | (i) | Sources of Cash for Plan Distributions | 40 |
|  |  | (ii) | Exit Facility | 40 |
|  |  | (iii) | Settlement of Certain Claims and Interests | 41 |
|  |  | (iv) | Issuance and Distribution of New Common Stock | 42 |
|  |  | (v) | New Stockholders' Agreement | 42 |
|  |  | (vi) | Restructuring Transactions | 42 |
|  |  | (vii) | Corporate Existence | 42 |
|  |  | (viii) | Vesting of Assets in the Reorganized Debtors | 43 |
|  |  | (ix) | Cancellation of Existing Indebtedness and Securities | 43 |
|  |  | (x) | Corporate Action | 43 |
|  |  | (xi) | New Certificates of Incorporation and New By-Laws | 44 |
|  |  | (xii) | Directors and Officers of the Reorganized Debtors | 44 |
|  |  | (xiii) | Effectuating Documents; Further Transactions | 44 |
|  |  | (xiv) | Management Incentive Plan | 45 |
|  |  | (xv) | Senior Management and Management Employment Agreements | 45 |
|  |  | (xvi) | Exemption from Certain Taxes and Fees | 45 |
|  |  | (xvii) | Legacy D&O Liability Insurance Policies | 45 |
|  |  | (xviii) | Indemnification Provisions | 45 |
|  |  | (xix) | Indemnification of Consenting Noteholders and Consenting Shareholders | 46 |
|  |  | (xx) | Assumption of Independent Director Indemnification Obligations | 46 |
|  |  | (xxi) | Preservation of Causes of Action | 46 |
|  |  | (xxii) | Litigation Trust | 46 |
|  |  | (xxiii) | Dissolution of Holdings | 47 |
|  | E. | Conditions Precedent to Confirmation and Consummation of the Plan | | 47 |
|  |  | (i) | Conditions Precedent to the Effective Date | 47 |
|  |  | (ii) | Waiver of Conditions | 47 |
|  |  | (iii) | Effect of Failure of Conditions | 48 |
|  | F. | Settlement, Release, Injunction and Related Provision | | 48 |
|  |  | (i) | Compromise and Settlement of Claims, Interests and Controversies | 48 |
|  |  | (ii) | Discharge of Claims and Termination of Interests | 48 |
|  |  | (iii) | Release of Liens | 48 |
|  |  | (iv) | Releases by the Debtors | 49 |
|  |  | (v) | Releases by the Releasing Parties | 49 |
|  |  | (vi) | Liabilities to, and Rights of, Governmental Units | 50 |
|  |  | (vii) | Exculpation | 50 |
|  |  | (viii) | Injunction | 50 |
|  |  | (ix) | Term of Injunctions or Stays | 52 |
| VII. | | THE LITIGATION TRUST | | 52 |
|  | A. | Contributed Claims Transferred and Assigned to the Litigation Trust | | 52 |
|  | B. | Opt-In and Net Proceeds of the Litigation Trust | | 53 |
|  | C. | Establishment of the Litigation Trust and the Litigation Trust Agreement | | 54 |
|  | D. | Appointment of the Litigation Trustees | | 55 |
|  | E. | Prosecution of the Assets of the Litigation Trust | | 55 |
|  | F. | Powers of and Distributions by Litigation Trustees | | 55 |
|  | G. | Proceeds of the Litigation Trust | | 55 |

KE 27455051

H.      Consenting Shareholders Expenses ................................................................. 55

I.       Funding of the Litigation Trust ..................................................................... 56

J.       Litigation Trust Counsel ............................................................................... 56

**VIII.    ANTICIPATED EVENTS OF THE CHAPTER 11 CASES ................................................ 56**

A.      Voluntary Petitions ...................................................................................... 57

B.      Expected Timetable of the Chapter 11 Cases ................................................ 57

C.      First Day Relief ............................................................................................ 57

      (i)     Approval of Solicitation Procedures and Scheduling of Confirmation Hearing .............. 57
      (ii)    Patient Overpayment Refund Motion ........................................................... 57
      (iii)   Cash Management System ............................................................................ 58
      (iv)   Wages ......................................................................................................... 58
      (v)    Insurance .................................................................................................... 58
      (vi)   Taxes ......................................................................................................... 58
      (vii)   Trade Vendors and Other Unsecured Creditors ............................................ 58
      (viii)  Utilities ...................................................................................................... 58
      (ix)   Equity Trading Motion ................................................................................ 58
      (x)    Other Procedural Motions and Professional Retention Applications ................ 59

D.      The Exit Facility .......................................................................................... 59

**IX.      PROJECTED FINANCIAL INFORMATION ................................................................ 59**

**X.       RISK FACTORS .................................................................................................... 60**

A.      Risks Relating to Bankruptcy ........................................................................ 62

      (i)     Parties in interest may object to the Plan's classification of Claims and Interests ............ 62
      (ii)    The Debtors may fail to satisfy vote requirements. ......................................... 62
      (iii)   The Debtors may not be able to obtain Confirmation of the Plan. ................... 62
      (iv)   The conditions precedent to the Effective Date of the Plan may not occur. ...... 62
      (v)    The Debtors may not be able to achieve their projected financial results ........... 63
      (vi)   Certain tax implications of the Debtors' Chapter 11 Cases. ............................ 63
      (vii)   The Debtors' emergence from chapter 11 is not assured. ............................... 63
      (viii)  The Debtors may fail to satisfy solicitation requirements. ............................. 63
      (ix)   The Debtors may have to resolicit. ............................................................... 64
      (x)    The Debtors may not be able to conform and consummate the Plan quickly. .... 64

B.      Risks Related to the Debtors' and Reorganized Debtors' Business and Plan Securities ............ 64

      (i)     Indebtedness may adversely affect the Reorganized Debtors' operations and financial condition. ............................................................................................ 64
      (ii)    The Exit Facility may contain certain restrictions and limitations that could significantly affect the Reorganized Debtors' ability to operate their businesses, as well as significantly affect their liquidity. ........................................................... 64
      (iii)   If the Debtors lose key executive officers, the Debtors' business could be disrupted and the Debtors' financial performance could suffer. ............................ 65
      (iv)   The Debtors' businesses, financial condition, and results of operations could be materially adversely affected by the occurrence of natural disasters, such as hurricanes, or other catastrophic events, including war and terrorism. ............... 65
      (v)    The value of the New Common Stock may be adversely affected by a number of factors. ....................................................................................................... 65
      (vi)   Any recovery from the Litigation Trust is speculative. .................................. 65
      (vii)   The New Common Stock will be junior to the Exit Facility ............................ 65
      (viii)  There may be risks related to the issuance of New Common Stock. ................. 65

vi

XI.   CONFIRMATION OF THE PLAN.................................................................................66

    A.   Requirements for Confirmation of the Plan ..............................................................66

    B.   Best Interests of Creditors/Liquidation Analysis .....................................................66

    C.   Feasibility...............................................................................................................67

    D.   Acceptance by Impaired Classes..............................................................................67

    E.   Confirmation Without Acceptance by All Impaired Classes .....................................67

        (i)    No Unfair Discrimination .............................................................................67
        (ii)   Fair and Equitable Test ................................................................................68

    F.   Valuation of the Debtors ..........................................................................................68

XII.   CERTAIN SECURITIES LAW MATTERS .............................................................68

    A.   Plan Securities.........................................................................................................68

    B.   Issuance and Resale of Plan Securities under the Plan..............................................68

        (i)    Exemptions from Registration Requirements of the Securities Act and State
               Blue Sky Laws .............................................................................................68
        (ii)   Resales of Plan Securities; Definition of Underwriter...................................69
        (iii)  New Common Stock/Management Incentive Plan ..........................................70

XIII.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE
       PLAN..........................................................................................................................71

    A.   Introduction.............................................................................................................71

    B.   Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors ..............71

        (i)    Cancellation of Debt and Reduction of Tax Attributes...................................71
        (ii)   Limitation of Tax Attributes.........................................................................72
        (iii)  Alternative Minimum Tax ............................................................................73

    C.   Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed
       Claims .....................................................................................................................74

        (i)    Consequences to Holders of Senior Notes Claims.........................................74
        (ii)   Accrued Interest...........................................................................................75
        (iii)  Market Discount ..........................................................................................76

    D.   Receipt of Interests in the Litigation Trust...............................................................76

    E.   Withholding and Reporting.......................................................................................76

XIV.   SOLICITATION AND VOTING PROCEDURES ...................................................77

    A.   The Solicitation Package..........................................................................................77

    B.   Voting Deadline .......................................................................................................78

    C.   Voting Instructions...................................................................................................78

        (i)    Note to Class 3 and Class 4 Claim Holders. .................................................79

    D.   Voting Tabulation ....................................................................................................80

       The following additional procedures will apply with respect to tabulating Master Ballots: ...........80

XV.   RECOMMENDATION ..........................................................................................82

KE 27455051

EXHIBITS

EXHIBIT A    Plan of Reorganization

EXHIBIT B    Exit Facility Commitment Letter

EXHIBIT C    Potential Defendants and Witnesses List

EXHIBIT D    Liquidation Analysis

EXHIBIT E    New Stockholders Agreement

EXHIBIT F    Litigation Trust Agreement

EXHIBIT G    Facts and Circumstances Regarding the Claims and Causes of Action
             Contributed to the Litigation Trust

EXHIBIT H    Plan Support Agreement

EXHIBIT I    Financial Projections

EXHIBIT J    Valuation Analysis

EXHIBIT K    Retained Causes of Action List

---

**THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH
EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT
BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN**

---

## I.    EXECUTIVE SUMMARY[3]

The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to certain Holders of Claims in connection with the solicitation of acceptances of the *Joint Prepackaged Plan of Reorganization of Physiotherapy Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated October 10, 2013, (as amended, supplemented and modified from time to time, the "Plan").  A copy of the Plan is attached hereto as **Exhibit A**.  The Plan constitutes a separate chapter 11 plan for each Debtor unless otherwise provided for in the Plan.  Except for unclassified Claims, all Claims against a particular Debtor are placed in Classes for each of the Debtors.

As of October 10, 2013, the Debtors had outstanding funded indebtedness in the aggregate principal amount of approximately $350 million consisting of approximately (a) $140 million under their senior secured Bridge Loan Facility and (b) $210 million under their 11.875% Senior Notes due 2019.  In addition, as of the date hereof, the Debtors owe approximately $3.5 million to trade vendors and other general unsecured creditors and approximately $5 million to patients in patient refunds and credit balances.  Due to the revenue recognition issues described in more detail in section V.A of this Disclosure Statement, the Debtors, in consultation with their advisors, have determined that a restructuring is necessary to significantly delever their capital structure, obtain access to longer term financing and permit the incremental funding necessary to implement their business plan and provide appropriate operating liquidity, and position the Debtors to more effectively compete in their industry.

The Debtors are pleased that after extensive, good-faith negotiations with their Bridge Loan Lenders, the Ad Hoc Committee of Senior Noteholders and certain of their Shareholders, they have achieved agreement on a consensual restructuring transaction to be implemented swiftly through a prepackaged chapter 11 plan of reorganization that will achieve the Debtors' restructuring goals by:  (a) reducing the Debtors' total funded indebtedness (including interest) by approximately 62%, from approximately $375 million as of October 10, 2013 to approximately $144 million; (b) providing the Debtors' with reasonable, long term financing and access to incremental commitments that will enable the Debtors to support their go-forward business needs; and (c) providing for the establishment and funding of a litigation trust to consolidate and coordinate prosecution of certain claims and Causes of Action of the Contributing Claimants.  The parties all agree that prolonged chapter 11 cases to implement the restructuring transaction would not be in the best interest of creditors, and have designed the prepackaged Plan to minimize the Debtors' stay in chapter 11.  Expedited confirmation and consummation of the Plan will minimize any impact of bankruptcy on the Debtors' operations and enable the Debtors to emerge from chapter 11 as a financially stronger and more competitive business.

The Plan contemplates, among other things, the occurrence of the following transactions:

- The Bridge Loan Credit Agreement will be refinanced pursuant to an amended and restated 3-year term loan facility on the terms set forth in the Exit Facility Commitment Letter attached hereto as **Exhibit B**, with any non-participating lenders under the Bridge Loan Facility to be paid in full in Cash.

- The Senior Notes will be fully equitized, with Holders of Senior Notes Claims receiving the right to their pro rata share of 100% of the new common equity (subject to dilution by the Management Incentive Plan) of Reorganized PAH (the "New Common Stock") as well as certain interests in the Litigation Trust described further herein.

- All of the Debtors' trade creditors and other holders of general unsecured claims will continue to be paid in full in the ordinary course of business and will be unaffected by the restructuring transactions.

- All existing equity interests in the Company (other than Intercompany Interests) will be cancelled.

- A Litigation Trust will be established and funded on the Effective Date to pursue all actions, Causes of

---

[3]    This Section I is intended only to provide a summary of certain key terms of the Plan, and is qualified in its entirety by reference to the entire Plan and exhibits thereto.

Action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims, and demands, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity, or otherwise, held by the Debtors and their Estates, the Consenting Noteholders with respect to no less than $150 million of face value of the Senior Notes and the Consenting Shareholders (collectively, the "Contributing Claimants") against those Persons and Entities listed on **Exhibit C** attached hereto (the "Potential Defendants and Witnesses"), related in any way to the Debtors, their predecessors, their respective affiliates and/or (a) through (e) below (collectively, the "Contributed Claims"), including without limitation:

> (a)     all claims and Causes of Action against any party based on, arising out of, or relating to the April 2012 transactions involving Holdings and/or PAH (the "2012 Transaction"), including without limitation any claims or Causes of Action for unlawful dividend, fraudulent conveyance or avoidance Claims under state or federal law, including the Bankruptcy Code;

> (b)     all claims and Causes of Action based on, arising out of, or related to the issuance of any security of PAH or Holdings;

> (c)     all claims and Causes of Action based on, arising out of, or related to the restatement, adjustment, correction, or modification of the Company's financial statements, including without limitation all claims or Causes of Action based on, arising out of or relating to (i) the Company's internal controls relating to financial statements and financial reporting and (ii) materially misleading financial statements provided to the Contributing Claimants in connection with the 2012 Transaction;

> (d)     all claims and Causes of Action based on, arising out of, or related to the misrepresentation of any of the Company's financial information and related internal controls, including without limitation the overstatement of the Company's revenue, accounts receivable, and/or EBITDA;

> (e)     all claims and Causes of Action based on, arising out of, or related to any failure to disclose, or actual or attempted cover up or obfuscation of any of the conduct described in Plan and the exhibits thereto and/or (a)-(d) above;

> (f)     any other potential claims, Causes of Action, charges, suits or rights of recovery under state, federal, or other applicable law.

- The Contributed Claims that may be asserted against the Potential Defendants and Witnesses with respect to the foregoing include all claims or Causes of Action arising under state and/or federal law, such as (but not limited to) claims arising under title 11 of the U.S. Code and applicable law, including without limitation sections 502(d), 510, 542 through 551, and 553 of title 11 and any similar state laws, violations of state and/or federal securities laws, breach of contract, breach of fiduciary duty (including aiding and abetting any such breach), and common law claims such as quantum meruit and unjust enrichment. For the avoidance of doubt, (a) the Contributed Claims will not include the rights of any of the Contributing Claimants or Released Parties to receive the distributions, if any, to which they are entitled under the Plan and the Confirmation Order and (b) the Contributed Claims will not include any actions, Causes of Action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims, and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity, or otherwise, against any of the Released Parties.

10

> *See* section VIII of this Disclosure Statement for additional information regarding the Litigation Trust, including how Holders of Senior Notes may opt-in to the settlement embodied in the Plan. *See also* **Exhibit G** of this Disclosure Statement for additional information regarding the claims and Causes of Action being assigned to, and preserved for potential prosecution by, the Litigation Trust.

- The Litigation Trust will be established for the benefit of the Consenting Shareholders and Holders of Allowed Senior Notes Claims (the "Litigation Trust Beneficiaries"). Net proceeds from the Litigation Trust (after deduction for all costs and expenses of the Litigation Trust (other than the initial funding of $4,500,000) and the satisfaction, to the extent applicable, of any Allowed Non-Subordinated Contribution and Reimbursement Claims and Trust Indemnification Claims, as further described herein) will be distributed as follows: (1) 50% to the Consenting Shareholders; and (2) 50% to the Holders of Senior Notes as of the Distribution Record Date, which will be the Effective Date.

> **THE LITIGATION TRUST MAY, BUT IS NOT REQUIRED TO, PURSUE ANY AND ALL CLAIMS AND/OR CAUSES OF ACTION THAT ARE CONTRIBUTED TO THE LITIGATION TRUST (WHETHER OR NOT DESCRIBED IN THE PLAN OR THIS DISCLOSURE STATEMENT) AS AGAINST ALL PERSONS OR ENTITIES (WHETHER OR NOT SUCH PERSONS AND ENTITIES ARE IDENTIFIED ON THE LIST OF POTENTIAL DEFENDANTS AND WITNESSES SET FORTH ON EXHIBIT C TO THIS DISCLOSURE STATEMENT OR OTHERWISE) OTHER THAN RELEASED PARTIES.**
>
> **SEE EXHIBIT G AND "RISK FACTORS" FOR A FURTHER DISCUSSION OF THE CONTRIBUTED CLAIMS.**

> **THE DEBTORS, THE BRIDGE LOAN LENDERS, THE AD HOC COMMITTEE OF SENIOR NOTEHOLDERS AND THE CONSENTING SHAREHOLDERS BELIEVE THAT THE COMPROMISE CONTEMPLATED UNDER THE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDES THE BEST RECOVERY TO CLAIM HOLDERS.**
>
> **FOR THESE REASONS AND OTHERS DESCRIBED HEREIN, THE DEBTORS URGE ALL PARTIES ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOT OR MASTER BALLOT AND TO VOTE TO ACCEPT THE PLAN.**

## II.    IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

This Disclosure Statement provides information regarding the Plan. The Debtors believe that the Plan is in the best interests of all creditors and urge all Holders of Claims entitled to vote to vote in favor of the Plan.

Unless the context requires otherwise, reference to "*we*," "*our*" and "*us*" are to the Debtors.

The confirmation of the Plan and effectiveness of the Plan are subject to certain material conditions precedent described herein and in the Plan. There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied will be satisfied (or waived).

> *You are encouraged to read this Disclosure Statement in its entirety, including without limitation, the Plan, and the section entitled "Risk Factors," before submitting your ballot to vote on the Plan.*

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, this Disclosure Statement, and the Plan Supplement, as applicable, and the summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference, are qualified in their entirety by reference to those documents. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the

statements contained herein will be correct at any time after such date.  Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and confirmation of, the Plan and may not be relied on for any other purpose.  The Debtors believe that the summary of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement is fair and accurate.  The summaries of the financial information and the documents annexed to this Disclosure Statement, including, but not limited to, the Plan, or otherwise incorporated herein by reference, are qualified in their entirety by reference to those documents.

This Disclosure Statement has not been approved or disapproved by the SEC or any federal, state, local or foreign regulatory agency, nor has the SEC or any other such agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly stated herein.

Upon confirmation of the Plan, certain of the securities described in this Disclosure Statement will be issued without registration under the Securities Act, or similar federal, state, local, or foreign laws, in reliance on the exemption set forth in section 1145 of the Bankruptcy Code.  To the extent exemptions from registration, other than section 1145 of the Bankruptcy Code, apply such securities may not be offered or sold except pursuant to a valid exemption or upon registration under the Securities Act, including, without limitation, section 3(a)(9) of the Securities Act.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws.  Statements concerning these and other matters are not guarantees of the Debtors' future performance.  Such forward-looking statements represent the Debtors' estimates and assumptions only as of the date such statements were made and involve known and unknown risks, uncertainties, and other unknown factors that could impact the Debtors' restructuring plans or cause the actual results of the Debtors to be materially different from the historical results or from any future results expressed or implied by such forward-looking statements. In addition to statements which explicitly describe such risks and uncertainties, readers are urged to consider statements labeled with the terms "believes," "belief," "expects," "intends," "anticipates," "plans," or similar terms to be uncertain and forward-looking. There can be no assurance that the restructuring transaction described herein will be consummated. Creditors and other interested parties should see the section entitled "Risk Factors" of this Disclosure Statement for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN[4]

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

---

[4] This Section III is intended only to provide a summary of certain key terms of the Plan, and is qualified in its entirety by reference to the entire Plan and exhibits thereto.

KE 27455051

Consummating a plan is the principal objective of a chapter 11 case.  A Bankruptcy Court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the Bankruptcy Court.  Subject to certain limited exceptions, the order issued by a Bankruptcy Court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

A "prepackaged" plan of reorganization is one in which a debtor seeks approval of a plan of reorganization from affected creditors before filing for bankruptcy.  Because solicitation of acceptances begins before the bankruptcy filing, the amount of time required for the bankruptcy case is often less than in more conventional bankruptcy cases.  Greater certainty of results and reduced costs are other benefits generally associated with prepackaged bankruptcy cases.

**B.**       **Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding whether to accept or reject the Plan.  This Disclosure Statement is being submitted in accordance with such requirements.

**C.**       **What is the financial restructuring contemplated by the Plan?**

As of October 10, 2013, the Debtors had outstanding funded debt in the aggregate principal amount of approximately $350 million consisting primarily of approximately (a) $140 million under their senior secured Bridge Loan Facility and (b) $210 million under their 11.875% Senior Notes due 2019.

As a result of the proposed Plan, the Reorganized Debtors will  reduce their total funded debt (including interest) to approximately $144 million (or by about 62%), after giving effect to the following Restructuring Transactions:

- The Bridge Loan Credit Agreement will be amended and restated on the terms set forth in the Exit Facility Credit Agreement, which terms permit, among other things, the incurrence of additional indebtedness on a pari passu basis of up to $8 million to address potential post-restructuring liquidity needs.  Each Holder of an Allowed Credit Agreement Claim will (i) receive its Pro Rata share of the Exit Facility to be provided under the Exit Facility Credit Agreement or (ii) be paid in full in Cash.

- In exchange for full and final satisfaction, settlement, release and discharge of the Allowed Senior Notes Claims, each Holder of an Allowed Senior Notes Claim will receive (i) the right to its Pro Rata share of 100% of the New Common Stock (subject to dilution by the Management Incentive Plan) based on the principal amount of Senior Notes held by such Holder on the Distribution Record Date and (ii) a share of the Senior Notes Litigation Trust Recovery.  The share of the Senior Notes Litigation Trust Recovery allocated to the Holder of an Allowed Senior Notes Claim will be based on whether a Holder elects to opt-in to the settlement described in Article IV.C of the Plan, and agree, by electing on its Ballot, to (i) become a Releasing Party and (ii) assign its Contributed Claims to the Litigation Trust.

- Allowed General Unsecured Claims will be Unimpaired and Reinstated, paid in the ordinary course of business, or paid upon the later of the Effective Date, the date on which such General Unsecured Claim against the Reorganized Debtors becomes an Allowed General Unsecured Claim, or such other date as may be ordered by the Bankruptcy Court.  The Debtors submit that paying the general unsecured creditors in the ordinary course of business will minimize any disruption to the Debtors' business, will help the Debtors maintain relationships with their trade creditors, will maximize the value of the Debtors' estates, and will allow for a smooth expeditious reorganization in the Chapter 11 Cases.

- No distribution will be made on account of Intercompany Claims.  On the Effective Date, or as soon thereafter as practicable, all Intercompany Claims will be Reinstated in full or in part or cancelled or

discharged in full or in part, in each case, to the extent determined appropriate by the Reorganized Debtors; provided that Intercompany Claims held by Holdings will not receive any distribution under the Plan and will be canceled and discharged on the Effective Date.

- Allowed Claims that are subordinated pursuant to section 510 of the Bankruptcy Code or other applicable law (the "Subordinated Claims") will not receive any distribution under the Plan.

- Allowed Non-Subordinated Contribution and Reimbursement Claims (as defined in the Plan), if any, will be assumed by the Litigation Trust and, to the extent not satisfied by any available insurance coverage, satisfied solely by way of setoff or recoupment, to the extent applicable, or payment by the Litigation Trust.

- Allowed Intercompany Interests will be Reinstated on the Effective Date.  Notwithstanding the foregoing, on the Effective Date, Holdings' Interests in PAH will be cancelled and discharged.

- All existing Interests (other than Allowed Intercompany Interests) will be extinguished and existing Interest Holders will not receive or retain on account of such Interests any property under the Plan.

- A Litigation Trust will be established for the benefit of the Litigation Trust Beneficiaries.  Net proceeds from the Litigation Trust (after deduction for all costs and expenses of the Litigation Trust (other than the initial funding of $4,500,000) and the satisfaction, to the extent applicable, of any Allowed Non-Subordinated Contribution and Reimbursement Claims and Trust Indemnification Claims) will be distributed as follows: (1) 50% to the Consenting Shareholders; and (2) 50% to the Holders of Senior Notes as of the Distribution Record Date, which will be the Effective Date, with an enhanced share for Consenting Noteholders.

Consummation of the Plan and the financial restructurings contemplated thereby will significantly deleverage the Debtors' capital structure and leave the Debtors with adequate liquidity for ongoing operations. With a sustainable capital structure aligned with the Debtors' revised business plan (and the potential for incremental liquidity as necessary), the Reorganized Debtors will be positioned to compete more effectively in the outpatient rehabilitation and physical therapy industry.

Under the Plan, the Holders of the Senior Notes will own all of the New Common Stock in Reorganized PAH, subject to dilution only by shares issued in connection with the Management Incentive Plan.

    **D.**    **Am I entitled to vote on the Plan and what will I receive from the Debtors if the Plan is consummated?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim you hold.  In general, a Holder of a Claim or an Interest may vote to accept or reject a plan of reorganization if (i) no party in interest has objected to such Claim or Interest (or the Claim or Interest has been Allowed subsequent to any objection or estimated for voting purposes), (ii) the Claim or Interest is Impaired by the Plan and (iii) the Holder of such Claim or Interest will receive or retain property under the plan on account of such Claim or Interest.

The only classes of Claims voting on this Plan are Classes 3 and 4.  Whether a Holder of a Claim in Class 3 (Bridge Loan Credit Agreement Claims) or Class 4 (Senior Notes Claims) may vote to accept or reject the Plan will also depend on whether the Holder held such Claim as of September 27, 2013 (the "Voting Record Date").

In general, if a Claim or an Interest is Unimpaired under a plan of reorganization, section 1126(f) of the Bankruptcy Code deems the Holder of such Claim or Interest to have accepted such plan, and thus the Holders of Claims in such Unimpaired Classes are not entitled to vote on such plan. Because the following Classes are Unimpaired under the Plan, the Holders of Claims in these Classes are not entitled to vote:

- Classes 1, 2, 5, 6, 8 and 9

In general, if the Holder of an Impaired Claim or Impaired Interest will not receive any distribution under a plan of reorganization in respect of such Claim or Interest, section 1126(g) of the Bankruptcy Code deems the Holder of such Claim or Interest to have rejected such plan, and thus the Holders of Claims in such Classes are not entitled to vote on such plan. The Holders of Claims and Interests in the following Classes are conclusively presumed to have rejected the Plan and are therefore not entitled to vote:

- Classes 7 and 10

The Plan will apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests (each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class") set forth herein will apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes will be treated as set forth in Article III.E of the Plan.

The following table provides a summary of the status, voting rights and the estimated percentage recoveries of each Class (or each Holder within such Class) of allowed Claims or Interests under the Plan:

| Class | Claim/Interest | Status | Voting Rights | % Recovery |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Deemed to Accept | 100% |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept | 100% |
| 3 | Bridge Loan Credit Agreement Claims | Impaired | Entitled to Vote | 100% |
| 4 | Senior Notes Claims | Impaired | Entitled to Vote | 40.3%[5] |
| 5 | General Unsecured Claims | Unimpaired | Deemed to Accept | 100% |
| 6 | Intercompany Claims | Unimpaired | Deemed to Accept | 100% |
| 7 | Subordinated Claims | Impaired | Deemed to Reject | 0% |
| 8 | Non-Subordinated Contribution and Reimbursement Claims[6] | Unimpaired | Deemed to Accept | 100% |
| 9 | Intercompany Interests | Unimpaired | Deemed to Accept | 0%-100% |
| 10 | Interests (other than Class 9 Interests) | Impaired | Deemed to Reject | 0% |

### E.    How do I vote on the plan?

The following materials constitute the solicitation package (the "Solicitation Package"):

- the appropriate Ballot or Master Ballot,[7] as applicable, and applicable voting instructions (the "Voting Instructions");

- a pre-addressed, postage pre-paid return envelope; and

- this Disclosure Statement with all exhibits, including the Plan.

---

[5]     This recovery percentage does not include any projected recovery from the Litigation Trust. *See* **Exhibit G** and "Risk Factors" for a further discussion of the Contributed Claims.

[6]     The Debtors do not believe that there are any allowable Non-Subordinated Contribution and Reimbursement Claims to be assumed by the Litigation Trust.

[7]     In accordance with customary practices, the Master Ballot(s) will be distributed at substantially the same time as the initial distribution of Solicitation Packages.

The voting Classes, Classes 3 and 4, entitled to vote to accept or reject the Plan were served the Solicitation Package (including the appropriate ballot) by overnight delivery and by electronic mail (if available). Additional paper copies of these documents may be requested from the Balloting Agent by writing to Physiotherapy Holdings, Inc. Ballot Processing Center, c/o Kurtzman Carson Consultants, 599 Lexington Avenue, 39th Floor, New York, New York 10022 or calling (917) 281-4800. The Solicitation Package is also available at the Debtors' website, http://www.kccllc.net/PhysioCorp.

The Debtors, have engaged KCC as the Balloting Agent to assist in the balloting and tabulation process. The Balloting Agent will, among other things, answer questions, provide additional copies of all Solicitation Package materials and generally oversee the solicitation process.

Only the Holders of Class 3 Bridge Loan Credit Agreement Claims and Class 4 Senior Notes Claims are entitled to vote to accept or reject the Plan. Unless otherwise permitted by the Debtors, to be counted, Ballots or Master Ballots must be received by the Balloting Agent by 11:59 p.m. (prevailing Eastern Time) on November 8, 2013 for Holders of Class 3 Bridge Loan Credit Agreement Claims and Class 4 Senior Notes Claims, the Voting Deadline. If multiple Ballots are received from the same Holder with respect to the same Bridge Loan Credit Agreement Claim or Senior Note Claim prior to the Voting Deadline, the last Ballot or Master Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot or Master Ballot.

VOTING INSTRUCTIONS ARE ATTACHED TO EACH BALLOT. PLEASE SEE ARTICLE XIV BELOW ENTITLED "SOLICITATION AND VOTING PROCEDURES" FOR ADDITIONAL INFORMATION.

Unless the Debtors, in their discretion decide otherwise, any Ballot or Master Ballot received after the Voting Deadline will not be counted. The Balloting Agent will process and tabulate Ballots or Master Ballots for the Class entitled to vote to accept or reject the Plan and will File a voting report (the "Voting Report") as soon as reasonably practicable after the Petition Date.

For answers to any questions regarding solicitation procedures, parties may contact the Balloting Agent directly, at (917) 281-4800, with any questions related to the solicitation procedures applicable to their Claims and Interests.

Any Ballot or Master Ballot that is properly executed, but fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection of the Plan, will not be counted.

All Ballots and Master Ballots are accompanied by Voting Instructions. It is important to follow the specific instructions provided with each Ballot and Master Ballot.

The Debtors are relying on section 3(a)(9) of the Securities Act and similar Blue Sky Laws to exempt from registration under the Securities Act and Blue Sky Laws the offer to Holders of Senior Notes Claims of new securities prior to the filing of the Chapter 11 Cases, including, without limitation, in connection with the Solicitation. After the filing of the Chapter 11 Cases, the Debtors are relying on the exemption from the Securities Act, and equivalent state law registration requirements, provided by section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue Sky Laws the offer and sale of New Common Stock and the exemption provided by section 3(a)(9) of the Securities Act.

F.      What happens to my recovery if the Plan is not confirmed, or does not go effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses. It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 proceeding, or of a liquidation scenario, *see* "Confirmation of the Plan - Best Interests of Creditors/Liquidation Analysis" beginning on page 66 and the Liquidation Analysis attached as **Exhibit D** to this Disclosure Statement.

**G.**     **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation," "Effective Date" and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. "Confirmation" of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can be consummated and go effective. Initial distributions to Holders of Allowed Claims will only be made on the Effective Date or as soon as practicable thereafter. *See* "Confirmation of the Plan," which begins on page 66, for a discussion of the conditions to Consummation of the Plan.

**H.**     **Will the Debtors be obliged to pay fees and expenses for professionals other than those engaged by the Debtors prior to the Petition Date in connection with the Chapter 11 Cases?**

Yes. On the Effective Date, the Debtors will pay the reasonable and documented fees and expenses of (i) Klee, Tuchin, Bogdanoff & Stern LLP, counsel to the Ad Hoc Committee of Senior Noteholders; (ii) local co-counsel to the Ad Hoc Committee of Senior Noteholders; (iii) Houlihan Lokey Capital, Inc., the financial advisor to the Ad Hoc Committee of Senior Noteholders; (iv) the Bridge Loan Agent; and (v) Latham & Watkins LLP, counsel to the Bridge Loan Agent; (vi) The Bank of New York Mellon Trust Company, N.A., the Senior Notes Indenture Trustee; and (vii) Reed Smith, counsel to the Senior Notes Indenture Trustee.

In addition, as partial consideration for contributing their Contributed Claims to the Litigation Trust, on the Effective Date, the Debtors will pay in full in Cash the legal fees and expenses of the Consenting Shareholders relating to the Plan and the Chapter 11 Cases through the Effective Date; provided, that in no event will such fees and expenses exceed $250,000 in the aggregate.

**I.**     **Will the Reorganized Debtors be obligated to continue to pay statutory fees after the Effective Date?**

Yes. On the Effective Date, the Debtors will pay, in full in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation. The Reorganized Debtors will pay all U.S. Trustee fees due and owing under 28 U.S.C. § 1930 until such time as the Reorganized Debtors move for entry of a final decree and the Bankruptcy Court enters such a decree; provided, however, that if the Litigation Trust opposes such motion, the Litigation Trust will thereafter bear the cost of all U.S. Trustee fees until the Bankruptcy Court enters a final decree closing the Chapter 11 Cases.

**J.**     **What is the Debtors' current financial condition and what is the Debtors' projected Cash balance on the Effective Date?**

While the Company is fundamentally sound and profitable, it has determined, in consultation with its advisors, that its current capital structure is unsustainable in light of the revenue recognition issues caused by the overstatements of revenue, as described in further detail herein. The Debtors will generate sufficient cash flows to meet their ongoing operating Cash needs upon consummating the Plan, and the terms of the Exit Facility provide, among other things, that the Debtors are permitted to incur up to $8 million of incremental secured debt on a pari-passu basis should that become necessary to their operations.

In addition, the Company is in the process of implementing a comprehensive cost savings plan, focused on the turnaround or closure of non-profitable clinics (clinics reduced from 648 as of the end of 2012 to approximately 544 by the end of 2013), a reduction in corporate costs, as well as various other measures. For the 12-month period ended August 31, 2013, the Company's total estimated collectible revenue was $313 million, and its adjusted EBITDA was $25 million (with an 8% margin). These projections include the benefit of the Debtors' cost savings initiatives, as well as the corresponding revenue reduction from clinic closures.

Through the Effective Date, the Debtors expect to pay approximately $8.2 million in fees and expenses on account of retained professionals and approximately $1.5 million in lease rejection Claims. After making payments for such retained professionals, lease rejection Claims and other Administrative Claims, and taking into account cash

flow related to ongoing operations, funding of the Litigation Trust and lease settlements, the Reorganized Debtors expect to have at least $5.9 million in Cash on hand.  *See* section IX of this Disclosure Statement for additional information.  *See also* the financial projections, which are attached hereto as **Exhibit I** and incorporated by reference herein (the "Financial Projections").

      **K.**      **What are the terms of the Exit Facility?**

The definitive terms of the Exit Facility will be consistent with the Exit Facility Commitment Letter, and permit, among other things, the Debtors to incur incremental indebtedness on a pari passu basis in the amount of up to $8 million.

The specific terms of the Exit Facility will be evidenced by a credit agreement, the form of which will be filed as part of the Plan Supplement.  The Debtors expect the Exit Facility may contain certain covenants, which may restrict (subject to certain exceptions) the Reorganized Debtors' ability to incur additional indebtedness; grant liens; consummate mergers, acquisitions, consolidations, liquidations and dissolutions; sell assets; pay dividends and make other payments in respect of capital stock; make capital expenditures; make investments, loans and advances; make payments and modifications to subordinated and other material debt instruments; enter into transactions with affiliates; and consummate sale-leaseback transactions.

The Debtors' ability to exit chapter 11 is contingent on the Debtors securing the Exit Facility contemplated by the Exit Facility Commitment Letter.  *See* "Risk Factors" regarding the Exit Facility, which begins on page 60.

      **L.**      **Are there risks to owning an Interest in the Reorganized Debtors upon emergence from chapter 11?**

Yes.  *See* "Risk Factors," which begins on page 60.

      **M.**      **What rights will Reorganized Debtors' new stockholders have?**

It is expected that Reorganized Debtors will be private companies.  Holders of New Common Stock will have the rights set forth in the New Stockholders Agreement, which will be in substantially the form attached hereto as **Exhibit E**.

      **N.**      **Is there potential litigation related to the Plan?**

Yes.  In the event it becomes necessary to confirm the Plan over the objection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such objecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* "Risk Factors — The Debtors may not be able to obtain Confirmation of the Plan," which begins on page 62.

      **O.**      **Will there be releases granted to parties in interest as part of the Plan?**

The Plan proposes to release each of:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Bridge Loan Agent; (d) the Bridge Loan Lenders; (e) the Consenting Noteholders; (f) the Ad Hoc Committee of Senior Noteholders; (g) the Senior Notes Indenture Trustee; (h) the Exit Facility Agent; (i) the Exit Lenders; (j) the Consenting Shareholders; and (k) with respect to each of the foregoing Entities in clauses (a) through (k), such Entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, and current (as of September 1, 2013) officers, directors, principals, members, partners, shareholders, employees, agents (other than third-party vendors performing services for the Debtors), financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, advisory board members and other professionals, and such Persons' respective heirs, executors, estates, servants, and nominees (collectively, the "Released Parties").  Notwithstanding the foregoing, under no circumstances will any of the Potential Defendants and Witnesses listed on **Exhibit C** constitute a Released Party.

KE 27455051

Pursuant to Article VIII.E of the Plan, the following parties will release the Released Parties from, among other things, any and all Claims and Causes of Action based on or related to the Chapter 11 Cases taking place on or before the Effective Date of the Plan: (a) the Debtors; (b) the Bridge Loan Agent; (c) the Bridge Loan Lenders; (d) the Consenting Noteholders; (e) the Senior Notes Indenture Trustee; (f) the Consenting Shareholders; and (g) without limiting the foregoing clauses (a), (b), (c), (d), (e), and (f), and notwithstanding anything contained herein to the contrary, the Holders of Claims against and Interests in the Debtors and the Reorganized Debtors who (i) vote to accept the Plan or are presumed to have voted to accept the Plan under section 1126(f) of the Bankruptcy Code and (ii) for Holders of Senior Notes Claims, have opted-in to the settlement described in Article III.C.4 of the Plan (collectively, the "Releasing Parties").

For more detail *see* "Settlement, Release, Injunction and Related Provision" which begins on page 48.

**P.    Why is the Company Establishing a Litigation Trust and what types of claims and Causes of Action are included in the Trust?**

The Plan proposes to establish and fund on the Effective Date a Litigation Trust for the benefit of the Litigation Trust Beneficiaries to pursue the Contributed Claims transferred and assigned to the Litigation Trust, including, without limitation:

(a)    all claims and Causes of Action against any party based on, arising out of, or relating to the 2012 Transaction, including without limitation any claims or causes of Action for unlawful dividend, fraudulent conveyance or avoidance claims under state or federal law, including the Bankruptcy Code;

(b)    all claims and Causes of Action based on, arising out of, or related to the issuance of any security of PAH or Holdings;

(c)    all claims and Causes of Action based on, arising out of, or related to the restatement, adjustment, correction, or modification of the Company's financial statements, including without limitation all claims or Causes of Action based on, arising out of, or relating to (i) the Company's internal controls relating to financial statements and financial reporting and (ii) materially misleading financial statements provided to the Contributing Claimants in connection with the 2012 Transaction;

(d)    all claims and Causes of Action based on, arising out of, or related to the misrepresentation of any of the Company's financial information and related internal controls, including without limitation the overstatement of the Company's revenue, accounts receivable, and/or EBITDA;

(e)    all claims and Causes of Action based on, arising out of, or related to any failure to disclose or actual or attempted cover up or obfuscation of any of the conduct described in Plan and the exhibits thereto and/or (a)-(d) above; and

(f)    any other potential claims, Causes of Action, charges, suits or rights of recovery under state, federal, or other applicable law.

The Contributed Claims that may be asserted against the Potential Defendants and Witnesses with respect to the foregoing include all claims or Causes of Action arising under state and/or federal law, such as (but not limited to) claims arising under title 11 of the U.S. Code and applicable law, including without limitation sections 502(d), 510, 542 through 551, and 553 of title 11 and any similar state laws, violations of state and/or federal securities laws, breach of contract, breach of fiduciary duty (including aiding and abetting any such breach), and common law claims such as quantum meruit and unjust enrichment. *See* **Exhibit G** of this Disclosure Statement for a non-exclusive list of (i) potential claims and Causes of Action, which are expressly identified and preserved by the Debtors for possible prosecution and assigned to the Litigation Trust by the Contributing Claimants and (ii) Persons and Entities whom such potential claims and Causes of Action may be asserted against.

KE 27455051

The Litigation Trust will be governed by a Litigation Trust Agreement, the form of which is attached as **Exhibit F** hereto and will be filed as part of the Plan Supplement.  The Debtors believe that establishing the Litigation Trust is appropriate because it will effectively and efficiently enable the Litigation Trustees to pursue the above-described claims and Causes of Action and distribute the proceeds recovered to Holders of the Senior Notes (the Debtors' Impaired creditors) and the Consenting Shareholders.  The claims and Causes of Action that are being contributed to the Litigation Trust include the Contributed Claims of the Consenting Shareholders, the Consenting Noteholders, and the Debtors and their estates.  For the avoidance of doubt, the Litigation Trust shall not be authorized to pursue any claims or Causes of Action against a Released Party.  *See* section VIII of this Disclosure Statement for additional information regarding the Litigation Trust.

    **Q.**      **Will all Holders of Senior Notes Claims receive an Interest in the Litigation Trust?**

Yes.  Except to the extent that a Holder of an Allowed Senior Notes Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of the Allowed Senior Notes Claims, each Holder of an Allowed Senior Notes Claim shall receive (i) the right to its Pro Rata share of 100% of the New Common Stock (subject to dilution by the Management Incentive Plan) based on the principal amount of Senior Notes held by such Holder on the Distribution Record Date and (ii) a share of the Senior Notes Litigation Trust Recovery.

The share of the Senior Notes Litigation Trust Recovery allocated to the Holder of an Allowed Senior Notes Claim will be based on whether a Holder elects to opt-in to the settlement described in Article IV.C of the Plan and contribute its Contributed Claims to the Litigation Trust.

    **R.**      **Can I contribute my Contributed Claims to the Litigation Trust?**

Yes.  To opt-in to the settlement, a Holder of an Allowed Senior Notes Claim must agree, by electing on its Ballot, to (i) become a Releasing Party and (ii) assign its Contributed Claims to the Litigation Trust.  By electing to opt-in to the settlement on its Ballot, the Holder of an Allowed Senior Notes Claim agrees that, subject to the occurrence of the Effective Date and the formation of the Litigation Trust, it will be deemed, without any further action, (i) to have assigned its Contributed Claims to the Litigation Trust and (ii) to have agreed to execute any documents reasonably requested to effectuate the foregoing.  If the Plan is confirmed and consummated, the Litigation Trust Agreement will be binding on all Holders of Senior Notes Claims and all Holders of Senior Notes Claims will be deemed to have executed the Litigation Trust Agreement as of the Effective Date.

    **S.**      **When will the Plan Supplement be filed and what will it include?**

The Plan Supplement will be filed by the Debtors no later than five days before the Confirmation Hearing or as soon as reasonably practicable thereafter, and may be amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules, and will include the following:  (a) the New Corporate Governance Documents for Reorganized PAH; (b) the Rejected Executory Contract and Unexpired Lease List; (c) the Assumed Executory Contract and Unexpired Lease List; (d) a list of retained Causes of Action; (e) the Litigation Trust Agreement; (f) the Exit Facility Credit Agreement; (g) the members of the New Boards, to the extent known; (h) the Description of Transaction Steps; and (i) the Management Employment Agreements.  Any reference to the Plan Supplement in the Plan will include each of the documents identified above as (a) through (i).

    **T.**      **What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan?**

Following the Effective Date of the Plan, the Company willl implement a Management Incentive Plan (the "Management Incentive Plan") that will reserve up to 10% of the New Common Stock of PAH on a fully diluted basis.  The terms, form of equity (*e.g.*, options and/or restricted stock units), and allocation of the Management Incentive Plan will be determined by the new board of directors of PAH (the "New PAH Board").

KE 27455051

U.    **What are the Debtors' Intercompany Claims and Intercompany Interests?**

In the ordinary course of business and as a result of their corporate structure, certain of the Debtor entities hold equity of other Debtor entities and maintain business relationships with each other, resulting in Intercompany Claims and Intercompany Interests.  The Intercompany Claims reflect costs and revenues, which are allocated among the appropriate Debtor entities, resulting in Intercompany Claims.

The Plan's treatment of Allowed Intercompany Claims and Allowed Intercompany Interests represents a common component of a chapter 11 plan involving multiple debtors in which the value of the going-concern enterprise may be replicated upon emergence for the benefit of creditor constituents receiving distributions under a plan.  The Plan provides that the Reorganized Debtors may reinstate Allowed Intercompany Claims and Allowed Intercompany Interests as necessary to preserve the Reorganized Debtors' corporate structure or compromise such Claims and Interests, in full or in part, in their sole discretion and to the extent determined appropriate.

V.    **What will happen to Holdings on the Effective Date?**

On the Effective Date, or as soon as practicable thereafter, Holdings will be dissolved in accordance with the description of Restructuring Transactions set for in the Plan Supplement (the "<u>Description of Transaction Steps</u>").

W.    **What are the Subordinated Claims and what treatment will they receive under the Plan?**

Subordinated Claims are all Claims that are subordinated pursuant to section 510 of the Bankruptcy Code or otherwise applicable law.  Holders of Allowed Subordinated Claims will not receive any distribution under the Plan.  On the Effective Date, Allowed Subordinated Claims will be discharged, canceled, released and extinguished.

X.    **What are the Non-Subordinated Contribution and Reimbursement Claims?**

"<u>Non-Subordinated Contribution and Reimbursement Claims</u>" are Claims against the Debtors for contribution, indemnification, or reimbursement that are not Subordinated Claims and are brought:    (a) by any Person or Entity arising out of or resulting from the pursuit of litigation by the Litigation Trust; (b) by a Released Party other than a current officer or employee of the Debtors (as of September 1, 2013) arising out of or resulting from (i) all claims and Causes of Action against any party based on, arising out of, or relating to the 2012 Transaction, including without limitation any claims or Causes of Action for unlawful dividend, fraudulent conveyance or avoidance, (ii) all claims and Causes of Action based on, arising out of, or related to the issuance of any Security of any Debtor, (iii) all claims and Causes of Action based on, arising out of, or related to the restatement, adjustment, correction, or modification of the Debtors' financial statements, including without limitation all claims or Causes of Action based on, arising out of, or relating to (x) the Debtors' internal controls relating to financial statements and financial reporting; and (y) materially misleading financial statements provided to the Contributing Claimants in connection with the 2012 Transaction, (iv) all claims and Causes of Action based on, arising out of, or related to the misrepresentation of any of the Debtors' financial information and related internal controls, including without limitation the overstatement of the Debtors' revenue, accounts receivable, and/or EBITDA, (v) all claims and Causes of Action based on, arising out of, or related to any failure to disclose, or actual or attempted cover up or obfuscation of any of the conduct described in this Disclosure Statement (including on **<u>Exhibit G</u>** hereto) and/or (i)-(iv) above, (vi) all claims and Causes of Action for breach of fiduciary duty (including but not limited to breaches of the duties of care, good faith, and loyalty), and (vii) any and all claims and Causes of Action arising from actions taken or not taken in connection with the Restructuring and the Chapter 11 Cases; or (c) by a Released Party that is a current officer or employee of the Debtors (as of September 1, 2013) arising out of or resulting from (i) all claims and Causes of Action against any party based on, arising out of, or relating to the 2012 Transaction, including without limitation any claims or Causes of Action for unlawful dividend, fraudulent conveyance or avoidance, (ii) all claims and Causes of Action based on, arising out of, or related to the issuance of any Security of any Debtor, (iii) all claims and Causes of Action based on, arising out of, or related to the restatement, adjustment, correction, or modification of the Debtors' financial statements, including without limitation all claims or Causes of Action based on, arising out of, or relating to (x) the Debtors' internal controls relating to financial statements and financial reporting; and (y) materially misleading financial statements provided to the Contributing Claimants in connection with the 2012 Transaction, (iv) all claims and Causes of Action based

21

on, arising out of, or related to the misrepresentation of any of the Debtors' financial information and related internal controls, including without limitation the overstatement of the Debtors' revenue, accounts receivable, and/or EBITDA, and (v) all claims and Causes of Action based on, arising out of, or related to any failure to disclose, or actual or attempted cover up or obfuscation of any of the conduct described in this Disclosure Statement (including on **Exhibit G** hereto) and/or (i)-(iv) above.  For the avoidance of doubt, Independent Director Indemnification Obligations do not constitute Non-Subordinated Contribution and Reimbursement Claims or Subordinated Claims, and will be assumed by the Reorganized Debtors.

      **Y.**      **How many Holders of Non-Subordinated Contribution and Reimbursement Claims are likely to be in Class 8?**

The Debtors do not believe that there are any allowable Non-Subordinated Contribution and Reimbursement Claims; provided however that if there are any Allowed Non-Subordinated Contribution and Reimbursement Claims, they will be assumed by the Litigation Trust and nothing herein shall impair the rights of the Holders of any such Allowed Non-Subordinated Contribution and Reimbursement Claims to have such claims satisfied by the Litigation Trust in accordance with the Plan.

As further described in Article VII.A of the Plan, the Bankruptcy Court will retain jurisdiction to determine any dispute regarding any asserted Non-Subordinated Contribution and Reimbursement Claims, including whether any such asserted Claim should be Allowed or is a Subordinated Claim.

      **Z.**      **What kinds of Claims will the Debtors, the Reorganized Debtors or Litigation Trust have and not have authority to settle?**

The Debtors, the Reorganized Debtors or the Litigation Trust, as applicable, will have the exclusive authority to file, settle, compromise, withdraw or litigate to judgment any Claims or objections to Claims, other than (1) Fee Claims, as permitted under the Plan, (which Fee Claims will be subject to objection by any Person with standing to object) and (2) Non-Subordinated Contribution and Reimbursement Claims and Trust Indemnification Claims  described in Article IV.Z of the Plan, where the Litigation Trust will have the exclusive authority to file, settle, compromise, withdraw, or litigate to judgment such Claims.

For the avoidance of doubt, the Litigation Trust will not have authority to file, settle, compromise, withdraw or litigate to judgment any retained claims or Causes of Action provided in **Exhibit K** of this Disclosure Statement, as such claims and Causes of Action will be vested in the Reorganized Debtors, not the Litigation Trust.

      **AA.**      **How will Claims asserted with respect to rejection damages affect my recovery under the Plan?**

Because the Plan provides for payment in full to Holders of Allowed General Unsecured Claims, Claims arising from the Debtors' rejection of Executory Contracts and Unexpired Leases will not impact the recoveries to Holders of any Claims in any Class.

      **BB.**      **What is the deadline to vote on the Plan?**

The deadline to vote on the Plan is 11:59 p.m. (prevailing Eastern Time) on November 8, 2013 for Holders of Bridge Loan Credit Agreement Claims and Senior Notes Claims.

      **CC.**      **Can I object to the Plan?**

Yes. Following commencement of the Chapter 11 Cases, the Debtors will request that the Bankruptcy Court schedule promptly a Confirmation Hearing by no later than December 17, 2013 and will provide notice of the Confirmation Hearing to all necessary parties.  The Debtors will file, serve on parties in interest and publish in the national edition of *The Wall Street Journal*, *The New York Times*, and *USA Today* the notice of the Confirmation Hearing, which will contain, among other things, the deadline for objections to the Plan and the date and time of the Confirmation Hearing. Written objections to Confirmation of the Plan, if any, which conform to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, must be filed, together

with a proof of service, with the Bankruptcy Court and *actually be received* on or before the Plan Objection Deadline by the following parties (as well as to the chambers of the United States Bankruptcy Judge assigned to the Chapter 11 Cases and to those parties who have filed a notice of appearance in the Chapter 11 Cases):

- <u>The Debtors</u>:  Physiotherapy Holdings, Inc., Whiteland Business Park, Suite 200, Exton, Pennsylvania 19341, Attn:  General Counsel;

- <u>Proposed Co-Counsel to the Debtors</u>:  Klehr Harrison Harvey Branzburg LLP, 919 N. Market Street, Suite 1000, Wilmington Delaware 19801, Attn: Domenic E. Pacitti, Esq.; 1835 Market Street, Suite 1400, Philadelphia, Pennsylvania, Attn:  Morton Branzburg, Esq.;

- <u>Proposed Co-Counsel to the Debtors</u>:  Kirkland & Ellis LLP, , 601 Lexington Avenue, New York, New York 10022, Attn:  Jonathan S. Henes, P.C., Nicole L. Greenblatt, Esq. and David S. Meyer, Esq.;

- <u>Bridge Loan Agent</u>:  U.S. Bank, National Association, 214 N. Tryon Street, 26th Floor, Charlotte, North Carolina 28202, Attn:  CDO Trust Services/James Hanley;

- <u>Counsel for the Bridge Loan Agent</u>:  Latham and Watkins LLP, 355 South Grand Avenue, Los Angeles, California 90071, Attn:  Stacey Rosenberg, Esq.;

- <u>Counsel for the Ad Hoc Committee of Senior Noteholders</u>:  Klee, Tuchin, Bogdanoff & Stern LLP, 1999 Avenue of the Stars, 39th Floor, Los Angeles, California 90067, Attn:   Michael Tuchin, Esq. and David A. Fidler, Esq.;

- <u>Senior Notes Indenture Trustee</u>:  Bank of New York Mellon Trust Company, N.A., 601 Travis, 16th Floor, Houston, Texas 77002, Attn: Dennis J. Roemlein CCTS;

- <u>Counsel to the Senior Notes Indenture Trustee</u>:   Reed Smith LLP, Reed Smith Centre, 225 Fifth Avenue, Pittsburgh, Pennsylvania 15222, Attn:  Eric A. Schaffer, Esq.;

- <u>Counsel to the Consenting Shareholders</u>: Dechert LLP, 1095 Avenue of the Americas, New York, New York 10036, Attn: Michael J. Sage, Esq. and Nicole B. Herther-Spiro, Esq.; and

- <u>United States Trustee for the District of Delaware</u>:  Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801.

**DD.    Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and any party in interest may object to Confirmation of the Plan.

**EE.    When is the Confirmation Hearing set to occur?**

Following commencement of the Chapter 11 Cases, the Debtors will request that the Bankruptcy Court schedule promptly a Confirmation Hearing by no later than December 17, 2013 and will provide notice of the Confirmation Hearing to all necessary parties.  The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to confirmation of the Plan must be filed and served on the Debtors, and certain other parties prior to the Confirmation Hearing in accordance with the notice of the Confirmation Hearing.  The Debtors will publish the notice of the Confirmation Hearing, which will contain, among other things, the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the national edition of *The Wall Street Journal*, *The New York Times*, and *USA Today* to provide notification to those persons who may not receive notice by mail.

**FF.     What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a Bankruptcy Court binds the debtor, any issuer of securities under the plan of reorganization, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of the plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**GG.     What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing pursuant to chapter 11.  As a result, Confirmation of the Plan means that the Debtors will not be liquidated or forced to go out of business.  The Reorganized Debtors will continue to operate their businesses going forward using Cash from operations and any additional availability permitted and obtained under the terms of the Exit Facility, which will be utilized to implement the Reorganized Debtors' business plan.

**HH.     Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

The New PAH Board to be selected prior to the Effective Date will be composed of three (3) to seven (7) directors, one of whom will be the Chief Executive Officer of PAH and the remainder of whom will be initially chosen by the Ad Hoc Committee of Senior Noteholders.  The Ad Hoc Committee of Senior Noteholders has begun a search process for potential members of the New PAH Board.

**II.     Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe the Plan, which contemplates a significant deleveraging of their capital structure and affords the Litigation Trust Beneficiaries the opportunity to benefit from prosecution by the Litigation Trust of the Contributed Claims, is in the best interest of all creditors. The Debtors also submit that any other alternative does not in any way realize or recognize the value inherent under the Plan.

**IV.     THE DEBTORS' BUSINESSES AND CORPORATE AND CAPITAL STRUCTURE**

**A.     Overview of the Debtors' Businesses**

The Debtors are the largest pure-play provider of outpatient physical therapy services in the United States with a national footprint of 581 outpatient rehabilitation and orthotics & prosthetics clinics located in 29 states plus the District of Columbia.

*[SEE GRAPHICS ON NEXT PAGE]*



With over 1,500 clinicians managing over 2.9 million patient visits per year, the Debtors provide the entire spectrum of outpatient rehabilitation therapy, including physical and/or occupational therapy, sports and industrial rehabilitation, hand and aquatic therapy, women's health, pediatric and geriatric programs.  The Debtors provide a comprehensive suite of orthotic, prosthetic and core rehabilitation therapy solutions, including all forms of physical therapy, at each clinic to service the needs of their patients.  Additionally, the Debtors offer a palette of specialty services to address the specific demands of its patients and referral base, including occupational therapy, speech therapy, pediatrics, hand therapy, sports performance therapy, isokinetic therapy, functional capacity evaluations and temporomandibular and craniofacial treatment.  Visits at the Debtors' clinics generally are driven by new patient referrals.  The Debtors have a uniform approach to marketing to local physicians, who account for over 70% of referrals through marketing conducted by the individual clinic practitioners and directors.

     *(i)*     ***The Debtors' Operations***

The Company's business is comprised of two segments:  (a) outpatient rehabilitation ("OR") services and (b) orthotics and prosthetics ("O&P") services.  The Company's OR business generates revenue from 581 clinics, and the O&P segment generates revenue principally from 29 clinics.

Martin McGahan, the Company's Interim Chief Executive Officer ("Interim CEO"), currently supervises the day-to-day operation of the Company's OR and O&P clinics.  Five regional vice presidents (each an "RVP") report directly to the Interim CEO and are responsible for managing clinic operations in their respective regions.[8] The RVPs are supported by eighteen area vice presidents (each an "AVP") who are responsible for managing clinic operations in their respective areas as a subset of the 5 regions managed by the RVPs.  Additionally, the Interim CEO receives support from the Company's Director of Operations, who interfaces with the both the RVPs and AVPs and focuses on clinic performance and detailed operating metric dashboards.  This regional structure enables the Company to customize the Debtors' business plans to cater to each clinic's local patient and referral populations. The structure also provides a solid framework to effectively manage new clinics, either from acquisitions or through de novo clinics, and foster career development of leading clinicians.

In addition, the Company has joint venture arrangements with hospitals located near the Company-owned clinics.  The partnership arrangements allow the Company to maintain operational and management control of its OR clinics and coordinate physician marketing and programs with its hospital partners.  In addition to forming joint

---

[8]      Prior to Martin McGahan's appointment as Interim CEO, the AVPs, the Director of Operations and the RVPs reported to Pete Grabaskas, the Company's former Chief Operating Officer who departed the Company effective June 14, 2013.  The Debtors are currently involved in mediation with Mr. Grabaskas's regarding Mr. Grabaskas's severance pay and benefits.

KE 27455051

venture arrangements with select hospitals, the Company manages physician in-office ancillary rehabilitation therapy services.  In all cases, the AVPs manage the Company's clinics located near the hospitals' surrounding regional areas.

All of the Debtors' clinics are operated at leased locations.  Moreover, the Company's headquarters in Exton, Pennsylvania is also a leased facility.

### (ii)    Outpatient Rehabilitation Business

The Company is the nation's foremost provider of OR services and has earned a strong reputation with patients, physicians, referral sources and payers for its high quality of care and talented clinicians.  OR services generated approximately $295.6 million of revenue for the 12-month period ended August 31, 2013.

Patients in need of physical therapy services often suffer from orthopedic and musculoskeletal injuries, strokes, multiple sclerosis, arthritis and other degenerative joint conditions.  Patients are frequently referred to the Company by their physicians or by hospital discharge planners.  Upon receipt of a referral, Company clinicians obtain the necessary medical and insurance coverage information from the referred patient, and then recommend a therapy program based on the patient's past medical history, interests and goals.  In many states, the Company is able to provide OR services to patients without requiring a referral.

The Debtors offer a variety of therapy solutions to accommodate patients' needs.  Each treatment has different characteristics that make it more or less suitable to specific patients' injuries or concerns:

- _Orthotic and Musculo-Skeletal Injury Rehabilitation_:  This therapy is designed for patients experiencing pain from an acute injury, chronic condition, total joint replacement arthritis or other degenerative joint condition.  Clinicians focus on specific areas of the patients' musculoskeletal system (bones, muscles, ligaments, tendons, cartilage, spine and joints) that are impacted by the injury, disease or trauma to develop a customized plan to achieve the most rapid and complete recovery possible.  Treatment may include manual therapy (hands-on mobilization of soft tissue), modalities (ultrasound, electrical stimulation), gait training, therapeutic exercise (range of motion, strengthening) and other therapies that target the underlying cause of the patients' pain and treats the effects of the patients' injuries or diseases.

- _Sports Injury Rehabilitation_:  Rehabilitation focuses on treating athletes' injuries, preventing future injuries and improving patients' skill level and physical ability through muscle strengthening and performance-enhancement therapy.

- _Physio@Work_:  This unique program is designed to help injured employees' return to work as soon as possible.  Therapists develop occupation-specific treatment plans for each injured worker and partner with employers to developed customized programs designed to reduce the incidence and severity of work-related injuries.

- _Certified Hand Therapy_:  The customized hand and upper extremity therapy program is designed for patients who experience pain in their arms or hands. The Company's hand therapists use their specialized skills in assessment and treatment to prevent dysfunction, restoration of function and/or reversal of the progression of their patients' pathology.

- _Pediatric Prevention (PhysioKids)_:  PhysioKids is a comprehensive pediatric therapy program that incorporates physical, occupational and speech therapy that is tailored to children, from birth to age 21, and addresses a wide range of conditions and needs, including motor control problems, physical disabilities and sensory issues, among many others.

### (iii)    Orthotics and Prosthetics Business

In addition to the OR clinics, the Debtors operate 29 O&P clinics where they employ approximately 96 licensed O&P practitioners.  The orthotists and prosthetists analyze and evaluate each patient's specific condition,

KE 27455051

medical history, occupation and hobbies to design a highly customized brace or other artificial device that enables the patient to achieve her personal goals.  The Company provides on-site fabrication and offers a breadth of O&P products and services, including:

- _Spinal Orthotics_:  Orthotists design spinal bracing for post-operative back surgery, scoliosis and thoracic lumbar injuries, among many other conditions that are designed to limit movement during healing or to prevent painful movements.

- _Nueromuscular_:  The Company is one of the few select O&P service providers to offer The WalkAide®, which employs new orthotics technology to restore the functionality of an impaired limb. The WalkAide® is used to treat foot drop, as well as a variety of upper motor neuron deficiencies.  It recreates a natural nerve-to-muscle response using electrical stimulation to help patients with proper dorsiflexion of the foot, so they can achieve a normal walking gait. In many cases, patients who use The WalkAide® no longer need to use a cane or walker.

- _Lower-Limb Prosthetics_:  The Company offers lower-extremity prostheses that are designed to meet the special needs of all levels of amputation.  Specialists recommend lightweight prostheses with energy-storing components that enable patients to ambulate and sit without the need for belts, corsets and pelvic bands that may limit patients' ability to function normally.

- _Upper-Limb Prosthetics_:  Practitioners work with patients to provide them with the most advanced, functional and cosmetically pleasing upper-limb prostheses that are custom designed to support the patients' specific activities, hobbies or vocations.

To demonstrate its commitment to the O&P profession and the future advancement of patient care, the Debtors offer a comprehensive residency program, where new and upcoming medical school graduates receive training in each of the specialty O&P treatment options offered by the Company.  Many of the Debtors' nationally recognized orthotists and prosthetists serve as teaching staff and mentors to the residents and educate them on the latest developments in the O&P field, providing residents who complete the program with a distinctly competitive advantage over their peers.

The Debtors' O&P segment generated approximately $17.3 million of revenue for the 12-month period ended August 31, 2013.

### (iv)    Revenue Sources

The majority of the Debtors' revenues are derived from commercial payers, including healthcare insurers, managed care organizations, workers' compensation programs, contract management services and private pay sources, with the remaining reimbursement derived from Medicare and Medicaid.  The diagrams below set forth Physiotherapy's payer revenue mix (% of billed charges for 2013 through June 30, 2013) and its payer visit mix.




In addition, the Debtors contract with insurers and managed care entities on a local, regional and national basis, reflecting the strength of the Company's scale and density.  The Debtors generally contract with those payers having a significant patient population across numerous geographic regions, typically on a fee-for-service basis.  As of August 2013, the Debtors had 872 active agreements with 27 of the contracts being national agreements.  The Company's top 20 payor contracts represent approximately 56% of the Debtors' total contract volume.

During the 12 months ended August 31, 2013, the Debtors had total collectible revenue of $312.9 million, $295.6 million (94.5%) from the OR business and $17.3 million (5.5%) from the O&P business.  During the six months ended August 31, 2013, the Debtors' visit mix was comprised of approximately 99% third party payers, including Medicare, Medicaid, healthcare insurers, managed care organizations, workers' compensation programs and contract management services.  Approximately 1% of visit mix came from self-pay visits or other private pay visits.

The Debtors, with the assistance of Alvarez & Marsal ("A&M") and their other advisors, are currently implementing a comprehensive cost savings plan, focused on the turnaround or closure of non-profitable clinics (OR clinics reduced from 648 as of the end of 2012 to 544 by the end of 2013), a reduction in corporate costs, as well as various other measures.  The Debtors believe that implementing the costs savings plan will improve the Company's operational performance, increase revenues and drive value for its key stakeholders.

The Company's projections, which are summarized below, include the benefit of these cost savings initiatives, as well as the corresponding revenue reduction from the clinic closures.









**Source:** Restated 2012 results and Management projections

**Notes**
(1) Financial results unaudited. LTM as of August 2013
(2) Financial results include O&P EBITDA of $2.6 million in 2012A and $2.0 million in LTM and projected periods, net of corporate costs

### B.    The Debtors' Prepetition Organizational Structure

*[SEE CHART ON NEXT PAGE]*

# Physiotherapy Holdings, Inc.
## Corporate and Capital Structure Chart

Physiotherapy Holdings, Inc. (DE)

**Greater than 5% equity owners**
Court Square Capital Partners II, LP
Court Square Capital Partners II-A, LP
Court Square Capital Partners (Offshore) II, LP

Physiotherapy Associates Holdings, Inc. (DE)

Physiotherapy Corporation (DE)

Physiotherapy-BMI, Inc. (DE)

Rehabilitation Consultants, Inc. (DE)

Physiotherapy Associates, Inc. (MI)

Physiotherapy-BMHI Holdings, Inc. (DE)

LifeSigns Management, Inc. (MI)

R.S. Network, Inc. (IL)

Physiotherapy Associates-Union Rehab, LLC (MD)

Physiotherapy Associates NRH Rehab, LLC (MD) **80%**
80% Physiotherapy BMHI Holdings, Inc.
20% NRH Ambulatory Services, Inc.

LifeBridge Sports Medicine and Rehabilitation LLC (MD) **50%**
50% Physiotherapy Associates, Inc.
50% Lifebridge Investments, Inc.

Trumbull P.T. Corp. (CT)

Professional Rehab Associates, Inc. (PA)

Leesburg Sports, Inc. (NY)

SMR Banyan Tree, Inc. (NY)

Alexandria Sports, Inc. (NY)

Eden Sports, Inc. (NY)

Benchmark Acquisition Corp. (DE)

Rehab Associates, L.L.C. (AL)
99% Benchmark Acquisition Corp.
1% Benchmark Medical Management Co.

Rehab Colorado, LLC (AL)

Rehab Missouri, LLC (AL)

Rehab Xcel, LLC (AL)

Rehab Associates of Jackson Hospital, LLC (AL) **80%**
80% Physiotherapy BMHI Holdings, Inc.
20% Jackson Hospital & Clinic, Inc.

Northstar Health Services, Inc. (DE)

NSHS Services, Inc. (DE)

Benchmark O & P Holdings, Inc. (DE)

Freedom Management Services, LLC (PA)
1% Benchmark Medical Management Co.
99% Benchmark O&P Holdings, Inc.

Wisconsin Prosthetics and Orthotics, Inc. (WI)

Benchmark Orthotics & Prosthetics, Inc. (DE)

Actra Rehabilitation Associates, Inc. (WI)

Cape Prosthetics-Orthotics, Inc. (MO)

Orthopaedic Services of Paducah, Inc. (KY)

Swanson Orthotic & Prosthetic Center, Inc. (OH)

Keystone Rehabilitation Systems, Inc. (PA)

The Rehab Center (PA) **49%**
49% Keystone Rehabilitation Systems, Inc.
51% Somerset Community Hospital

Progressive Therapy Services, Inc. (OH)

Indiana Rehabilitation Services, LLC (DE) **49%**
49% Keystone Rehabilitation Services, Inc.
51% Indiana Regional Medical Center

Keystone Rehabilitation Systems of McMurray (PA-GP)
65% Keystone Rehabilitation Systems, Inc.
35% Physiotherapy-BMHI Holdings, Inc.

Keystone Rehabilitation Associates of Warren (OH-GP)
50% Keystone Rehabilitation Systems, Inc.
50% Physiotherapy-BMHI Holdings, Inc.

Benchmark Medical Management Company (DE)

MATRIX Rehabilitation, Inc. (DE)

MATRIX Healthcare Services, LLC (DE)

MATRIX Rehabilitation-Delaware, Inc. (DE)

MATRIX Rehabilitation-Georgia, Inc. (DE)

MATRIX Rehabilitation-Ohio, Inc. (DE)

MATRIX Rehabilitation-Texas, Inc. (DE)

MATRIX Rehabilitation-South Carolina, Inc. (DE)

Integrity Physical Therapy, Inc. (DE)

PhysioLink Corporation (DE)

Theraphysics Partners of Colorado, Inc. (DE)

Theraphysics Partners of Texas, Inc. (DE)

Carrollton Physical Therapy Clinic, Inc. (TX)

North Dallas Physical Therapy Associates, Inc. (TX)

The Parks Physical Therapy and Work Hardening Center, Inc. (TX)

Susquehanna Physical Therapy Associates, Inc. (PA)

Blue Hen Physical Therapy, Inc. (DE)

Potomac Rehabilitation Services, Inc. (MD)

Morris Area Rehabilitation Association, Inc. (NJ)

Frederick Orthopedic Rehabilitation, Inc. (MD)

Therapy Associates of Martinsville, Inc. (VA)

**Key**
- Borrower under the Bridge Loan Facility
- Guarantor of the Bridge Loan Facility
- Issuer of the Senior Notes
- Guarantor of the Senior Notes
- Joint Venture or Investment (% ownership)

29

### C.        The Debtors' Prepetition Capital Structure

#### (i)        *Initial Financing*

On April 30, 2012, in connection with Court Square's acquisition of the Company, the Company entered into a $123.5 million first lien senior secured credit facility and issued $210 million in senior unsecured notes pursuant to the Senior Notes Indenture (as defined below).

(a)        Initial Senior Secured Credit Facility

PAH (formerly Merger Sub), as borrower, Holdings and certain of PAH's direct and indirect subsidiaries (collectively, the "Guarantors"), Jefferies Finance LLC ("Jefferies"), as administrative agent and collateral agent, General Electric Capital Corporation, as syndication agent and issuing bank, and the lenders party thereto (the "Initial Secured Lenders"), were originally parties to that certain credit agreement, dated April 30, 2012 (the "2012 Credit Agreement" and, together with all associated agreements, instruments and documents, the "Loan Documents").

Pursuant to the terms of the Loan Documents, the Initial Secured Lenders agreed to provide the Debtors with (a) a term loan in the original principal amount of $100 million (the "Term Loan"), (b) revolving loans in an aggregate principal amount of up to $25 million  (the "Revolving Loans"), (c) swingline loans in an aggregate principal amount at any time outstanding not in excess of $5 million (the "Swingline Loans") and (d) letters of credit, with aggregate total face amounts at any time outstanding not in excess of $5 million (the "Letters of Credit," and, collectively with the Term Loan, Revolving Loans, and Swingline Loans, the "Initial Senior Secured Credit Facility"). Each of the Debtors (with the exception of PAH, which was merged with and into Merger Sub in 2012 and consequently assumed all of the obligations of Merger Sub under the Loan Documents) is a guarantor of the Initial Senior Secured Credit Facility. The Revolving Loans and the Term Loan were scheduled to mature on April 30, 2017 and April 30, 2018, respectively.

Borrowings under the Initial Senior Secured Credit Facility bore interest at an annual rate equal to (a) in the case of ABR Borrowings, the Alternate Base Rate plus an Applicable Margin of 3.75%, or (b) in the case of Eurodollar Borrowings, the Adjusted LIBOR Rate plus an Applicable Margin of 4.75%. Issued and drawn Letters of Credit accrued interim interest at a rate equal to the interest rate applicable to ABR Borrowings or Eurodollar Borrowings, as applicable, plus 2.0%.

Pursuant to the 2012 Credit Agreement and the related security agreement, each of the Debtors had granted the Initial Secured Lenders a first priority security interest in all property owned or acquired by the Debtors or in which the Debtors have any right, title or interest, including, among other things, all stock and stock equivalents of the Debtors (other than stock in Holdings).

As described further below, in connection with restructuring discussions, the Debtors refinanced the Initial Senior Secured Credit Facility in July of 2013. At the time of the Refinancing (as defined below), approximately $123.5 million was outstanding under the Initial Senior Secured Credit Facility, including $99 million under the Term Loan, $24.5 million under the fully-drawn Revolving Loans, and $421,380 in issued and undrawn Letters of Credit.

(b)        Senior Notes

The 11.875% senior unsecured notes due May 1, 2019 (the "Senior Notes," and the holders of these Senior Notes, the "Noteholders") were issued under that certain Senior Notes Indenture, dated April 30, 2012 (as may hereafter be amended, supplemented or modified from time to time, the "Senior Notes Indenture"), by and among PAH (formerly Merger Sub), as issuer, certain of its direct and indirect subsidiaries (collectively, the "Senior Notes Guarantors") and the Bank of New York Mellon Trust Company, N.A., as Senior Notes Indenture trustee, registrar, paying agent and custodian under the Senior Notes Indentures (the "Senior Notes Indenture Trustee").

The Senior Notes are guaranteed on a senior unsecured basis by each of PAH's existing and future domestic wholly-owned subsidiaries that once guaranteed the Debtors' obligations under the Initial Senior Secured Credit Facility and now guarantee those obligations with respect to the Bridge Loan Facility (as defined herein).

KE 27455051

In connection with recent restructuring discussions, and as a condition to the forbearance described below, PAH and the Senior Notes Indenture Trustee executed an amendment to the Senior Notes Indenture, dated June 18, 2013 (the "Supplemental Indenture"), which increased the interest rate on the Senior Notes by 1% until the date the Senior Notes Indenture Trustee receives notice from the Debtors that all outstanding defaults under the Senior Notes Indenture Trustee have been cured.

As of the date hereof, indebtedness outstanding under the Senior Notes Indenture on account of the Senior Notes totals approximately $210 million, excluding unpaid interest and fees.

### *(ii)* *2013 Refinancing*

#### (a)    Bridge Loan Facility

In connection with negotiations among the Initial Secured Lenders and the Ad Hoc Committee of Senior Noteholders regarding a comprehensive restructuring, on July 31, 2013, Holdings, PAH and certain of PAH's direct and indirect subsidiaries refinanced the Initial Senior Secured Credit Facility (the "Refinancing") by entering into that certain Credit Agreement (the "Bridge Loan Credit Agreement") with U.S. Bank National Association, as administrative agent and collateral agent ("Bridge Loan Agent"), and a majority of the Noteholders, as lenders (the "Bridge Loan Lenders"), pursuant to which the Bridge Loan Lenders provided a $140 million new term loan credit facility (the "Bridge Loan Facility"), the proceeds of which were used to pay off in full the Initial Senior Secured Credit Facility, provide the Company with the working capital necessary to operate its business and fund the administrative costs associated with the Company's restructuring efforts. The term loans under the Bridge Loan Facility bear interest at: (a) base rate plus a margin of 6.50%; or (2) the eurodollar rate (subject to a 2% LIBOR floor) plus a margin of 7.50%.

The Bridge Loan Facility matures on November 8, 2013, and the obligations and guarantees thereunder are secured by a first priority security interest in substantially all of the Debtors' assets. Pursuant to the Plan Support Agreement, the Bridge Loan Lenders agreed to extend the maturity date to November 15, 2013 with no amendment, extension or similar fee payable to the Bridge Loan Lenders by the Debtors for such extension.

As of the date hereof, the aggregate outstanding principal amount under the Bridge Loan Credit Agreement is approximately $140 million and accrued and unpaid interest thereon is approximately $369,444.

## V.    EVENTS LEADING TO THE COMMENCEMENT OF CHAPTER 11 CASES

### A.    Corporate History: The 2012 Transaction and the Overstatement of Revenue and Profitability

In 2012, affiliates of Court Square Capital Partners acquired the Debtors' businesses through a merger transaction, which was financed with a combination of debt and equity that formed the genesis of the Debtors' prepetition capital structure. In March 2013, in the course of its fiscal year 2012 audit, the Company discovered that there had been an overstatement of revenue and profitability. Upon such discovery, the board of directors of PAH took proactive steps to address the potential impact of the accounting issues and to begin restructuring discussions with its stakeholders, including hiring Kirkland & Ellis LLP as restructuring counsel, engaging Rothschild, Inc. as financial advisor, hiring A&M as operational and restructuring advisor and appointing Matt Cantor as an independent director.

At the same time, the Board of Directors— acting through a special committee formed to investigate the causes and to investigate potential claims related to the revenue recognition and accounting issues (the "Special Committee")—also engaged Dechert LLP as special counsel, and Dechert LLP subsequently retained Capstone Advisory Group LLC to investigate potential claims related to the overstatement of revenue and accounting issues and to advise PTA's board of directors of the nature and extent of the problem. The facts and circumstances surrounding the 2012 Transaction, the overstatements of revenue and profitability, and the impact of such overstatements on the Debtors' financial position are the subject of the Special Committee's investigation and of the Contributed Claims that will be assigned to, and preserved for prosecution by, the Litigation Trust. A summary of the relevant factual history and the potential claims and Causes of Action that may be brought by the Litigation

31

Trust against, among others, the Potential Defendants and Witnesses listed on **Exhibit C**, is provided in **Exhibit G** of this Disclosure Statement.

> The Litigation Trust may, but is not required to, pursue any and all claims and/or Causes of Action that are contributed to the Litigation Trust (whether or not described in the Plan or this Disclosure Statement) as against all Persons or Entities (whether or not such Persons and Entities are identified on the list of Potential Defendants and Witnesses set forth on Exhibit C to this Disclosure Statement or otherwise) other than Released Parties.
>
> *See* **Exhibit G** and "Risk Factors" for a further discussion of the Contributed Claims.

**B.     The Debtors' Restructuring Efforts**

As a result of the overstatement of revenue and profitability described above and in **Exhibit G**, the Debtors informed the Initial Secured Lenders that they would not be able to deliver their audited financial statements by the April 30, 2013 deadline under the 2012 Credit Agreement and negotiated an extension to provide audited financials by May 31, 2013. To preserve liquidity during this time, the Debtors elected to forego the May 1, 2013 $12.5 million interest payment on the Senior Notes. The Debtors' inability to deliver the audited financials and their failure to make the May 1, 2013 coupon payment resulted in defaults both under the 2012 Credit Agreement and the Senior Notes Indenture.

At around the same time, certain of the Debtors' Noteholders (then holding approximately 65% in principal amount of the Senior Notes) organized into the Ad Hoc Committee of Senior Noteholders and retained Klee, Tuchin, Bogdanoff & Stern LLP as counsel and Houlihan Lokey as financial advisor. The Ad Hoc Committee of Senior Noteholders now holds approximately 90% in principal amount of the Senior Notes and is comprised of Beach Point Capital Management LP, Blue Mountain Management, LLC, Ellis Lake Capital, LLC, Knighthead Capital Management, LLC, Mast Capital Management, LLC, Silver Rock Financial LLC and Western Asset Management Company (including funds and accounts managed and/or advised by any of the foregoing).

Beginning in May 2013, the Debtors proactively engaged the Initial Secured Lenders and the Ad Hoc Committee of Senior Noteholders in discussions regarding potential restructuring alternatives. Through these initially collaborative talks, on June 10, 2013 the Debtors entered into forbearance agreements with the Initial Secured Lenders and Ad Hoc Committee of Senior Noteholders (the "Secured Lender Forbearance Agreement" and the "Noteholder Forbearance Agreement," respectively) under which the Debtors agreed to, among other things, pay a 0.25% consent fee and default interest to the Initial Secured Lenders and increase the interest rate on the Senior Notes by 1% in exchange for both creditor groups forbearing from exercising any remedies through July 31, 2013. The Secured Lender and Noteholder Forbearance Agreements also required certain deliverables from the Debtors, including:

- financial statements for the quarter ended March 31, 2013 and projections for the remainder of 2013 to be delivered on or before June 14, 2013;

- a three-year business plan and projections to be delivered or before July 3, 2013; and

- a detailed restructuring term sheet to be delivered on or before July 17, 2013.

After delivery of the initial restructuring term sheet, the Debtors commenced discussions with the Initial Secured Lenders and Ad Hoc Committee of Senior Noteholders regarding a comprehensive resolution to deleverage their capital structure and develop a mechanism for pooling potential litigation claims relating to the Debtors' revenue recognition issues and issuance of the Senior Notes.

Ultimately, the Initial Secured Lenders and Ad Hoc Committee of Senior Noteholders shared different and irreconcilable views about the acceptable terms of a restructuring solution. Consequently, the Debtors and the Ad Hoc Committee of Senior Noteholders engaged in accelerated and constructive efforts to refinance the Initial Senior Secured Credit Facility in advance of the expiration of the forbearance periods. On July 31, 2013, the day the Secured Lender and Noteholder Forbearance Agreements were set to expire, the Debtors and six of the seven members of the Ad Hoc Committee of Senior Noteholders finalized a refinancing of the Initial Senior Secured Credit Facility and entered the Bridge Loan Credit Agreement and the security agreements in connection therewith.

KE 27455051

PAH, the Senior Notes Guarantors and the members of the Ad Hoc Committee of Senior Noteholders also entered a second forbearance agreement pursuant to which the Ad Hoc Committee of Senior Noteholders agreed to continue to forbear in exercising their rights and remedies under the Senior Notes Indenture through September 3, 2013.  The parties have extended the forbearance period from time to time.

Throughout the extended forbearance period, the Debtors and their key stakeholders engaged in negotiations regarding a comprehensive balance sheet restructuring that would leave the Debtors adequately capitalized and ready to execute against their revised business plan -- as well as ensure that all claims and Causes of Action related to the 2012 Transaction and accounting misstatements would be preserved, developed and ideally pooled to ensure a coordinated approach that would benefit the Contributing Claimants.  For several months, the Debtors, the Ad Hoc Committee of Senior Noteholders' advisors, the Consenting Shareholders and special counsel for the claims investigation had extensive negotiations, reports and discussions regarding, among other things, the terms of the Litigation Trust and the Plan (as further described herein).

Throughout this period, the Debtors explored several strategic alternatives, including an out-of-court restructuring comprised of an exchange offer of the Senior Notes for equity in Restructured PAH.  The Debtors' financial advisors and investment banker, Rothschild, also commenced a process to determine if there were financing sources that would enable the Debtors to refinance the Bridge Loan Facility on more advantageous economic terms than those provided by the Exit Facility.  As of August 23, 2013, 6 financing sources had provided indications of interest which contemplated a full or near-full refinancing of the Bridge Loan Facility or some level of participation in a refinancing credit facility.  All indications were preliminary and predicated on certain issues and concerns being addressed prior to obtaining a refinancing commitment, including (a) the possibility that the Noteholders may not be in favor of obtaining financing from, and converting to equity behind, certain of the interested financing parties, especially at a similar or higher all-in costs than the current Bridge Loan Facility, (b) the quality of earning assessment, given the lack of audited 2013 financials and (c) substantial business due diligence, and, in the case of one potential lender, market demand.

Based on the feedback from potential financing sources, Rothschild advised the Debtors' board of directors that a refinancing of the Bridge Loan Facility appeared potentially feasible, though it was unlikely to occur at a lower interest rate than the Bridge Loan Facility and would also include various transaction fees and associated costs.  Based on the existing facts and circumstances, the Debtors, in consultation with their advisors, determined that there is no other third-party financing source at this time to refinance the Bridge Loan Facility at a lower interest cost than the Bridge Loan Facility, and that extending the maturity date of the Bridge Loan Facility and obtaining access to the Exit Facility is the best available financing arrangement under the circumstances.

Ultimately, the Debtors, the Ad Hoc Committee of Senior Noteholders and the Bridge Loan Lenders determined that commencing the Chapter 11 Cases to implement a swift, consensual transaction would maximize value and best position the Company for future success.

Accordingly, in the weeks leading up to the dissemination of this Disclosure Statement, the Debtors and their advisors engaged in extensive negotiations and discussions with the Ad Hoc Committee of Senior Noteholders, the Bridge Loan Lenders and their advisors regarding the terms of a potential expedited in-court restructuring transaction that would restructure the Debtors' funded indebtedness and establish the Litigation Trust.

C.      **The Plan Support Agreement**

On October 10, 2013, after weeks of good faith, arm's length negotiations, the Debtors reached an agreement with the Bridge Loan Lenders, the Ad Hoc Committee of Senior Noteholders and the Consenting Shareholders with respect to a consensual restructuring on the terms set forth in the Plan that would appropriately delever the Debtors' capital structure and establish, for the benefit of the Litigation Trust Beneficiaries, a Litigation Trust to pursue any Contributed Claims transferred and assigned to the Litigation Trust.

To evidence their support of the Debtors' restructuring and to finalize the Plan in a manner consistent with the Restructuring Term Sheet, the Bridge Loan Lenders, the Ad Hoc Committee of Senior Noteholders and the Consenting Shareholders executed the "Plan Support Agreement," dated as of October 10, 2013 and attached hereto as **Exhibit H**.  The Plan Support Agreement requires, as a condition to the Bridge Loan Lenders', the Ad Hoc Committee of Senior Noteholders' and the Consenting Shareholders' support of the Plan (and the creation of the

Litigation Trust), among other things, that the Debtors' restructuring efforts meet certain agreed upon milestones, including the following:

- The Debtors commence solicitation for the Plan on or prior to October 10, 2013;

- The Debtors commence the Chapter 11 Cases by no later than November 15, 2013; and

- The Effective Date of the Plan occurs no later than December 31, 2013 (with respect to the Consenting Noteholders) or February 14, 2014 (with respect to the Consenting Shareholders).

**D.      Solicitation**

On or about October 10, 2013, prior to filing the Chapter 11 Cases, the Debtors caused a copy of the Plan, this Disclosure Statement, and the appropriate Ballots to be delivered to the Holders of Class 3 Bridge Loan Credit Agreement and Class 4 Senior Notes Claims, the Holders of Claims entitled to vote to accept or reject the Plan. The Debtors established November 8, 2013 at 11:59 p.m. (prevailing Eastern Time) for Holders of Class 3 and Class 4 Claims as the deadline for the receipt of votes to accept or reject the Plan. On the Petition Date, along with the Plan and this Disclosure Statement, the Debtors intend to file a motion seeking approval of the adequacy of this Disclosure Statement, approval of the Solicitation Package and Confirmation of the Plan.

**VI.      SUMMARY OF THE PLAN[9]**

**A.      General Basis for the Plan**

The Debtors have determined that prolonged Chapter 11 cases could damage severely their ongoing business operations and may threaten their viability as a going concern. Consequently, the Debtors submit that the prepackaged nature of the Plan (as set forth in the Plan and described herein) will allow the Debtors to exit chapter 11 quickly, while deleveraging their capital structure, securing long term financing commitments, and implementing an efficient pooling and sharing mechanisms to pursue any Contributed Claims transferred and assigned to the Litigation Trust, including without limitation: (a) all claims and Causes of Action against any party based on, arising out of, or relating to the 2012 Transaction, including without limitation any claims or Causes of Action for unlawful dividend, fraudulent conveyance or avoidance claims under state or federal law, including the Bankruptcy Code, (b) all claims and Causes of Action based on, arising out of, or related to the issuance of any security of the Debtors, (c) all claims and Causes of Action based on, arising out of, or related to the restatement, adjustment, correction, or modification of the Debtors' financial statements, including without limitation all claims or Causes of Action based on, arising out of, or relating to (i) the Debtors' internal controls relating to financial statements and financial reporting; and (ii) materially misleading financial statements provided to the Contributing Claimants in connection with the 2012 Transaction, (d) all claims and Causes of Action based on, arising out of, or related to the misrepresentation of any of the Debtors' financial information and related internal controls, including without limitation the overstatement of the Debtors' revenue, accounts receivable, and/or EBITDA, (e) all claims and Causes of Action based on, arising out of, or related to any failure to disclose, or actual or attempted cover up or obfuscation of any of the conduct described in the Disclosure Statement, the Restructuring Term Sheet and/or (a)-(d) above, and (f) any other potential claims, causes of action, charges, suits or rights of recovery under state, federal, or other applicable law.

---

[9]      This Section VI is intended only to provide a summary of the key terms, structure, classification, treatment, and implementation of the Plan, and is qualified in its entirety by reference to the entire Plan and exhibits thereto. Although the statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in documents referred to therein, this Disclosure Statement does not purport to be a precise or complete statement of all such terms and provisions, and should not be relied on for a comprehensive discussion of the Plan. Instead, reference is made to the Plan and all such documents for the full and complete statements of such terms and provisions. The Plan itself (including attachments) will control the treatment of creditors and equity holders under the Plan. To the extent there are any inconsistencies between this Section VI and the Plan (including attachments) the latter will govern.

The Contributed Claims that may be asserted against the Potential Defendants and Witnesses with respect to the foregoing include all claims or Causes of Action arising under state and/or federal law, such as (but not limited to) claims arising under title 11 of the U.S. Code and applicable law, including without limitation sections 502(d), 510, 542 through 551, and 553 of title 11 and any similar state laws, violations of state and/or federal securities laws, breach of contract, breach of fiduciary duty (including aiding and abetting any such breach), and common law claims such as quantum meruit and unjust enrichment.  *See* **Exhibit G** and **Exhibit C** of this Disclosure Statement for a non-exclusive list of (i) potential claims and Causes of Action, which are expressly identified and preserved by the Debtors for possible prosecution and assigned to the Litigation Trust by the Contributing Claimants, and (ii) Persons and Entities whom such potential claims and Causes of Action may be asserted against.

Under the Plan, the Debtors will fully equitize the Senior Notes and thereby deleverage the Debtors' balance sheet by more than $200 million.  After emergence from Chapter 11, the only debt obligations with recourse to the Reorganized Debtors will consist of the Exit Facility, which permits, among other things, the incurrence of $8 million in additional secured debt on a pari passu basis should the Reorganized Debtors require additional working capital to run their businesses.  The Debtors' Plan proposes to pay all Allowed General Unsecured Claims (classified in Class 5) in full in Cash either on the Effective Date or in the ordinary course of business after the Debtors' chapter 11 emergence.

### B.        Treatment of Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

#### (i)        *Administrative Claims*

(a)        Administrative Claims

Except with respect to Administrative Claims that are Fee Claims and except to the extent that a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment with respect to such Holder, each Holder of an Allowed Administrative Claim will be paid in full in Cash on the later of:  (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that Allowed Administrative Claims that arise in the ordinary course of the Debtors' business will be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

Except as otherwise provided in Article II.A of the Plan, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date will be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims will be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than the Administrative Claims Objection Deadline.

(b)        Professional Compensation

(i)        Fee Claims

Professionals asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, or any other applicable order of the Bankruptcy Court, an application for final allowance of such Fee Claim no later than 20 days after the Effective Date.  Objections to any Fee Claim must be Filed and served on the Reorganized Debtors

and the requesting party no later than 40 days after the Effective Date. To the extent necessary, the Plan and the Confirmation Order will amend and supersede any previously entered order regarding the payment of Fee Claims. Notwithstanding anything to the contrary contained herein, in no event will the Debtors' payments for professional fees and expenses for the period September 9, 2013 through the Effective Date relating to the investigation of the 2012 Transaction and the preparation for litigation of the Contributed Claims exceed $250,000, unless otherwise agreed to by the Ad Hoc Committee of Senior Noteholders in their sole and absolute discretion.

(ii)        Professional Fee Escrow Account

On the Effective Date, the Debtors will establish and fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals.  The Professional Fee Escrow Account will be maintained in trust for the Professionals.  Such funds will not be considered property of the Litigation Trust, property of the Debtors' Estates, or property of the Reorganized Debtors.  The amount of Accrued Professional Compensation Claims owing to the Professionals will be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Claims are Allowed by a Final Order.  Allowed Accrued Professional Compensation Claims will be paid first from amounts in the Professional Fee Escrow Account and then by the Reorganized Debtors.  When all Allowed Professional Compensation Claims are paid in full in Cash, amounts remaining in the Professional Fee Escrow Account, if any, will revert to the Reorganized Debtors.

(iii)       Professional Fee Reserve Amount

To receive payment for unbilled fees and expenses incurred through and including the Effective Date, the Professionals will estimate their Accrued Professional Compensation Claims prior to and as of the Confirmation Date, along with an estimate of fees and expenses to be incurred through and including the Effective Date, and will deliver such estimate to the Debtors no later than five days prior to the anticipated Confirmation Date; provided, however, that such estimate will not be considered an admission with respect to the fees and expenses of such Professional.  If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated as of the Confirmation Date will comprise the Professional Fee Reserve Amount.

(iv)       Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtors or the Litigation Trust, as applicable, will, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Reorganized Debtors or Litigation Trust, as applicable, following the Effective Date.  Upon the Effective  Date, any requirement that Professionals comply with section 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate and the Reorganized Debtors or Litigation Trust, as applicable, may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action, order, or approval of the Bankruptcy Court.

(ii)        *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date will receive, at the option of the Debtors or the Reorganized Debtors, one of the following treatments:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, plus interest at the rate determined under applicable non-bankruptcy law and to the extent provided for by section 511 of the Bankruptcy Code, payable on the or as soon as practicable following the Effective Date; (b) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, plus interest at the rate determined under applicable non-bankruptcy law and to the extent provided for by section 511 of the Bankruptcy Code; or (c) such other treatment as may be agreed upon by such holder and the Debtors or otherwise determined upon an order of the Bankruptcy Court.

(iii)     *Statutory Fees*

Notwithstanding anything to the contrary contained in the Plan, on the Effective Date, the Debtors will pay, in full in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation.  The Reorganized Debtors will pay all U.S. Trustee fees due and owing under 28 U.S.C. § 1930 until such time as the Reorganized Debtors move for entry of a final decree and the Bankruptcy Court enters such a decree; provided, however, that if the Litigation Trust opposes such motion, the Litigation Trust will thereafter bear the cost of all U.S. Trustee fees until the Bankruptcy Court enters a final decree closing the Chapter 11 Cases.

C.     **Classification and Treatment of Claims and Interests**

(i)     *Classification of Claims and Interests*

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests.  All Claims and Interests, except for Administrative Claims and Priority Tax Claims, are classified in the Classes set forth in Article III of the Plan.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied before the Effective Date.

(ii)     *Treatment of Claims and Interests*

To the extent a Class contains Allowed Claims or Allowed Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below:

| | | SUMMARY OF PLAN TREATMENT AND EXPECTED RECOVERIES | |
|---|---|---|---|
| **Class** | **Claim/Interest** | **Treatment of Claim/Interest** | **Projected Recovery Under the Plan** |
| 1 | Priority Non-Tax Claims | Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Non-Tax Claim (Allowed in the aggregate principal amount plus interest on such Claim and any reasonable fees, costs, charges or other expenses provided for under the Bridge Loan Credit Agreement), each Holder of such Allowed Priority Non-Tax Claim will be paid in full in Cash on or as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Priority Non-Tax Claim against the Debtors becomes an Allowed Priority Non-Tax Claim, (iii) such other date as may be ordered by the Bankruptcy Court or (iv) when due and payable in the ordinary course of business. | 100% |
| 2 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim will receive one of the following treatments, in the sole discretion of the applicable Debtor:  (i) the Debtors or | 100% |

37

| | | the Reorganized Debtors will pay such Allowed Other Secured Claims in full in Cash, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code; (ii) the Debtors or the Reorganized Debtors will deliver the collateral securing any such Allowed Other Secured Claim; or (iii) the Debtors or the Reorganized Debtors will otherwise treat such Allowed Other Secured Claim in any other manner such that the Claim will be rendered not Impaired. | |
|---|---|---|---|
| 3 | Bridge Loan Credit Agreement Claims | The Bridge Loan Credit Agreement Claims will be Allowed in the aggregate principal amount of $140 million plus interest on such Claim, and any reasonable fees, costs, charges and other expenses provided for under the Bridge Loan Credit Agreement.  Except to the extent that a Holder of an Allowed Bridge Loan Credit Agreement Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of the Allowed Bridge Loan Credit Agreement Claims, each Holder of an Allowed Bridge Loan Credit Agreement Claim will (i) receive its Pro Rata share of the Exit Facility or (ii) be paid in full in Cash. | 100% |
| 4 | Senior Notes Claims | The Senior Notes Claims will be Allowed in the aggregate principal amount of $210 million.  Except to the extent that a Holder of an Allowed Senior Notes Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of the Allowed Senior Notes Claims, each Holder of an Allowed Senior Notes Claim will receive (i) subject to the final two sentences of this paragraph, its Pro Rata share of 100% of the New Common Stock (subject to dilution by the Management Incentive Plan) based on the principal amount of Senior Notes held by such Holder on the Distribution Record Date (calculated by issuing ten (10) shares of New Common Stock for every $1,000 in principal amount of Senior Notes held by such Holder on the Distribution Record Date) and (ii) a share of the Senior Notes Litigation Trust Recovery.  The share of the Senior Notes Litigation Trust Recovery allocated to the Holder of an Allowed Senior Notes Claim will be determined in accordance with Article IV.V of the Plan and will be based on whether a Holder elects to opt-in to the settlement described in Article IV.C of the Plan.  To opt-in to the settlement, a Holder of an Allowed Senior Notes Claim must agree, by electing on its Ballot, to (i) become a Releasing Party and (ii) assign its Contributed Claims to the Litigation Trust.  By electing to opt-in to the settlement on its Ballot, the Holder of an Allowed Senior Notes Claim agrees that, subject to the occurrence of the Effective Date and the formation of the Litigation Trust, it will be deemed, without further action, (i) to have assigned its Contributed Claims to the Litigation Trust and (ii) to have agreed to execute any documents reasonably requested to effectuate the foregoing.  The Litigation Trust Agreement will be binding on all Holders of Senior Notes Claims and all Holders of Senior Notes Claims will | 40.3%[10] |

---

[10]    This does not include any projected recovery from the Litigation Trust.  *See* **Exhibit G** and "Risk Factors" for a further discussion of the Contributed Claims.

KE 27455051

| | | | |
|---|---|---|---|
| | | be deemed to have executed the Litigation Trust Agreement as of the Effective Date. All distributions made in respect of Allowed Senior Note Claims will be made on account of the principal amount of such Claims and not on account of any prepetition or postpetition interest that may be owed in respect of such Claims. The Holders of Claims in Class 4 will be required to execute the New Stockholders Agreement before receiving their respective distributions of the New Common Stock under the Plan. If a Holder of a Class 4 Claim as of the Distribution Record Date does not return a completed and executed signature page to the New Stockholders Agreement so that it is received by the Disbursing Agent on or before the 90th day after the Effective Date, such Holder shall be deemed to forever forfeit its right to receive the New Common Stock (but not its share of the Senior Notes Litigation Trust Recovery). | |
| 5 | General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each General Unsecured Claim, each Holder of such Allowed General Unsecured Claim will receive one of the following treatments, in the sole discretion of the applicable Reorganized Debtor: (i) the Debtors or the Reorganized Debtors will pay such Allowed General Unsecured Claim in the ordinary course of business or (ii) the Debtors or the Reorganized Debtors will pay such Allowed General Unsecured Claim in full in Cash, including interest at the contractual rate, upon the later of (A) the Effective Date, (B) the date on which such General Unsecured Claim against the Debtors becomes an Allowed General Unsecured Claims or (C) such other date as may be ordered by the Bankruptcy Court. | 100% |
| 6 | Intercompany Claims | No distribution will be made on account of Allowed Intercompany Claims. To preserve the Debtors' corporate structure, on the Effective Date, or as soon thereafter as practicable, all Allowed Intercompany Claims will be reinstated in full or in part or cancelled or discharged in full or in part, in each case, to the extent determined appropriate by the Reorganized Debtors; provided that Intercompany Claims held by Holdings will not receive any distribution under the Plan and will be canceled and discharged on the Effective Date. The Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors historical intercompany account settlement practices. | 100% |
| 7 | Subordinated Claims | Holders of Allowed Subordinated Claims will not receive any distribution on account of such Subordinated Claims. On the Effective Date, Allowed Subordinated Claims will be discharged, canceled, released and extinguished. | 0% |
| 8 | Non-Subordinated Contribution and Reimbursement | On the Effective Date, all of the Debtors' obligations with respect to Allowed Non-Subordinated Contribution and Reimbursement Claims will be assumed by the Litigation Trust and, to the extent | 100% |

| | | | |
|---|---|---|---|
| | Claims | not satisfied by any available insurance coverage, satisfied solely by way of setoff or recoupment, to the extent applicable, or payment by the Litigation Trust, which will be paid after the payment of costs and expenses, including legal fees, of the Litigation Trust, but prior to any further distributions to Litigation Trust Beneficiaries and will not be paid from the Litigation Trust Funding. Any Allowed Non-Subordinated Contribution and Reimbursement Claims will only be satisfied from the proceeds of the Contributed Claims after the payment of attorneys' fees and expenses, and there will be no clawback against previous distributions to Litigation Trust Beneficiaries in order to satisfy any such Claims. | |
| 9 | Intercompany Interests | No distribution will be made on account of Allowed Intercompany Interests. To preserve the Debtors' corporate structure, on the Effective Date, or as soon thereafter as practicable, all Allowed Intercompany Interests will be reinstated in full or in part or cancelled or discharged in full or in part, in each case, to the extent determined appropriate by the Reorganized Debtors. Notwithstanding the foregoing, on the Effective Date, Holdings' Interests in PAH will be cancelled and discharged. | 0%-100% |
| 10 | Interests (Other than Class 9 Interests) | Holders of Interests (other than Class 9 Interests) will not receive any distribution on account of such Interests. On the Effective Date, Class 10 Interests will be cancelled and discharged. | 0% |

## D.    Means for Implementation of the Plan

### (i)    Sources of Cash for Plan Distributions

All consideration necessary for the Reorganized Debtors to make payments or distributions pursuant hereto will be obtained from the Exit Facility, or other Cash from the Debtors, including Cash from business operations. Further, the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

### (ii)    Exit Facility

On the Effective Date, the Reorganized Debtors will be authorized to execute and deliver those documents necessary or appropriate to satisfy the conditions to effectiveness of the Exit Facility, the terms, conditions and covenants of each of which will be consistent with the Exit Facility Commitment Letter, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any person.

Pursuant to the terms of the Exit Facility Credit Agreement, the Exit Facility will provide the Debtors with a term loan credit facility of $144.162 million (and permit additional indebtedness on a pari passu basis of up to $8 million), of which $142 million will be used to refinance the existing Bridge Loan Facility and for general liquidity, to be issued and accessed in accordance with the Exit Facility Credit Agreement and secured by a first-priority lien on and security interests in substantially all the Reorganized Debtors' assets, which facility will be consistent in all material respects with the Exit Facility Commitment Letter and in form and substance reasonably acceptable to the Ad Hoc Committee of Senior Noteholders, to be executed and delivered by the parties thereto on or about, and as a condition to, the Effective Date. The Exit Facility provides for fees to the Exit Lenders equal to 1.5% of the amount of the term loan (or $2.162 million) in the form of an original issue discount.

Borrowings under the Exit Facility will bear interest at an annual rate equal to (a) in the case of ABR Borrowings, the Alternate Base Rate plus an Applicable Margin of 9.00% (subject to a 2.0% floor) or (b) in the case of Eurodollar Borrowings, the Adjusted LIBOR Rate plus an Applicable Margin of 10.00% (subject to a 1.0% floor).

Pursuant to the terms of the Exit Facility Credit Agreement, each of the Debtors will grant the Exit Lenders a perfected first priority security interest in substantially all tangible and intangible assets, including, without limitation, cash, deposit and securities accounts, accounts receivable, inventory, intellectual property, material owned real property, 100% of the capital stock of all guarantors, and 65% of the stock of each first-tier foreign subsidiary of any loan party, subject to certain exceptions and qualifications to be mutually agreed consistent with the "Existing Precedent," as defined in the Exit Facility Commitment Letter.

The Exit Facility and the Reorganized Debtors' Cash on hand will provide sufficient available funds as of the Effective Date to: (i) permit repayment in full of all Allowed Bridge Loan Credit Agreement Claims (including principal, interest, and reasonable fees, costs, charges and other expenses provided for under the Bridge Loan Credit Agreement) of Holders of Allowed Bridge Loan Agreement Claims who elect to be paid in full in Cash on the Effective Date; (ii) make the other required Effective Date payments under the Plan; and (iii) provide the Reorganized Debtors with working capital necessary to run their businesses and to fund certain capital expenditures (in accordance with the Exit Facility). Any letters of credit issued under the Bridge Loan Facility will be deemed to be issued under the Exit Facility or cash collateralized.

Beach Point Capital Management LP, Blue Mountain Management, LLC, Ellis Lake Capital, LLC, Knighthead Capital Management, LLC, and Western Asset Management Company (including funds and accounts managed and/or advised by any of the foregoing) have committed to provide the Exit Facility on the terms and subject to the conditions set forth in the Exit Facility Commitment Letter.

Mast Capital Management, LLC and Silver Rock Financial LLC (including funds and accounts managed and/or advised by them), which are Bridge Loan Lenders that hold approximately $22.6 million and $15.3 million of the Bridge Loan Credit Agreement Claims, respectively, will not be participating in the Exit Facility. Pursuant to the terms of the Bridge Loan Credit Agreement, such Bridge Loan Lenders will therefore be entitled to an exit fee equal to 1.5% of their Bridge Loan Credit Agreement Claims (or approximately $338,000 and $229,000, respectively).

### (iii)    *Settlement of Certain Claims and Interests*

To consensually resolve all outstanding disputes among the Debtors, the Consenting Bridge Loan Lenders, the Consenting Noteholders and the Consenting Shareholders, the Debtors, the Consenting Bridge Loan Lenders, the Consenting Noteholders and the Consenting Shareholders have agreed to the settlement embodied in the Plan, including the creation of the Litigation Trust to most effectively and efficiently pursue the Contributed Claims, which will be effective as of the Effective Date. The settlement was extensively negotiated in good faith and is an integral component of the Debtors' overall restructuring and the transactions contemplated in the Plan.

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the distributions and other benefits provided under the Plan, the Plan constitutes a request for the Bankruptcy Court to authorize and approve the proposed settlement. Entry of the Confirmation Order will confirm (i) the Bankruptcy Court's approval, as of the Effective Date, of the Plan and all components of the proposed settlement and (ii) the Bankruptcy Court's finding that the proposed settlement is (a) in the best interests of the Debtors, their respective Estates and the holders of Claims and Interests and (b) fair, equitable and reasonable.

Any Holder of an Allowed Senior Notes Claim will be permitted to opt-in to the aforementioned settlement between the Debtors, the Consenting Bridge Loan Lenders, the Consenting Noteholders and the Consenting Shareholders as set forth in Article III.C.4 of the Plan; provided, however, that notwithstanding the foregoing, none of the Potential Defendants and Witnesses, set forth in **Exhibit C** of this Disclosure Statement, will receive the releases or indemnification provided under the settlement or be a "Released Party" under the Plan.

(iv)    *Issuance and Distribution of New Common Stock*

The issuance of the New Common Stock by Reorganized PAH, including options, stock appreciation rights, or other equity awards, if any, in connection with the Management Incentive Plan, is authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests.

On the Effective Date, an initial number of up to approximately 2.1 million shares of New Common Stock will be issued and, as soon as reasonably practicable thereafter, distributed to Holders of Claims in Class 4, subject to dilution with respect to any shares issued pursuant to the Management Incentive Plan.

All of the shares of New Common Stock issued pursuant to the Plan will be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the New Common Stock under the Plan will be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions will bind each Entity receiving such distribution or issuance.

(v)    *New Stockholders' Agreement*

Upon the Effective Date, Reorganized PAH will be a private company governed by the New Stockholders Agreement. The New Stockholders Agreement will be adopted on the Effective Date and will be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of New Common Stock will be bound thereby. The Holders of Claims in Class 4 will be required to execute the New Stockholders Agreement before receiving their respective distributions of the New Common Stock under the Plan. If a Holder of a Class 4 Claim as of the Distribution Record Date does not return a completed and executed signature page to the New Stockholders Agreement so that it is received by the Disbursing Agent on or before the 90th day after the Effective Date, such Holder shall be deemed to forever forfeit its right to receive the New Common Stock (but not its share of the Senior Notes Litigation Trust Recovery).

(vi)    *Restructuring Transactions*

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Restructuring Transactions under and in connection with the Plan, including: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (d) the execution and delivery of all documents in connection with the creation and funding of the Litigation Trust; and (e) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law (the "Restructuring Transactions").

(vii)    *Corporate Existence*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor (other than Holdings) will continue to exist after the Effective Date as a Reorganized Debtor and as a separate corporation, limited liability company, partnership or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation or governing documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation or governing documents) are amended by the Plan or otherwise amended in accordance with applicable law. To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval

42

(other than any requisite filings required under applicable state or federal law).  As set forth in Article IV.W of the Plan, on the Effective Date, Holdings will be dissolved.

### (viii)    *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, (i) all property in each Estate, all Causes of Action and any property acquired by any of the Debtors pursuant to the Plan, except for the assets contributed to the Litigation Trust, including any Contributed Claims of the Debtors and their Estates, will vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances, except for Liens securing the Exit Facility and (ii) all property of the Debtors and their Estates contributed to the Litigation Trust, including any Contributed Claims of the Debtors, will be transferred to and vest in the Litigation Trust, free and clear of all Liens, claims, charges or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any claims, Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### (ix)    *Cancellation of Existing Indebtedness and Securities*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date: (i) the obligations of the Debtors under the Bridge Loan Credit Agreement, the Senior Notes, and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) will be cancelled solely as to the Debtors and the Reorganized Debtors, and the Reorganized Debtors will not have any continuing obligations thereunder; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) will be released and discharged; provided, however, notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim will continue in effect solely for purposes of enabling Holders of Allowed Claims to receive distributions under the Plan as provided herein and permitting the Senior Notes Indenture Trustee to perform any necessary functions under the Senior Notes Indenture with respect to distributions to Holders of Allowed Senior Notes Claims and to have the benefit of all the protections and other provisions of the Senior Notes Indenture in doing so and to assert the Senior Notes Indenture Trustee Charging Lien against distributions to Holders of Senior Note Claims for payment of any unpaid Senior Notes Indenture Trustee Fees; provided, further, however, that the preceding proviso will not affect (i) the Senior Notes Indenture Trustee Charging Lien or (ii) the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under this Plan.  On and after the Effective Date, all duties and responsibilities of the Bridge Loan Agent and the Senior Notes Indenture Trustee, as applicable, will be discharged unless otherwise specifically set forth in or provided for under the Plan.

### (x)    *Corporate Action*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan will be deemed authorized and approved in all respects, including:  (i) execution and entry into the Exit Facility; (ii) entry into the New Corporate Governance Documents; (iii) establishment and funding of the Litigation Trust; (iv) the distribution of the New Common Stock; (v) selection of the directors and officers for the Reorganized Debtors; (vi) implementation of the Restructuring Transactions contemplated by this Plan; (vii) adoption of the Management Incentive Plan; (viii) adoption or assumption, as applicable, of the agreements with existing management; and (ix) all other actions contemplated by the Plan (whether to occur before on or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any

KE 27455051

corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan will be deemed to have occurred and will be in effect, without any requirement of further action by the security holders, directors or officers of the Debtors or the Reorganized Debtors.

On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors (as applicable) will be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Corporate Governance Documents, the Exit Facility Credit Agreement, the Litigation Trust Agreement, and any and all related and ancillary agreements, documents, and filings, New Common Stock, and any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by Article IV of the Plan will be effective notwithstanding any requirements under non-bankruptcy law.  The issuance of the New Common Stock will be exempt from the requirements of section 16(b) of the Securities Exchange Act of 1934 (pursuant to Rule 16b-3 promulgated thereunder) with respect to any acquisition of such securities by an officer or director (or a director deputized for purposes thereof) as of the Effective Date.

### (xi)    *New Certificates of Incorporation and New By-Laws*

On or promptly after the Effective Date, the Reorganized Debtors will file their respective New Certificates of Incorporation with the applicable Secretaries of State and/or other applicable authorities in their respective states or countries of incorporation in accordance with the corporate laws of the respective states or countries of incorporation.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Certificates of Incorporation will prohibit the issuance of non-voting equity securities.  After the Effective Date, the Reorganized Debtors may amend and restate their respective New Certificates of Incorporation and New By-Laws and other constituent documents as permitted by the laws of their respective states or countries of incorporation and their respective New Certificates of Incorporation and New By-Laws.

### (xii)    *Directors and Officers of the Reorganized Debtors*

As of the Effective Date, the term of the current members of the board of directors of PAH will expire, and the initial boards of directors, including the New PAH Board and the New Subsidiary Boards, as well as the officers of each of the Reorganized Debtors will be appointed in accordance with the New Certificates of Incorporation and New By-Laws of each Reorganized Debtor.

On the Effective Date, the New PAH Board will consist of three (3) to seven (7) directors, one (1) of whom will be the chief executive officer of PAH and the remainder of whom will be initially chosen by the Ad Hoc Committee of Senior Noteholders.  The New PAH Board will elect members of the New Subsidiary Boards.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the initial New PAH Board and the New Subsidiary Boards, as well as those Persons that serve as an officer of any of the Reorganized Debtors.  To the extent any such director or officer is an "insider" as such term is defined in section 101(31) of the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed.  Each such director and officer will serve from and after the Effective Date pursuant to the terms of the New Certificates of Incorporation, New By-Laws, and other constituent documents of the Reorganized Debtors.

### (xiii)    *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors and the officers and members of the New Boards thereof, are authorized to and may issue, execute, deliver, file or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan, the New Corporate Governance Documents, the Exit Facility Credit Agreement, the Litigation Trust Agreement and the Securities issued pursuant to the Plan, including the New Common Stock, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization or consents except those expressly required pursuant to the Plan.

#### (xiv)    *Management Incentive Plan*

Following the Effective Date the Reorganized Debtors will implement a Management Incentive Plan, which will reserve up to 10% of the fully diluted New Common Stock, or the non-equity equivalent thereof, to be reserved for issuance to officers, directors and employees of the Reorganized Debtors, on terms to be determined by the New PAH Board.  The terms, form of equity (*e.g.*, options and/or restricted stock units), and allocation of the Management Incentive Plan will be determined by the New PAH Board.

#### (xv)    *Senior Management and Management Employment Agreements*

The Debtors' existing senior management team (other than the Interim CEO) will remain in their current capacities as officers of the Reorganized Debtors, and the Management Employment Agreements will be assumed (as may be amended) and filed as part of the Plan Supplement.  If no new chief executive officer is chosen as of the Effective Date, Martin McGahan of Alvarez & Marsal Healthcare Industry Group will continue in his capacity as interim chief executive officer until a new chief executive officer is selected by the New PAH Board.

#### (xvi)    *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto will not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order will direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (i) the creation of any mortgage, deed of trust, lien, or other security interest, (ii) the making or assignment of any lease or sublease, (iii) any restructuring transaction authorized by the Plan, or (iv) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; (d) bills of sale; or (e) assignments executed in connection with any restructuring transaction occurring under the Plan.

#### (xvii)    *Legacy D&O Liability Insurance Policies*

The Legacy D&O Liability Insurance Policies are not executory contracts and, therefore, will not be assumed or rejected by the Debtors. If the Bankruptcy Court determines that a Legacy D&O Liability Insurance Policy is an executory contract and must be assumed, or assumed and assigned, to maintain coverage, the applicable Legacy D&O Liability Insurance Policy will be assumed and, if necessary, assigned to the applicable Reorganized Debtor.

#### (xviii)    *Indemnification Provisions*

As of the Effective Date, each Reorganized Debtor's certificate of incorporation and/or bylaws (or other formation documents) will, to the extent not satisfied by any available insurance coverage, provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to, current (as of September 1, 2013) directors, officers or employees who were employed as directors, officers or employees of such Debtor, on or after September 1, 2013 at least to the same extent as the bylaws (or other formation documents) of each of the respective Debtors on the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed, or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Reorganized Debtors will amend and/or restate its certificate of incorporation or bylaws (or other formation documents) before or after the Effective Date to terminate or materially adversely affect any of the Reorganized Debtors' obligations or such directors', officers' employees' or agents' rights; provided, however, that there will be no indemnification, defense, reimbursement, exculpation, liability, or advancement of fees and expenses by the Reorganized Debtors with respect to Subordinated Claims or Non-Subordinated Contribution and Reimbursement Claims (with such claims treated as set forth in Article III.C.7 and Article III.C.8, respectively, of the Plan); provided, further, that nothing in the Plan, Plan Supplement, or any documentation related thereto will in any way provide for any release, indemnification, defense, reimbursement, exculpation, liability, or advancement of fees and expenses of any of the Potential Defendants and Witnesses set forth in **Exhibit C** of this Disclosure Statement.

*(xix)*    ***Indemnification of Consenting Noteholders and Consenting Shareholders***

The Litigation Trust will, to the extent not satisfied by any available insurance coverage, indemnify and hold harmless each of the following Persons and Entities, solely to the extent such Person or Entity is not one of the Potential Defendants and Witnesses, for any and all Released Claims brought by any Person or Entity: (i) Consenting Noteholders; (ii) Consenting Shareholders; (iii) the Consenting Noteholders' and Consenting Shareholders' respective predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, and current (as of September 1, 2013) officers, directors, principals, members, partners, shareholders, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, advisory board members and other professionals; and (iv) the respective heirs, executors, estates, servants, and nominees of the Persons and Entities set forth in (i)-(iii) above (the "Trust Indemnification Claims").

*(xx)*    ***Assumption of Independent Director Indemnification Obligations***

On the Effective Date, the Debtors and the Reorganized Debtors will assume the Independent Director Indemnification Obligations pursuant to sections 365 and 1123 of the Bankruptcy Code.  The Independent Director Indemnification Obligations that are assumed, deemed assumed, honored, or reaffirmed by the Debtors hereunder will remain in full force and effect, will not be modified, reduced, discharged, impaired, or otherwise affected in any way, and will survive Unimpaired and unaffected, irrespective of when such obligation arose.

*(xxi)*    ***Preservation of Causes of Action***

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan and excluding the Contributed Claims of the Debtors, which are contributed to the Litigation Trust, the Reorganized Debtors will retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute or settle such Causes of Action will be preserved notwithstanding the occurrence of the Effective Date.  For the avoidance of doubt, the preservation of Causes of Action described in the preceding sentence includes, but is not limited to, the Debtors' (i) right to object to Administrative Claims, (ii) right to object to other claims and (iii) right to subordinate claims.  The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors in their respective discretion.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.

The Reorganized Debtors reserve and will retain the applicable Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  The applicable Reorganized Debtor through its authorized agents or representatives, will retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors will have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action except as otherwise expressly provided in the Plan and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

*(xxii)*    ***Litigation Trust***

The Litigation Trust will be established and funded on the Effective Date and pursuant to the Plan to pursue certain claims and Causes of Action against the Potential Defendants and Witnesses.  In consideration for transferring and assigning their Contributed Claims to the Litigation Trust, and in the case of the Noteholders, as partial payment of their claims under the Plan, the Consenting Shareholders and the Noteholders[11] will each receive

---

[11]    The Consenting Noteholders will receive an enhanced share of the 50% allocated to the Noteholders.

50% of the net proceeds from the Litigation Trust (after deduction for all costs and expenses of the Litigation Trust (other than the initial funding of $4.5 million) and the satisfaction, to the extent applicable, of any Allowed Non-Subordinated Contribution and Reimbursement Claims and Trust Indemnification Claims).  *See* section VIII of this Disclosure Statement for additional information regarding the Litigation Trust.  *See also* **Exhibit G** and "Risk Factors" for a further discussion regarding the Contributed Claims.

> (xxiii)   *Dissolution of Holdings*

On the Effective Date or as soon as practicable thereafter, Holdings will be dissolved in accordance with the Description of Transaction Steps.

### E.   Conditions Precedent to Confirmation and Consummation of the Plan

> (i)   *Conditions Precedent to the Effective Date*

It will be a condition to the Effective Date of the Plan that the following conditions will have been satisfied or waived pursuant to the provisions of Article VIII.B of the Plan:

> (a)   The Bankruptcy Court will have entered the Confirmation Order in form and substance reasonably acceptable to the Consenting Bridge Loan Lenders, the Ad Hoc Committee of Senior Noteholders and Consenting Shareholders.

> (b)   Any amendments, modifications or supplements to the Plan (including the Plan Supplement), if any, will be reasonably acceptable to:  (a) the Debtors; (b) the Consenting Bridge Loan Lenders; (c) the Ad Hoc Committee of Senior Noteholders; and (d) the Consenting Shareholders.

> (c)   All actions, documents, certificates and agreements necessary to implement the Plan will have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws.

> (d)   The Debtors will enter into the Exit Facility and the conditions precedent to funding under the Exit Facility will have been satisfied or waived.

> (e)   Reorganized PAH will have executed the New Stockholders Agreement.

> (f)   The Litigation Trustees will have been appointed and the Reorganized Debtors, the Debtors, the Consenting Noteholders who have executed the Plan Support Agreement, the Consenting Shareholders and the Litigation Trustees will have executed and delivered the Litigation Trust Agreement.

> (g)   The Litigation Trust shall have been established and the Initial Litigation Trust Funding shall have been funded to the Litigation Trust.

> (h)   The Professional Fee Escrow Account will have been established and funded.

> (ii)   *Waiver of Conditions*

The conditions to Confirmation and to Consummation set forth in Article IX of the Plan may be waived only by the Person whom is entitled to satisfaction of such condition, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

KE 27455051

(iii)     *Effect of Failure of Conditions*

If the Consummation of the Plan does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will:  (a) constitute a waiver or release of any claims or Causes of Action by the Debtors, any Holders, or any other Entity; (b) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

**F.        Settlement, Release, Injunction and Related Provision**

(i)     *Compromise and Settlement of Claims, Interests and Controversies*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan will constitute a good faith compromise of substantially all Claims, Interests, and controversies relating to the contractual, legal, and equitable rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders, and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors or the Litigation Trust, as applicable, may compromise and settle claims against them and Causes of Action held by them against other Entities.

(ii)     *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument or other agreement or document created pursuant to the Plan, the distributions, rights and treatment that are provided in the Plan will be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan.  Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases will be deemed cured on the Effective Date.  The Confirmation Order will be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

(iii)     *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates will be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests will revert to the Reorganized Debtors.  In addition, the Bridge Loan Agent, at the request and expense of the Reorganized Debtors,

KE 27455051

will execute and deliver all documents reasonably required to evidence the release of such mortgages, deeds of trust, Liens, pledges and other security interests and will authorize the Reorganized Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.

        *(iv)*    **Releases by the Debtors**

        **Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date of the Plan, the Released Parties are hereby expressly, unconditionally, irrevocably, generally, and individually and collectively released, acquitted, and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all actions, claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, by statute or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or each of their respective Affiliates (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, ever had, now has, or hereafter can, will, or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Transactions, the Disclosure Statement or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event, or other occurrence relating to the Debtors, taking place on or before the Confirmation Date of the Plan, including any Released Claims, other than with respect to each Released Party, Claims or liabilities arising out of or relating to any act or omission of such Released Party unknown to the Debtors as of the Petition Date that constitutes gross negligence, willful misconduct or fraud, in each case as determined by Final Order of a court of competent jurisdiction; *provided, however*, that notwithstanding anything herein to the contrary, none of the Potential Defendants and Witnesses, set forth on <u>Exhibit C</u>, shall be a Released Party or receive or be deemed to receive a release under the Plan or the Confirmation Order.**

        *(v)*    **Releases by the Releasing Parties**

        **As of the Effective Date of the Plan, to the fullest extent permitted by applicable law, each of the Releasing Parties will be deemed to have expressly, unconditionally, irrevocably, generally and individually and collectively, released, acquitted and discharged the Debtors, the Reorganized Debtors and the Released Parties from any and all actions, claims, interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract or tort, by statute or otherwise, that such Releasing Party (whether individually or collectively) ever had, now has, or hereafter can, will, or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Restructuring Transactions, the Disclosure Statement, or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event, or other occurrence relating to the Debtors, taking place on or before the Confirmation Date of the Plan, including any Released Claims, other than with respect to each party released herein, Claims or liabilities arising out of or relating to any act or omission of such Released Party unknown to the Releasing Party as of the Petition Date that constitutes gross negligence, willful misconduct, or fraud, in each case, as determined by Final Order of a court of competent jurisdiction; *provided, however*, that notwithstanding anything herein to the**

49

contrary, none of the Potential Defendants and Witnesses, set forth on **Exhibit C**, shall be a Released Party or receive or be deemed to receive a release under the Plan or the Confirmation Order.

> ### (vi)    *Liabilities to, and Rights of, Governmental Units*

Nothing in the Plan or Confirmation Order will discharge, release or preclude:  (a) any liability to a Governmental Unit that is not a Claim; (b) any Claim of a Governmental Unit arising on or after the Confirmation Date; (c) any liability to a Governmental Unit on the part of any Person or Entity other than the Debtors or Reorganized Debtors; (d) any valid right of setoff or recoupment by a Governmental Unit; or (e) any criminal liability.  Nothing in the Plan or Confirmation Order will enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence.  The discharge and injunction provisions contained in the Plan and Confirmation Order are not intended and will not be construed to bar any Governmental Unit from, after the Confirmation Date, pursuing any police or regulatory action.

> ### (vii)    *Exculpation*

Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any (i) Exculpated Claim and (ii) any obligation, Cause of Action, or liability for any Exculpated Claim, except for those that result from any such act or omission that is determined in a Final Order to have constituted fraud, gross negligence, or willful misconduct, but in all respects such Entities will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan; provided, however, that the foregoing "Exculpation" will have no effect on the liability of any Entity for acts or omissions occurring after the Effective Date.

> ### (viii)    *Injunction*

FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN ARTICLE VIII OF THE PLAN, THE RELEASING PARTIES WILL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION, OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO ARTICLE  VIII OF THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.D OR ARTICLE VIII.E, DISCHARGED PURSUANT TO ARTICLE VIII.B OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.G OF THE PLAN ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS:    (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (B) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (C) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (D) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

KE 27455051

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS THEREUNDER WILL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES.  ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS WILL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS WILL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS WILL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS WILL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO WILL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL ENTITIES WILL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, OR THE LITIGATION TRUST, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS, OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

FOR THE AVOIDANCE OF DOUBT, ALL CLAIMS AGAINST THE POTENTIAL DEFENDENTS AND WITNESSES, SET FORTH ON **EXHIBIT C**, INCLUDING WITHOUT LIMITATION THE CONTRIBUTED CLAIMS AND CLAIMS ARISING FROM THE FACTS AND CIRCUMSTANCES SET FORTH IN **EXHIBIT G**, WILL NOT BE RELEASED OR DISCHARGED UNDER THE PLAN OR CONFIRMATION ORDER, BUT WILL BE PRESERVED IN ACCORDANCE WITH THE PLAN AND MAY BE PURSUED AND LITIGATED BY THE LITIGATION TRUST.  NO PERSON MAY RELY ON THE ABSENCE OF A SPECIFIC REFERENCE IN THE PLAN, THE CONFIRMATION ORDER, THE LITIGATION TRUST AGREEMENT OR THIS DISCLOSURE STATEMENT TO ANY CONTRIBUTED CLAIMS AGAINST SUCH PERSON AS ANY INDICATION THAT THE LITIGATION TRUST WILL NOT PURSUE ANY AND ALL AVAILABLE CONTRIBUTED CLAIMS AGAINST SUCH PERSON.  UNLESS ANY CONTRIBUTED CLAIMS AGAINST A PERSON ARE EXPRESSLY WAIVED, RELINQUISHED, EXCULPATED, RELEASED, COMPROMISED, OR SETTLED IN THE PLAN, THE CONFIRMATION ORDER OR A BANKRUPTCY COURT ORDER, ALL CONTRIBUTED CLAIMS ARE EXPRESSLY RESERVED BY AND FOR THE LITIGATION TRUST, FOR LATER ADJUDICATION, AND, THEREFORE, NO PRECLUSION DOCTRINE, INCLUDING THE DOCTRINES OF RES JUDICATA, COLLATERAL ESTOPPEL, ISSUE PRECLUSION, CLAIM PRECLUSION, ESTOPPEL (JUDICIAL, EQUITABLE, OR OTHERWISE) OR LACHES WILL APPLY TO SUCH CONTRIBUTED CLAIMS UPON, AFTER, OR AS A CONSEQUENCE OF THE CONFIRMATION ORDER.  THE OBJECTION TO THE ALLOWANCE OF ANY CLAIMS FILED WITH THE BANKRUPTCY COURT WITH RESPECT TO WHICH THEY DISPUTE LIABILITY, PRIORITY, AND/OR AMOUNT (OR ANY OBJECTIONS, AFFIRMATIVE DEFENSES AND/OR COUNTERCLAIMS, WHETHER OR NOT LITIGATED TO FINAL ORDER) SHALL NOT IN ANY WAY LIMIT THE ABILITY OR THE RIGHT OF THE LITIGATION TRUST TO ASSERT, COMMENCE OR PROSECUTE ANY CONTRIBUTED CLAIMS. NOTHING CONTAINED IN THE PLAN, THE CONFIRMATION ORDER, THE LITIGATION TRUST AGREEMENT OR THIS DISCLOSURE STATEMENT WILL BE DEEMED TO BE A WAIVER, RELEASE, OR RELINQUISHMENT OF ANY CONTRIBUTED CLAIMS, WHICH THE CONTRIBUTING CLAIMANTS HAD IMMEDIATELY PRIOR TO THE EFFECTIVE DATE.  THE LITIGATION TRUST SHALL HAVE, RETAIN, RESERVE, AND BE ENTITLED TO ASSERT ALL SUCH CONTRIBUTED CLAIMS FULLY AS IF THE CONTRIBUTED CLAIMS HAD NOT BEEN TRANSFERRED TO THE LITIGATION TRUST IN ACCORDANCE WITH THE PLAN, THE CONFIRMATION ORDER AND THE LITIGATION TRUST AGREEMENT.

### (ix)    *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), will remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order will remain in full force and effect in accordance with their terms.

## VII.    THE LITIGATION TRUST

The Plan proposes to establish and fund a Litigation Trust for the benefit of the Litigation Trust Beneficiaries on the Effective Date.  The Plan and the Litigation Trust Agreement will govern the management and administration of the Litigation Trust and the respective rights, powers, and obligations of the Litigation Trustees and the Litigation Trust Beneficiaries. The Litigation Trust Agreement will be binding on all Litigation Trust Beneficiaries who will be deemed to have executed the Litigation Trust Agreement as of the Effective Date.

### A.    Contributed Claims Transferred and Assigned to the Litigation Trust

On the Effective Date, any Contributed Claims against the Potential Defendants and Witnesses related in any way to the Debtors, their predecessors, their respective affiliates and/or (a) through (e) below will be absolutely transferred and assigned to the Litigation Trust, including without limitation:  (a) all claims and Causes of Action against any party based on, arising out of, or relating to the 2012 Transaction, including without limitation any claims or Causes of Action for unlawful dividend, fraudulent conveyance or avoidance claims under state or federal law, including the Bankruptcy Code, (b) all claims and Causes of Action based on, arising out of, or related to the issuance of any Security of the Debtors,  (c) all claims and Causes of Action based on, arising out of, or related to the restatement, adjustment, correction, or modification of the Debtors' financial statements, including without limitation all claims or Causes of Action based on, arising out of, or relating to (i) the Debtors' internal controls relating to financial statements and financial reporting; and (ii) materially misleading financial statements provided to the Contributing Claimants  in connection with the 2012 Transaction, (d) all claims and Causes of Action based on, arising out of, or related to the misrepresentation of any of the Debtors' financial information and related internal controls, including without limitation the overstatement of the Debtors' revenue, accounts receivable, and/or EBITDA, (e) all claims and Causes of Action based on, arising out of, or related to any failure to disclose, or actual or attempted cover up or obfuscation of any of the conduct described in this Disclosure Statement (including on Exhibit G hereto) and/or (a)-(d) above, and (f) any other potential claims, causes of action, charges, suits or rights of recovery under state, federal, or other applicable law.  The Contributed Claims that may be asserted against the Potential Defendants and Witnesses with respect to the foregoing include all claims or Causes of Action arising under state and/or federal law, such as (but not limited to) claims arising under title 11 of the U.S. Code and applicable law, including without limitation sections 502(d), 510, 542 through 551, and 553 of title 11 and any similar state laws, violations of state and/or federal securities laws, breach of contract, breach of fiduciary duty (including aiding and abetting any such breach), and common law claims such as quantum meruit and unjust enrichment.  *See* **Exhibit G** and **Exhibit C** of this Disclosure Statement for a non-exclusive list of (i) potential claims and Causes of Action, which are expressly identified and preserved by the Debtors for possible prosecution and assigned to the Litigation Trust by the Contributing Claimants, and (ii) Persons and Entities whom such potential claims and Causes of Action may be asserted against.

For the avoidance of doubt, (a) the Contributed Claims shall not include the rights of any of the Contributing Claimants or Released Parties to receive the distributions, if any, to which they are entitled under this Plan and the Confirmation Order and (b) the Contributed Claims shall not include any actions, Causes of Action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims, and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity, or otherwise, against any of the Released Parties.  For the avoidance of doubt, in the exercise of their reasonable discretion and in accordance with the Litigation Trust Agreement, the Trustees shall not be obligated to pursue all Contributed Claims.

In accordance with section 1123(b) of the Bankruptcy Code, with respect to the Contributed Claims of the Debtors, which are assigned and contributed to the Litigation Trust under the Plan, and Non-Subordinated

Contribution and Reimbursement Claims, if any, which, to the extent they are Allowed, are assumed by the Litigation Trust, the Litigation Trust will retain and may enforce all of the Debtors' rights to commence and pursue, as appropriate, any and all such Causes of Action, whether arising before or after the Petition Date, including any such actions specifically enumerated in the Disclosure Statement or the Plan Supplement, and the Litigation Trust's rights to commence, prosecute, or settle such Causes of Action will be preserved notwithstanding the occurrence of the Effective Date.  The Litigation Trust may pursue such Causes of Action, as appropriate, in accordance with the Litigation Trust Agreement.  No Person or Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Litigation Trust will not pursue any and all available Causes of Action against them.  The Litigation Trust expressly reserves all rights to prosecute any and all such Causes of Action against any Person or Entity, except as otherwise expressly provided in the Plan.  For the avoidance of doubt, the preservation of the Causes of Action described in this paragraph includes, but is not limited to, the Litigation Trust's right to object to Non-Subordinated Contribution and Reimbursement Claims, if any.

Notwithstanding anything to the contrary set forth in the Confirmation Order, the Plan, or the Disclosure Statement, (a) all claims and Causes of Action (whether or not described in the Plan or Disclosure Statement) held by Consenting Shareholders and Consenting Noteholders are specifically preserved as against all Persons and Entities (whether or not such Persons and Entities are identified on the list of Potential Defendants and Witnesses or otherwise) other than Released Parties, and (b) the Litigation Trust may, but is not required to, pursue any and all claims and/or Causes of Action that are contributed to the Litigation Trust (whether or not described in the Plan or this Disclosure Statement) as against all Persons or Entities (whether or not such Persons and Entities are identified on the list of Potential Defendants and Witnesses set forth on Exhibit C to this Disclosure Statement or otherwise) other than Released Parties.

## B.    Opt-In and Net Proceeds of the Litigation Trust

Net proceeds from the Litigation Trust (after deduction for all costs and expenses of the Litigation Trust (other than the initial funding of $4,500,000) and the satisfaction, to the extent applicable, of any Allowed Non-Subordinated Contribution and Reimbursement Claims and Trust Indemnification Claims) will be distributed as follows:  (1) 50% to the Consenting Shareholders; and (2) 50% to the Holders of the Senior Notes, (with a Holder's share of the 50% based on whether such Holder opts-in to the settlement and thereby assigns and transfers its Contributed Claims to the Litigation Trust, as described below).  Upon the Effective Date, there will be 10,000 units allocated to the Litigation Trust Beneficiaries and will be distributed as follows:

- 5,000 units to the Consenting Shareholders with each Consenting Shareholder's respective share of the 5,000 units being determined by dividing the number of shares held by such Consenting Shareholder by the total number of shares held by all Consenting Shareholders (*i.e.*, if the Consenting Shareholders collectively hold 250 shares and a particular Consenting Shareholder holds 50 shares, that Consenting Shareholder would receive 50/250 x 5,000 = 1,000 units); and

- 5,000 units to the Holders of Senior Notes as of the Distribution Record Date with each Holder's respective share of the 5,000 units being determined as follows (rounded to one decimal):

  (1)    The denominator of the fraction applied to each Holder of Senior Notes will be equal to the sum of (x) total outstanding principal of Senior Notes, *i.e.*, $210,000,000, plus (y) the total principal amount of the Senior Notes with respect to which Contributed Claims are transferred to the Litigation Trust;

  (2)    The numerator of the fraction applied to each Holder of Senior Notes will be equal to the sum of (x) the principal amount of Senior Notes held by such Holder, plus (y) the total principal amount of the Senior Notes with respect to which Contributed Claims are transferred by such Holder to the Litigation Trust;

  (3)    The fraction thus derived will be multiplied by 5,000 units.

To illustrate, if holders of $150,000,000 in principal amount of the Senior Notes contribute Contributed Claims to the Litigation Trust, the preceding denominator would be 360,000,000. If an individual holder had

53

$6,000,000 principal amount of Senior Notes and contributed its Contributed Claims to the Litigation Trust, the relevant numerator would be $12,000,000 and such holder would receive 12/360 x 5,000 = 166.7 units in the Litigation Trust.

Subsequent to the Effective Date, units in the Litigation Trust may be further adjusted as specifically set forth in the Litigation Trust Agreement.

The share of the Senior Notes Litigation Trust Recovery allocated to the Holder of an Allowed Senior Notes Claim will be based on whether a Holder elects to opt-in to the settlement described in Article IV.C of the Plan and contributes its Contributed Claims to the Litigation Trust.  To opt-in to the settlement, a Holder of an Allowed Senior Notes Claim must agree, by electing on its Ballot, to (i) become a Releasing Party and (ii) assign its Contributed Claims to the Litigation Trust.  By electing to opt-in to the settlement on its Ballot, the Holder of an Allowed Senior Notes Claim agrees that, subject to the occurrence of the Effective Date and the formation of the Litigation Trust, it will be deemed, without any further action, (i) to have assigned its Contributed Claims to the Litigation Trust and (ii) to have agreed to execute any documents reasonably requested to effectuate the foregoing.  The Litigation Trust Agreement will be binding on all Holders of Senior Notes Claims and all Holders of Senior Notes Claims will be deemed to have executed the Litigation Trust Agreement as of the Effective Date.

C.      **Establishment of the Litigation Trust and the Litigation Trust Agreement**

On the Effective Date, the Litigation Trust will be established and become effective for the benefit of the Litigation Trust Beneficiaries.  The powers, authority, responsibilities, and duties of the Litigation Trust and the Litigation Trustees are set forth in and will be governed by the Litigation Trust Agreement.  The Litigation Trust Agreement will be in the form of **Exhibit F** of this Disclosure Statement.  The Litigation Trust and the Litigation Trustees will be bound by the Plan.

Upon the transfer by the Debtors and their Estates of the Contributed Claims held by them to the Litigation Trust, the Debtors or the Reorganized Debtors, as applicable, will have no reversionary or further interest in or with respect to the Assets of the Litigation Trust or the Litigation Trust.  For all federal income tax purposes, the Litigation Trust Beneficiaries will be treated as grantors and owners thereof and it is intended that the Litigation Trust be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations and that such trust is intended to qualify as a "grantor trust" owned by the Litigation Trust Beneficiaries.  For federal income tax purposes, it is intended that (a) the transfer of the Debtors' Contributed Claims to the Litigation Trust be treated as (i) a transfer of the Contributed Claims possessed by the Debtors to the Noteholders as partial payment of their claims under the Plan followed by (ii) the transfer by such Noteholders to the Litigation Trust of such Contributed Claims, (b) the transfer of the Consenting Noteholders' and Consenting Shareholders' Contributed Claims to the Litigation Trust be treated as contributions of such Contributed Claims to the Litigation Trust by the applicable transferor, (c) the Initial Funding (as defined herein) from the Debtors be treated as (x) a transfer of such portion of the Initial Funding from the Debtors to the Noteholders followed by (y) the contribution of such portion of the Initial Funding to the Litigation Trust from the Noteholders and (d) the Initial Funding from the Consenting Shareholders be treated as a contribution to the Litigation Trust from the Consenting Shareholders.  The Litigation Trustees may litigate and liquidate the Contributed Claims and will make distributions to the Litigation Trust Beneficiaries in accordance with the terms of the Litigation Trust Agreement.  The Litigation Trust will not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the Litigation Trust Agreement.

On the Effective Date, the Reorganized Debtors will execute the Litigation Trust Agreement and will take all other steps necessary to establish the Litigation Trust pursuant to the Litigation Trust Agreement and consistent with the Plan.  On the Effective Date, and in accordance with and pursuant to the terms of the Plan, the Reorganized Debtors will transfer, assign and deliver to the Litigation Trust all of their rights, title and interests in all of the Assets of the Litigation Trust, notwithstanding any prohibition of assignability under non-bankruptcy law.  In connection with the transfer of such assets, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Litigation Trust will vest in the Litigation Trust and its representatives, and the Debtors and the Litigation Trust are authorized to take all necessary actions to effectuate the transfer of such privileges.  The Litigation Trust will agree to accept and hold the Assets of the Litigation Trust in the Litigation Trust for the benefit of the Litigation Trust Beneficiaries,

54

subject to the terms of the Plan and the Litigation Trust Agreement. All parties (including the Debtors, the Litigation Trustees and the Litigation Trust Beneficiaries) will execute any documents or other instruments as necessary to cause title to the Assets of the Litigation Trust to be transferred to the Litigation Trust.

### D.        Appointment of the Litigation Trustees

On the Effective Date and in accordance with the provisions of the Plan and the Litigation Trust Agreement, three Litigation Trustees will be appointed. One of the trustees will be appointed by (and may be replaced by) the Consenting Noteholders, one of the trustees will be appointed by (and may be replaced by) the Consenting Shareholders, and one of the trustees will be an independent member appointed (or replaced) by mutual agreement of the Consenting Noteholders and Consenting Shareholders. The Litigation Trustees will govern the Litigation Trust in accordance with the Litigation Trust Agreement.

### E.        Prosecution of the Assets of the Litigation Trust

The claims contributed to the Litigation Trust may only be prosecuted or settled by the Litigation Trustees. The Reorganized Debtors may not prosecute or settle any claims contributed to the Litigation Trust.

The Litigation Trustees will be authorized to act on behalf of the Litigation Trust, including with respect to retaining counsel and controlling the prosecution and/or abandonment of the assets of the Litigation Trust without further consent of any other person, including, without limitation, the Reorganized Debtors and the Litigation Trust Beneficiaries, except as otherwise set forth in the Litigation Trust Agreement.

The settlement of any claims contributed to the Litigation Trust requires the majority vote of the Litigation Trustees. The Reorganized Debtors will reasonably cooperate with the Trustees and counsel to the Litigation Trust in the prosecution and defense of claims involving the Litigation Trust.

### F.        Powers of and Distributions by Litigation Trustees

The Litigation Trustees will be empowered to, as applicable: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan and the Litigation Trust Agreement; (b) make all distributions contemplated under the Plan and the Litigation Trust Agreement; (c) employ professionals or personnel to assist it with respect to such distributions without further order from the Bankruptcy Court and (d) exercise such other powers as may be vested in the Litigation Trustees by order of the Bankruptcy Court, pursuant to the Plan, or under the Litigation Trust Agreement.

The Litigation Trustees will make distributions to the Litigation Trust Beneficiaries in accordance with the terms of the Litigation Trust Agreement.

### G.        Proceeds of the Litigation Trust

Net proceeds from the Litigation Trust (after deduction for all costs and expenses of such trust (other than the initial funding of $4,500,000) and the satisfaction, to the extent applicable, of any Allowed Non-Subordinated Contribution and Reimbursement Claims and Trust Indemnification Claims) will be distributed as follows: (1) 50% to the Consenting Shareholders; and (2) 50% to the Holders of Senior Notes as of the Distribution Record Date, in the manner set forth in the Plan.

As further described in section VIII.B of this Disclosure Statement, Holders of Senior Notes will be entitled to an increased share of the 50% of the Litigation Trust by electing in their Ballots to transfer their Contributions Claims to the Litigation Trust.

### H.        Consenting Shareholders Expenses

As partial consideration for contributing their Contributed Claims to the Litigation Trust, the legal fees and expenses of the Consenting Shareholders relating to the restructuring and the Chapter 11 Cases paid to outside counsel up to a maximum of $250,000 will be paid in full by the Debtors on the Effective Date.

KE 27455051

I.      **Funding of the Litigation Trust**

(a)      The Litigation Trust shall be funded with (i) $2,250,000 from the Debtors on behalf of the Noteholders, subject to credits as set forth in clause (b) below, on the Effective Date, (ii) $2,250,000 from the Consenting Shareholders on the Effective Date ((i) and (ii), the "Initial Funding"), and (iii) the Contributed Claims on the Effective Date ((i), (ii), and (iii) collectively, the "Initial Trust Assets").  For the avoidance of doubt, the Initial Funding and any Additional Funding (defined below) shall not be reimbursed by the Litigation Trust (except in connection with the final distribution), shall not be available to any creditors of the Litigation Trust, and can only be used to pay the out-of-pocket costs of investigating and prosecuting the Trust Causes of Action, including without limitation the fees and expenses of expert witnesses, travel costs, copying and mailing costs, and any other incidental costs.

(b)      The Debtors shall be entitled to a credit, with respect to the amounts to be funded by the Debtors pursuant to clause (a)(i) above, for amounts actually paid by the Debtors on or prior to the Effective Date to proposed counsel to the Litigation Trust for fees and expenses incurred on or after September 9, 2013, in an amount of up to $250,000, plus any further amounts approved by the Consenting Noteholders in their sole and absolute discretion.  For the avoidance of doubt, the $2,250,000 to be funded by the Consenting Shareholders to the Litigation Trust pursuant to clause (a)(ii) above shall not be paid or reimbursed by the Debtors on the Effective Date or otherwise.

(c)      In the event that the Trustees reasonably determine that additional funding ("Additional Funding") of the Litigation Trust beyond the Initial Trust Assets is required, the Trustees may seek Additional Funding only from the Litigation Trust Beneficiaries by providing thirty (30) days' written notice to all Litigation Trust Beneficiaries, which Additional Funding shall be provided by any or all Litigation Trust Beneficiaries in their sole and absolute discretion; provided that no Additional Funding shall be offered or funded during the first twelve-month period after the creation of the Litigation Trust.  The Additional Funding shall be offered to all Litigation Trust Beneficiaries pro rata based on the respective number of Beneficial Interests each Beneficiary has as a percentage of the total Beneficial Interests outstanding at such time (as used in this paragraph, "Pro Rata"), and thereafter those who fund their Pro Rata share of the Additional Funding shall be offered a Pro Rata share of any amounts of the Additional Funding initially offered to the Litigation Trust Beneficiaries who do not choose to fund their Pro Rata share of the Additional Funding, successively until the Additional Funding is funded.  However funded, whether or not Pro Rata, those Litigation Trust Beneficiaries who fund the Additional Funding shall be entitled to one hundred (100) additional Beneficial Interests for each $100,000 contributed (with amounts not exactly equal to a multiple of $100,000 denominated as a proportionate additional fraction of one hundred (100) Beneficial Interests, rounded to one decimal).  For the avoidance of doubt, there are no mandatory contributions to the Litigation Trust, and all Additional Funding shall be made (or not made) in each Litigation Trust Beneficiary's sole and absolute discretion.

J.      **Litigation Trust Counsel**

Proposed counsel to the Litigation Trust will continue to be retained and paid by the Company and Holdings, with an additional budget of $250,000 for fees and expenses from September 9, 2013 through the Effective Date, to be paid by the Company.  Both the additional budget of $250,000, plus any further amounts approved by the Consenting Noteholders, in their sole and absolute discretion, and paid by the Company for the fees and expenses of proposed counsel to the Litigation Trust during the Chapter 11 Cases will reduce, on a dollar for dollar basis, the amount to be funded by the Company to the Litigation Trust at closing, as provided in section VII.I above.  Promptly following the Petition Date and through the Effective Date, the Debtors will retain proposed counsel to the Litigation Trust as special counsel, and will pay the reasonable and documented fees and expenses of special counsel to the extent necessary to allow special counsel to continue the investigation and prepare for litigation of the Contributed Claims, consistent with this paragraph.

VIII.      **ANTICIPATED EVENTS OF THE CHAPTER 11 CASES**

In order to facilitate the Chapter 11 Cases and minimize disruption to the Debtors' operations, the Debtors will seek certain relief, including but not limited to, the relief summarized below.  The relief sought will facilitate

the administration of the Chapter 11 Cases, however, there is no guarantee that the Bankruptcy Court will grant any or all of the requested relief.

A.      **Voluntary Petitions**

The following entities of the Debtors will File chapter 11 bankruptcy petitions on the Petition Date commencing the Chapter 11 Cases: (a) Holdings; (b) Actra Rehabilitation Associates, Inc.; (c) Alexandria Sports; Inc.; (d) Benchmark Acquisition Corp.; (e) Benchmark Medical Management Company; (f) Benchmark O&P Holdings, Inc.; (g) Benchmark Orthotics & Prosthetics, Inc.; (h) Blue Hen Physical Therapy, Inc.; (i) Cape Prosthetics-Orthotics, Inc.; (j) Carrollton Physical Therapy Clinic, Inc.; (k) Integrity Physical Therapy, Inc.; (l) Keystone Rehabilitation Associates of Warren; (m) Keystone Rehabilitation Systems, Inc.; (n) Keystone Rehabilitation Systems of McMurray (6304); (o) Leesburg Sports, Inc.; (p) MATRIX Healthcare Services, LLC; (q) MATRIX Rehabilitation, Inc.; (r) MATRIX Rehabilitation-Delaware, Inc.; (s) MATRIX Rehabilitation-Georgia, Inc.; (t) MATRIX Rehabilitation-Ohio, Inc.; (u) MATRIX Rehabilitation-South Carolina, Inc.; (v) MATRIX Rehabilitation-Texas, Inc.; (w) Morris Area Rehabilitation Association, Inc.; (x) North Dallas Physical Therapy Associates, Inc.; (y) Northstar Health Services, Inc.; (z) NSHS Services, Inc.; (aa) Orthopaedic Services of Paducah, Inc.; (bb) PhysioLink Corporation; (cc) PAH; (dd) Physiotherapy Associates-Union Rehab, LLC; (ee) Physiotherapy Associates, Inc.; (ff) Physiotherapy Corporation; (gg) Physiotherapy-BMHI Holdings, Inc.; (hh) Physiotherapy-BMI, Inc.; (ii) Potomac Rehabilitation Services, Inc.; (jj) Professional Rehab Associates, Inc.; (kk) Progressive Therapy Services, Inc.; (ll) R.S. Network, Inc.; (mm) Rehab Associates, LLC; (nn) Rehab Colorado, LLC; (oo) Rehab Missouri, LLC; (pp) Rehab Xcel, LLC; (qq) Rehabilitation Consultants, Inc.; (rr) SMR Banyan Tree, Inc.; (ss) Swanson Orthotic & Prosthetic Center, Inc.; (tt) The Parks Physical Therapy and Work Hardening Center, Inc.; (uu) Theraphysics Partners of Colorado, Inc.; (vv) Theraphysics Partners of Texas, Inc.; (ww) Therapy Associates of Martinsville, Inc.; (xx) Trumbull P.T. Corp.; and (yy) Wisconsin Prosthetics and Orthotics, Inc.

B.      **Expected Timetable of the Chapter 11 Cases**

The Debtors expect the Chapter 11 Cases to proceed quickly and will use commercially reasonable efforts to confirm and consummate the Plan within 45 to 60 days from the Petition Date.

The Debtors cannot assure you, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors. On the Petition Date, the Debtors will promptly request the Bankruptcy Court to set a hearing date to approve this Disclosure Statement and to confirm the Plan by no later than December 17, 2013. If the Plan is confirmed, the Effective Date of the Plan is projected to be as soon as practicable after the date the Bankruptcy Court enters the Confirmation Order and the other conditions to consummation of the Plan set forth in Article IX.A and Article IX.B of the Plan are satisfied or waived (to the extent permitted under the Plan and applicable law). Should these projected timelines prove accurate, the Debtors could emerge from protection under chapter 11 within approximately 45 to 60 days of the Petition Date.

C.      **First Day Relief**

The Debtors intend to present certain motions (the "First Day Motions") to the Bankruptcy Court on the Petition Date seeking relief. The First Day Motions may include, but are not necessarily limited to, the following:

(i)      ***Approval of Solicitation Procedures and Scheduling of Confirmation Hearing***

To expedite the Chapter 11 Cases, the Debtors intend to seek an immediate order setting dates for a combined hearing to (a) approve the adequacy of the Disclosure Statement, (b) approve the procedures for the Solicitation and (c) confirm the Plan. The Debtors will seek the earliest possible date permitted by the applicable rules and the Bankruptcy Court's calendar for such hearing.

(ii)      ***Patient Overpayment Refund Motion***

The Debtors will seek authority to (a) maintain and administer their patient refund program, (b) make payments to patients and honor accrued prepetition obligations under the patient refund program and (c) continue, replace, modify or terminate the patient refund program in the ordinary course of business. Absent the relief

requested in this motion, the Debtors' ability to operate could be threatened.  If the Debtors do not honor their obligations with respect to their patient refund program, they risk falling out of compliance with various state law regulations, as well as alienating patients and eroding the Debtor's hard-earned reputation and brand loyalty.

### (iii)    *Cash Management System*

This motion seeks authority for the Debtors to maintain its prepetition Cash management systems after commencement of the Chapter 11 Cases, including Intercompany transfers and use of the Company's bank accounts. The Debtors will also seek to accord administrative priority status to claims with respect to any Intercompany transactions.  This will facilitate the efficient operation of the Debtors by not requiring them to make artificial adjustments within their complex Cash management system.

### (iv)    *Wages*

The Debtors will seek authority to pay all employees their wage Claims in the ordinary course of business. Additionally, the Debtors intend to continue all their prepetition benefit programs, including, among others, the medical, dental, 401(k), and severance plans to the extent applicable.  This relief will allow the Debtors to maintain employee morale and prevent costly distractions and retention issues.

### (v)    *Insurance*

The Debtors will seek authority to pay certain liability, property, and other insurance in the ordinary course of business and maintain financing of certain of their insurance premiums.  Failure to maintain and renew certain of these policies could result in personal liability on the Debtors' officers if they are not paid.  Thus, in order to prevent costly distractions to key management employees, the Debtors will seek authority to pay those insurance premiums in the ordinary course of business.

### (vi)    *Taxes*

The Debtors will seek authority to pay certain sales, use, franchise, and other taxes in the ordinary course of business.  Certain of these taxes impose personal liability on the Debtors' officers if they are not paid.  Thus, in order to prevent costly distractions to key management employees, the Debtors will seek authority to pay those taxes in the ordinary course of business.

### (vii)    *Trade Vendors and Other Unsecured Creditors*

The Debtors will seek an order from the Bankruptcy Court authorizing the payment of certain Claims of vendors and certain other unsecured creditors, including certain Claims that arose prior to our bankruptcy filing, as they become due in the ordinary course of business, subject to the continuation of ordinary trade terms.

### (viii)    *Utilities*

The Debtors will seek an order from the Bankruptcy Court (a) determining that the Debtors' utility providers are adequately protected, (b) approving the Debtors' proposed adequate assurance, (c) prohibiting utility providers from altering, refusing, or discontinuing services and (d) determining that the Debtors are not required to provide any additional adequate assurance pending entry of a final order.  The Debtors believe that uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of the Debtors' reorganization.

### (ix)    *Equity Trading Motion*

The Debtors will seek an order from the Bankruptcy Court (a) authorizing the Debtors to establish notification and hearing procedures regarding the transfers of, or declarations of worthlessness for federal or state tax purposes, with respect to common stock in Holdings or of any beneficial interest therein, (b) requiring compliance with such procedures before trades or transfers of such securities or declarations of worthlessness become effective and (c) ordering that any transfer or declaration of worthlessness with respect to the common stock

in violation of the proposed notification and hearing procedures will be void *ab initio*.  The Debtors believe that this relief will protect and preserve the Debtors' valuable tax attributes, ultimately benefitting all stakeholders.

> ### *(x)*    *Other Procedural Motions and Professional Retention Applications*

The Debtors also plan to File several procedural motions that are standard in Chapter 11 Cases, as well as applications to retain the various Professionals who will be assisting the Debtors during these Chapter 11 Cases.

## D.    The Exit Facility

The Debtors intend to obtain an exit financing facility to (i) permit repayment in full of all Allowed Bridge Loan Credit Agreement Claims (including principal, interest, and reasonable fees, costs, charges and other expenses provided for under the Bridge Loan Credit Agreement) of Holders of Allowed Bridge Loan Agreement Claims who elect to be paid in full in Cash on the Effective Date; (ii) make the other required Effective Date payments under the Plan; and (iii) provide the Reorganized Debtors with working capital necessary to run their businesses and to fund certain capital expenditures (in accordance with the Exit Facility).  The terms and conditions of the Exit Facility are reflected in the Exit Facility Commitment Letter attached hereto as **Exhibit B**.

## IX.    PROJECTED FINANCIAL INFORMATION

As further discussed in Article XI.C of this Disclosure Statement, the Debtors believe the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, except with respect to Holdings, where Article IV.W of the Plan provides that Holdings will be dissolved on the Effective Date (in accordance with Section 1129(a)(11)).  In connection with developing the Plan, and for purposes of determining whether the Plan satisfies feasibility standards, the Debtors' management has developed the Financial Projections.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws.  Statements concerning these and other matters are not guarantees of the Debtors' future performance.  Such forward-looking statements represent the Debtors' estimates and assumptions only as of the date such statements were made and involve known and unknown risks, uncertainties, and other unknown factors that could impact the Debtors' restructuring plans or cause the actual results of the Debtors to be materially different from the historical results or from any future results expressed or implied by such forward-looking statements.  In addition to statements which explicitly describe such risks and uncertainties, readers are urged to consider statements labeled with the terms "believes," "belief," "expects," "intends," "anticipates," "plans," or similar terms to be uncertain and forward-looking.  There can be no assurance that the restructuring transaction described in the Disclosure Statement will be consummated.  Creditors and other interested parties should see the section entitled "Risk Factors" of the Disclosure Statement for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.  The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the pendency of the Chapter 11 Cases;
- the Debtors' expected future financial position, liquidity, results of operations, profitability, and cash flows;
- projected dividends;
- financing plans;
- competitive position;
- business strategy;
- budgets;
- projected cost reductions;
- projected and estimated liability costs;
- results of litigation;
- disruption of operations;
- plans and objectives of management for future operations;
- contractual obligations;
- off-balance sheet arrangements;
- growth opportunities for existing services;
- projected price increases;
- projected general market conditions;
- benefits from new technology; and
- effect of changes in accounting due to recently issued accounting standards.

KE 27455051

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement and the Plan.

Creditors and other interested parties should see the section entitled "Risk Factors" of this Disclosure Statement for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

## X.    RISK FACTORS

There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project and the Debtors undertake no obligation to update any such statement.  These risks, uncertainties and factors include:

- the Debtors' ability to develop, confirm and consummate the Plan;

- the Debtors' ability to reduce their overall financial leverage and the risks associated with operating businesses in the Chapter 11 Cases;

- the applicable Debtors' ability to comply with the terms of the Exit Facility;

- customer response to the Chapter 11 Cases;

- inability to have Claims discharged/settled during the Chapter 11 Cases;

- general economic, business and market conditions;

- interest rate fluctuations;

- exposure to litigation, including with respect to potential Subordinated Claims;

- the Debtors' insurance coverage, which may not be available or sufficient to cover losses that the Debtors could suffer;

- intellectual property claims;

- a long and protracted restructuring could adversely impact our management and otherwise adversely affect the Debtors business;

- Debtors may not be able to settle certain creditor claims for the amounts or the consideration that we anticipate;

- Debtors' operating history may not be sufficient for investors to evaluate the Company's business and prospects;

- any future effects as a result of the pendency of the Chapter 11 Cases;

- Debtors' expected future financial position, liquidity, results of operations, profitability, and

- Debtors may incur significant costs and liabilities

- changes in reimbursement rates provided by Medicare, Medicaid and commercial payors for OR and O&P services;

- the Debtors' ability to generate sufficient revenues or cash flow to meet their operating needs or other obligations;

- financial conditions of the Debtors' customers;

- adverse tax changes;

- limited access to capital resources;

- other uncertainties in starting up new operations at the Company, including, the Debtors' ability to hire and retain qualified employees;

- the Debtors' operational strategy, which differs from that of many existing local competitors;

- the Debtors' ability to extend credit to, and collect receivables from, their credit players;

- intense existing and future competition;

- relationships with customers and suppliers are terminable at will and the loss of any of significant customers or suppliers could have an adverse effect on Debtors' results of operations;

- Debtors are dependent on entering into additional service contracts and/or developing their spot market business to grow their business;

- Debtors may have difficulty managing growth in their business, which could adversely affect their financial condition and results of operations;

- Debtors may be unable to maintain pricing on core services;

- Many of the Debtors' customers' activity levels, spending for the OR and O&P products and services and payment patterns may be impacted by

60

as a result of environmental, health and safety laws and regulations that govern their operations;

- Future legislative and regulatory developments at both the federal and state level could materially increase the Debtors' operating costs and/or adversely affect their competitive position;

- A terrorist attack or armed conflict could harm the Debtors' business;

- Failure to establish and maintain effective internal control over financial reporting;

- Regulatory compliance costs and restrictions could impair the Debtors' business;

- Debtors' dependence on third-party vendors on location while providing services to their customers could result in operational delays and subsequent declines in revenues;

- Debtors may not be able to finance the growth of their OR business, which they expect may require significant amounts of capital, including the acquisition of equipment;

- New technology may cause the Debtors to become less competitive;

- Debtors' future financial results could be adversely impacted by asset impairments or other charges;

- Debtors may be subject to Claims for personal injury and property damage, which could materially adversely affect the Debtors' financial condition and results of operations;

- Other factors, risks and uncertainties detailed from time to time in the Company's previous SEC filings and elsewhere in the Disclosure Statement;

- The Litigation Trust may, but is not required to, pursue any and all claims and/or Causes of Action that are contributed to the Litigation Trust (whether or not described in the Plan or this Disclosure Statement) as against all Persons or Entities (whether or not such Persons and Entities are identified on the list of Potential Defendants and Witnesses set forth on **Exhibit C** to this Disclosure Statement or otherwise) other than Released Parties;

- There are no assurances regarding recoveries to the Litigation Trust Beneficiaries after taking into account the costs of litigation and payment of any Allowed Non-Subordinated Contribution and Reimbursement Claims and Trust Indemnification

deterioration in the credit markets;

- Debtors' ability to access the credit and capital markets on commercially reasonable terms may be adversely affected by factors beyond their control;

- Because the Debtors rely on a limited number of customers and O&P suppliers for their O&P services and operations, a change in the Debtors' O&P supplier relations or a decrease in their O&P customer base may adversely affect their O&P business, financial condition and results of operations;

- Debtors' inability to control the inherent risks of acquiring and integrating businesses in the future could adversely affect their operations;

- Debtors' inability to make satisfactory alternative arrangements in the event of an interruption in supply of certain key materials and equipment, customized orthotics and prosthetics and related products, could harm their business, results of operations and financial condition;

- Debtors may not be successful in implementing technology development and enhancements;

- Debtors depend on the services of key executives and key employees, the loss of whom could materially harm their business;

- Debtors may be unable to employ a sufficient number of skilled and qualified workers;

- Debtors may be adversely impacted by work stoppages or other labor matters;

- Debtors could become subject to product liability Claims, which could be time-consuming and costly to defend;

- Debtors' business involves certain operating risks and the Debtors' insurance may not be adequate to cover all losses or liabilities that the Debtors might incur in their operations; and

- The value realized from the Litigation Trust's pursuit of the claims and Causes of Action set forth in **Exhibit G**, including the Contributed Claims, is speculative, as the probability of achieving successful litigation outcomes, under all contexts and circumstances, is inherently uncertain.

61

Claims being assumed by the Litigation Trust,

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors, they should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.      Risks Relating to Bankruptcy

#### (i)      *Parties in interest may object to the Plan's classification of Claims and Interests.*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### (ii)      *The Debtors may fail to satisfy vote requirements.*

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan.

#### (iii)      *The Debtors may not be able to obtain Confirmation of the Plan.*

With regard to any proposed plan of reorganization, the debtor seeking confirmation of a plan may not receive the requisite acceptances to confirm such plan. If the requisite acceptances of the Plan are received, the Debtors intend to seek Confirmation of the Plan by the Bankruptcy Court.  If the requisite acceptances of the Plan are not received, the Debtors may nevertheless seek Confirmation of the Plan notwithstanding the dissent of certain Classes of Claims.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code if the Plan satisfies section 1129(b) of the Bankruptcy Code.  To confirm a plan over the objection of a dissenting class, the Bankruptcy Court also must find that at least one impaired class (which cannot be an "insider" class) has accepted the Plan.

Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court is not obligated to confirm the plan as proposed.  A dissenting Holder of a Claim against the Debtors could challenge the balloting procedures as not being in compliance with the Bankruptcy Code, which could mean that the results of the balloting may be invalid.  If the Bankruptcy Court determined that the balloting procedures were appropriate and the results were valid, the Bankruptcy Court could still decline to confirm the Plan, if the Bankruptcy Court found that any of the statutory requirements for confirmation had not been met.

If the Plan is not confirmed by the Bankruptcy Court, (a) the Debtors may not be able to reorganize their businesses; (b) the distributions that holders of Claims ultimately would receive, if any, with respect to their Claims is uncertain; and (c) there is no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that will be acceptable to the Bankruptcy Court and the Holders of Claims.  It is also possible that third parties may seek and obtain approval from the Bankruptcy Court to terminate or shorten the exclusivity period during which only the Debtors may propose and confirm a plan of reorganization.

#### (iv)      *The conditions precedent to the Effective Date of the Plan may not occur.*

As more fully set forth in the Plan, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not take place.

KE 27455051

It is a condition precedent to the Effective Date of the Plan that the Exit Facility has closed.  To the extent that the Debtors are unable to satisfy the conditions set forth in the Exit Facility Commitment Letter or obtain the financing contemplated by the Exit Facility, they may not be able to exit the Chapter 11 Cases.

<em>(v)</em>        <strong><em>The Debtors may not be able to achieve their projected financial results.</em></strong>

The Financial Projections set forth on **Exhibit I** to this Disclosure Statement represent the Debtors' management's best estimate of the Debtors' future financial performance based on currently known facts and assumptions about the Debtors' future operations as well as the U.S. and world economy in general and the industry segments in which the Debtors operate in particular.  The Debtors' actual financial results may differ significantly from the Financial Projections.  If the Debtors do not achieve their projected financial results, the trading prices of the New Common Stock may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

<em>(vi)</em>        <strong><em>Certain tax implications of the Debtors' Chapter 11 Cases.</em></strong>

Holders of Allowed Claims should carefully review Article XIII herein, "Certain United States Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and these chapter 11 cases may adversely affect the Reorganized Debtors.

<em>(vii)</em>        <strong><em>The Debtors' emergence from chapter 11 is not assured.</em></strong>

While the Debtors expect to emerge from chapter 11, there can be no assurance that the Debtors will successfully reorganize or when this reorganization will occur, irrespective of the Debtors' obtaining Confirmation of the Plan.

<em>(viii)</em>        <strong><em>The Debtors may fail to satisfy solicitation requirements.</em></strong>

Section 1126(b) of the Bankruptcy Code provides that the holder of a claim against, or equity interest in, a debtor who accepts or rejects a plan of reorganization before the commencement of a chapter 11 case is deemed to have accepted or rejected such plan under the Bankruptcy Code so long as the solicitation of such acceptance was made in accordance with applicable non-bankruptcy law governing the adequacy of disclosure in connection with such solicitations, or, if such laws do not exist, such acceptance was solicited after disclosure of "adequate information," as defined in section 1125 of the Bankruptcy Code.

In addition, Bankruptcy Rule 3018(b) states that a holder of a claim or equity interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the Bankruptcy Court finds that the plan was not transmitted to substantially all creditors and equity security holders of the same class, that an unreasonably short time was prescribed for such creditors and equity security holders to accept or reject the plan, or that the solicitation was not in compliance with section 1126(b) of the Bankruptcy Code.

To satisfy the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b), the Debtors are attempting to deliver this Solicitation and Disclosure Statement to all Holders of Allowed Bridge Loan Credit Agreement Claims and Holders of Allowed Senior Notes Claims as of the Voting Record Date.  In that regard, the Debtors believe that the solicitation of votes to accept or reject the Plan is proper under applicable non-bankruptcy law, rules and regulations.  The Debtors cannot be certain, however, that the solicitation of acceptances or rejections will be approved by the Bankruptcy Court, and if such approval is not obtained, the confirmation of the Plan could be denied.  If the Bankruptcy Court were to conclude that the Debtors did not satisfy the solicitation requirements then the Debtors may seek to resolicit votes to accept or reject the Plan or to solicit votes to accept or reject the Plan from one or more Classes that were not previously solicited.  The Debtors cannot provide any assurances that such a resolicitation would be successful.

63

(ix)  **The Debtors may have to resolicit.**

If the Debtors resolicit acceptances of the Plan from parties entitled to vote thereon, Confirmation of the Plan could be delayed and possibly jeopardized. Nonconfirmation of the Plan could result in an extended chapter 11 proceeding, during which time the Debtors could experience significant deterioration in their relationships with trade vendors and major customers. Furthermore, if the Effective Date is significantly delayed, there is a risk that the Plan Support Agreement may expire or be terminated in accordance with its terms.

(x)  **The Debtors may not be able to conform and consummate the Plan quickly.**

The Debtors may not be able to conform and consummate the Plan quickly if, among other things, the Effective Date is significantly delayed due to the Debtors' need to resolicit the Plan or if there are significant objections to the Plan that otherwise require the Bankruptcy Court to adjourn the Confirmation Hearing to allow the Debtors with sufficient time to address the objections and, if necessary, amend the Plan, Plan Supplement or other restructuring documents or File responses to objecting parties' concerns with respect to the Plan.

B.  **Risks Related to the Debtors' and Reorganized Debtors' Business and Plan Securities**

(i)  **Indebtedness may adversely affect the Reorganized Debtors' operations and financial condition.**

According to the terms and conditions of the Plan, upon the Effective Date, the Reorganized Debtors will have outstanding indebtedness of approximately $144 million under the Exit Facility.

The Reorganized Debtors' ability to service their debt obligations will depend, among other things, upon their future operating performance. These factors depend partly on economic, financial, competitive and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may not be able to generate sufficient Cash from operations to meet their debt service obligations as well as fund necessary capital expenditures and investments in sales and marketing. In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

Any default under the Exit Facility could adversely affect their growth, financial condition, results of operations, the value of their equity and ability to make payments on such debt. The Reorganized Debtors may incur significant additional debt in the future. If current debt amounts increase, the related risks that the Reorganized Debtors now face will intensify.

(ii)  **The Exit Facility may contain certain restrictions and limitations that could significantly affect the Reorganized Debtors' ability to operate their businesses, as well as significantly affect their liquidity.**

The Exit Facility may contain a number of significant covenants that could adversely affect the Reorganized Debtors' ability to operate their businesses, as well as significantly affect their liquidity, and therefore could adversely affect the Reorganized Debtors' results of operations. These covenants may restrict (subject to certain exceptions) the Reorganized Debtors' ability to incur additional indebtedness; grant liens; consummate mergers, acquisitions consolidations, liquidations and dissolutions; sell assets; pay dividends and make other payments in respect of capital stock; make capital expenditures; make investments, loans and advances; make payments and modifications to subordinated and other material debt instruments; enter into transactions with affiliates; consummate sale-leaseback transactions; change their fiscal year; and enter into hedging arrangements (except as otherwise expressly permitted). In addition, the Reorganized Debtors may be required to maintain a minimum interest coverage ratio and a maximum leverage ratio.

The breach of any covenants or obligations in the Exit Facility, not otherwise waived or amended, could result in a default under the applicable Exit Facility and could trigger acceleration of those obligations. Any default under the Exit Facility could adversely affect the Reorganized Debtors' growth, financial condition, results of operations, and ability to make payments on debt.

> **(iii)** *If the Debtors lose key executive officers, the Debtors' business could be disrupted and the Debtors' financial performance could suffer.*

The Debtors' businesses depend upon the efforts, abilities and expertise of the Debtors' executive officers. The Debtors are implementing a multifaceted strategy to mitigate the risk and cost of losing such executive officers. To the extent certain executive officers cease employment with the Debtors and the Debtors are unable to mitigate the resulting costs, the Debtors' business could be impacted.

> **(iv)** *The Debtors' businesses, financial condition, and results of operations could be materially adversely affected by the occurrence of natural disasters, such as hurricanes, or other catastrophic events, including war and terrorism.*

Natural disasters, such as hurricanes, floods, fires, and earthquakes could have a significant adverse effect on the Debtors' businesses, financial condition, and results of operations. The Debtors cannot predict the extent to which such events may affect them, directly or indirectly, in the future. The Debtors also cannot ensure that they will be able to obtain any insurance coverage with respect to occurrences of terrorist acts and any losses that could result from these acts.

The prolonged disruption at any of the Debtors' property due to natural disasters, terrorist attacks, or other catastrophic events could adversely affect the Debtors' businesses, financial condition and results of operations.

> **(v)** *The value of the New Common Stock may be adversely affected by a number of factors.*

The value of the New Common Stock may be adversely affected by a number of factors, including many of the risks described in this Disclosure Statement. If, for example, the Reorganized Debtors fail to comply with the covenants in the Exit Facility, resulting in an event of default thereunder, certain of the Reorganized Debtors' outstanding indebtedness could be accelerated, which could have a material adverse effect on the value of the New Common Stock.

> **(vi)** *Any recovery from the Litigation Trust is speculative.*

The value realized from the Litigation Trust's pursuit of the claims and Causes of Action described in **Exhibit G**, including the Contributed Claims, is speculative, as the probability of achieving successful litigation outcomes, under all contexts and circumstances, is inherently uncertain. There are no assurances regarding amounts that will be available to distribute to the Litigation Trust Beneficiaries after satisfaction of the costs and expenses of the Litigation Trust and payment of Non-Subordinated Contribution and Reimbursement Claims (if any) being assumed by the Trust pursuant to the Plan.

> **(vii)** *The New Common Stock will be junior to the Exit Facility.*

The Reorganized Debtors' existing and future indebtedness under the Exit Facility and other non-equity Claims will rank senior to the New Common Stock as to rights upon any foreclosure, dissolution, winding up, liquidation or reorganization, or other bankruptcy proceeding. In the event of any distribution or payment of the Reorganized Debtors' assets in any foreclosure, dissolution, winding-up, liquidation or reorganization, or other bankruptcy proceeding, the Reorganized Debtors' creditors will have a superior Claim and Interest, as applicable, to the Interests of the Holders of the New Common Stock. If any of the foregoing events occur, there can be no assurance that there will be assets in an amount significant enough to warrant any distribution in respect of the New Common Stock.

> **(viii)** *There may be risks related to the issuance of New Common Stock.*

In connection with the restructuring pursuant to the Plan under chapter 11 of the Bankruptcy Code, the Debtors will rely on section 1145 of the Bankruptcy Code to exempt the issuance of the New Common Stock from the registration requirements of the Securities Act (and of any state securities or "blue sky" laws). Section 1145 exempts from registration the sale of a debtor's securities under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or equity interest in, or a claim for an administrative expense in a case

concerning, such debtor.  In reliance upon this exemption, the issuance of the New Common Stock will generally be exempt from the registration requirements of the Securities Act.  Accordingly, recipients will be able to resell the New Equity Interest without registration under the Securities Act or other federal securities laws, unless the recipient is an "underwriter" with respect to such securities, within the meaning of section 1145(b) of the Bankruptcy Code.  Section 1145(b) of the Bankruptcy Code defines "underwriter" as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, or (b) offers to sell securities issued under a plan for the holders of such securities, or (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (d) is an "issuer" of the relevant security, as such term is used in Section 2(11) of the Securities Act.

Notwithstanding the foregoing, statutory underwriters may be able to sell securities without registration pursuant to the non-exclusive safe harbors provided in Rule 144 and/or Rule 144A under the Securities Act.  Parties that believe that they may be statutory underwriters as defined in section 1145(b) of the Bankruptcy Code are advised to consult with their own counsel as to the availability and requirements of the non-exclusive exemptions provided by Rule 144 and Rule 144A.

There can be no assurance that any market for the New Common Stock will develop or be sustained.  If an active market does not develop or is not sustained, the market price and liquidity of the New Common Stock may be adversely affected.  The liquidity of any market for the New Common Stock will depend on a number of factors, including, without limitation:

- the number of holders of the New Common Stock;

- the Reorganized Debtors' operating performance and financial condition;

- the market for similar securities;

- the Reorganized Debtors' credit rating; and

- the interest of securities dealers in making a market in the New Common Stock.

## XI.    CONFIRMATION OF THE PLAN

### A.    Requirements for Confirmation of the Plan

Among the requirements for the Confirmation of the Plan are that the Plan (i) is accepted by all impaired Classes of Claims, or if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (ii) is feasible; and (iii) is in the "best interests" of Holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11; (ii) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11; and (iii) the Plan has been proposed in good faith.

### B.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a Bankruptcy Court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7.

The Debtors have attached hereto as **Exhibit D** a liquidation analysis prepared by the Debtors' management with the assistance of A&M.

### C.        Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtors, or any successor to the debtors (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors (other than Holdings, which will be dissolved on the Effective Date of the Plan) have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors prepared the Financial Projections, as set forth on **Exhibit I** attached hereto.

### D.        Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.[12]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that *actually* voted to accept or to reject the plan.  Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

### E.        Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a Bankruptcy Court to confirm a plan even if all impaired classes have not accepted it, underlined provided that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  Subject to the Plan Support Agreement, the Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Supplement document, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

####        *(i)        No Unfair Discrimination*

This test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  In general, Bankruptcy Courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy Courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

---

[12]        A class is "impaired" unless the plan:  (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

KE 27455051

(ii)     *Fair and Equitable Test*

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in such class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

F.     **Valuation of the Debtors**

*See* **Exhibit J** of this Disclosure Statement for a valuation analysis of the Reorganized Debtors, which was performed and prepared by Rothschild.

XII.     **CERTAIN SECURITIES LAW MATTERS**

A.     **Plan Securities**

The Plan provides for the Reorganized Debtors to distribute New Common Stock to Holders of Allowed Claims in Class 2 (the "Plan Securities").

The Debtors believe that the Plan Securities constitute "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and all applicable state Blue Sky Laws. The Debtors further believe that the offer and sale of the Plan Securities pursuant to the Plan are, and subsequent transfers of the New Common Stock by the holders thereof that are not "underwriters," as defined in Section 2(a)(11) of the Securities Act and in the Bankruptcy Code, will be, exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code and applicable state Blue Sky Laws.

B.     **Issuance and Resale of Plan Securities under the Plan**

(i)     *Exemptions from Registration Requirements of the Securities Act and State Blue Sky Laws*

The Debtors are relying on exemptions from the registration requirements of the Securities Act, including, without limitations, section 3(a)(9) thereof, to exempt the offer of the Plan Securities that may be deemed to be made pursuant to the solicitation of votes on the Plan. Section 3(a)(9) of the Securities Act 3(a)(9) provides that the registration requirements of the Securities Act will not apply to "any security exchanged by the issuer with its existing security holders exclusively where no commission or other remuneration is paid or given directly or indirectly for soliciting such exchange." Importantly, an exchange of debt is a separate offer from the exchange of claims for an enhanced litigation interest.

The Debtors are also relying on section 18(b)(4)(C) of the Securities Act to exempt from state securities law requirements the offer of the Plan Securities that may be deemed to be made pursuant to the solicitation of votes on the Plan. Section 18(b)(4)(C) provides, among other things, that state securities laws will not apply to securities that are exempt from federal registration under section 3(a)(9) of the Securities Act. The Debtors do not have any contract, arrangement, or understanding relating to, and will not, directly or indirectly, pay any commission or other remuneration to any broker, dealer, salesperson, agent, or any other person for soliciting votes to accept or reject the Plan. The Debtors have received assurances that no person will provide any information to Holders of Allowed Claims relating to the solicitation of votes on the Plan other than to refer the Holders of Senior Notes to the information contained in this Disclosure Statement. In addition, no broker, dealer, salesperson, agent, or any other

person, is engaged or authorized to express any statement, opinion, recommendation, or judgment with respect to the relative merits and risks of the Plan.

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any applicable state Blue Sky Laws) will not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if: (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for Cash and property. In reliance upon these exemptions and the exemption set forth in the preceding paragraph, including the exemption provided by section 3(a)(9) and 18(b)(4)(C) of the Securities Act, the offer and sale of the Plan Securities will not be registered under the Securities Act or any applicable state Blue Sky Laws.

To the extent that the issuance of the Plan Securities is covered by section 1145 of the Bankruptcy Code, the Plan Securities may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code. In addition, Plan Securities governed by section 1145 of the Bankruptcy Code generally may be able to be resold without registration under applicable state Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Laws of those states; however, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined. Therefore, recipients of the Plan Securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state Blue Sky Laws in any given instance and as to any applicable requirements or conditions to such availability.

Recipients of the Plan Securities are advised to consult with their own legal advisors as to the applicability of section 1145 of the Bankruptcy Code to the Plan Securities and the availability of any exemption from registration under the Securities Act and state Blue Sky Laws.

### (ii)    *Resales of Plan Securities; Definition of Underwriter*

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (1) with a view to distribution of such securities and (2) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Resales of the Plan Securities by Entities deemed to be "underwriters" (which definition includes "controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Under certain circumstances, holders of Plan Securities who are deemed to be "underwriters" may be entitled to resell their Plan Securities pursuant to the non-exclusive safe harbor resale provisions of Rule 144 and Rule 144A of the Securities Act.

Generally, Rule 144 provides that if certain conditions are met, specified persons who resell restricted securities will not be deemed to be "underwriters" as defined in section 2(11) of the Securities Act.  Rule 144 provides that:

(i)        a non-affiliate who has not been an affiliate during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is current public information regarding the issuer and after a one year holding period if there is not current public information regarding the issuer at the time of the sale; and

(ii)        an affiliate may sell restricted securities after a six month holding period if at the time of the sale there is current public information regarding the issuer and after a one-year holding period if there is not current public information regarding the issuer at the time of the sale, provided that in each case the affiliate otherwise complies with the volume, manner of sale and notice requirements of Rule 144.

As noted in this Disclosure Statement, it is not contemplated that the Reorganized Debtors will be public reporting companies and, therefore, it is not expected that current public information will be available to permit resales pursuant to Rule 144 following the Effective Date.

Rule 144A provides a non-exclusive safe harbor exemption from the registration requirements of the Securities Act for resales to certain "qualified institutional buyers" of securities that are "restricted securities" within the meaning of the Securities Act, irrespective of whether the seller of such securities purchased its securities with a view towards reselling such securities, if certain other conditions are met (e.g., the availability of information required by paragraph 4(d) of Rule 144A and certain notice provisions).  Under Rule 144A, a "qualified institutional buyer" is defined to include, among other persons "dealers" registered as such pursuant to section 15 of the Exchange Act, and entities that purchase securities for their own account or for the account of another qualified institutional buyer and that, in the aggregate, own and invest on a discretionary basis at least $100 million in the securities of unaffiliated issuers.

Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person") with respect to the Plan Securities would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the Plan Securities and, in turn, whether any Person may freely resell Plan Securities. The Debtors recommend that potential recipients of Plan Securities consult their own counsel concerning their ability to trade such securities without compliance with the registration requirements of applicable federal and state securities laws.

### (iii)        *New Common Stock/Management Incentive Plan*

The Plan contemplates the implementation of the Management Incentive Plan, which will provide for grants of options and/or restricted units/equity reserved for management, directors, and employees of the Reorganized Debtors in an amount of up to 10% of the New Common Stock to be issued by the Reorganized PAH to incentivize the senior management team of the Reorganized Debtors.

Such New Common Stock will be issued pursuant to Rule 701 promulgated under the Securities Act or pursuant to the exemption provided by section 3(a)(9) of the Securities Act.

KE 27455051

**XIII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

**A.    Introduction**

      The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain Holders of Claims. The following summary does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote to accept or reject the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the Bankruptcy Courts. No assurance can be given that the IRS would not assert, or that a Bankruptcy Court would not sustain, a different position than any position discussed herein. This summary does not apply to Holders of Claims that are not "U.S. persons" (as such phrase is defined in the IRC). This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders in light of their individual circumstances. This discussion does not address tax issues with respect to such Holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, foreign taxpayers, persons who are related to the Debtors within the meaning of the IRC, persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, and regulated investment companies and those holding, or who will hold, Claims, the Exit Facility, or New Common Stock, as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, estate, gift, or non-U.S. taxation is addressed. Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds a Claim as a "capital asset" (within the meaning of Section 1221 of the Tax Code). Except as stated otherwise, this summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

      **ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

      **INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE**: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX RELATED PENALTIES UNDER THE IRC. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**B.    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors**

      *(i)    Cancellation of Debt and Reduction of Tax Attributes*

      In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of Cash paid, (y) the issue price of any new indebtedness

of the taxpayer issued and (z) the fair market value of any new consideration (including New Common Stock) given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a Bankruptcy Court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes will be reduced in the following order: (a) NOLs; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits. A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to Section 108(b)(5) of the IRC. In the context of a consolidated group of corporations, the tax rules provide for a complex ordering mechanism in determining how the tax attributes of one member can be reduced by the COD Income of another member.

Because the Plan provides that Holders of certain Claims will receive New Common Stock, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend in part on the fair market value of the New Common Stock. This value cannot be known with certainty until after the Effective Date. The Debtors expect that, subject to the limitations discussed herein, they will be required to make material reductions in their tax attributes, which could include a complete reduction of the NOLs of the Debtors' consolidated tax group.

### (ii)      Limitation of Tax Attributes

The amount of tax attributes that will be available to the Reorganized Debtors at emergence is based on a number of factors and is impossible to calculate at this time. Some of the factors that will impact the amount of available tax attributes include: (a) the amount of tax losses incurred by the Debtors in 2012 and 2013; (b) the fair market value of the New Common Stock; and (c) the amount of COD Income incurred by the Debtors in connection with consummation of the Plan. Following consummation of the Plan, the Debtors anticipate that any remaining NOLs may be subject to limitation under Section 382 of the IRC by reason of the transactions pursuant to the Plan.

Under Section 382 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs and built-in losses (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally is subject to an annual limitation. As discussed in greater detail herein, the Debtors anticipate that the issuance of the New Common Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of Section 382 of the IRC applies. This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of COD Income.

(a)      General Section 382 Annual Limitation

This discussion refers to the limitation determined under Section 382 of the IRC in the case of an ownership change as the "Section 382 Limitation." In general, the annual Section 382 Limitation on the use of Pre-Change Losses in any "post-change year" is equal to the product of (1) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (2) the "long-term tax-exempt rate" (which is the highest of the adjusted Federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs, currently approximately **3.5%**). The Section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. However, if a corporation that has undergone an ownership change does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the Section 382 Limitation is generally reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses, absent any increases due to recognized built-in gains discussed above. Generally, a NOL may be carried over to each of the twenty taxable

years following the taxable year of the loss.  As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

(b)    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when shareholders and/or so-called "qualified creditors" of a debtor Company in chapter 11 receive, in respect of their Claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception").  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, the debtor's NOLs are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year period preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the debtor undergoes another ownership change within two years after consummation, then the debtor's Pre-Change Losses effectively are eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception").  When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change.  Under the 382(l)(6) Exception differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses.

Because the Debtors do not expect the Holders of allowed Senior Notes Claims to be treated as qualified creditors, the Debtors do not expect to qualify for  the 382(l)(5) Exception.  As a result, the Debtors expect that their use of the Pre-Change Losses after the Effective Date will be subject to limitation based on the rules discussed above, but taking into account the 382(l)(6) Exception.  Regardless of whether the Reorganized Debtors qualify for the 382(l)(6) Exception or the 382(l)(5) Exception , the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of Section 382 of the IRC were to occur after the Effective Date.  In order to prevent such a subsequent ownership change, the New Certificate of Incorporation of Reorganized Debtors may contain restrictions on trading of New Common Stock that are intended to prevent such a change.  The specific terms of any such restrictions have not yet been determined.

(iii)    *Alternative Minimum Tax*

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year.  AMTI is generally equal to regular taxable income with certain adjustments.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  For example, except for alternative tax NOLs generated in or deducted as carryforwards in taxable years ending in certain years, which can offset 100% of a corporation's AMTI, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards.  Additionally, under Section 56(g)(4)(G) of the IRC, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under Section 382(h) of the IRC, immediately before the ownership change.

73

C.      **Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Claims**

> (i)      *Consequences to Holders of Senior Notes Claims*

Pursuant to the Plan, each Holder of an allowed Senior Notes Claim will receive such Holder's Pro Rata share of the New Common Stock and interests in the Litigation Trust.

Whether a Holder of an allowed Senior Notes Claim recognizes gain or loss as a result of the exchange of its claim for the New Common Stock depends, in part, on whether the exchange qualifies as a tax-free recapitalization, which in turn depends on whether the debt underlying the allowed Senior Notes Claim surrendered is treated as a "security" for purposes of the reorganization provisions of the IRC.

> (a)      Treatment of a Debt Instrument as a "Security"

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued. The Senior Notes Indenture had an initial term of approximately seven years. As a result, it is not entirely clear whether the Senior Notes will qualify as "securities." However, the Debtors expect to take the position that the debt instruments underlying the Senior Notes Claims are "securities."

> (b)      Treatment of a Holder of an Allowed Senior Notes Claim if the Exchange of its Claim is Treated as a Reorganization

If a debt instrument constituting a surrendered allowed Senior Notes Claim is treated as a "security" for U.S. federal income tax purposes, the exchange of a Holder's allowed Senior Notes Claim for the New Common Stock would be treated as a recapitalization, and therefore a reorganization, under the IRC. In such case, a Holder would not recognize loss with respect to the exchange but would recognize gain  (1) to the extent of the fair market value of the portion of the Litigation Trust interests received by such Holder that are attributable to the Contributed Claims and the Initial Funding that are treated as being received by such Holder from the Debtors in exchange for such Holder's Allowed Senior Notes Claim, as discussed further below (the "Exchanged Litigation Trust Interests") and (2) to the extent that the shares of the New Common Stock received are allocable to accrued but untaxed interest (*see* discussion below, "Accrued Interest"). Any such gain should be capital in nature (subject to the "market discount" rules described below) and should be long term capital gain if the Senior Notes Claims were held for more than one year by the Holder. To the extent that a portion of the New Common Stock or the Exchanged Litigation Trust Interests is allocable to accrued interest, the Holder may recognize ordinary income. Such Holder's aggregate tax basis in its New Common Stock would be equal to the tax basis of the obligations constituting the allowed Senior Notes Claim surrendered, increased by any gain recognized in the exchange, and decreased by the fair market value of the Exchanged Litigation Trust Interests received by such Holder, and a Holder's holding period for its New Common Stock would include the holding period for the obligation constituting the surrendered allowed Senior Notes Claim; provided that the tax basis of the New Common Stock treated as received in satisfaction of accrued but untaxed interest would equal the amount of such accrued but untaxed interest, and the holding period for any such New Common Stock would not include the holding period of the debt instrument constituting the surrendered allowed Senior Notes Claim. A Holder's tax basis in the Exchanged Litigation Trust Interests received in exchange for such Holder's Allowed Senior Notes Claims should equal their fair market value as of the Effective Date. A Holder's holding period for such Exchanged Litigation Trust Interests should begin on the day following the Effective Date.

KE 27455051

(c)     Treatment of a Holder of an Allowed Senior Notes if the Exchange of its Claim is not Treated as a Reorganization

If a debt instrument constituting a surrendered allowed Senior Notes Claim is not treated as a "security" for U.S. federal income tax purposes, a Holder of such a Claim would be treated as exchanging its allowed Senior Notes Claim for New Common Stock and Exchanged Litigation Trust Interests in a fully taxable exchange. A Holder of an allowed Senior Notes Claim who is subject to this treatment would recognize gain or loss equal to the difference between (1) the fair market value of (A) the New Common Stock that is not allocable to accrued but untaxed interest, and (B) the Exchanged Litigation Trust Interests received in exchange for such Holder's allowed Senior Notes Claim, and (2) the Holder's adjusted tax basis in the obligations constituting the surrendered allowed Senior Notes Claim. Generally, a Holder's adjusted tax basis in the obligations constituting the surrendered allowed Senior Notes Claim will be equal to the cost of the obligations to such Holder, increased by any accrued but unpaid interest previously included in such Holder's income. If applicable, a Holder's tax basis in the obligations constituting the surrendered allowed Senior Notes Claim may also be (i) increased by any market discount previously included in income by such Holder pursuant to an election to include market discount in gross income currently as it accrues, and (ii) reduced by any cash payments received on the obligation other than payments of qualified stated interest, and by any amortizable bond premium that the Holder has previously deducted. Any such gain should be capital in nature (subject to the "market discount" rules described below) and any such gain or loss should be long term capital gain or loss if the Senior Notes Claims were held for more than one year by the Holder. To the extent that a portion of the New Common Stock or the Exchanged Litigation Trust Interests received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income.  See the discussions of accrued interest and market discount below. A Holder's tax basis in the New Common Stock and Litigation Trust interests received in exchange for such Holder's Allowed Senior Notes Claims would equal their fair market value as of the Effective Date. A Holder's holding period for the New Common Stock and such Exchanged Litigation Trust Interests received on the Effective Date would begin on the day following the Effective Date.

It is plausible that a Holder receiving the Litigation Trust interests could treat the transaction as an "open" transaction for U.S. federal tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the proceeds ultimately received from the Litigation Trust. The U.S. federal income tax consequences of an open transaction are uncertain and highly complex, and a Holder should consult with its own tax advisor if it believes open transaction treatment might be appropriate.

**The tax consequences of the Plan and to the Holders of allowed Senior Notes Claim are uncertain. Holders of allowed Senior Notes Claims should consult their tax advisors regarding whether such Claims be treated as "securities" for U.S. federal income tax purposes.**

(ii)    *Accrued Interest*

To the extent that any amount received by a Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount will be taxable to the Holder as ordinary interest income. Conversely, a Holder of a surrendered Allowed Claim will generally recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the Holder's gross income but was not paid in full by the Debtors.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the Plan, distributions in respect of Allowed Claims will be allocated first to the principal amount of such claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS nor a Bankruptcy Court with respect to the appropriate tax treatment for creditors.

KE 27455051

### (iii)    *Market Discount*

Under the "market discount" provisions of Sections 1276 through 1278 of the IRC, some or all of any gain realized by a Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (b) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition (determined as described above) of debts that it acquired with market discount will generally be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued). If a Holder did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry the obligations constituting its allowed Senior Notes Claim, such deferred amounts would become deductible at the time of such taxable disposition. To the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such debts but was not recognized by the Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

### D.    Receipt of Interests in the Litigation Trust

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, pursuant to Treasury Regulation section 301.7701-4(d) and related regulations, the Debtors believe that the Trustee of the Litigation Trust intends to take a position on the Litigation Trust's tax return that the Litigation Trust should be treated as a grantor trust set up for the benefit of the Litigation Trust Beneficiaries for U.S. federal income tax purposes. Holders of Allowed Senior Notes Claims that receive a beneficial interest in the Litigation Trust will be treated for U.S. federal income tax purposes as receiving their Pro Rata shares of the Assets and the Initial Funding transferred to the Litigation Trust from the Debtors in a taxable exchange for their Allowed Senior Notes Claims and then contributing such Pro Rata shares to the Litigation Trust in exchange for beneficial interests in the Litigation Trust. Any Assets originally held by such Holder and contributed directly to the Litigation Trust by such Holders would not be part of the taxable exchange described above. Holders of Allowed Senior Notes Claims that receive a beneficial interest in the Litigation Trust will be required to report on their United States federal income tax returns their share of the Litigation Trust's items of income, gain, loss, deduction, and credit in the year recognized by the Litigation Trust. This requirement may result in such Holders being subject to tax on their allocable share of the Litigation Trust's taxable income prior to receiving any cash distributions from the Litigation Trust. Holders of Allowed Senior Notes Claims that receive a beneficial interest in the Litigation Trust are urged to consult their tax advisors regarding the tax consequences of the right to receive and of the receipt (if any) of property from the Litigation Trust.

### E.    Withholding and Reporting

The Debtors will withhold all amounts required by law to be withheld from payments of interest. The Debtors will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim. Additionally, backup withholding, currently at a rate of 28%, will generally apply to such payments if a Holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Any amounts withheld under the backup withholding rules will be allowed as a credit against

such holder's U.S. federal income tax liability and may entitle such holder to a refund from the IRS, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XIV.    SOLICITATION AND VOTING PROCEDURES

### A.    The Solicitation Package

This section XIV.A summarizes briefly the procedures to accept or reject the Plan.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.

The following materials constitute the Solicitation Package:

- the appropriate Ballots or Master Ballots[13] and applicable Voting Instructions;

- a pre-addressed, postage pre-paid return envelope; and

- this Disclosure Statement with all exhibits, including the Plan, and any other supplements or amendments to these documents.

The voting Classes, Classes 3 and 4, entitled to vote to accept or reject the Plan will be served with paper copies and by electronic mail, if available, of this Disclosure Statement with all exhibits, including the Plan (and the appropriate ballot).  Additional paper copies of these documents may be requested from the Balloting Agent by writing to Physiotherapy Holdings, Inc. Ballot Processing Center, c/o Kurtzman Carson Consultants, 599 Lexington Avenue, 39th Floor, New York, New York 10022 or calling (917) 281-4800.  The Solicitation Package is also available at the Debtors' website, http://www.kccllc.net/PhysioCorp.

The Plan Supplement will be Filed by the Debtors no later than five days before the Confirmation Hearing or as soon as reasonably practicable thereafter, and as may be amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules, including the following: (a) the New Corporate Governance Documents with respect to Reorganized PAH; (b) the Rejected Executory Contract and Unexpired Lease List (c) a list of retained Causes of Action; (d) the Litigation Trust Agreement; (e) the Exit Facility Credit Agreement; (f) the members of the New Boards, to the extent known; and (g) the Management Employment Agreements.  The detailed terms of some of the documents to be contained in the Plan Supplement have yet to be finalized and will continue to be negotiated by the Debtors.  When Filed, the Plan Supplement will be

---

[13]    In accordance with customary practices, the Master Ballot(s) will be distributed at substantially the same time as the initial distribution of Solicitation Packages.

available in both electronic and hard copy form, although the Debtors will not serve paper or CD-ROM copies. Details about how to access the Plan Supplement will be provided in the notice sent to all parties in interest upon the commencement of the Chapter 11 Cases.

**B.      Voting Deadline**

The period during which Ballots and Master Ballots with respect to the Plan will be accepted by the Debtors will terminate at 11:59 p.m. (prevailing Eastern Time) on November 8, 2013 for Holders of Bridge Loan Credit Agreement Claims and Holders of Senior Notes Claims, unless the Debtors, in their sole discretion, extend the date until which Ballots and Master Ballots will be accepted.  If multiple Ballots are received from the same Holder with respect to the same Bridge Loan Credit Agreement Claim or Senior Note Claim prior to the Voting Deadline, the last Ballot or Master Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot or Master Ballot.  Except to the extent the Debtors so determine or as permitted by the Bankruptcy Court, Ballots and Master Ballots that are received after the Voting Deadline will not be counted or otherwise used by the Debtor in connection with the Debtors request for Confirmation of the Plan (or any permitted modification thereof).

The Debtors reserve the absolute right, at any time or from time to time, to extend the period of time (on a daily basis, if necessary) during which Ballots and Master Ballots will be accepted for any reason, including determining whether or not the requisite number of acceptances have been received, by making a public announcement of such extension no later than the first Business Day next succeeding the previously announced Voting Deadline.  The Debtors will give notice of any such extension in a manner deemed reasonable to the Debtors in its discretion.  There can be no assurance that the Debtors will exercise its right to extend the Voting Deadline.

**C.      Voting Instructions**

Only the Holders of Allowed Class 3 Bridge Loan Credit Agreement Claims and Class 4 Senior Notes Claims as of the Voting Record Date are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate Ballots or Master Ballots and returning them by electronic mail or in the envelope provided.  Notwithstanding the foregoing, in the event that a Holder returns an original properly completed Ballot via mail or overnight courier, as well as a Ballot via electronic mail, only the original properly completed ballot will be counted for voting purposes.  The Ballots and Master Ballots will clearly indicate the appropriate return address (or, in the case of the Beneficial Holders of the Debtors' Senior Notes who hold their position through a nominee (the "<u>Nominee</u>") and received the Ballots from Nominees, such Beneficial Holders will be instructed to comply with the return instructions provided by the Nominee).  It is important to follow the specific instructions provided on each Ballot or Master Ballot.  Ballots and Master Ballots should be sent to the Balloting Agent on or before the Voting Deadline as indicated in the chart below.  For the avoidance of doubt, Nominees must submit originally executed Class 4 Senior Notes Claims Master Ballots to the Balloting Agent.

The Debtors are providing the Solicitation Package to Holders of Senior Notes Claims or Nominees whose names appear as of the Voting Record Date in the records maintained by the Depository Trust Company ("<u>DTC</u>").

The Debtors have engaged KCC as the Balloting Agent to assist in the balloting and tabulation process. The Balloting Agent will process and tabulate Ballots and Master Ballots for each Class entitled to vote to accept or reject the Plan and will File the Voting Report as soon as practicable after the Petition Date, which Voting Report will be supplemented after the Voting Deadline.

The deadline by which the Balloting Agent must receive your Ballot or Master Ballot is 11:59 p.m. (prevailing Eastern Time) on November 8, 2013 for Holders of Bridge Loan Credit Agreement Claims and Holders of Senior Notes Claims.

**Any Ballot or Master Ballot that is properly executed, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, will not be counted.**

**All Ballots are accompanied by return envelopes.  It is important to follow the specific instructions provided on each Ballot.**

KE 27455051

| BALLOTS AND MASTER BALLOTS |
| :---: |
| **Via Overnight Courier or Hand Delivery or by Facsimile or Electronic Mail with an Original Signed Copy by Overnight Delivery in the Envelope Provided to: Physiotherapy Holdings, Inc. Ballot Processing Center c/o Kurtzman Carson Consultants 599 Lexington Avenue 39th Floor New York, NY 10022 Telephone: (877) 833-4150 Facsimile: (212) 702-0864 Electronic Mail:  physiocorpinfo@kccllc.com** |

> **(i)**      ***Note to Class 3 and Class 4 Claim Holders.***

> (a)      Certification.

By signing and returning a Ballot or Master Ballot, each Holder of a Claim in Class 3 and Class 4 will be certifying to the Bankruptcy Court and the Debtors that, among other things:

- the Holder has received and reviewed a copy of the Disclosure Statement and Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

- the Holder has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Disclosure Statement, Solicitation Package or other publicly available materials;

- the Holder has cast the same vote with respect to all Claims in the particular Class; and

- no other Ballots or Master Ballots with respect to the same Claim have been cast, or, if any other Ballots or Master Ballots have been cast with respect to such Claim, then any such Ballots or Master Ballots are thereby revoked, in accordance with the procedures set forth herein.

> (b)      Beneficial Holders.

A Beneficial Holder holding Class 4 Claims as a record Holder in its own name or who has directly received a Ballot from the Balloting Agent should vote on the Plan by completing and signing the enclosed applicable Ballot and returning it directly to the Balloting Agent on or before the Voting Deadline using the enclosed self-addressed, post pre-paid return envelope.

Any Beneficial Holder holding Class 4 Claims in a "street name" through a Nominee and who has not directly received the Ballot from the Balloting Agent may vote on the Plan by following the method below:

- Complete and sign the enclosed Beneficial Holder Ballot.  Return the Ballot to the Nominee as promptly as possible and in sufficient time to allow such Nominee to process the Ballot and return it to KCC on a Master Ballot by the Voting Deadline.  If no self-addressed, postage pre-paid envelope was enclosed for this purpose, the Nominee must be contacted for instructions.

Any Ballot returned to a Nominee by a Beneficial Holder described in this section will not be counted for purposes of acceptance or rejection of the Plan until such Nominee properly completes and delivers to KCC that Ballot (properly validated) or a Master Ballot that reflects the vote of such Beneficial Holder.

KE 27455051

If any Beneficial Holder owns Claims through more than one Nominee, such Beneficial Holder should execute a separate Ballot for those Claims held through any one Nominee, unless otherwise approved by the Debtors. Each such separate Ballot must indicate the name of the particular Nominee through which Claims being voted by that Ballot are held, the amount of Claims held through such Nominee and be returned to the Balloting Agent. The Balloting Agent may validate the Ballot with the Nominee and by returning an executed Ballot, the Beneficial Holder directs the Nominee to provide any information requested to make such validation.

        (c)       Nominees.

A Nominee that on the Voting Record Date is the registered Holder of Claims for a Beneficial Holder should obtain the vote of such Beneficial Holder of such Claims.

        (i)       Master Ballots.

A Nominee may obtain the votes of Beneficial Holders by forwarding to the Beneficial Holders the unsigned Ballots, together with the Disclosure Statement, a return envelope provided by, and addressed to, the Nominee, and other materials requested to be forwarded. Each such Beneficial Holder must then indicate its vote on the Ballot, review and complete the information requested in the Ballot, execute the Ballot, and return the Ballot to the Nominee. After collecting the Ballots, the Nominee should, in turn, complete a Master Ballot compiling the votes and other information from the Ballot, execute the Master Ballot, and deliver the Master Ballot to KCC so that it is received by KCC before the Voting Deadline. All Ballots returned by Beneficial Holders should be retained by Nominees for inspection for at least one year from the Voting Deadline.

**Each Nominee should advise its Beneficial Holders to return their Ballots to the Nominee by a date calculated by the Nominee to allow it to prepare and return the Master Ballot to KCC so that it is received by KCC before the Voting Deadline.**

**D.**       **Voting Tabulation**

The Ballot and/or Master Ballot do not constitute, and will not be deemed to be, a Proof of Claim or an assertion or admission of a Claim or Interest. Only Holders of Claims in the voting Class will be entitled to vote with regard to such Claims.

Unless the Debtors decide otherwise, Ballots and Master Ballots received after the Voting Deadline may not be counted. Except as otherwise provided in the Solicitation Procedures, a Ballot or Master Ballot will be deemed delivered only when the Balloting Agent actually receives the executed Ballot or Master Ballot as instructed in the Voting Instructions. No Ballot or Master Ballot should be sent to the Debtors, the Debtors' agents (other than the Balloting Agent) or the Debtors' financial or legal advisors. The Debtors expressly reserve the right to amend from time to time the terms of the Plan (subject to compliance with the requirements of section 1127 of the Bankruptcy Code and the terms of the Plan regarding modifications). The Bankruptcy Code may require the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to Plan Confirmation. In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court. To the extent there are multiple Claims within Classes, the Debtors may, in their discretion, and to the extent possible, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes.

In the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

***The following additional procedures will apply with respect to tabulating Master Ballots:***

- votes cast by holders of public securities through Nominees will be applied to the applicable positions held by such Nominees as of the Voting Record Date, as evidenced by the record and depository listings. Votes submitted by a Nominee will not be counted in excess of the amount of public securities held by such Nominee as of the Voting Record Date;

KE 27455051

- if conflicting votes or "over-votes" are submitted by a Nominee, the Balloting Agent will use reasonable efforts to reconcile discrepancies with the Nominee;

- if over-votes are submitted by a Nominee which are not reconciled prior to the preparation of the certification of vote results, the votes to accept and to reject the Plan will be approved in the same proportion as the votes to accept and to reject the Plan submitted by the Nominee, but only to the extent of the Nominee's Voting Record Date position in the public securities; and

- for the purposes of tabulating votes, each Beneficial Holder will be deemed (regardless of whether such holder includes interest in the amount voted on its Ballot) to have voted only the principal amount of its public securities; any principal amounts thus voted will be thereafter adjusted by the Balloting Agent, on a proportionate basis with a view to the amount of securities actually voted, to reflect the corresponding claim amount, including any accrued but unpaid prepetition interest, with respect to the securities thus voted.

The Debtors will file with the Bankruptcy Court, as soon as practicable after the Petition Date, the Voting Report prepared by the Balloting Agent. The Voting Report will, among other things, delineate every Ballot or Master Ballot that does not conform to the Voting Instructions or that contains any form of irregularity (each an "Irregular Ballot"), including, but not limited to, those Ballots or Master Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, or damaged. The Balloting Agent will attempt to reconcile the amount of any Claim reported on a Ballot or Master Ballot with the records of the applicable Nominee, if applicable, or in the alternative with the Debtors' records, but in the event such amount cannot be timely reconciled without undue effort on the part of the Balloting Agent, the amount shown in the records of the Nominee, if applicable, or the Debtors' records will govern. The Voting Report also will indicate the Debtors' intentions with regard to such Irregular Ballots. Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots or Master Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

## XV.    RECOMMENDATION

In the opinion of each of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.


Dated:  October 10, 2013

Respectfully submitted,


PHYSIOTHERAPY HOLDINGS, INC.
(on behalf of itself and each of the Debtors)


By: */s/ Martin McGahan*
    Name: Martin McGahan
    Title: Chief Restructuring Officer and Interim Chief
    Executive Officer

Prepared                                                                 by:

*/s/ Jonathan S. Henes, P.C.*
Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:        (302) 426-1189
Facsimile:        (302) 426-9193

- and -

Morton Branzburg (admitted *pro hac vice*)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:        (215) 569-2700
Facsimile:        (215) 568-6603

- and -

Jonathan S. Henes, P.C. (*pro hac vice* admission pending)
Nicole L. Greenblatt (*pro hac vice* admission pending)
David S. Meyer (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

KE 27455051

## Exhibit A

**Plan of Reorganization**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| PHYSIOTHERAPY HOLDINGS, INC., *et al.*,[1] | Case No. 13-_____ (    ) |
| Debtors. | Joint Administration Requested |

### JOINT PREPACKAGED PLAN OF REORGANIZATION OF PHYSIOTHERAPY HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:        (302) 426-1189
Facsimile:        (302) 426-9193

- and -

Morton Branzburg (*pro hac vice* admission pending)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:        (215) 569-2700
Facsimile:        (215) 568-6603

Jonathan S. Henes, P.C. (*pro hac vice* admission pending)
Nicole L. Greenblatt (*pro hac vice* admission pending)
David S. Meyer (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

Dated: October 10, 2013

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Physiotherapy Holdings; Inc. (5193); Actra Rehabilitation Associates, Inc. (7806); Alexandria Sports; Inc. (7654); Benchmark Acquisition Corp. (3850); Benchmark Medical Management Company (0335); Benchmark O & P Holdings, Inc. (6848); Benchmark Orthotics & Prosthetics, Inc. (7000); Blue Hen Physical Therapy, Inc. (7267); Cape Prosthetics-Orthotics, Inc.(7914); Carrollton Physical Therapy Clinic, Inc. (2832); Integrity Physical Therapy, Inc. (1075); Keystone Rehabilitation Associates of Warren (8341); Keystone Rehabilitation Systems, Inc. (8380); Keystone Rehabilitation Systems of McMurray (6304); Leesburg Sports, Inc. (4190); MATRIX Healthcare Services, LLC (7344); MATRIX Rehabilitation, Inc. (3147); MATRIX Rehabilitation-Delaware, Inc. (2504); MATRIX Rehabilitation-Georgia, Inc. (4073); MATRIX Rehabilitation-Ohio, Inc. (2505); MATRIX Rehabilitation-South Carolina, Inc.(5603); MATRIX Rehabilitation-Texas, Inc. (9542); Morris Area Rehabilitation Association, Inc. (2043); North Dallas Physical Therapy Associates, Inc. (5331); Northstar Health Services, Inc. (7152); NSHS Services, Inc. (6789); Orthopaedic Services of Paducah, Inc. (3143); PhysioLink Corporation (3705); Physiotherapy Associates Holdings, Inc. (3367); Physiotherapy Associates-Union Rehab, LLC (0041); Physiotherapy Associates, Inc. (7193); Physiotherapy Corporation (3816); Physiotherapy-BMHI Holdings, Inc. (3361); Physiotherapy-BMI, Inc. (4107); Potomac Rehabilitation Services, Inc. (2725); Professional Rehab Associates, Inc. (2393); Progressive Therapy Services, Inc. (8449); R.S. Network, Inc. (9104); Rehab Associates, LLC (9381); Rehab Colorado, LLC (5804); Rehab Missouri, LLC (0587); Rehab Xcel, LLC (0586); Rehabilitation Consultants, Inc. (1166); SMR Banyan Tree, Inc. (6933); Swanson Orthotic & Prosthetic Center, Inc. (2308); The Parks Physical Therapy and Work Hardening Center, Inc. (2926); Theraphysics Partners of Colorado, Inc. (2115); Theraphysics Partners of Texas, Inc. (9976); Therapy Associates of Martinsville, Inc. (1394); Trumbull P.T. Corp. (3855); and Wisconsin Prosthetics and Orthotics, Inc. (7815). The Debtors' main corporate address is 855 Springdale Drive, Suite 200, Exton, PA 19341.

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
     GOVERNING LAW ..................................................................................................... 1

     A.      Defined Terms. ........................................................................................ 1
     B.      Rules of Interpretation. ........................................................................ 12
     C.      Computation of Time. .......................................................................... 13
     D.      Governing Law. ................................................................................... 13
     E.      Reference to Monetary Figures. ........................................................... 13
     F.      Reference to the Debtors or the Reorganized Debtors. ........................ 13

ARTICLE II. ADMINISTRATIVE CLAIMS AND OTHER UNCLASSIFIED CLAIMS ....................................... 13

     A.      Administrative Claims. ........................................................................ 13
     B.      Priority Tax Claims. ............................................................................ 15
     C.      Statutory Fees. ..................................................................................... 15

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ..................................... 15

     A.      Classification of Claims and Interests. ................................................ 15
     B.      Summary of Classification. ................................................................. 15
     C.      Treatment of Claims and Interests. ..................................................... 16
     D.      Special Provision Governing Claims. .................................................. 20
     E.      Elimination of Vacant Classes. ........................................................... 20
     F.      Acceptance or Rejection of the Plan. .................................................. 20
     G.      Confirmation Pursuant to Sections 1129(a) (10) and 1129(b) of the
             Bankruptcy Code. ................................................................................ 21
     H.      Controversy Concerning Impairment. ................................................. 21
     I.      Subordinated Claims. .......................................................................... 21

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ............................................................... 21

     A.      Sources of Cash for Plan Distributions. ............................................... 21
     B.      Exit Facility. ........................................................................................ 21
     C.      Settlement of Certain Claims and Interests. ........................................ 22
     D.      Issuance and Distribution of New Common Stock. ............................. 22
     E.      New Stockholders Agreement. ............................................................ 22
     F.      Restructuring Transactions. ................................................................. 23
     G.      Corporate Existence. ............................................................................ 23
     H.      Vesting of Assets in the Reorganized Debtors. ................................... 23
     I.      Cancellation of Existing Indebtedness and Securities. ........................ 23
     J.      Corporate Action. ................................................................................ 24
     K.      New Certificates of Incorporation and New By-Laws. ........................ 24
     L.      Directors and Officers of the Reorganized Debtors. ........................... 24
     M.      Effectuating Documents; Further Transactions. .................................. 25
     N.      Management Incentive Plan. ................................................................ 25
     O.      Senior Management and Management Employment Agreements ........ 25
     P.      Exemption from Certain Taxes and Fees. ............................................ 25
     Q.      Legacy D&O Liability Insurance Policies. ......................................... 25
     R.      Indemnification Provisions. ................................................................. 26
     S.      Indemnification of Consenting Noteholders and Consenting Shareholders. ........... 26
     T.      Assumption of Independent Director Indemnification Obligations. ........... 26

U.      Preservation of Causes of Action...................................................................26
V.      Litigation Trust ..............................................................................................27
W.      Dissolution of Holdings ................................................................................29

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................29

A.      Assumption and Rejection of Executory Contracts and Unexpired Leases. ...........29
B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases. .............30
C.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed............30
D.      Insurance Policies. ........................................................................................30
E.      Modifications, Amendments, Supplements, Restatements, or Other
        Agreements. ...................................................................................................31
F.      Reservation of Rights. ....................................................................................31
G.      Nonoccurrence of Effective Date....................................................................31
H.      Contracts and Leases Entered Into After the Petition Date.....................................31

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS .......................................................................31

A.      Timing and Calculation of Amounts to Be Distributed. ..........................................31
B.      Disbursing Agent. ..........................................................................................32
C.      Rights and Powers of Disbursing Agent. ........................................................32
D.      Delivery of Distributions and Undeliverable or Unclaimed Distributions...............32
E.      Manner of Payment.........................................................................................33
F.      Section 1145 Exemption.................................................................................34
G.      Section 3(a)(9) Exemption..............................................................................34
H.      Compliance with Tax Requirements................................................................34
I.      Allocations. ...................................................................................................34
J.      Setoffs and Recoupment. ...............................................................................34
K.      Claims Paid or Payable by Third Parties. .......................................................35

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
        DISPUTED CLAIMS ...........................................................................................35

A.      Prosecution of Objections to Claims................................................................35
B.      Claims Administration Responsibilities............................................................36
C.      Estimation of Claims. .....................................................................................36
D.      Adjustment to Claims Without Objection.........................................................36
E.      Disallowance of Claims. .................................................................................36
F.      No Distributions Pending Allowance. .............................................................36
G.      Distributions After Allowance. .......................................................................37

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS .............................37

A.      Compromise and Settlement of Claims, Interests, and Controversies. ...................37
B.      Discharge of Claims and Termination of Interests. ...........................................37
C.      Release of Liens. ............................................................................................37
D.      Releases by the Debtors...................................................................................38
E.      Releases by the Releasing Parties. ..................................................................38
F.      Liabilities to, and Rights of, Governmental Units. ..........................................39
G.      Exculpation. ...................................................................................................39
H.      Injunction.......................................................................................................39
I.      Term of Injunctions or Stays............................................................................41

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN........................................41

      A.      Conditions Precedent to the Effective Date. ............................................41
      B.      Waiver of Conditions....................................................................................41
      C.      Effect of Failure of Conditions. ...................................................................41

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN .....................................42

      A.      Modification and Amendments......................................................................42
      B.      Effect of Confirmation on Modifications......................................................42
      C.      Revocation or Withdrawal of Plan................................................................42

ARTICLE XI. RETENTION OF JURISDICTION ..................................................................................42

ARTICLE XII. MISCELLANEOUS PROVISIONS ................................................................................44

      A.      Immediate Binding Effect.............................................................................44
      B.      Additional Documents. .................................................................................45
      C.      Payment of Certain Professional Fees. .........................................................45
      D.      Statutory Committee and Cessation of Fee and Expense Payment. .............45
      E.      Payment of Fees and Expenses for Counsel to the Consenting
            Shareholders. ...............................................................................................45
      F.      Reservation of Rights...................................................................................45
      G.      Successors and Assigns. ...............................................................................45
      H.      Notices. .......................................................................................................45
      I.      Entire Agreement.........................................................................................47
      J.      Exhibits. ......................................................................................................47
      K.      Severability of Plan Provisions....................................................................48
      L.      Votes Solicited in Good Faith. .....................................................................48
      M.      Closing of Chapter 11 Cases........................................................................48
      N.      Conflicts......................................................................................................48

## INTRODUCTION

Physiotherapy Holdings, Inc. ("Holdings") and its debtor affiliates, as debtors and debtors in possession propose this joint prepackaged plan of reorganization (the "Plan") for the resolution of the Claims against and Interests in each of the Debtors pursuant to chapter 11 of the Bankruptcy Code (as such terms are defined below). Capitalized terms used in the Plan and not otherwise defined shall have the meanings ascribed to such terms in Article I.A.

Holders of Claims and Interests should refer to the Disclosure Statement (as such terms are defined below) for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information and projections of future operations, as well as a summary and description of this Plan.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.      *Defined Terms.*

As used in this Plan, capitalized terms have the meanings ascribed to them below.

1.      "*2012 Transaction*" means all transactions whenever occurring, including, without limitation, borrowings, dividends, sales, and purchases of securities (whether debt or equity) or bonuses that in any way relate to the acquisition, satisfaction or issuance of debt or equity of the Debtors or any Affiliate on or about April 30, 2012.

2.      "*Accrued Professional Compensation*" means, at any given moment, all accrued, contingent, and/or unpaid fees and expenses for services rendered through and including the Effective Date by any retained Professional in the Chapter 11 Cases that the Bankruptcy Court has not denied by Final Order; provided, however, that any such fees and expenses (a) have not been previously paid (regardless of whether a fee application has been Filed for any such amount) and (b) have been applied against any retainer that has been provided to such Professional.  To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation.

3.      "*Ad Hoc Committee of Senior Noteholders*" means that certain committee of Holders of Senior Notes Claims.

4.      "*Administrative Claim*" means any Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (b) Accrued Professional Compensation Claims; (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of the Judicial Code; and (d) all Allowed requests for compensation or expense reimbursement for making a substantial contribution to the Chapter 11 cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

5.      "*Administrative Claims Bar Date*" means the date that is 30 days after the Effective Date.

6.      "*Administrative Claims Objection Deadline*" means the date that is 60 days after the Effective Date.

7.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

8.      "*Allowed* m"eans as to a Claim or an Interest, a Claim or an Interest allowed under the Plan, under the Bankruptcy Code, as applicable, or by a Final Order.

9. *"Assumed Executory Contract and Unexpired Lease List"* means the list (as may be amended), as determined by the Debtors or the Reorganized Debtors and in form and substance reasonably acceptable to the Ad Hoc Committee of Senior Noteholders, of Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) that will be assumed by the Reorganized Debtors pursuant to the provisions of Article V.A and which shall be included in the Plan Supplement.

10. *"Ballot"* means the form or forms distributed to certain Holders of Claims entitled to vote on the Plan by which such parties may indicate acceptance or rejection of the Plan.

11. *"Bankruptcy Code"* means title 11 of the United States Code, 11 U.S.C. §§101-1532, as may be amended from time to time.

12. *"Bankruptcy Court"* means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of the reference under 28 U.S.C. § 157, the United States District Court for the District of Delaware.

13. *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

14. *"Bridge Loan Agent"* means U.S. Bank, National Association, in its capacities as administrative agent and collateral agent under the Bridge Loan Credit Agreement and any other capacities thereunder or related thereto, including any capacity held by any of its Affiliates.

15. *"Bridge Loan Credit Agreement"* means that certain credit agreement, dated as of July 31, 2013 (as amended, supplemented, or modified from time to time), by and among Physiotherapy Associates Holdings, Inc., as borrower, Holdings and the Bridge Loan Credit Agreement Guarantors, as guarantors, the Bridge Loan Lenders, and U.S. Bank, National Association, in its capacities as administrative agent and collateral agent.

16. *"Bridge Loan Credit Agreement Claims"* means any Claim derived from, based upon, relating to, or arising from the Bridge Loan Credit Agreement.

17. *"Bridge Loan Credit Agreement Guarantors"* means Holdings, Keystone Rehabilitation Systems of McMurray, and the Senior Notes Guarantors.

18. *"Bridge Loan Facility"* means the $140 million term loan provided under the Bridge Loan Credit Agreement.

19. *"Bridge Loan Lenders"* means the lenders party to the Bridge Loan Credit Agreement.

20. *"Business Day"* means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)).

21. *"Cash"* means the legal tender of the United States of America.

22. *"Causes of Action"* means any action, claim, cause of action, controversy, demand, right, right of setoff, cross claim, counterclaim, recoupment, claim for breach of duty imposed by law or in equity, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured, or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

K&E 27461178

23.    *"Chapter 11 Cases"* means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

24.    *"Claim"* means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against a Debtor.

25.    *"Claims Register"* means the official register of Claims maintained by Kurtzman Carson Consultants LLC, retained as the Debtors' notice, claims, and solicitation agent.

26.    *"Class"* means a class of Claims or Interests as set forth in Article III pursuant to section 1122(a) of the Bankruptcy Code.

27.    *"Committee"* means any official committee (and all subcommittees thereof) appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

28.    *"Confirmation"* means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

29.    *"Confirmation Date"* means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

30.    *"Confirmation Hearing"* means the confirmation hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

31.    *"Confirmation Order"* means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code in form and substance reasonably acceptable to the Ad Hoc Committee of Senior Noteholders.

32.    *"Consenting Bridge Loan Lenders"* means 100% of the Bridge Loan Lenders.

33.    *"Consenting Noteholders"* means (i) those Holders of Senior Notes Claims who have executed the Plan Support Agreement and collectively hold more than 66 $^{2/3}$% in principal amount of Senior Notes and (ii) those Holders of Senior Notes Claims who have opted-in to the settlement described in Article III.C.4 below, in accordance with the terms of the Plan and any applicable Ballot and solicitation procedures.

34.    *"Consenting Shareholders"* means the Court Square affiliates that have executed the Plan Support Agreement and that collectively hold approximately 89.98% of the outstanding shares in Holdings.

35.    *"Consummation"* means the occurrence of the Effective Date.

36.    *"Contributed Claims"* shall have the meaning set forth in Article IV.V.

37.    *"Contributing Claimants"* means the Debtors and their Estates, the Consenting Noteholders, and the Consenting Shareholders.

38.    *"Court Square"* means (i) Court Square Capital Partners II, L.P., Court Square Capital Partners II-A, L.P., Court Square Capital Partners (Executive) II, L.P., Court Square Capital Partners (Offshore) II, L.P. (in their respective capacities as equity holders, debt holders, and advisor, only) and (ii) each of their current and former Affiliates, (iii) any investment fund managed by Court Square Capital Partners II, L.P. or its Affiliates, (iv) any current or former Affiliates of any such investment fund, (v) any successor to Court Square Capital Partners II, L.P., investment management business, and (vi) current or former directors, officers, members, shareholders, partners, employees, and agents of any of the foregoing entities.

3

39.     "*Cure Claim*" means a Claim based upon a Debtor's default under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtor pursuant to section 365 of the Bankruptcy Code.

40.     "*Cure Notice*" means a notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include (a) procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases, (b) Cure Claims to be paid in connection therewith, and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

41.     "*Debtor*" means one of the Debtors, in its individual capacity as a debtor and debtor in possession in the Chapter 11 Cases.

42.     "*Debtors*" means, collectively: (a) Holdings; (b) Actra Rehabilitation Associates, Inc.; (c) Alexandria Sports; Inc.; (d) Benchmark Acquisition Corp.; (e) Benchmark Medical Management Company; (f) Benchmark O & P Holdings, Inc.; (g) Benchmark Orthotics & Prosthetics, Inc.; (h) Blue Hen Physical Therapy, Inc.; (i) Cape Prosthetics-Orthotics, Inc.; (j) Carrollton Physical Therapy Clinic, Inc.; (k) Integrity Physical Therapy, Inc.; (l) Keystone Rehabilitation Associates of Warren; (m) Keystone Rehabilitation Systems, Inc.; (n) Keystone Rehabilitation Systems of McMurray (o) Leesburg Sports, Inc.; (p) MATRIX Healthcare Services, LLC; (q) MATRIX Rehabilitation, Inc.; (r) MATRIX Rehabilitation-Delaware, Inc.; (s) MATRIX Rehabilitation-Georgia, Inc.; (t) MATRIX Rehabilitation-Ohio, Inc.; (u) MATRIX Rehabilitation-South Carolina, Inc.; (v) MATRIX Rehabilitation-Texas, Inc.; (w) Morris Area Rehabilitation Association, Inc.; (x) North Dallas Physical Therapy Associates, Inc.; (y) Northstar Health Services, Inc.; (z) NSHS Services, Inc.; (aa) Orthopaedic Services of Paducah, Inc.; (bb) PhysioLink Corporation; (cc) PAH; (dd) Physiotherapy Associates-Union Rehab, LLC; (ee) Physiotherapy Associates, Inc.; (ff) Physiotherapy Corporation; (gg) Physiotherapy-BMHI Holdings, Inc.; (hh) Physiotherapy-BMI, Inc.; (ii) Potomac Rehabilitation Services, Inc.; (jj) Professional Rehab Associates, Inc.; (kk) Progressive Therapy Services, Inc.; (ll) R.S. Network, Inc.; (mm) Rehab Associates, LLC; (nn) Rehab Colorado, LLC; (oo) Rehab Missouri, LLC; (pp) Rehab Xcel, LLC; (qq) Rehabilitation Consultants, Inc.; (rr) SMR Banyan Tree, Inc.; (ss) Swanson Orthotic & Prosthetic Center, Inc.; (tt) The Parks Physical Therapy and Work Hardening Center, Inc.; (uu) Theraphysics Partners of Colorado, Inc.; (vv) Theraphysics Partners of Texas, Inc.; (ww) Therapy Associates of Martinsville, Inc.; (xx) Trumbull P.T. Corp.; and (yy) Wisconsin Prosthetics and Orthotics, Inc.

43.     "*Description of Transaction Steps*" means the description of the Restructuring Transactions as set forth in the Plan Supplement.

44.     "*Disbursing Agent*" means the Reorganized Debtors or the Entity or Entities selected by the Reorganized Debtors to make or facilitate distributions contemplated under the Plan.

45.     "*Disclosure Statement*" means the Disclosure Statement for the Joint Prepackaged Plan of Reorganization of Physiotherapy Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, dated October 10, 2013, as amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, and that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules and any other applicable law, and is in form and substance reasonably acceptable in all respects to the Consenting Shareholders and the Ad Hoc Committee of Senior Noteholders.

46.     "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

47.     "*Distribution Record Date*" means the Effective Date.

48.     "*Effective Date*" means the date selected by the Debtors, the Ad Hoc Committee of Senior Noteholders, the Consenting Bridge Loan Lenders, and the Consenting Shareholders that is a Business Day after the Confirmation Date on which (a) the conditions to the occurrence of the Effective Date have been satisfied or waived pursuant to Article IX.A and Article IX.B and (b) no stay of the Confirmation Order is in effect.

K&E 27461178

49.        *"Entity"* means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

50.        *"Estate"* means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

51.        *"Exculpated Claim"* means any Claim related to any act or omission derived from, based upon, related to, or arising from the Debtors' restructuring efforts, the Chapter 11 Cases, formulation, preparation, dissemination, negotiation, solicitation or filing of the Disclosure Statement, the Plan (including any term sheets related thereto), or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Consummation, and the administration and implementation of the Plan, including (a) the New Corporate Governance Documents, (b) the Restructuring Transactions, (c) the issuance of the New Common Stock, and (d) the distribution of property under the Plan or any other agreement, provided, however, that any Contributed Claim shall not be an Exculpated Claim.

52.        *"Exculpated Party"* means each of:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Bridge Loan Agent; (d) the Bridge Loan Lenders; (e) the Ad Hoc Committee of Senior Noteholders; (f) the Holders of Senior Notes Claims who executed the Plan Support Agreement; (g) the Senior Notes Indenture Trustee; (h) the Exit Facility Agent; (i) the Exit Lenders; (j) the Consenting Shareholders; and (k) with respect to each of the foregoing Entities in clauses (a) through (j), such Entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, and current (as of September 1, 2013) officers, directors, principals, members, partners, shareholders employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, advisory board members and other professionals, and such Persons' respective heirs, executors, estates, servants, and nominees.  Notwithstanding the foregoing, under no circumstances shall any of the Potential Defendants and Witnesses constitute an Exculpated Party.

53.        *"Executory Contract"* means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

54.        *"Exit Facility*" means (a) a term loan credit facility of $144.162 million, of which $140 million shall be used to refinance the existing Bridge Loan Facility and (b) incremental credit facilities, each to be issued and accessed in accordance with the Exit Facility Credit Agreement and each secured by a first-priority lien on and security interests in substantially all the Reorganized Debtors' assets, which facilities shall be consistent in all material respects with the Exit Facility Commitment Letter and in form and substance reasonably acceptable to the Ad Hoc Committee of Senior Noteholders, to be executed and delivered by the parties thereto on or about, and as a condition to, the Effective Date.

55.        *"Exit Facility Agent"* means U.S. Bank National Association or such other financial institution in its capacity as administrative agent, collateral agent, and issuing bank under the Exit Facility Credit Agreement.

56.        *"Exit Facility Commitment Letter"* means the commitment letter, which is attached as Exhibit B to the Disclosure Statement, setting forth the material terms of the Exit Facility Credit Agreement.

57.        *"Exit Facility Credit Agreement"* means that certain agreement governing the Exit Facility, dated on or about the Effective Date by and among the Reorganized Debtors, the lenders party thereto, and the Exit Facility Agent, in its capacities as administrative agent, collateral agent, and issuing bank (as amended, restated, supplemented, or otherwise modified from time to time).

58.        *"Exit Lenders"* means those "Lenders" under (and as defined in) the Exit Facility Credit Agreement.

K&E 27461178

59.     *"Federal Judgment Rate"* means the federal judgment rate in effect as of the Petition Date.

60.     *"Fee Claim"* means a Claim for Accrued Professional Compensation.

61.     *"File," "Filed,"* or *"Filing"* means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

62.     *"Final Order"* means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

63.     *"General Unsecured Claim"* means any Unsecured Claim that is not (a) an Administrative Claim, (b) a Priority Tax Claim, (c) a Priority Non-Tax Claim, (d) a Senior Notes Claim, (e) a Subordinated Claim, (f) a Non-Subordinated Contribution and Reimbursement Claim, (g) a Fee Claim, or (h) an Intercompany Claim.

64.     *"Governmental Unit"* means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

65.     *"Holder"* means an Entity holding a Claim or an Interest.

66.     *"Impaired"* means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

67.     *"Independent Director Indemnification Obligations"* means the Debtors' obligation to indemnify Matthew Cantor, a current independent director of Holdings and PAH, with respect to or based upon any act or omission taken or omitted in any of such capacities, or for or on behalf of Holdings or PAH, pursuant to and to the maximum extent provided by (a) that certain Director Agreement by and between Holdings, PAH, and Matthew Cantor, dated as of May 1, 2013, (b) the (i) articles of incorporation, (ii) certificates of formation, (iii) bylaws, and (iv) similar corporate documents (including under an Executory Contract or otherwise) of Holdings and/or PAH, and (c) applicable law, as in effect as of the Petition Date.

68.     *"Initial Litigation Trust Funding"* shall have the meaning set forth in Article IV.V.

69.     *"Intercompany Claim"* means any Claim held by a Debtor against another Debtor.

70.     *"Intercompany Interest"* means an Interest in a Debtor held by another Debtor.

71.     *"Interests"* means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors together with any warrants, options, or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto.

72.     *"Internal Revenue Code"* means the Internal Revenue Code of 1986, as amended from time to time.

73.     *"Judicial Code"* means title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

74.    "*Legacy D&O Liability Insurance Policies*" means Policy Nos. 0306-3479 and 0307-4999 issued by Darwin National Assurance Company, including all endorsements, riders, and amendments thereto.

75.    "*Lien" me*ans a lien as defined in section 101(37) of the Bankruptcy Code.

76.    "*Litigation Trust*" means that certain trust established pursuant to the Plan and the Confirmation Order on the Effective Date.

77.    "*Litigation Trust Agreement*" means that certain agreement, in form and substance mutually acceptable to the Ad Hoc Committee of Senior Noteholders and the Consenting Shareholders, setting forth the terms and conditions governing the Litigation Trust, the form of which is attached as Exhibit F to the Disclosure Statement and will be included in the Plan Supplement.

78.    "*Litigation Trust Beneficiaries*" means, collectively, the Consenting Shareholders and Holders of Allowed Senior Notes Claims, each in their capacity as beneficiaries of the Litigation Trust, and their permitted assignees and transferees in accordance with the Litigation Trust Agreement.

79.    "*Litigation Trust Funding*" shall have the meaning set forth in Article IV.V.

80.    "*Litigation Trust Units*" means the 10,000 trust units initially allocated to the Litigation Trust Beneficiaries on the Effective Date, and any additional trust units allocated in accordance with the Litigation Trust Agreement.

81.    "*Litigation Trustee*s" means those three (3) original trustees and any successors to the original trustees.  As set forth in the Litigation Trust Agreement, one of the trustees shall be appointed by (and may be replaced by) the Consenting Noteholders, one of the trustees shall be appointed by (and may be replaced by) the Consenting Shareholders, and one of the trustees shall be an independent member appointed (or replaced) by mutual agreement of the Consenting Noteholders and Consenting Shareholders.  The trustees shall govern the Litigation Trust in accordance with the Litigation Trust Agreement.

82.    "*Management Employment Agreements*" means those management employment agreements by and between the Debtors and the Debtors' current (as of September 1, 2013) senior management team.

83.    "*Management Incentive Plan*" means that certain post-Effective Date equity incentive program, which shall provide for up to 10% of the New Common Stock, on a fully diluted basis.  The terms, form of equity, and allocation of the Management Incentive Plan shall be determined by the New PAH Board.

84.    "*New Boards*" means, collectively, the New PAH Board and the New Subsidiary Boards, as initially comprised in accordance with the terms of the applicable New Corporate Governance Documents.

85.    "*New By-Laws*" means the form of the by-laws of each of the Reorganized Debtors.

86.    "*New Certificates of Incorporation*" means the form of the certificates of incorporation of the Reorganized Debtors.

87.    "*New Common Stock*" means a certain number of common shares in the capital of Reorganized PAH authorized pursuant to the Plan, of which up to approximately 2.1 million shares shall be initially issued and outstanding as of the Effective Date.

88.    "*New Corporate Governance Documents*" means, as applicable, (a) the New Certificates of Incorporation, (b) the New By-Laws, and (c) the New Stockholders Agreement.

89.    "*New PAH Board*" means the initial board of directors of Reorganized PAH.

7

90.     *"New Stockholders Agreement"* means the stockholders agreement for Reorganized PAH, the form of which is attached as Exhibit E to the Disclosure Statement and will be included in the Plan Supplement.

91.     *"New Subsidiary Boards"* means, with respect to each of the Reorganized Debtors other than Reorganized PAH, the initial board of directors or member, as the case may be, of each such Reorganized Debtor.

92.     *"Non-Subordinated Contribution and Reimbursement Claims"* means Claims against the Debtors for contribution, indemnification, or reimbursement that are not Subordinated Claims and are brought: (a) by any Person or Entity arising out of or resulting from the pursuit of litigation by the Litigation Trust; (b) by a Released Party other than a current officer or employee of the Debtors (as of September 1, 2013) arising out of or resulting from (i) all claims and Causes of Action against any party based on, arising out of, or relating to the 2012 Transaction, including without limitation any claims or Causes of Action for unlawful dividend, fraudulent conveyance or avoidance, (ii) all claims and Causes of Action based on, arising out of, or related to the issuance of any Security of any Debtor, (iii) all claims and Causes of Action based on, arising out of, or related to the restatement, adjustment, correction, or modification of the Debtors' financial statements, including without limitation all claims or Causes of Action based on, arising out of, or relating to (x) the Debtors' internal controls relating to financial statements and financial reporting; and (y) materially misleading financial statements provided to the Contributing Claimants in connection with the 2012 Transaction, (iv) all claims and Causes of Action based on, arising out of, or related to the misrepresentation of any of the Debtors' financial information and related internal controls, including without limitation the overstatement of the Debtors' revenue, accounts receivable, and/or EBITDA, (v) all claims and Causes of Action based on, arising out of, or related to any failure to disclose, or actual or attempted cover up or obfuscation of any of the conduct described in the Disclosure Statement (including on Exhibit G thereto) and/or (i)-(iv) above, (vi) all claims and Causes of Action for breach of fiduciary duty (including but not limited to breaches of the duties of care, good faith, and loyalty), and (vii) any and all claims and Causes of Action arising from actions taken or not taken in connection with the Restructuring and the Chapter 11 Cases; or (c) by a Released Party that is a current officer or employee of the Debtors (as of September 1, 2013) arising out of or resulting from (i) all claims and Causes of Action against any party based on, arising out of, or relating to the 2012 Transaction, including without limitation any claims or Causes of Action for unlawful dividend, fraudulent conveyance or avoidance, (ii) all claims and Causes of Action based on, arising out of, or related to the issuance of any Security of any Debtor, (iii) all claims and Causes of Action based on, arising out of, or related to the restatement, adjustment, correction, or modification of the Debtors' financial statements, including without limitation all claims or Causes of Action based on, arising out of, or relating to (x) the Debtors' internal controls relating to financial statements and financial reporting; and (y) materially misleading financial statements provided to the Contributing Claimants in connection with the 2012 Transaction, (iv) all claims and Causes of Action based on, arising out of, or related to the misrepresentation of any of the Debtors' financial information and related internal controls, including without limitation the overstatement of the Debtors' revenue, accounts receivable, and/or EBITDA, and (v) all claims and Causes of Action based on, arising out of, or related to any failure to disclose, or actual or attempted cover up or obfuscation of any of the conduct described in the Disclosure Statement (including on Exhibit G thereto) and/or (i)-(iv) above.  For the avoidance of doubt, Independent Director Indemnification Obligations do not constitute Non-Subordinated Contribution and Reimbursement Claims or Subordinated Claims, and shall be assumed by the Reorganized Debtors.

93.     *"Other Secured Claim"* means any Secured Claim that is not a Bridge Loan Credit Agreement Claim.

94.     *"PAH"* means Physiotherapy Associates Holdings, Inc.

95.     *"Person"* means a person as such term as defined in section 101(41) of the Bankruptcy Code.

96.     *"Petition Date"* means the date on which each of the Debtors commenced the Chapter 11 Cases.

8

97.    *"Plan"* means this Joint Prepackaged Plan of Reorganization of Physiotherapy Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, including the Plan Supplement (as modified, amended, or supplemented from time to time), which is incorporated herein by reference.

98.    *"Plan Supplement"* means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, each in form and substance reasonably acceptable to the Consenting Bridge Loan Lenders, the Ad Hoc Committee of Senior Noteholders,, and Consenting Shareholders, to be Filed by the Debtors no later than five days before the Confirmation Hearing or as soon as reasonably practicable thereafter, and as may be amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules, including the following: (a) the New Corporate Governance Documents for Reorganized PAH; (b) the Rejected Executory Contract and Unexpired Lease List; (c) the Assumed Executory Contract and Unexpired Lease List; (d) a list of retained Causes of Action; (e) the Litigation Trust Agreement; (f) the Exit Facility Credit Agreement; (g) the members of the New Boards, to the extent known; (h) the Description of Transaction Steps; and (i) the Management Employment Agreements.  Any reference to the Plan Supplement in this Plan shall include each of the documents identified above as (a) through (i).  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement in accordance with Article X.A hereof, and the Reorganized Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement in accordance with applicable law.

99.    *"Plan Support Agreement"* means that certain plan support agreement, dated as of October 10, 2013, by and among the Debtors, the Consenting Bridge Loan Lenders, the Consenting Noteholders party thereto, and the Consenting Shareholders, a copy of which is attached as Exhibit H to the Disclosure Statement

100.    *"Potential Defendants and Witnesses"* means those Persons and/or Entities set forth on Exhibit C to the Disclosure Statement, as such exhibit may be amended prior to the Effective Date with the consent of the Contributing Claimants, or on or after the Effective Date in accordance with the Litigation Trust Agreement.

101.    *"Priority Non-Tax Claims"* means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

102.    *"Priority Tax Claims"* means any Claim of the kind specified in section 507(a)(8) of the Bankruptcy Code.

103.    *"Professional"* means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

104.    *"Professional Fee Escrow Account"* means an interest-bearing account to hold and maintain an amount of Cash equal to the Professional Fee Reserve Amount funded by the Debtors on the Effective Date solely for the purpose of paying all Allowed and unpaid Accrued Professional Compensation Claims.

105.    *"Professional Fee Reserve Amount"* means the aggregate Accrued Professional Compensation Claims through the Effective Date as estimated in accordance with Article II.A.2(c) hereof.

106.    *"Proof of Claim"* means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

107.    *"Pro Rata"* means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of all Allowed Claims in that Class.

108.    *"Reinstated"* means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

K&E 27461178

109.    *"Rejected Executory Contract and Unexpired Lease List"* means the list (as may be amended), as determined by the Debtors or the Reorganized Debtors and in form and substance reasonably acceptable to the Ad Hoc Committee of Senior Noteholders, of Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) that will be rejected by the Debtors pursuant to the provisions of Article V.A and which shall be included in the Plan Supplement.

110.    *"Rejection Claim"* means a Claim arising from the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code.

111.    *"Released Claims"* means (i) any and all claims and Causes of Action relating to any Debtor arising at any time prior to the Effective Date, including without limitation (a) all claims and Causes of Action against any party based on, arising out of, or relating to the 2012 Transaction, including without limitation any claims or Causes of Action for unlawful dividend, fraudulent conveyance or avoidance, (b) all claims and Causes of Action based on, arising out of, or related to the issuance of any Security of any Debtor, (c) all claims and Causes of Action based on, arising out of, or related to the restatement, adjustment, correction, or modification of the Debtors' financial statements, including without limitation all claims or Causes of Action based on, arising out of, or relating to (i) the Debtors' internal controls relating to financial statements and financial reporting; and (ii) materially misleading financial statements provided to the Contributing Claimants in connection with the 2012 Transaction, (d) all claims and Causes of Action based on, arising out of, or related to the misrepresentation of any of the Debtors' financial information and related internal controls, including without limitation the overstatement of the Debtors' revenue, accounts receivable, and/or EBITDA, and (e) all claims and Causes of Action based on, arising out of, or related to any failure to disclose, or actual or attempted cover up or obfuscation of any of the conduct described in the Disclosure Statement (including on Exhibit G thereto) and/or (a)-(d) above; and (ii) any and all claims and Causes of Action arising from actions taken or not taken in connection with the Restructuring and the Chapter 11 Cases; <u>provided</u>, <u>however</u>, that with respect to any Released Party, Released Claims shall not include any claims, Causes of Action or liabilities arising out of or relating to any act or omission of such Released Party that constitutes gross negligence, willful misconduct, or fraud.

112.    *"Released Party"* means each of:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Bridge Loan Agent; (d) the Bridge Loan Lenders; (e) the Consenting Noteholders; (f) the Ad Hoc Committee of Senior Noteholders; (g) the Senior Notes Indenture Trustee; (h) the Exit Facility Agent; (i) the Exit Lenders; (j) the Consenting Shareholders; and (k) with respect to each of the foregoing Entities in clauses (a) through (k), such Entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, and current (as of September 1, 2013) officers, directors, principals, members, partners, shareholders, employees, agents (other than third-party vendors performing services for the Debtors), financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, advisory board members and other professionals, and such Persons' respective heirs, executors, estates, servants, and nominees.  Notwithstanding the foregoing, under no circumstances shall any of the Potential Defendants and Witnesses constitute a Released Party.

113.    *"Releasing Parties"* means each of: (a) the Debtors; (b) the Bridge Loan Agent; (c) the Bridge Loan Lenders; (d) the Consenting Noteholders; (e) the Senior Notes Indenture Trustee; (f) the Consenting Shareholders; and (g) without limiting the foregoing clauses (a), (b), (c), (d), (e), and (f), and notwithstanding anything contained herein to the contrary, the Holders of Claims against and Interests in the Debtors and the Reorganized Debtors who (i) vote to accept the Plan or are presumed to have voted to accept the Plan under section 1126(f) of the Bankruptcy Code and (ii) for Holders of Senior Notes Claims, have opted-in to the settlement described in Article III.C.4 below.

114.    *"Reorganized Debtors"* means the Debtors (other than Holdings, which shall be dissolved on the Effective Date), or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

115.    *"Reorganized PAH"* means PAH, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date, it being understood that, as of the Effective Date, Reorganized PAH shall be a corporation organized under the laws of the state of Delaware.

K&E 27461178

116.    *"Restructuring Transactions"* means one or more transactions pursuant to section 1123 of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (d) the execution and delivery of all documents in connection with the creation and funding of the Litigation Trust; and (e) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

117.    *"Secured"* means when referring to a Claim:  (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed as such pursuant to the Plan.

118.    *"Securities Act"* means the Securities Act of 1933, 15 U.S.C. 77a-77aa, together with the rules and regulations promulgated thereunder.

119.    *"Security"* means a security as defined in section 2(a)(1) of the Securities Act.

120.    *"Senior Notes"* means those certain 11.875% Senior Notes due 2019 issued pursuant to the Senior Notes Indenture.

121.    *"Senior Notes Claim"* means any Claim derived from, based upon, relating to, or arising from the Senior Notes Indenture.

122.    *"Senior Notes Guarantors"* means, collectively: (a) Actra Rehabilitation Associates, Inc.; (b) Alexandria Sports; Inc.; (c) Benchmark Acquisition Corp.; (d) Benchmark Medical Management Company; (e) Benchmark O & P Holdings, Inc.; (f) Benchmark Orthotics & Prosthetics, Inc.; (g) Blue Hen Physical Therapy, Inc.; (h) Cape Prosthetics-Orthotics, Inc.; (i) Carrollton Physical Therapy Clinic, Inc.; (j) Integrity Physical Therapy, Inc.; (k) Keystone Rehabilitation Associates of Warren; (l) Keystone Rehabilitation Systems, Inc.; (m) Leesburg Sports, Inc.; (n) MATRIX Healthcare Services, LLC; (o) MATRIX Rehabilitation, Inc.; (p) MATRIX Rehabilitation-Delaware, Inc.; (q) MATRIX Rehabilitation-Georgia, Inc.; (r) MATRIX Rehabilitation-Ohio, Inc.; (s) MATRIX Rehabilitation-South Carolina, Inc.; (t) MATRIX Rehabilitation-Texas, Inc.; (u) Morris Area Rehabilitation Association, Inc.; (v) North Dallas Physical Therapy Associates, Inc.; (w) Northstar Health Services, Inc.; (x) NSHS Services, Inc.; (y) Orthopaedic Services of Paducah, Inc.; (z) PhysioLink Corporation; (aa) PAH; (bb) Physiotherapy Associates-Union Rehab, LLC; (cc) Physiotherapy Associates, Inc.; (dd) Physiotherapy Corporation; (ee) Physiotherapy-BMHI Holdings, Inc.; (ff) Physiotherapy-BMI, Inc.; (gg) Potomac Rehabilitation Services, Inc.; (hh) Professional Rehab Associates, Inc.; (ii) Progressive Therapy Services, Inc.; (jj) R.S. Network, Inc.; (kk) Rehab Associates, LLC; (ll) Rehab Colorado, LLC; (mm) Rehab Missouri, LLC; (nn) Rehab Xcel, LLC; (oo) Rehabilitation Consultants, Inc.; (pp) SMR Banyan Tree, Inc.; (qq) Swanson Orthotic & Prosthetic Center, Inc.; (rr) The Parks Physical Therapy and Work Hardening Center, Inc.; (ss) Theraphysics Partners of Colorado, Inc.; (tt) Theraphysics Partners of Texas, Inc.; (uu) Therapy Associates of Martinsville, Inc.; (vv) Trumbull P.T. Corp.; and (ww) Wisconsin Prosthetics and Orthotics, Inc.

123.    *"Senior Notes Indenture"* means that certain indenture, dated as of April 30, 2012, as amended by the Supplemental Indenture (and as may be further amended, supplemented, or modified from time to time), for an issuance of $210,000,000 of Senior Notes at 11.875% interest, by and among PAH (successor by merger to Physiotherapy Merger Sub, Inc.), the Senior Notes Guarantors, and the Senior Notes Indenture Trustee.

K&E 27461178

124.     *"Senior Notes Indenture Trustee"* means The Bank of New York Mellon Trust Company N. A., in its capacities as trustee, registrar, paying agent and custodian under the Senior Notes Indenture.

125.     *"Senior Notes Indenture Trustee Charging Lien"* means any Lien or other priority in payment to which the Senior Notes Indenture Trustee is entitled, pursuant to the Senior Notes Indenture, against distributions to be made to holders of Allowed Senior Notes Claims, for payment of any Senior Notes Indenture Trustee Fees.

126.     *"Senior Notes Indenture Trustee Fees"* means the reasonable compensation, fees, expenses, disbursements and indemnity claims, including, without limitation, attorneys' and agents' fees, expenses and disbursements, incurred by the Senior Notes Indenture Trustee, whether prior to or after the Petition Date and whether prior to or after the consummation of the Plan, to the extent provided for under the Senior Notes Indenture.

127.     *"Senior Notes Litigation Trust Recovery"* means the 5,000 Litigation Trust Units allocated to Holders of Senior Notes on the Effective Date pursuant to the Plan.

128.     *"Subordinated Claims"* means Claims that are subordinated by section 510 of the Bankruptcy Code or otherwise applicable law.

129.     *"Supplemental Indenture"* means that certain supplemental indenture, dated as of June 18, 2013, by and among PAH (successor by merger to Physiotherapy Merger Sub, Inc.) and the Senior Notes Indenture Trustee

130.     *"Treasury Regulations"* means regulations (including temporary and proposed) promulgated under the Internal Revenue Code.

131.     *"Trust Indemnification Claims"* shall have the meaning set forth in Article IV.S.

132.     *"Unexpired Lease"* means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

133.     *"Unimpaired"* means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

134.     *"Unsecured Claim"* means any Claim that is neither Secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court, including any Claim arising from the rejection of an Executory Contract or Unexpired Lease under section 365 of the Bankruptcy Code.

135.      *"U.S. Trustee"* means the United States Trustee for the District of Delaware.

136.     *"Voting Deadline"* means 11:59 p.m. (prevailing Eastern Time) on November 8, 2013.

B.     *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than

to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and the Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (13) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further Bankruptcy Court order; and (14) any undefined term used herein that is defined in the Bankruptcy Code shall have the meaning ascribed to such term in the Bankruptcy Code.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided, however, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND OTHER UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.      *Administrative Claims.*

1.      Administrative Claims.

Except with respect to Administrative Claims that are Fee Claims and except to the extent that a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment with respect to such Holder, each Holder of an Allowed Administrative Claim shall be paid in full in Cash on the later of:  (a) on or as

soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that Allowed Administrative Claims that arise in the ordinary course of the Debtors' business shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

Except as otherwise provided in this Article II.A, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than the Administrative Claims Objection Deadline.

      2.      Professional Compensation.

      (a)      Fee Claims.

Professionals asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, or any other applicable order of the Bankruptcy Court, an application for final allowance of such Fee Claim no later than 20 days after the Effective Date. Objections to any Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party no later than 40 days after the Effective Date. To the extent necessary, the Plan and the Confirmation Order shall amend and supersede any previously entered order regarding the payment of Fee Claims. Notwithstanding anything contrary to the foregoing contained in the Plan, in no event shall the Debtors' payments for professional fees and expenses for the period September 9, 2013 through the Effective Date relating to the investigation of the 2012 Transaction and the preparation for litigation of the Contributed Claims exceed $250,000, unless otherwise agreed to by the Ad Hoc Committee of Senior Noteholders in their sole and absolute discretion.

      (b)      Professional Fee Escrow Account.

On the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Such funds shall not be considered property of the Litigation Trust, property of the Debtors' Estates, or property of the Reorganized Debtors. The amount of Accrued Professional Compensation Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Claims are Allowed by a Final Order. Allowed Accrued Professional Compensation Claims shall be paid first from amounts in the Professional Fee Escrow Account and then by the Reorganized Debtors. When all Allowed Professional Compensation Claims are paid in full in Cash, amounts remaining in the Professional Fee Escrow Account, if any, shall revert to the Reorganized Debtors.

      (c)      Professional Fee Reserve Amount.

To receive payment for unbilled fees and expenses incurred through and including the Effective Date, the Professionals shall estimate their Accrued Professional Compensation Claims prior to and as of the Confirmation Date, along with an estimate of fees and expenses to be incurred through and including the Effective Date, and shall deliver such estimate to the Debtors no later than five days prior to the anticipated Confirmation Date; provided, however, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional. If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional. The total amount so estimated as of the Confirmation Date shall comprise the Professional Fee Reserve Amount.

(d)      Post-Effective Date Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtors or the Litigation Trust, as applicable, shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Reorganized Debtors or Litigation Trust, as applicable, following the Effective Date. Upon the Effective  Date, any requirement that Professionals comply with section 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate and the Reorganized Debtors or Litigation Trust, as applicable, may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action, order, or approval of the Bankruptcy Court.

B.      *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, at the option of the Debtors or Reorganized Debtors, one of the following treatments:  (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, plus interest at the rate determined under applicable nonbankruptcy law and to the extent provided for by section 511 of the Bankruptcy Code, payable on the or as soon as practicable following the Effective Date; (2) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, plus interest at the rate determined under applicable nonbankruptcy law and to the extent provided for by section 511 of the Bankruptcy Code; or (3) such other treatment as may be agreed upon by such holder and the Debtors or otherwise determined upon an order of the Bankruptcy Court.

C.      *Statutory Fees.*

Notwithstanding anything to the contrary contained herein, on the Effective Date, the Debtors shall pay, in full in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation. The Reorganized Debtors shall pay all U.S. Trustee fees due and owing under 28 U.S.C. § 1930 until such time as the Reorganized Debtors move for entry of a final decree and the Bankruptcy Court enters such a decree; provided, however, that if the Litigation Trust opposes such motion, the Litigation Trust shall thereafter bear the cost of all U.S. Trustee fees until the Bankruptcy Court enters a final decree closing the Chapter 11 Cases.

**ARTICLE III.
CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

A.      *Classification of Claims and Interests.*

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests.  All Claims and Interests, except for Administrative Claims and Priority Tax Claims, are classified in the Classes set forth in this Article III.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied before the Effective Date.

B.      *Summary of Classification.*

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as set forth below.  The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.  All of the potential Classes for the Debtors

are set forth herein.  Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.E hereof.

The following chart summarizes the classification of Claims and Interests pursuant to the Plan:

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Bridge Loan Credit Agreement Claims | Impaired | Entitled to Vote |
| 4 | Senior Notes Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| 6 | Intercompany Claims | Unimpaired | Deemed to Accept |
| 7 | Subordinated Claims | Impaired | Deemed to Reject |
| 8 | Non-Subordinated Contribution and Reimbursement Claims | Unimpaired | Deemed to Accept |
| 9 | Intercompany Interests | Unimpaired | Deemed to Accept |
| 10 | Interests (other than Class 9 Interests) | Impaired | Deemed to Reject |

C.    *Treatment of Claims and Interests.*

To the extent a Class contains Allowed Claims or Allowed Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below:

1.    Class 1 - Priority Non-Tax Claims.

(a)    *Classification:* Class 1 consists of Priority Non-Tax Claims.

(b)    *Treatment:* Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Non-Tax Claim, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash on or as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Priority Non-Tax Claim against the Debtors becomes an Allowed Priority Non-Tax Claim, (iii) such other date as may be ordered by the Bankruptcy Court, or (iv) when due and payable in the ordinary course of business.

(c)    *Voting:* Class 1 is Unimpaired by the Plan, and each Holder of a Class 1 Priority Non-Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1 Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan.

2.    Class 2 - Other Secured Claims.

(a)    *Classification:* Class 2 consists of Other Secured Claims.

(b)    *Treatment:* Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive one of the following treatments, in the sole discretion of the applicable Debtor or Reorganized Debtor:  (i) the Debtors or the Reorganized Debtors shall pay such

16

Allowed Other Secured Claims in full in Cash, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code; (ii) the Debtors or the Reorganized Debtors shall deliver the collateral securing any such Allowed Other Secured Claim; or (iii) the Debtors or the Reorganized Debtors shall otherwise treat such Allowed Other Secured Claim in any other manner such that the Claim shall be rendered Unimpaired.

(c)     *Voting:* Class 2 is Unimpaired by the Plan, and each Holder of a Class 2 Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 2 Other Secured Claims are not entitled to vote to accept or reject the Plan.

3.     Class 3 - Bridge Loan Credit Agreement Claims

(a)     *Classification:* Class 3 consists of all Bridge Loan Credit Agreement Claims.

(b)     *Allowance:* The Bridge Loan Credit Agreement Claims shall be Allowed in the aggregate principal amount of $140,000,000, plus interest on such Claim, and any reasonable fees, costs, charges and other expenses provided for under the Bridge Loan Credit Agreement.

(c)     *Treatment:* Except to the extent that a Holder of an Allowed Bridge Loan Credit Agreement Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of the Allowed Bridge Loan Credit Agreement Claims, each Holder of an Allowed Bridge Loan Credit Agreement Claim shall (i) receive its Pro Rata share of the Exit Facility or (ii) be paid in full in Cash.

(d)     *Voting:* Class 3 is Impaired.  Therefore, Holders of Class 3 Bridge Loan Credit Agreement Claims are provisionally entitled to vote to accept or reject the Plan.

4.     Class 4 - Senior Notes Claims

(a)     *Classification:* Class 4 consists of all Senior Notes Claims.

(b)     *Allowance:*  The Senior Notes Claims shall be Allowed in the aggregate principal amount of $210,000,000.

(c)     *Treatment:* Except to the extent that a Holder of an Allowed Senior Notes Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of the Allowed Senior Notes Claims, each Holder of an Allowed Senior Notes Claim shall receive (i) subject to the final two sentences of this paragraph, its Pro Rata share of 100% of the New Common Stock (subject to dilution by the Management Incentive Plan) based on the principal amount of Senior Notes held by such Holder on the Distribution Record Date (calculated by issuing ten (10) shares of New Common Stock for every $1,000 in principal amount of Senior Notes held by such Holder on the Distribution Record Date) and (ii) a share of the Senior Notes Litigation Trust Recovery.  The share of the Senior Notes Litigation Trust Recovery allocated to the Holder of an Allowed Senior Notes Claim will be determined in accordance with Article IV.V and will be based on whether a Holder elects to opt-in to the settlement described in Article IV.C.  To opt-in to the settlement, a Holder of an Allowed Senior Notes Claim must agree, by electing on its Ballot, to (i) become a Releasing Party and (ii) assign its Contributed Claims to the Litigation Trust. By electing to opt-in to the settlement on its Ballot, the Holder of an Allowed

17

Senior Notes Claim agrees that, subject to the occurrence of the Effective Date and the formation of the Litigation Trust, it will be deemed, without further action, (i) to have assigned its Contributed Claims to the Litigation Trust and (ii) to have agreed to execute any documents reasonably requested to effectuate the foregoing.  The Litigation Trust Agreement will be binding on all Holders of Senior Notes Claims and all Holders of Senior Notes Claims shall be deemed to have executed the Litigation Trust Agreement as of the Effective Date.  All distributions made in respect of Allowed Senior Note Claims shall be made on account of the principal amount of such Claims and not on account of any prepetition or postpetition interest that may be owed in respect of such Claims.  The Holders of Claims in Class 4 shall be required to execute the New Stockholders Agreement before receiving their respective distributions of the New Common Stock under the Plan.  If a Holder of a Class 4 Claim as of the Distribution Record Date does not return a completed and executed signature page to the New Stockholders Agreement so that it is received by the Disbursing Agent on or before the 90th day after the Effective Date, such Holder shall be deemed to forever forfeit its right to receive the New Common Stock (but not its share of the Senior Notes Litigation Trust Recovery).

(d)    *Voting:* Class 4 is Impaired.  Therefore, Holders of Class 4 Senior Notes Claims are entitled to vote to accept or reject the Plan.

5.    Class 5 - General Unsecured Claims.

(a)    *Classification:* Class 5 consists of General Unsecured Claims.

(b)    *Treatment:* Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each General Unsecured Claim, each Holder of such Allowed General Unsecured Claim shall receive one of the following treatments, in the sole discretion of the applicable Debtor or Reorganized Debtor:  (i) the Debtors or the Reorganized Debtors shall pay such Allowed General Unsecured Claim in the ordinary course of business or (ii) the Debtors or the Reorganized Debtors shall pay such Allowed General Unsecured Claim in full in Cash, including interest at the contractual rate, upon the later of (A) the Effective Date, (B) the date on which such General Unsecured Claim against the Debtors becomes an Allowed General Unsecured Claims, (C) or such other date as may be ordered by the Bankruptcy Court.

(c)    *Voting:* Class 5 is Unimpaired by the Plan, and each Holder of a Class 5 General Unsecured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 5 General Unsecured Claims are not entitled to vote to accept or reject the Plan.

6.    Class 6 - Intercompany Claims.

(a)    *Classification:* Class 6 consists of Intercompany Claims.

(b)    *Treatment:* No distribution shall be made on account of Allowed Intercompany Claims.  To preserve the Debtors' corporate structure, on the Effective Date, or as soon thereafter as practicable, all Allowed Intercompany Claims shall be reinstated in full or in part or cancelled or discharged in full or in part, in each case, to the extent determined appropriate by the Reorganized Debtors; provided that Intercompany Claims held by Holdings shall not receive any distribution under the Plan and shall be canceled and discharged on the Effective Date.  The Debtors and the Reorganized Debtors will be entitled to transfer funds between

18

and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors historical intercompany account settlement practices.

(c)     *Voting:* Class 6 is Unimpaired by the Plan, and each Holder of a Class 6 Intercompany Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 6 Intercompany Claims are not entitled to vote to accept or reject the Plan.

7.     Class 7 - Subordinated Claims.

(a)     *Classification:* Class 7 consists of Subordinated Claims.

(b)     *Treatment:* Holders of Allowed Subordinated Claims shall not receive any distribution on account of such Subordinated Claims. On the Effective Date, Allowed Subordinated Claims shall be discharged, canceled, released, and extinguished.

(c)     *Voting:* Class 7 is Impaired and Holders of Class 7 Subordinated Claims are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 7 Subordinated Claims are not entitled to vote to accept or reject the Plan.

8.     Class 8 - Non-Subordinated Contribution and Reimbursement Claims

(a)     *Classification:* Class 8 consists of Non-Subordinated Contribution and Reimbursement Claims.

(b)     *Treatment:* On the Effective Date, all of the Debtors' obligations with respect to Allowed Non-Subordinated Contribution and Reimbursement Claims shall be assumed by the Litigation Trust and, to the extent not satisfied by any available insurance coverage, satisfied solely by way of setoff or recoupment, to the extent applicable, or payment by the Litigation Trust, which shall be paid after the payment of costs and expenses, including legal fees, of the Litigation Trust, but prior to any further distributions to Litigation Trust Beneficiaries  and shall not be paid from the Litigation Trust Funding.  Any Allowed Non-Subordinated Contribution and Reimbursement Claims shall only be satisfied from the proceeds of the Contributed Claims after the payment of attorneys' fees and expenses, and there shall be no clawback against previous distributions to Litigation Trust Beneficiaries in order to satisfy any such claims.

(c)     *Voting:* Class 8 is Unimpaired by the Plan, and each Holder of a Class 8 Non-Subordinated Contribution and Reimbursement Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 8 Non-Subordinated Contribution and Reimbursement Claims are not entitled to vote to accept or reject the Plan.

9.     Class 9 - Intercompany Interests.

(a)     *Classification:* Class 9 consists of Intercompany Interests.

(b)     *Treatment:* No distribution shall be made on account of Allowed Intercompany Interests.  To preserve the Debtors' corporate structure, on the Effective Date, or

19

as soon thereafter as practicable, all Allowed Intercompany Interests shall be reinstated in full or in part or cancelled or discharged in full or in part, in each case, to the extent determined appropriate by the Reorganized Debtors. Notwithstanding the foregoing, on the Effective Date, Holdings' Interests in PAH shall be cancelled and discharged.

(c) *Voting:* Class 9 is Unimpaired by the Plan, and each Holder of a Class 9 Intercompany Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 9 Intercompany Interests are not entitled to vote to accept or reject the Plan.

10. Class 10 - Interests (other than Class 9 Interests).

(a) *Classification:* Class 10 consists of Interests (other than Class 9 Interests).

(b) *Treatment:* Holders of Interests (other than Class 9 Interests) shall not receive any distribution on account of such Interests. On the Effective Date, Class 10 Interests shall be cancelled and discharged.

(c) *Voting:* Class 10 is Impaired and Holders of Class 10 Interests are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 10 Interests are not entitled to vote to accept or reject the Plan.

D.      *Special Provision Governing Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors', the Reorganized Debtors', or the Litigation Trust's rights in respect of any Claims, including legal and equitable defenses to or setoffs or recoupments against any such Claims.

E.      *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.      *Acceptance or Rejection of the Plan.*

1. Voting Classes.

Classes 3 and 4 are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

2. Failure to Vote.

If Holders of Claims in a particular Impaired Class of Claims were given the opportunity to vote to accept or reject the Plan, but no Holders of Claims in such Impaired Class of Claims voted to accept or reject the Plan, then such Class of Claims shall be deemed to have accepted the Plan.

3. Presumed Acceptance of the Plan.

Classes 1, 2, 5, 6, 8, and 9 are Unimpaired under the Plan, and the Holders in such Classes are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

4.      Presumed Rejection of Plan.

Classes 7 and 10 are Impaired and shall receive no distribution under the Plan.  The Holders in such Classes are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

G.      *Confirmation Pursuant to Sections 1129(a) (10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

H.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests or any Class of Claims or Interests is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Subordinated Claims.*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.      *Sources of Cash for Plan Distributions.*

All consideration necessary for the Reorganized Debtors to make payments or distributions pursuant hereto shall be obtained from the Exit Facility, or other Cash from the Debtors, including Cash from business operations. Further, the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

B.      *Exit Facility.*

On the Effective Date, the Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to satisfy the conditions to effectiveness of the Exit Facility, the terms, conditions, and covenants of each of which shall be consistent with the Exit Facility Commitment Letter, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person.

Pursuant to the terms of the Exit Facility Credit Agreement, the Exit Facility will provide the Debtors with (a) a term loan credit facility of $144.162 million, of which $140 million shall be used to refinance the existing Bridge Loan Facility and (b) incremental credit facilities, each to be issued and accessed in accordance with the Exit Facility Credit Agreement.  The Exit Facility and the Reorganized Debtors' Cash on hand will provide sufficient available funds as of the Effective Date to: (i) permit repayment in full of all Allowed Bridge Loan Credit Agreement Claims (including principal, interest, and reasonable fees, costs, charges and other expenses provided for under the Bridge Loan Credit Agreement) of Holders of Allowed Bridge Loan Agreement Claims who elect to be

21

paid in full in Cash on the Effective Date; (ii) make the other required Effective Date payments under the Plan; and (iii) provide the Reorganized Debtors with working capital necessary to run their businesses and to fund certain capital expenditures (in accordance with the Exit Facility).  Any letters of credit issued under the Bridge Loan Facility shall be deemed to be issued under the Exit Facility or cash collateralized.

C.      *Settlement of Certain Claims and Interests.*

To consensually resolve all outstanding disputes among the Debtors, the Consenting Bridge Loan Lenders, the Consenting Noteholders, and the Consenting Shareholders, the Debtors, the Consenting Bridge Loan Lenders, the Consenting Noteholders, and the Consenting Shareholders have agreed to the settlement embodied in the Plan, including the creation of the Litigation Trust to most effectively and efficiently pursue the Contributed Claims, which shall be effective as of the Effective Date.  The settlement was extensively negotiated in good faith and is an integral component of the Debtors' overall restructuring and the transactions contemplated herein.

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the distributions and other benefits provided under the Plan, the Plan constitutes a request for the Bankruptcy Court to authorize and approve the proposed settlement.  Entry of the Confirmation Order shall confirm (i) the Bankruptcy Court's approval, as of the Effective Date, of the Plan and all components of the proposed settlement and (ii) the Bankruptcy Court's finding that the proposed settlement is (a) in the best interests of the Debtors, their respective Estates and the holders of Claims and Interests and (b) fair, equitable and reasonable.

Any Holder of an Allowed Senior Notes Claim shall be permitted to opt-in to the aforementioned settlement between the Debtors, the Consenting Bridge Loan Lenders, the Consenting Noteholders and the Consenting Shareholders as set forth in Article III.C.4 of the Plan; provided, however, that none of the Potential Defendants and Witnesses shall receive the releases or indemnification provided under the settlement or be a "Released Party" under the Plan.

D.      *Issuance and Distribution of New Common Stock.*

The issuance of the New Common Stock by Reorganized PAH, including options, stock appreciation rights, or other equity awards, if any, in connection with the Management Incentive Plan, is authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests.

On the Effective Date, an initial number of up to approximately 2.1 million shares of New Common Stock shall be issued and, as soon as reasonably practicable thereafter, distributed to Holders of Claims in Class 4, subject to dilution with respect to any shares issued pursuant to the Management Incentive Plan.

All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

E.      *New Stockholders Agreement.*

Upon the Effective Date, Reorganized PAH shall be a private company governed by the New Stockholders Agreement.  The New Stockholders Agreement shall be adopted on the Effective Date and shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of New Common Stock shall be bound thereby.  The Holders of Claims in Class 4 shall be required to execute the New Stockholders Agreement before receiving their respective distributions of the New Common Stock under the Plan.  If a Holder of a Class 4 Claim as of the Distribution Record Date does not return a completed and executed signature page to the New Stockholders Agreement so that it is received by the Disbursing Agent on or before the 90th day after the Effective Date, such Holder shall be deemed to forever forfeit its right to receive the New Common Stock (but not its share of the Senior Notes Litigation Trust Recovery).

F.      *Restructuring Transactions.*

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Restructuring Transactions under and in connection with the Plan.

G.      *Corporate Existence*.

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor (other than Holdings) shall continue to exist after the Effective Date as a Reorganized Debtor and as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation or governing documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation or governing documents) are amended by the Plan or otherwise amended in accordance with applicable law. To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state or federal law).  As set forth in Article IV.W below, on the Effective Date, Holdings shall be dissolved.

H.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, (i) all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan, except for the assets contributed to the Litigation Trust, including any Contributed Claims of the Debtors and their Estates, shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances, except for Liens securing the Exit Facility and (ii) all property of the Debtors and their Estates contributed to the Litigation Trust, including any Contributed Claims of the Debtors and their Estates, will be transferred to and vest in the Litigation Trust, free and clear of all Liens, claims, charges or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

I.      *Cancellation of Existing Indebtedness and Securities.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date: (i) the obligations of the Debtors under the Bridge Loan Credit Agreement, the Senior Notes, and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be cancelled solely as to the Debtors and the Reorganized Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, however, notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of enabling Holders of Allowed Claims to receive distributions under the Plan as provided herein and permitting the Senior Notes Indenture Trustee to perform any necessary functions under the Senior Notes Indenture with respect to distributions to Holders of Allowed Senior Notes Claims and to have the benefit of all the protections and other provisions of the Senior Notes Indenture in doing so and to assert the Senior Notes Indenture Trustee Charging Lien against distributions to

K&E 27461178

Holders of Senior Note Claims for payment of any unpaid Senior Notes Indenture Trustee Fees; provided, further, however, that the preceding proviso shall not affect (i) the Senior Notes Indenture Trustee Charging Lien or (ii) the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under this Plan. On and after the Effective Date, all duties and responsibilities of the Bridge Loan Agent and the Senior Notes Indenture Trustee, as applicable, shall be discharged unless otherwise specifically set forth in or provided for under the Plan.

J.    *Corporate Action.*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including:  (i) execution and entry into the Exit Facility; (ii) entry into the New Corporate Governance Documents; (iii) establishment and funding of the Litigation Trust; (iv) the distribution of the New Common Stock; (v) selection of the directors and officers for the Reorganized Debtors; (vi) implementation of the Restructuring Transactions contemplated by this Plan; (vii) adoption of the Management Incentive Plan; (viii) adoption or assumption, as applicable, of the agreements with existing management; and (ix) all other actions contemplated by the Plan (whether to occur before on or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, directors or officers of the Debtors or the Reorganized Debtors.

On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors (as applicable) shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Corporate Governance Documents, the Exit Facility Credit Agreement, the Litigation Trust Agreement, and any and all related and ancillary agreements, documents, and filings, New Common Stock, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV shall be effective notwithstanding any requirements under non-bankruptcy law.  The issuance of the New Common Stock shall be exempt from the requirements of section 16(b) of the Securities Exchange Act of 1934 (pursuant to Rule 16b-3 promulgated thereunder) with respect to any acquisition of such securities by an officer or director (or a director deputized for purposes thereof) as of the Effective Date.

K.    *New Certificates of Incorporation and New By-Laws.*

On or promptly after the Effective Date, the Reorganized Debtors will file their respective New Certificates of Incorporation with the applicable Secretaries of State and/or other applicable authorities in their respective states or countries of incorporation in accordance with the corporate laws of the respective states, or countries of incorporation.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Certificates of Incorporation will prohibit the issuance of non-voting equity securities.  After the Effective Date, the Reorganized Debtors may amend and restate their respective New Certificates of Incorporation and New By-Laws and other constituent documents as permitted by the laws of their respective states or countries of incorporation and their respective New Certificates of Incorporation and New By-Laws.

L.    *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the term of the current members of the board of directors of PAH shall expire, and the initial boards of directors, including the New PAH Board and the New Subsidiary Boards, as well as the officers of each of the Reorganized Debtors shall be appointed in accordance with the New Certificates of Incorporation and New By-Laws of each Reorganized Debtor.

On the Effective Date, the New PAH Board shall consist of three (3) to seven (7) directors, one (1) of whom shall be the chief executive officer of PAH and the remainder of whom shall be initially chosen by the Ad Hoc Committee of Senior Noteholders.  The New PAH Board shall elect members of the New Subsidiary Boards.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the initial New PAH Board and the New Subsidiary Boards, as well as those Persons that serve as an officer of any of the Reorganized Debtors. To the extent any such director or officer is an "insider" as such term is defined in section 101(31) of the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed.  Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Certificates of Incorporation, New By-Laws, and other constituent documents of the Reorganized Debtors.

M.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors and the officers and members of the New Boards thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan, the New Corporate Governance Documents, the Exit Facility Agreement, the Litigation Trust Agreement, and the Securities issued pursuant to the Plan, including the New Common Stock, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization or consents except those expressly required pursuant to the Plan.

N.      *Management Incentive Plan.*

Following the Effective Date the Reorganized Debtors will implement a Management Incentive Plan, which shall reserve up to 10% of the fully diluted New Common Stock, or the non-equity equivalent thereof, to be reserved for distribution to officers, directors and employees of the Reorganized Debtors, on terms to be determined by the New PAH Board.  The terms, form of equity (*e.g.*, options and/or restricted stock units), and allocation of the Management Incentive Plan shall be determined by the New PAH Board.

O.      *Senior Management and Management Employment Agreements*

The Debtors' existing senior management team (other than the Debtors' interim chief executive officer) shall remain in their current capacities as officers of the Reorganized Debtors, and the Management Employment Agreements shall be assumed (as may be amended) and filed as part of the Plan Supplement.  If no new chief executive officer is chosen as of the Effective Date, Martin McGahan of Alvarez & Marsal Healthcare Industry Group will continue in his capacity as interim chief executive officer until a new chief executive officer is selected by the New PAH Board.

P.      *Exemption from Certain Taxes and Fees.*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (i) the creation of any mortgage, deed of trust, lien, or other security interest, (ii) the making or assignment of any lease or sublease, (iii) any restructuring transaction authorized by the Plan, or (iv) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; (d) bills of sale; or (e) assignments executed in connection with any restructuring transaction occurring under the Plan.

Q.      *Legacy D&O Liability Insurance Policies.*

The Legacy D&O Liability Insurance Policies are not executory contracts and, therefore, will not be assumed or rejected by the Debtors. If the Bankruptcy Court determines that a Legacy D&O Liability Insurance Policy is an executory contract and must be assumed, or assumed and assigned, to maintain coverage, the applicable

Legacy D&O Liability Insurance Policy shall be assumed and, if necessary, assigned to the applicable Reorganized Debtor.

R.      *Indemnification Provisions.*

As of the Effective Date, each Reorganized Debtor's certificate of incorporation and/or bylaws (or other formation documents) shall provide, to the extent not satisfied by any available insurance coverage, for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to, current (as of September 1, 2013) directors, officers or employees who were employed as directors, officers or employees of such Debtor, on or after September 1, 2013 at least to the same extent as the bylaws (or other formation documents) of each of the respective Debtors on the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed, or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Reorganized Debtors shall amend and/or restate its certificate of incorporation or bylaws (or other formation documents) before or after the Effective Date to terminate or materially adversely affect any of the Reorganized Debtors' obligations or such directors', officers' or employees' rights; provided, however, that there shall be no indemnification, defense, reimbursement, exculpation, liability, or advancement of fees and expenses by the Reorganized Debtors with respect to Subordinated Claims or Non-Subordinated Contribution and Reimbursement Claims (with such claims treated as set forth in Article III.C.7 and Article III.C.8, respectively, of the Plan); provided, further, that nothing in the Plan, Plan Supplement, or any documentation related thereto shall in any way provide for any release, indemnification, defense, reimbursement, exculpation, liability, or advancement of fees and expenses of any of the Potential Defendants and Witnesses.

S.      *Indemnification of Consenting Noteholders and Consenting Shareholders.*

The Litigation Trust shall, to the extent not satisfied by any available insurance coverage, indemnify and hold harmless each of the following Persons and Entities, solely to the extent such Person or Entity is not one of the Potential Defendants and Witnesses, for any and all Released Claims brought by any Person or Entity: (i) Consenting Noteholders; (ii) Consenting Shareholders; (iii) the Consenting Noteholders' and Consenting Shareholders' respective predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, and current (as of September 1, 2013) officers, directors, principals, members, partners, shareholders, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, advisory board members and other professionals; and (iv) the respective heirs, executors, estates, servants, and nominees of the Persons and Entities set forth in (i)-(iii) above (the "Trust Indemnification Claims").

T.      *Assumption of Independent Director Indemnification Obligations.*

On the Effective Date, the Debtors and the Reorganized Debtors shall assume the Independent Director Indemnification Obligations pursuant to sections 365 and 1123 of the Bankruptcy Code. The Independent Director Indemnification Obligations that are assumed, deemed assumed, honored, or reaffirmed by the Debtors hereunder shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

U.      *Preservation of Causes of Action.*

1.      Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof and excluding the Contributed Claims of the Debtors, which are contributed to the Litigation Trust, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. For the avoidance of doubt, the preservation of Causes of Action described in the preceding sentence includes, but is not limited to, the Debtors' (i) right to object

to Administrative Claims, (ii) right to object to other Claims, and (iii) right to subordinate Claims. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors in their respective discretion. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.

The Reorganized Debtors reserve and shall retain the applicable Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. The applicable Reorganized Debtor through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action except as otherwise expressly provided in the Plan and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

V.    *Litigation Trust*

The Litigation Trust shall be established pursuant to this Plan and become effective for the benefit of the Litigation Trust Beneficiaries on the Effective Date. The Plan and the Litigation Trust Agreement shall govern the management and administration of the Litigation Trust and the respective rights, powers, and obligations of the Litigation Trustees and the Litigation Trust Beneficiaries. The Litigation Trust Agreement will be binding on all Litigation Trust Beneficiaries who shall be deemed to have executed the Litigation Trust Agreement as of the Effective Date.

On the Effective Date, all actions, Causes of Action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims, and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity, or otherwise, held by any of the Contributing Claimants against the Potential Defendants and Witnesses related in any way to the Debtors, their predecessors, their respective affiliates and/or (a) through (e) below (the "Contributed Claims"), will be absolutely transferred and assigned to the Litigation Trust, including without limitation (a) all claims and Causes of Action against any party based on, arising out of, or relating to the 2012 Transaction, including without limitation any claims or Causes of Action for unlawful dividend, fraudulent conveyance or avoidance claims under state or federal law, including the Bankruptcy Code, (b) all claims and Causes of Action based on, arising out of, or related to the issuance of any Security of the Debtors, (c) all claims and Causes of Action based on, arising out of, or related to the restatement, adjustment, correction, or modification of the Debtors' financial statements, including without limitation all claims or Causes of Action based on, arising out of, or relating to (i) the Debtors' internal controls relating to financial statements and financial reporting; and (ii) materially misleading financial statements provided to the Contributing Claimants in connection with the 2012 Transaction, (d) all claims and Causes of Action based on, arising out of, or related to the misrepresentation of any of the Debtors' financial information and related internal controls, including without limitation the overstatement of the Debtors' revenue, accounts receivable, and/or EBITDA, (e) all claims and Causes of Action based on, arising out of, or related to any failure to disclose, or actual or attempted cover up or obfuscation of any of the conduct described in the Disclosure Statement (including on Exhibit G thereto) and/or (a)-(d) above and (f) any other potential claims, Causes of Action, charges, suits or rights of recovery under state, federal, or other applicable law. The Contributed Claims that may be asserted against the Potential Defendants and Witnesses with respect to the foregoing include all claims or Causes of Action arising under state and/or federal law, such as (but not limited to) claims arising under title 11 of the U.S. Code and applicable law, including without limitation sections 502(d), 510, 542 through 551, and 553 of title 11 and any similar state laws, violations of state and/or federal securities laws, breach of contract, breach of fiduciary duty (including aiding and abetting any such breach), and common law claims such as quantum meruit and unjust enrichment. For the avoidance of doubt, (a) the Contributed Claims shall not include the rights of any of the Contributing Claimants or Released Parties to receive the distributions, if any, to which they are entitled under this Plan and the Confirmation Order and (b) the Contributed Claims shall not include any actions, Causes of Action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims, and demands whatsoever, whether known or unknown, reduced to judgment,

27

liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity, or otherwise, against any of the Released Parties. For the avoidance of doubt, in the exercise of their reasonable discretion and in accordance with the Litigation Trust Agreement, the Trustees shall not be obligated to pursue all Contributed Claims.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, with respect to the Contributed Claims of the Debtors and their Estates, which are assigned and contributed to the Litigation Trust under this Plan, and Non-Subordinated Contribution and Reimbursement Claims, if any, which, to the extent they are Allowed, are assumed by the Litigation Trust, the Litigation Trust shall retain and may enforce all of the Debtors' rights to commence and pursue, as appropriate, any and all such Causes of Action, whether arising before or after the Petition Date, including any such actions specifically enumerated in the Disclosure Statement or the Plan Supplement, and the Litigation Trust's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Litigation Trust may pursue such Causes of Action, as appropriate, in accordance with the Litigation Trust Agreement. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Litigation Trust will not pursue any and all available Causes of Action against them. The Litigation Trust expressly reserves all rights to prosecute any and all such Causes of Action against any Entity, except as otherwise expressly provided in the Plan. For the avoidance of doubt, the preservation of the Causes of Action described in this paragraph includes, but is not limited to, the Litigation Trust's right to object to Non-Subordinated Contribution and Reimbursement Claims, if any.

Notwithstanding anything to the contrary set forth in the Confirmation Order, the Plan, or the Disclosure Statement, (a) all claims and Causes of Action (whether or not described in the Plan or Disclosure Statement) held by the Consenting Noteholders and Consenting Shareholders are specifically preserved as against all Persons and Entities (whether or not such Persons and Entities are identified on the list of Potential Defendants and Witnesses or otherwise) other than Released Parties, and (b) the Litigation Trust may, but is not required to, pursue any and all such claims and/or Causes of Action that are contributed to the Litigation Trust (whether or not described in the Plan or Disclosure Statement) as against all Persons or Entities (whether or not such Persons and Entities are identified on the list of Potential Defendants and Witnesses or otherwise) other than Released Parties.

Net proceeds from the Litigation Trust (after deduction for all costs and expenses of the Litigation Trust (other than the initial funding of $4,500,000) and the satisfaction, to the extent applicable, of any Allowed Non-Subordinated Contribution and Reimbursement Claims and Trust Indemnification Claims) shall be distributed as follows: (1) 50% to the Consenting Shareholders and (2) 50% to the Holders of Senior Notes as of the Distribution Record Date, as set forth below. Upon the Effective Date, there shall be 10,000 units allocated to the beneficiaries of the Litigation Trust and shall be distributed as follows:

(i) 5,000 units to the Consenting Shareholders with each Consenting Shareholder's respective share of the 5,000 units being determined by dividing the number of shares held by such Consenting Shareholder by the total number of shares held by all Consenting Shareholders, i.e., if the Consenting Shareholders collectively hold 250 shares and a particular Consenting Shareholder holds 50 shares, that Consenting Shareholder would receive 50/250 x 5,000 = 1,000 units; and

(ii) 5,000 units to the holders of Senior Notes as of the Distribution Record Date with each holder's respective share of the 5,000 units being determined as follows:

(A) The denominator of the fraction applied to each holder of Senior Notes will be equal to the sum of (x) total outstanding principal of Senior Notes, *i.e.*, $210,000,000, plus (y) the total principal amount of the Senior Notes with respect to which Contributed Claims are transferred to the Litigation Trust;

(B) The numerator of the fraction applied to each holder of Senior Notes will be equal to the sum of (x) the principal amount of Senior Notes held by such holder, plus (y) the total principal amount of the Senior Notes with respect to which Contributed Claims are transferred by such holder to the Litigation Trust.

28

(C) The fraction thus derived will be multiplied by 5,000 units.

To illustrate, if holders of $150,000,000 in principal amount of the Senior Notes contribute Contributed Claims to the Litigation Trust, the preceding denominator would be 360,000,000. If an individual holder had $6,000,000 principal amount of Senior Notes and contributed its Contributed Claims to the Litigation Trust, the relevant numerator would be $12,000,000 and such holder would receive 12/360 x 5,000 = 166.7 units in the Litigation Trust.

Subsequent to the Effective Date, units in the Litigation Trust may be further adjusted as specifically set forth in the Litigation Trust Agreement.

The Litigation Trust shall initially be funded with $4,500,000, subject to adjustment and credits as set forth below, on and as a condition precedent to the Effective Date, as follows: (i) $2,250,000 from the Reorganized Debtors, minus amounts actually paid by the Debtors or Reorganized Debtors on or prior to the Effective Date to proposed counsel to the Litigation Trust for fees and expenses incurred on or after September 9, 2013, in an amount of up to $250,000, plus any further amounts approved by the Consenting Noteholders in their sole and absolute discretion and (ii) $2,250,000 from the Consenting Shareholders (the "Initial Litigation Trust Funding").  For the avoidance of doubt, the $2,250,000 to be funded by the Consenting Shareholders to the Litigation Trust shall not be paid or reimbursed by the Debtors or the Reorganized Debtors on the Effective Date or otherwise.  Additional funding to the Litigation Trust shall be governed by the procedures set forth in the Litigation Trust Agreement (such additional funding, together with the Initial Litigation Trust Funding, the "Litigation Trust Funding").

W.      Dissolution of Holdings

On the Effective Date or as soon as practicable thereafter, Holdings shall be dissolved in accordance with the Description of Transaction Steps.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      Assumption and Rejection of Executory Contracts and Unexpired Leases.

On the Effective Date, except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, Executory Contracts and Unexpired Leases, including those listed on the Assumed Executory Contract and Unexpired Lease List, shall be deemed assumed as of the Effective Date, unless such Executory Contract or Unexpired Lease: (i) was assumed or rejected prior to the Effective Date by the Debtors; (ii) previously expired or terminated pursuant to its own terms; (iii) is the subject of a motion to reject Filed on or before the Effective Date; (iv) is identified as an Executory Contract or Unexpired Lease on the Rejected Executory Contracts and Unexpired Lease List, or (v) is the subject of a dispute regarding the Cure Claim.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Rejected Executory Contract and Unexpired Leases List, or the Assumed Executory Contract and Unexpired Leases List pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.

B.        *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order or approval of the Bankruptcy Court.  Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan, as applicable.

**Rejection Claims for which a Proof of Claim is not timely Filed will be forever barred from assertion against the Debtors, their Estates, the Reorganized Debtors, the Litigation Trust, and their respective property unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.  Such Rejection Claims shall, as of the Effective Date, be subject to the discharge and permanent injunction set forth in Article VIII hereof.**

C.        *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed.*

Any monetary defaults under each Executory Contract and Unexpired Lease as reflected on the Assumed Executory Contract and Unexpired Leases List shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (i) the amount of the Cure Claim, (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (iii) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or by mutual agreement between Debtors and the applicable counterparty.  At least 10 days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption and proposed amounts of Cure Claims to the applicable third parties.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served, and actually received by the Debtors at least two days before the Confirmation Hearing.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount; provided, however, the Debtors, with the consent of the Ad Hoc Committee of Senior Noteholders, shall have the right to alter, amend, modify or supplement the Assumed Executory Contracts and Unexpired Lease List or Rejected Executory Contracts and Unexpired Lease List, as applicable, as identified in the Plan Supplement, through and including the Effective Date.  To the extent that the Debtors, with the consent of the Ad Hoc Committee of Senior Noteholders, alter, amend, modify or supplement the lists of Executory Contracts and Unexpired Lease included in the Plan Supplement, the Debtors will provide notice to each counterparty to an affected Executory Contract or Unexpired Lease within five days of such decision.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date of the Debtors or Reorganized Debtors assume such Executory Contract or Unexpired Lease.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

D.        *Insurance Policies.*

All of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan.  On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto.

30

With respect to AIG National Union Fire Insurance Company of Pittsburgh, Pa policy number 01-351-13-73, on the Effective Date, the Debtors will pay the Additional Premium Amount (as defined in such policy) for a six-year Discovery Period (as defined in such policy), provided that the Additional Premium Amount does not exceed $200,000.  Notwithstanding the foregoing, as set forth above, the Legacy D&O Liability Insurance Policies are not executory contracts and, therefore, are not assumed or rejected hereunder.

E.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

F.      *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor or the Litigation Trust has any liability thereunder.  If, prior to the Effective Date, there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, Reorganized Debtors, or Litigation Trust, as applicable, shall have 28 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

G.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim), or, in each case, as soon as reasonably practicable thereafter, each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class (except those distributions to Litigation Trust Beneficiaries, which distributions will be made by the Litigation Trust in accordance with the Litigation Trust Agreement).  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the

next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.  The Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.  Distributions to Holders of Claims or Interests related to public securities shall be made to such Holders in exchange for such securities, which shall be deemed cancelled as of the Effective Date.

B.      *Disbursing Agent.*

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Disbursing Agent on the Effective Date (except those distributions to Litigation Trust Beneficiaries, which distributions will be made by the Litigation Trust in accordance with the Litigation Trust Agreement).  To the extent the Disbursing Agent is one or more of the Reorganized Debtors, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

C.      *Rights and Powers of Disbursing Agent.*

1.      Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to:  (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.      Delivery of Distributions.

(a)      Delivery of Distributions to Holders of Bridge Loan Credit Agreement Claims.

Except as otherwise provided in the Plan, all distributions to Holders of Bridge Loan Credit Agreement Claims shall be governed by the Bridge Loan Credit Agreement.  The Disbursing Agent shall make such distributions directly to the Holders of Allowed Bridge Loan Credit Agreement Claims.

(b)      Delivery of Distributions to Senior Notes Indenture Trustee.

Except as otherwise provided in the Plan, all distributions on account of Allowed Senior Notes Claims shall be made by the Disbursing Agent at the direction and with the consent of the Senior Notes Indenture Trustee.  The Senior Notes Indenture Trustee shall direct the Disbursing Agent to hold or deliver such distributions to the beneficial owners of Allowed Senior Notes Claims in accordance with the provisions of this Plan and the terms of the Senior Notes Indenture. Any distributions held by the Disbursing Agent shall remain subject to the right of the Senior Notes Indenture Trustee to assert its Senior Notes Indenture Trustee Charging Lien against such distributions.

i.      Senior Notes Indenture Trustee Fees.  In order not to reduce the amount of distributions to Holders of Allowed Senior Notes Claims, and in light of the unimpairment of General Unsecured

32

Claims under the Plan, the Reorganized Debtors shall pay on the Effective Date all Senior Notes Indenture Trustee Fees in full in Cash, without application to or approval of the Bankruptcy Court and without a reduction to the recoveries of the Holders of the Senior Notes.

     ii.  <u>Additional Trustee's Fees and Expenses</u>.  In the event that the Senior Notes Indenture Trustee provides services related to distributions pursuant to the Plan, the Senior Notes Indenture Trustee will receive from the Reorganized Debtors, upon presentation of invoices in customary form and without further court approval, reasonable compensation for such services and reimbursement of reasonable expenses (including attorneys' and agents' fees) incurred in connection with such services.

    (c)  Delivery of Distributions in General.

   Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors, the Reorganized Debtors, the Disbursing Agent, and the Litigation Trust, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

    2.  Minimum Distributions.

   No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows:  (i) fractions of one-half (1/2) or greater shall be rounded to the next higher whole number and (ii) fractions of less than one-half (1/2) shall be rounded to the next lower whole number with no further payment therefor.

    3.  Undeliverable Distributions and Unclaimed Property.

   In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent or the Litigation Trustees, as applicable, have determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; <u>provided</u>, <u>however</u>, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the later of (i) the Effective Date and (ii) the date of the distribution.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors or the Litigation Trust, as applicable, automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

*E.*  *Manner of Payment.*

    1.  All distributions of New Common Stock under the Plan shall be made by the Disbursing Agent on behalf of Reorganized PAH.

    2.  All distributions with respect to, or effected with, the proceeds of the Exit Facility shall be deemed made as of the Effective Date.

    3.  All distributions of Cash under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor (or Debtors), other than distributions made by the Litigation Trust which shall be made in accordance with the Litigation Trust Agreement.

    4.  At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.        *Section 1145 Exemption.*

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Common Stock as contemplated by Article IV.D of the Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  In addition, under section 1145 of the Bankruptcy Code, such New Common Stock will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments and subject to any restrictions in the New Corporate Governance Documents, including the New Stockholders Agreement and Reorganized PAH's New Certificate of Incorporation.

G.        *Section 3(a)(9) Exemption.*

The Debtors are relying on exemptions from the registration requirements of the Securities Act, including, without limitations, section 3(a)(9) thereof, to exempt the offer and sale of the Plan Securities that may be deemed to be made pursuant to the solicitation of votes on the Plan.  Section 3(a)(9) of the Securities Act provides that the registration requirements of the Securities Act will not apply to "any security exchanged by the issuer with its existing security holders exclusively where no commission or other remuneration is paid or given directly or indirectly for soliciting such exchange."  The Debtors do not have any contract, arrangement, or understanding relating to, and will not, directly or indirectly, pay any commission or other remuneration to any broker, dealer, salesperson, agent, or any other person for soliciting votes to accept or reject the Plan. The Debtors have received assurances that no person will provide any information to Holders of Allowed Claims relating to the solicitation of votes on the Plan other than to refer the Holders of Senior Notes to the information contained in this Disclosure Statement. In addition, no broker, dealer, salesperson, agent, or any other person, is engaged or authorized to express any statement, opinion, recommendation, or judgment with respect to the relative merits and risks of the Plan.

H.        *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

I.        *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

J.        *Setoffs and Recoupment.*

The Debtors or the Reorganized Debtors may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim it may have against the Holder of such Claim.

K.      *Claims Paid or Payable by Third Parties.*

      1.      Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors or Litigation Trust, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, a Reorganized Debtor, or the Litigation Trust, as applicable.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, a Reorganized Debtor, or the Litigation Trust, as applicable, on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor or Litigation Trust, as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor or Litigation Trust, as applicable, annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

      2.      Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

      3.      Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the Reorganized Debtors, the Litigation Trust, or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.      *Prosecution of Objections to Claims.*

The Debtors, the Reorganized Debtors, or the Litigation Trust, as applicable, shall have the exclusive authority to File, settle, compromise, withdraw or litigate to judgment any objections to Claims, other than (1) Fee Claims, as permitted under the Plan (which Fee Claims shall be subject to objection by any Person with standing to object), and (2) Non-Subordinated Contribution and Reimbursement Claims and  Trust Indemnification Claims, where the Litigation Trust will have the exclusive authority to File, settle, compromise, withdraw, or litigate to judgment such Claims.  From and after the Effective Date, the Reorganized Debtors or the Litigation Trust, as applicable, may settle or compromise any Disputed Claim without notice to or action, order or approval of the Bankruptcy Court.  The Debtors, the Reorganized Debtors, and the Litigation Trust reserve all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

B.      *Claims Administration Responsibilities*.

Except as otherwise provided herein (including, without limitation, by Article V.B), Holders of Claims shall not be required to File a Proof of Claim, and no parties should File a Proof of Claim; provided that the Debtors, the Reorganized Debtors, and the Litigation Trust, as applicable, reserve all rights to object to any Claim for which a Proof of Claim is Filed.

The Debtors, the Reorganized Debtors, or the Litigation Trust, as applicable, may, in their discretion, File with the Bankruptcy Court (or any other court of competent jurisdiction) an objection to the allowance of any Claim or any other appropriate motion or adversary proceeding with respect thereto, and the Debtors, the Reorganized Debtors, and the Litigation Trust, as applicable, shall have the right to compromise, settle, withdraw or litigate to judgment any objections to Claims for which a Proof of Claim is Filed.

C.      *Estimation of Claims*.

Before or after the Effective Date, the Debtors or the Reorganized Debtors or the Litigation Trust, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor or the Litigation Trust, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D.      *Adjustment to Claims Without Objection*.

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled, or otherwise expunged (including pursuant to the Plan), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Reorganized Debtors or the Litigation Trust, as applicable, without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Disallowance of Claims*.

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors. All Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

F.      *No Distributions Pending Allowance*.

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

G.    *Distributions After Allowance*.

        To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Compromise and Settlement of Claims, Interests, and Controversies*.

        Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of substantially all Claims, Interests, and controversies relating to the contractual, legal, and equitable rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders, and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors or the Litigation Trust, as applicable, may compromise and settle claims against them and Causes of Action held by them against other Entities.

B.    *Discharge of Claims and Termination of Interests*.

        Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument or other agreement or document created pursuant to the Plan, the distributions, rights and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.    *Release of Liens*.

        Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and

37

interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors.  In addition, the Bridge Loan Agent, at the request and expense of the Reorganized Debtors, shall execute and deliver all documents reasonably required to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.

D.    *Releases by the Debtors.*

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date of the Plan, the Released Parties are hereby expressly, unconditionally, irrevocably, generally, and individually and collectively released, acquitted, and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all actions, claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, by statute or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or each of their respective Affiliates (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, ever had, now has, or hereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Transactions, the Disclosure Statement, or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event, or other occurrence relating to the Debtors, taking place on or before the Confirmation Date of the Plan, including any Released Claims, other than with respect to each Released Party, Claims or liabilities arising out of or relating to any act or omission of such Released Party unknown to the Debtors as of the Petition Date that constitutes gross negligence, willful misconduct, or fraud, in each case as determined by Final Order of a court of competent jurisdiction; *provided, however,* that notwithstanding anything herein to the contrary, none of the Potential Defendants and Witnesses shall be a Released Party or receive or be deemed to receive a release under the Plan or the Confirmation Order.**

E.    *Releases by the Releasing Parties.*

**As of the Effective Date of the Plan, to the fullest extent permitted by applicable law, each of the Releasing Parties shall be deemed to have expressly, unconditionally, irrevocably, generally, and individually and collectively, released, acquitted, and discharged the Debtors, the Reorganized Debtors, and the Released Parties from any and all actions, claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, by statute or otherwise, that such Releasing Party (whether individually or collectively) ever had, now has, or hereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Restructuring Transactions, the Disclosure Statement, or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event, or other occurrence relating to the Debtors, taking place on or before the Confirmation Date of the Plan, including any Released Claims, other than with respect to each party released herein, Claims or liabilities arising out of or relating to any act or omission of such Released Party unknown to the Releasing Party as of the Petition Date that constitutes gross negligence, willful misconduct, or fraud, in each case, as determined by Final Order of a court of competent jurisdiction; *provided, however*, that notwithstanding anything herein to the contrary, none of the**

K&E 27461178

**Potential Defendants and Witnesses shall be a Released Party or receive or be deemed to receive a release under the Plan or the Confirmation Order.**

F.  *Liabilities to, and Rights of, Governmental Units.*

Nothing in the Plan or Confirmation Order shall discharge, release, or preclude:  (i) any liability to a Governmental Unit that is not a Claim; (ii) any Claim of a Governmental Unit arising on or after the Confirmation Date; (iii) any liability to a Governmental Unit on the part of any Person or Entity other than the Debtors or Reorganized Debtors; (iv) any valid right of setoff or recoupment by a Governmental Unit; or (v) any criminal liability.  Nothing in the Plan or Confirmation Order shall enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence.  The discharge and injunction provisions contained in the Plan and Confirmation Order are not intended and shall not be construed to bar any Governmental Unit from, after the Confirmation Date, pursuing any police or regulatory action.

G.  *Exculpation.*

**Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any (i) Exculpated Claim and (ii) any obligation, Cause of Action, or liability for any Exculpated Claim, except for those that result from any such act or omission that is determined in a Final Order to have constituted fraud, gross negligence, or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan; provided, however, that the foregoing "Exculpation" shall have no effect on the liability of any Entity for acts or omissions occurring after the Effective Date.**

H.  *Injunction.*

FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN ARTICLE VIII HEREOF, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION, OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO ARTICLE VIII HEREOF.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS, OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.D OR ARTICLE VIII.E, DISCHARGED PURSUANT TO ARTICLE VIII.B, OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.G ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (i) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (ii) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (iii) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (iv) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY, OR ESTATES.  ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

EXCEPT AS EXPRESSLY SET FORTH HEREIN, ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, OR THE LITIGATION TRUST, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS, OR ANY ACT OR OMISSION, TRANSACTION, OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

FOR THE AVOIDANCE OF DOUBT, ALL CLAIMS AGAINST THE POTENTIAL DEFENDANTS AND WITNESSES, SET FORTH ON EXHIBIT C TO THE DISCLOSURE STATEMENT, INCLUDING WITHOUT LIMITATION THE CONTRIBUTED CLAIMS AND CLAIMS ARISING FROM THE FACTS AND CIRCUMSTANCES SET FORTH IN EXHIBIT G TO THE DISCLOSURE STATEMENT, WILL NOT BE RELEASED OR DISCHARGED UNDER THE PLAN OR THE CONFIRMATION ORDER, BUT WILL BE PRESERVED IN ACCORDANCE WITH THE PLAN AND MAY BE PURSUED AND LITIGATED BY THE LITIGATION TRUST.  NO PERSON OR ENTITY MAY RELY ON THE ABSENCE OF A SPECIFIC REFERENCE IN THE PLAN, THE CONFIRMATION ORDER, THE LITIGATION TRUST AGREEMENT OR THIS DISCLOSURE STATEMENT TO ANY CONTRIBUTED CLAIMS AGAINST SUCH PERSON OR ENTITY AS ANY INDICATION THAT THE LITIGATION TRUST WILL NOT PURSUE ANY AND ALL AVAILABLE CONTRIBUTED CLAIMS AGAINST SUCH PERSON OR ENTITY.  UNLESS ANY CONTRIBUTED CLAIMS AGAINST A PERSON OR ENTITY ARE EXPRESSLY WAIVED, RELINQUISHED, EXCULPATED, RELEASED, COMPROMISED, OR SETTLED IN THE PLAN, THE CONFIRMATION ORDER OR A BANKRUPTCY COURT ORDER, ALL CONTRIBUTED CLAIMS ARE EXPRESSLY RESERVED BY AND FOR THE LITIGATION TRUST, FOR LATER ADJUDICATION, AND, THEREFORE, NO PRECLUSION DOCTRINE, INCLUDING THE DOCTRINES OF RES JUDICATA, COLLATERAL ESTOPPEL, ISSUE PRECLUSION, CLAIM PRECLUSION, ESTOPPEL (JUDICIAL, EQUITABLE, OR OTHERWISE) OR LACHES WILL APPLY TO SUCH CONTRIBUTED CLAIMS UPON, AFTER, OR AS A CONSEQUENCE OF THE CONFIRMATION ORDER.  THE OBJECTION TO THE ALLOWANCE OF ANY CLAIMS FILED WITH THE BANKRUPTCY COURT WITH RESPECT TO WHICH THEY DISPUTE LIABILITY, PRIORITY, AND/OR AMOUNT (OR ANY OBJECTIONS, AFFIRMATIVE DEFENSES AND/OR COUNTERCLAIMS, WHETHER OR NOT LITIGATED TO FINAL ORDER) SHALL NOT IN ANY WAY LIMIT THE ABILITY OR THE RIGHT OF THE LITIGATION TRUST TO ASSERT, COMMENCE OR PROSECUTE ANY CONTRIBUTED CLAIMS.  NOTHING CONTAINED IN THE PLAN, THE CONFIRMATION ORDER, THE LITIGATION TRUST AGREEMENT OR THE DISCLOSURE STATEMENT WILL BE DEEMED TO BE A WAIVER, RELEASE, OR RELINQUISHMENT OF ANY CONTRIBUTED CLAIMS WHICH THE CONTRIBUTING CLAIMANTS HAD IMMEDIATELY PRIOR TO THE EFFECTIVE DATE.  THE LITIGATION TRUST SHALL HAVE, RETAIN, RESERVE, AND BE ENTITLED TO ASSERT ALL CONTRIBUTED CLAIMS FULLY AS IF THE CONTRIBUTED CLAIMS HAD NOT BEEN TRANSFERRED TO THE LITIGATION TRUST IN ACCORDANCE WITH THE PLAN, THE CONFIRMATION ORDER AND THE LITIGATION TRUST AGREEMENT.

*I.        Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**ARTICLE IX.**
**CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN**

A.        *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article VIII.B hereof:

1.        The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Consenting Bridge Loan Lenders, the Ad Hoc Committee of Senior Noteholders, and the Consenting Shareholders.

2.        Any amendments, modifications, or supplements to the Plan (including the Plan Supplement), if any, shall be reasonably acceptable to:  (a) the Debtors, (b) the Consenting Bridge Loan Lenders, (c) the Ad Hoc Committee of Senior Noteholders, and (d) the Consenting Shareholders.

3.        All actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws.

4.        The Debtors shall enter into the Exit Facility and the conditions precedent to funding under the Exit Facility shall have been satisfied or waived.

5.        Reorganized PAH shall have executed the New Stockholders Agreement.

6.        The Litigation Trustees shall have been appointed and the Reorganized Debtors, the Debtors, the Consenting Noteholders who have executed the Plan Support Agreement, the Consenting Shareholders, and the Litigation Trustees shall have executed and delivered the Litigation Trust Agreement.

7.        The Litigation Trust shall have been established and the Initial Litigation Trust Funding shall have been funded to the Litigation Trust.

8.        The Professional Fee Escrow Account shall have been established and funded.

B.        *Waiver of Conditions.*

The conditions to Consummation set forth in Article IX may be waived only by the Person whom is entitled to satisfaction of such condition, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

C.        *Effect of Failure of Conditions.*

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (i) constitute a waiver or release of any claims or Causes of Action by the Debtors, any Holders, or any other Entity; (ii) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

41

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments*.

Subject to the Plan Support Agreement, and except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code.  Subject to the Plan Support Agreement and certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications*.

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan*.

Subject to the Plan Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor, any Holder, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor, any Holder or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, except as set forth in the Plan, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the determination of a whether a Claim shall be deemed a Subordinated Claim or Non-Subordinated Contribution and Reimbursement Claim in connection with the Plan;

3.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals (including Fee Claims) authorized pursuant to the Bankruptcy Code or the Plan;

42

4.      resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable, and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V, the Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

5.      ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

6.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor, or the Estates that may be pending on the Effective Date;

7.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      adjudicate, decide, or resolve any and all matters that may arise in connection with or relate to the Litigation Trust Agreement;

9.      adjudicate, decide, or resolve any and all matters related to the Litigation Trust Units;

10.     adjudicate, decide, and resolve any and all Causes of Action arising under the Bankruptcy Code, including without limitation sections 502(d), 510, 542-551 and 553 commenced by the Litigation Trust;

11.     enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, the Disclosure Statement, or the Litigation Trust Agreement;

12.     enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

13.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan, including obligations of the Litigation Trust and the Litigation Trustees;

14.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

15.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII, and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

16.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.K.1;

17.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

18.     determine any other matters that may arise in connection with or relate to the Plan, the New Corporate Governance Documents, the Disclosure Statement, the Confirmation Order, or any contract,

instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

19.       enter an order or Final Decree concluding or closing any of the Chapter 11 Cases;

20.       adjudicate any and all disputes arising from or relating to distributions under the Plan;

21.       consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

22.       determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

23.       hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising in connection with the implementation of the agreements, documents, or instruments executed in connection with the Plan or the Litigation Trust Agreement;

24.       hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

25.       hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in connection with and under the Plan, including under Article VIII;

26.       enforce all orders previously entered by the Bankruptcy Court, resolve any cases, controversies, suits, or disputes that may arise in connection with any Entity's rights arising from or obligations incurred in connection with the Plan; and

27.       hear any other matter not inconsistent with the Bankruptcy Code.

For the avoidance of doubt, the Bankruptcy Court shall not retain jurisdiction over any Causes of Action arising under state or other federal law (other than Causes of Action arising under the Bankruptcy Code) brought by the Litigation Trust in a state or other federal court of competent jurisdiction; provided, however, that nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, the Disclosure Statement, or the Litigation Trust Agreement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.       *Immediate Binding Effect.*

Subject to Article IX.A and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, the Litigation Trust, and any and all Holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.      *Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or Reorganized Debtors, as applicable, and all Holders receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Payment of Certain Professional Fees.*

On the Effective Date, the Debtors shall pay the reasonable and documented fees and expenses of (i) Klee, Tuchin, Bogdanoff & Stern LLP, counsel to the Ad Hoc Committee of Senior Noteholders; (ii) local co-counsel to the Ad Hoc Committee of Senior Noteholders; (iii) Houlihan Lokey Capital, Inc., the financial advisor to the Ad Hoc Committee of Senior Noteholders; and (iv) the Bridge Loan Agent.

D.      *Statutory Committee and Cessation of Fee and Expense Paymen*t.

On the Effective Date, any Committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.  The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by any statutory committees after the Effective Date.

E.      *Payment of Fees and Expenses for Counsel to the Consenting Shareholders.*

As partial consideration for contributing their Contributed Claims to the Litigation Trust, on the Effective Date, the Debtors shall pay in full in Cash the legal fees and expenses of the Consenting Shareholders relating to the Plan and the Chapter 11 Cases through the Effective Date; provided, that in no event shall such fees and expenses exceed $250,000 in the aggregate.

F.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders before the Effective Date.

G.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

H.      *Notices.*

To be effective, all notices, requests, and demands to or upon the Debtors, the Ad Hoc Committee of Senior Noteholders, the Bridge Loan Agent, the Senior Notes Indenture Trustee, and the Consenting Shareholders shall be in writing (including by facsimile transmission), and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed to the following:

**If to the Debtors:**

Physiotherapy Holdings, Inc.
Whiteland Business Park
855 Springdale Drive, Suite 200
Exton, Pennsylvania 19341
Attention: General Counsel
Facsimile No: (610) 644-3262

**With copies to:**

Klehr Harrison Harvey Branzburg LLP
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Attention: Michael W. Yurkewicz and Domenic E. Pacitti
Facsimile No: (302) 426-9193
E-mail address: myurkewicz@klehr.com and dpacitti@klehr.com

- and -

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention: Jonathan S. Henes, P.C., Nicole L. Greenblatt, and David S. Meyer
Facsimile No: (212) 446-4900
E-mail address: jonathan.henes@kirkland.com, nicole.greenblatt@kirkland.com, and
david.meyer@kirkland.com

**If to the Ad Hoc Committee of Senior Noteholders:**

Klee, Tuchin, Bogdanoff & Stern LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067-6049
Attention: Michael L. Tuchin and David A. Fidler
Facsimile No: (310) 407-9090
E-mail address: mtuchin@ktbslaw.com, dfidler@ktbslaw.com

**If to the Bridge Loan Agent:**

U.S. Bank, National Association
214 N. Tryon Street, 26th Floor
Charlotte, NC 28202
Attention: CDO Trust Services/James Hanley
Facsimile No: (704) 335-4678

**With copies to:**

Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, CA 90071-1560
Attention: Stacey Rosenberg
Facsimile No: (213) 891-8763

**If to the Senior Notes Indenture Trustee:**

The Bank of New York Mellon Trust Company, N.A.

46

601 Travis, 16th Floor
Houston, TX 77002
Facsimile: (713) 483-6979
Attention: Dennis J. Roemlein CCTS
E-mail address: dennis.roemlein@bnymellon.com

**With copies to:**

Reed Smith
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222
Facsimile: (412) 288-3063
Attention: Eric A. Schaffer
E-mail Address: eschaffer@reedsmith.com

**If to the Consenting Shareholders:**

Court Square
Park Avenue Plaza
55 East 52nd Street, 34th Floor
New York, NY 10055
Attention: John Weber and Thomas McWilliams
Facsimile: (212) 752-6397

**With copies to:**

Dechert LLP
1095 Avenue of the Americas
New York, NY 10036-6797
Attention: Michael J. Sage, Matthew L. Larrabee and Nicole B. Herther-Spiro
Facsimile No: (212) 698-3599


After the Effective Date, the Reorganized Debtors may, in their sole discretion, notify Entities that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

I.      *Entire Agreement.*

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.      *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Debtors' notice, claims and balloting agent at Kurtzman Carson Consultants, LLC or the Bankruptcy Court's website at http://www.deb.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

K.      *Severability of Plan Provisions.*

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.   Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, the New Corporate Governance Documents, the Litigation Trust Agreement, and the Exit Facility Credit Agreement, as any of such documents may have been altered or interpreted in accordance with the foregoing, are:  (i) valid and enforceable pursuant to their terms; (ii) integral to the Plan and may not be deleted or modified without the consent of the parties thereto; and (iii) non-severable and mutually dependent.  The Litigation Trust Agreement shall be binding on all Litigation Trust Beneficiaries who shall be deemed to have executed the Litigation Trust Agreement as of the Effective Date.

L.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e), 1125(g), and 1126(b) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan and, therefore, no such parties, individuals, or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

M.      *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Cases.

N.      *Conflicts.*

To the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other document referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with the Confirmation Order, the Confirmation Order shall govern and control.  Moreover, to the extent that any provision of the Plan Support Agreement conflicts with or is in any way inconsistent with the Plan, the Plan shall govern and control in all respects.

*[Remainder of page intentionally left blank]*

Dated:    October 10, 2013
          Wilmington, Delaware

                              PHYSIOTHERAPY HOLDINGS, INC., on behalf of itself
                              and each of the other Debtors

                              By:    /s/ *Martin McGahan*

                              Name: Martin McGahan
                              Title:   Chief Restructuring Officer and Interim Chief
                              Executive Officer

COUNSEL:

/s/ *Jonathan S. Henes, P.C.*

Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:        (302) 426-1189
Facsimile:        (302) 426-9193

-and-

Morton R. Branzburg (*pro hac vice* admission pending)
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:        (215) 569-2700
Facsimile:        (856) 586-6603

- and -

Jonathan S. Henes, P.C. (*pro hac vice* admission pending)
Nicole L. Greenblatt (*pro hac vice* admission pending)
David S. Meyer (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

49

## Exhibit B

## Exit Facility Commitment Letter

**Execution Version**

### COMMITMENT LETTER

October 10, 2013

PERSONAL AND CONFIDENTIAL

Physiotherapy Associates Holdings, Inc.
Whiteland Business Park
855 Springdale Drive Suite 200
Exton, PA 19341

Attention:  Elizabeth K. Arnold

Ladies and Gentlemen:

You have advised Knighthead Capital Management, LLC, solely on behalf of certain funds and accounts it manages and/or advises ("*Knighthead*"), BlueMountain Capital Management, LLC (acting through such of its affiliates or branches as it deems appropriate, "*BlueMountain*"), Beach Point Capital Management LP (acting on behalf of certain funds and accounts it manages that own a portion of the loans under the Existing Credit Agreement (defined below), "*Beach Point*"), Ellis Lake Master Fund, LP (acting through such of its affiliates or branches as it deems appropriate, "*Ellis Lake*") and Western Asset Management Company, as investment manager and agent on behalf of its client accounts (acting through such of its affiliates or branches as it deems appropriate, "*Western*" and together with Knighthead, BlueMountain, Beach Point and Ellis Lake, "*we*," "*us*" or the "*Commitment Parties*") that on or about November 8, 2013, Physiotherapy Associates Holdings, Inc. ("*Company*", "*Borrower*" or "*you*"), a Delaware corporation, together with its subsidiaries and affiliates (collectively, the "*Debtors*") intends to commence a "pre-packaged" bankruptcy case (the "Bankruptcy Case") by filing a petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et. seq. with the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*") and that the Company intends to refinance (the "*Refinancing*") all outstanding indebtedness under that certain Credit Agreement, dated as of July 31, 2013 among Company, Physiotherapy Holdings, Inc. ("*Holdings*"), the Subsidiary Guarantors (as defined therein) (together with Holdings, the "*Guarantors*" and together, with the Borrower and Holdings, the "*Credit Parties*"), the Lenders (as defined therein) and U.S. Bank National Association, as administrative agent (the "*Existing Credit Agreement*") pursuant to the terms of, and upon the effective date of, the Joint Prepackaged Plan of Reorganization of Physiotherapy Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code attached as Exhibit A to that certain Plan Support Agreement, dated as of October 10, 2013, (the "*Plan Support Agreement*") among the Borrower, the Commitment Parties (or their affiliates) and certain other holders of debt issued by the Borrower (the "*Plan*").  Capitalized terms used but not defined herein shall have the meanings assigned to them in the Summary of Principal Terms and Conditions of the Term Loan Facility attached hereto as Exhibit A (the "*Term Sheet*;" this commitment letter, the Term Sheet and the Funding Conditions attached hereto as Exhibit B, collectively, this "*Commitment Letter*").  The date on which the Refinancing is consummated is referred to as the "*Closing Date*."

You have advised us that the total funds needed to consummate the Refinancing (including fees and expenses) will be provided from $144.162 million of borrowings by the Borrower under a Term Loan Facility (the "*Term Loan Facility*") among the Borrower and the Commitment Parties.

1.      Commitments.

(a)      The Commitment Parties are pleased to confirm by this Commitment Letter their several but not joint commitment to you (the "***Commitment***") to provide or cause one or more of the funds and accounts they manage and/or their affiliates to provide $144.162 million of the aggregate principal amount of the Term Loan Facility, subject to the terms and conditions set forth herein, and in the respective amounts set forth on Schedule I hereto.

(b)      It is agreed that U.S. Bank National Association, or another entity reasonably acceptable to the Commitment Parties and you, will act as sole administrative agent and sole collateral agent (in such capacity, the "***Administrative Agent***") for the Term Loan Facility.

(c)      The commitments and agreements of the Commitment Parties described herein are subject solely to the following conditions precedent:

(i)      other than as a result of the events leading up to and following commencement of the Bankruptcy Case and the continuation and prosecution thereof, there not having occurred or become known to the Commitment Parties any event, development or circumstance since June 30, 2013 that the Commitment Parties determine has caused or could reasonably be expected to cause a material adverse change in the business, financial condition, results of operations, assets or liabilities of the Company and its subsidiaries, taken as a whole;

(ii)      each Credit Party having executed and delivered definitive financing documentation with respect to the Term Loan Facility (the "***Credit Documentation***"), substantially in the form of the Existing Credit Agreement (but not including Section 6.22 thereof; it being acknowledged that certain of the dollar thresholds in the affirmative and negative covenant baskets shall be subject to mutual agreement of the parties) or otherwise satisfactory to the Administrative Agent, each Commitment Party and their counsel, which shall be subject to, and contain the terms and conditions set forth in, the Term Sheet; and

(iii)      the other conditions set forth below in the Funding Conditions attached hereto as Exhibit B.

2.      Expenses.  You agree to reimburse the Commitment Parties promptly upon demand (together with reasonably detailed supporting documentation) for all reasonable and documented out-of-pocket costs and expenses incurred by them in connection with the Term Loan Facility and any related documentation (including the Credit Documentation) and the administration, amendment, modification, enforcement or waiver thereof, whether incurred prior or subsequent to the date hereof and including, without limitation, travel expenses and reasonable fees, disbursements and other charges of one primary counsel (and appropriate local counsel in applicable foreign and local jurisdictions, but limited to one local counsel in each such jurisdiction, and solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to the affected indemnified persons similarly situated).

3.      Indemnification.

(a)      You hereby agree to indemnify and hold harmless the Commitment Parties, the Administrative Agent and each of their respective affiliates and all of their respective officers, directors, partners, trustees, employees, shareholders, advisors, agents, attorneys and controlling persons and each of their respective heirs, successors and assigns (each, an "***Indemnified Person***") from and against any and all losses, claims, damages, liabilities and expenses to which any Indemnified Person may become subject arising out of or in connection with this Commitment Letter, the Term Loan Facility, the use of

2

the proceeds therefrom, the Refinancing, the Bankruptcy Case, any of the other transactions contemplated by this Commitment Letter, any other transaction related thereto or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto and which may be brought by you or any of the Guarantors or any of their respective affiliates or any other party, and to reimburse each Indemnified Person promptly upon demand for all legal and other expenses reasonably incurred by it in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (including, without limitation, in connection with the enforcement of the indemnification obligations set forth herein); *provided, however*, that no Indemnified Person will be entitled to indemnity hereunder in respect of any loss, claim, damage, liability or expense to the extent that (i) it is found by a final, non-appealable judgment of a court of competent jurisdiction that such loss, claim, damage, liability or expense resulted directly from the gross negligence, bad faith or willful misconduct of such Indemnified Person, (ii) such loss, claim, damage, liability or expense resulted from a material breach of the obligations of such Indemnified Person under this Commitment Letter (as determined by a court of competent jurisdiction in a final and non-appealable decision) or (iii) to the extent arising from any dispute solely among Indemnified Persons (other than the Administrative Agent in its capacity as such). In no event will any Indemnified Person be liable on any theory of liability for indirect, special or consequential damages, lost profits or punitive damages as a result of any failure to fund any of the Term Loan Facility contemplated hereby or otherwise in connection with the Term Loan Facility. No Indemnified Person will be liable for any damages arising from the use by unauthorized persons of information, projections or other materials sent through electronic, telecommunications or other information transmission systems that are intercepted by unauthorized persons, except to the extent any such damages are found by a final judgment of a court of competent jurisdiction to arise from the gross negligence, bad faith or willful misconduct of such Indemnified Person.

(b)     You further agree that, without the prior written consent of the Commitment Parties, which consent will not be unreasonably withheld, you will not enter into any settlement of a lawsuit, investigation, claim or other proceeding arising out of this Commitment Letter or the transactions contemplated by this Commitment Letter unless such settlement includes an explicit and unconditional release from the party bringing such lawsuit, investigation, claim or other proceeding of all Indemnified Persons.

4.     Expiration of Commitment.  The Commitment will expire at 5:00 p.m., New York City time, on October 10, 2013 unless on or prior to such time you have executed and returned to the Commitment Parties a copy of this Commitment Letter. If you do so execute and deliver to the Commitment Parties this Commitment, the Commitment Parties agree to hold the Commitment available for you until the earliest to occur of (A) the Closing Deadline, (B) 5:00 p.m. New York time on November 15, 2013, unless the Debtors shall have commenced the Bankruptcy Case or such later date agreed to by each of the Commitment Parties, (C) 5:00 p.m. New York time, on the effective date of the Plan and (D) the termination of the Plan Support Agreement. The "**Closing Deadline**" shall be 5:00 p.m., New York City time, on December 31, 2013 or such later date agreed to by each of the Commitment Parties. The Commitment will terminate on the Closing Date, and you agree to rely exclusively on your rights and the commitments set forth in the Credit Documentation in respect of all loans and extensions of credit to be made on or after the Closing Date.

5.     Confidentiality.

(a)     Please note that this Commitment Letter and any written or oral communications provided by the Commitment Parties or any of their affiliates in connection with the transactions contemplated hereby are exclusively for the information of the Board of Directors and senior management

3

of Company and may not be disclosed to any other person or entity or circulated or referred to publicly without our prior written consent except that you: (i) may provide a copy of this Commitment Letter (including any exhibits and annexes thereto) to the Bankruptcy Court to obtain its approval for any of the Company and its subsidiaries to execute, deliver and perform its obligations hereunder, (ii) may disclose this Commitment Letter to the official advisors to the committee of unsecured creditors appointed in the Bankruptcy Case (the "***Creditors' Committee***"), so long as the disclosure to the advisors to the Creditors' Committee is on a confidential "professionals only" basis, (iii) may file a copy of this Commitment Letter (including the Term Sheet) in any public record in which it is required by law to be filed (in which case you agree to inform us promptly thereof to the extent not prohibited by law), (iv) may disclose this Commitment Letter (including the Term Sheet) if required pursuant to a subpoena, applicable law or order issued by a court of competent jurisdiction or by a judicial, administrative or legislative body or committee in connection with any litigation or other adversary proceeding involving any of them (in which case you agree to inform us promptly thereof to the extent not prohibited by law), (v) may disclose this Commitment Letter and such communications to the Company's officers, directors, agents and advisors who are directly involved in the consideration of the Term Loan Facility to the extent you notify such persons of their obligation to keep this Commitment Letter and such communications confidential and such persons agree to hold the same in confidence, (vi) may disclose this Commitment Letter in protecting and enforcing your rights with respect to this Commitment Letter, *provided* that such disclosure would be only on a confidential basis or pursuant to the procedures of any pending legal or administrative proceeding and (vii) may disclose this Commitment Letter in connection with the Bankruptcy Case, including in connection with the solicitation of votes on, and the confirmation of the Plan.

(b)     You acknowledge that the Commitment Parties may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which you may have conflicting interests regarding the transactions described herein and otherwise. The Commitment Parties will not use confidential information obtained from you by virtue of the transactions contemplated by this Commitment Letter or their other relationships with you in connection with the performance by the Commitment Parties of services for other companies, and the Commitment Parties will not furnish any such information to other companies. You also acknowledge that the Commitment Parties have no obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained from other companies.

6.     <u>Survival</u>. The provisions of this Commitment Letter relating to the payment of fees and expenses, indemnification and contribution and confidentiality and the provisions of Section 7 hereof will survive the expiration or termination of the Commitment or this Commitment Letter (including any extensions) and the execution and delivery of the Credit Documentation.

7.     <u>Choice of Law; Jurisdiction; Waivers</u>.

(a)     This Commitment Letter will be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of law principles that would result in the application of any laws other than the laws of the State of New York. The parties hereto hereby irrevocably submit to the exclusive jurisdiction of any New York State or Federal court sitting in the County of New York in respect of any suit, action or proceeding arising out of or relating to the provisions of this Commitment Letter and irrevocably agree that all claims in respect of any such suit, action or proceeding may be heard and determined in any such court. The parties hereto hereby waive any objection that they may now or hereafter have to the laying of venue of any such suit, action or proceeding brought in any such court, and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. **The parties hereto hereby waive, to the**

4

**fullest extent permitted by applicable law, any right to trial by jury with respect to any action or proceeding arising out of or relating to this Commitment Letter.**

(b)      No Commitment Party will be liable in any respect for any of the obligations or liabilities of any other Commitment Party under this Commitment Letter or those obligations or liabilities of any Commitment Party arising from or relating to the transactions contemplated hereby.  Nothing in this letter is intended to create fiduciary obligations by any Commitment Party nor a fiduciary relationship between any Commitment Party and (1) the Commitment Parties collectively, (2) any other Commitment Party, or (3) any other party.

8.      <u>Miscellaneous</u>.

(a)      This Commitment Letter may be executed in one or more counterparts, each of which will be deemed an original, but all of which taken together will constitute one and the same instrument.  Delivery of an executed signature page of this Commitment Letter by facsimile transmission or other electronic transmission (i.e., ".pdf" or ".tif") will be effective as delivery of a manually executed counterpart hereof.  This Commitment Letter may not be amended or waived except by an instrument in writing signed by each of the parties hereto.

(b)      You may not assign any of your rights, or be relieved of or assign any of your obligations hereunder without the prior written consent of the Commitment Parties (and any purported assignment without such consent will be null and void).

(c)      This Commitment Letter, including the attached Exhibits and Schedules set forth the entire understanding of the parties hereto as to the scope of the Commitment and the obligations of the Commitment Parties hereunder.  This Commitment Letter supersedes all prior understandings and proposals, whether written or oral, between any of the Commitment Parties and you relating to any financing or the transactions contemplated hereby.

(d)      This Commitment Letter has been and is made solely for the benefit of the parties signatory hereto, the Indemnified Persons, and their respective heirs, successors and assigns, and nothing in this Commitment Letter, expressed or implied, is intended to confer or does confer on any other person or entity any rights or remedies under or by reason of this Commitment Letter or the agreements of the parties contained herein.

(e)      You acknowledge that the Commitment Parties may be (or may be affiliated with) full service financial firms and as such from time to time may effect transactions for their own account or the account of customers, and hold long or short positions in debt or equity securities or loans of companies that may be the subject of the transactions contemplated by this Commitment Letter.  You hereby waive and release, to the fullest extent permitted by law, any claims you have with respect to any conflict of interest arising from such transactions, activities, investments or holdings, or arising from the failure of such Commitment Party or any of their respective affiliates to bring such transactions, activities, investments or holdings to your attention.  In addition, you acknowledge that the transactions contemplated by this Commitment Letter are arm's-length commercial transactions and that each Commitment Party is acting as principal and in its own best interests.  You are relying on your own experts and advisors to determine whether the transactions contemplated by this Commitment Letter are in your best interests.  You agree that each Commitment Party will act under this Commitment Letter as an independent contractor and that nothing in this Commitment Letter, the nature of our services, or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between any Commitment Party on the one hand and you, or your respective stockholders or your respective affiliates on the other hand.

(f)        Each Commitment Party hereby notifies the Company that, pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Patriot Act**") it may be required to obtain, verify and record information that identifies the Company and the Guarantors, which information includes the name and address of the Company and the Guarantors and other information that will allow the Commitment Parties to identify the Company and the Guarantors in accordance with the Patriot Act.  This notice is given in accordance with the requirements of the Patriot Act and is effective for each Commitment Party.

[*Remainder of this page intentionally left blank*]

6

If you are in agreement with the foregoing, kindly sign and return to us the enclosed copy of this Commitment Letter.

Very truly yours,

KNIGHTHEAD MASTER FUND, L.P.
By: Knighthead Capital Management, LLC, its
Investment Manager

By: _____
     Name:   **Laura Torrado**
     Title:    **Authorized Signatory**

LMA SPC for and on behalf of the MAP 84 Segregated
Portfolio
By: Knighthead Capital Management, L.L.C., its
Investment Advisor

By: _____
     Name:
     Title:    **Laura Torrado**
               **Authorized Signatory**

BLUEMOUNTAIN CAPITAL MANAGEMENT, LLC

By: _____
    Name: David M. O'Mara
    Title: Assistant General Counsel and Vice President

BEACH POINT CAPITAL MANAGEMENT LP, on behalf of certain funds and accounts it manages that own a portion of the loans under the Existing Credit Agreement

By: _____

    Name:  Carl Goldsmith
    Title:  Senior Portfolio Manager

ELLIS LAKE MASTER FUND, LP
By: Ellis Lake GP, LLC

By: _____
    Name: Anthony Pasqua
    Title: Authorized Signatory

WESTERN ASSET MANAGEMENT COMPANY, as investment manager and agent on behalf of its client accounts

By: _____

Name:

Title:    W. Stephen Venable, Jr.
          Manager, US Legal and Corporate Affair.

Commitment Letter

Accepted and agreed to as of the
date first above written:

PHYSIOTHERAPY ASSOCIATES HOLDINGS, INC.

By: _____

Name:  Elizabeth Arnold

Title:  CFO

<u>**EXHIBIT A TO COMMITMENT LETTER**</u>

<u>**SUMMARY OF TERMS OF TERM LOAN FACILITY**</u>

**$144.162 Million Senior Secured Credit Facility**

  This Summary of Terms and Conditions ("***Term Sheet***") summarizes certain terms and conditions of the Term Exit Facility (as defined below) that are to be entered into in connection with a Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (the "***Plan***") of Physiotherapy Associates Holdings, Inc. (the "***Company***") and certain of the Company's affiliates.  It is intended that all material terms of the facilities described herein are herein set forth and matters that are not expressly set out in this Term Sheet are subject to mutual agreement of the parties.

| | |
|---|---|
| ***Term Exit Facility:*** | $144.162 million senior secured term loan facility (the "***Term Exit Facility***") consisting of term loans ("***Term Loans***"). |
| ***Borrower:*** | Physiotherapy Associates Holdings, Inc. (the "***Borrower***"). |
| ***Guarantors:*** | All obligations of the Borrower under the Term Exit Facility and under any interest rate protection or other swap or hedging arrangements or cash management arrangements entered into with a Lender (defined below), the Agent (defined below) or any affiliate of a Lender or the Agent ("***Hedging/Cash Management Arrangements***") will be unconditionally guaranteed jointly and severally on a senior secured basis (the "***Guarantees***") by each existing and subsequently acquired or organized subsidiary (other than any excluded subsidiary) of Borrower (collectively, the "***Guarantors***"); subject to exclusions substantially consistent with those set forth in the Existing Precedent (defined below).<br><br>The Guarantors and the Borrower are collectively referred to herein as the "***Loan Parties***". |
| ***Administrative and Collateral Agent:*** | U.S. Bank National Association (in such capacity, the "***Agent***"). |

| | |
|---|---|
| ***Incremental Term Facility:*** | Borrower will have the option to increase the amount of the Term Exit Facility (each, an "***Incremental Term Facility***") by up to $8 million so long as no event of default has occurred and is continuing at the time of such increase or immediately after giving effect thereto, and *provided* that (i) no Lender shall be required to provide additional commitments for such Incremental Term Facility, (ii) such Incremental Term Facility shall rank pari passu in right of payment and of security with the Term Loans, (iii) such Incremental Term Facility shall not mature earlier than the latest Maturity Date with respect to the then outstanding Term Loans and (iv) such Incremental Term Facility shall be treated substantially the same as the Term Loans (in each case, including with respect to mandatory and voluntary repayments), provided that (a) other than with respect to fees paid by the Borrower to secure the commitments for such Incremental Term Facility (which, for the avoidance of doubt, (i) shall be permitted and (ii) other Lenders under the Term Exit Facility shall not be entitled to similar fees), the terms and conditions applicable to the Incremental Term Facility may be materially different from those of the Term Loans to the extent such differences apply only after the Term Maturity Date and (b) the interest rates applicable to the Incremental Term Facility shall be determined by the Borrower and the lenders thereof. |

***Mandatory Prepayments:***

Loans under the Term Exit Facility shall be prepaid with:

(A)   Commencing with the first full fiscal year of the Borrower ended [_____][1], 50% of Excess Cash Flow;

(B)   100% of the net cash proceeds of all non-ordinary course asset sales or other dispositions of property by the Borrower and the other Loan Parties (including insurance and condemnation proceeds and sale leaseback proceeds) subject to exceptions to be agreed and subject to the right to reinvest an aggregate amount of $5,000,000 of such proceeds, if such proceeds are reinvested in the business (other than working capital, except for short term capital assets), including in permitted acquisitions, capital expenditures or prepub expenditures (or committed to be reinvested) within 12 months and, if so committed to be reinvested, so long as such reinvestment is actually completed within 90 days thereafter, and other exceptions to be set forth in the Term Exit Facility Documentation;

---

[1]   One year after the Closing Date.

(C)    100% of the net cash proceeds of issuances of debt obligations of the Borrower and the other Loan Parties after the Closing Date (excluding debt permitted under the Term Exit Facility Documentation); and

(D)    100% of the net cash proceeds of issuances of equity securities of the Borrower and the other Loan Parties after the Closing Date.

Mandatory prepayments shall be applied, without premium or penalty, subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of Adjusted LIBOR borrowings other than on the last day of the relevant interest period, on a pro rata basis to the Term Facility and any Incremental Term Facility under the Term Exit Facility Documentation.

Any Lender under the Term Facility may elect not to accept its pro rata portion of any mandatory prepayment (each a "***Declining Lender***").   Any prepayment amount declined by a Declining Lender shall be re-offered to the other Lenders and any amounts so rejected after such re-offer may be retained by the Borrower.

*Optional Prepayments:*    Voluntary reductions of the unutilized portion of the Term Exit Facility commitments and voluntary prepayments of borrowings under the Term Exit Facility will be permitted at any time in minimum principal amounts to be agreed upon, without premium (except as provided below) or penalty (except as provided below), subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of Adjusted LIBOR borrowings other than on the last day of the relevant interest period.

All voluntary prepayments of the Term Facility and any Incremental Term Facility will be applied as directed by the Borrower.

All voluntary prepayments of the Term Loans and mandatory prepayments of the Term Loans with the proceeds of debt shall be accompanied by a premium (expressed as a percentage of the principal amount of such Term Loans to be prepaid) equal to (a) on or prior to the one year anniversary of the Closing Date, 5.0%, (b) after the one year anniversary of the Closing Date but on or prior to the second anniversary of the Closing Date, 3.0% and (c) thereafter, 0%.

Notwithstanding anything to the contrary herein, (i) the Borrower shall be permitted to make voluntary prepayments in the aggregate principal amount of $5,000,000 per year without

premium or penalty and (ii) there shall be no prepayment premium or penalty if such prepayment shall be made with the proceeds of a disposition of any or all of the assets of the Loan Parties.

***Use of Proceeds:***   To (i) refinance the Borrower's existing senior credit facility, (ii) fund certain fees and expenses associated with the Term Exit Facility, and (iii) fund working capital and general corporate purposes.

***Fees and Interest Rates:***   As set forth on Annex A-I.

***Maturity:***   The Term Exit Facility will mature on the third anniversary of the Closing Date (the "***Term Maturity Date***").

***Amortization:***   None.

***Collateral:***   To secure all obligations of the Loan Parties to Agent, Lenders, and under any Hedge Agreements, the Loan Parties shall grant to Agent (subject to exceptions and thresholds as provided in the Term Exit Facility Documentation Principles below):

A first priority security interest in all of the present and future tangible and intangible assets of the Loan Parties (including, without limitation, cash, deposit and securities accounts, accounts receivable, inventory, intellectual property, material owned real property, 100% of the capital stock of the Guarantors and 65% of the stock of each first-tier foreign subsidiary of any Loan Party) (the "***Collateral***") subject to exceptions consistent with the Existing Precedent.

***Documentation Principles:***   The documentation governing the Term Exit Facility (the "***Term Exit Facility Documentation***") will be based on Existing Precedent and will contain only those representations, warranties, covenants and events of default expressly set forth therein with such changes and modifications as are mutually agreed or otherwise expressly set forth in this Term Sheet.

As used in this Term Sheet, "***Existing Precedent***" shall mean documentation substantially identical to the Credit Agreement dated as of July 31, 2013, by and among Physiotherapy Associates Holdings, Inc., as borrower, Physiotherapy Holdings, Inc., the Guarantors (as defined therein) party thereto, the Lenders (as defined therein) party thereto, U.S. Bank National Association, as administrative agent and collateral agent, and the

other parties thereto (but excluding Section 6.22 thereof; it being acknowledged that certain of the dollar thresholds in the affirmative and negative covenant baskets shall be subject to mutual agreement of the parties), and related guarantee agreements, security agreements, intellectual property security agreements and any other documents executed and/or delivered in connection with the Existing Precedent, (i) with changes and modifications that (x) reflect the terms of this Term Sheet, (y) cure mistakes or defects or (z) reflect operational, agency, assignment and related provisions not specifically set forth in this Term Sheet and not in contravention of anything specifically set forth in this Term Sheet that are customarily included in credit agreements of this type and (ii) such other modifications as are mutually agreed.

| | |
|---|---|
| ***Representations and Warranties:*** | Substantially identical to the Existing Precedent. |
| ***Affirmative Covenants:*** | Substantially identical to the Existing Precedent. |
| ***Negative Covenants:*** | Substantially identical to the Existing Precedent and including the ability to incur $25 million of unsecured subordinated debt and $5 million of purchase money debt and capital leases. |
| ***Financial Covenants:*** | Maximum Total Leverage Ratio and Minimum Consolidated Interest Coverage Ratio, in each case on terms to be mutually agreed consistent with the financial projections of the Loan Parties. |
| ***Financial Reporting:*** | Substantially identical to the Existing Precedent and taking into account fresh start accounting modifications. |
| ***Events of Default:*** | Substantially identical to the Existing Precedent. |
| ***Conditions Precedent to Closing:*** | Customary for exit financing facilities of this type. |
| ***Scheduled Closing Date:*** | The closing date ("***Closing Date***") shall occur upon the satisfaction or waiver of the Conditions Precedent to Closing. |
| ***Expenses and Indemnification:*** | The Borrower shall pay all reasonable and documented or invoiced out-of-pocket costs and expenses of the Agent associated with the syndication of the Term Exit Facility and the preparation, execution and delivery, administration, amendment, modification, waiver and/or enforcement of the Loan Documents (including the reasonable fees, disbursements and other charges of Latham & |

Watkins LLP), in each case consistent with expenses and indemnification terms in the Existing Precedent.

***Governing Law and Forum:***    New York.

Annex A-I<br>Interest Rates and Fees

**Interest Rate Options:**    Borrower may elect that the Term Loans bear interest at a rate per annum equal to:

(i) the Base Rate plus the Applicable Margin; or

(ii) the LIBOR Rate plus the Applicable Margin.

As used herein:

"***Base Rate***" shall be defined substantially consistent with the Existing Precedent.

"***LIBOR Rate***" shall be defined substantially consistent with the Existing Precedent.

"***Applicable Margin***"[2] shall mean:

| Base Rate | 9.0% |
|---|---|
| LIBOR Rate | 10.0% |

There shall be a minimum (i) LIBOR Rate (i.e. LIBOR Rate prior to adding any applicable interest rate margins thereto) requirement of 1.00% per annum and (ii) Base Rate requirement of 2.00% per annum. The Borrower may elect interest periods of 1, 2, 3 or 6 months (or, if agreed by all relevant Lenders, 9 or 12 months) for adjusted LIBOR borrowings.

**Interest Payment Dates:**    In the case of Loans bearing interest based upon the Base Rate ("***Base Rate Loans***"), quarterly in arrears.

In the case of Loans bearing interest based upon the LIBOR Rate ("***LIBOR Rate Loans***"), on the last day of each relevant interest period, except in the case of any interest period in excess of three months, every three months.

**Default Rate:**    At any time when (i) a payment or bankruptcy event of default has occurred and is continuing or (ii) following

---

[2]    Grid pricing stepdowns to be mutually agreed.

written notice from the Required Lenders (as defined in the Term Exit Facility Documentation) when any other event of default has occurred and is continuing, all outstanding amounts then due under the Term Exit Facility shall bear interest at 2.00% above the interest rate otherwise applicable thereto.

**Rate and Fee Basis:**    All per annum rates shall be calculated on the basis of a year of 360 days and the actual number of days elapsed.

**Lender Fee:**    1.5% OID.

# EXHIBIT B TO COMMITMENT LETTER

## FUNDING CONDITIONS

*Capitalized terms used but not defined herein have the meanings assigned to them in the Commitment Letter to which this Exhibit B is attached and of which it forms a part. The availability of the Term Loan Facility is conditioned upon satisfaction or waiver of solely the conditions precedent summarized below.*

(a)     <u>Bankruptcy Plan</u>.  The Plan and related disclosure statement and other solicitation material, the Confirmation Order (as defined below) and all documents to be executed and/or delivered in connection with implementation of the Plan, or affecting the Term Loan Facility, shall be on terms and conditions satisfactory to the Commitment Parties, in their sole discretion, and no amendment, modification, supplement or waiver shall have been made to any or all of the Plan, the related disclosure statement and other solicitation material, the Confirmation Order and all documents to be executed and/or delivered in connection with the implementation of the Plan, in each case, without the prior written consent of the Commitment Parties, that , in the reasonable judgment of each of the Commitment Parties is materially adverse to the rights and interest of such Commitment Party.  The Commitment Parties acknowledge and agree that the Plan and the other solicitation material associated therewith are satisfactory to the Commitment Parties.

(b)     <u>Confirmation Order</u>. The Bankruptcy Court shall have entered an order, in form and substance satisfactory to the Commitment Parties (the "***Confirmation Order***"), confirming the Plan and approving the Plan-related solicitation procedures, and the Confirmation Order shall not have been stayed, amended, modified or reversed.

(c)     <u>Conditions to Bankruptcy Plan</u>.  The Plan shall have become effective in accordance with its terms, and all conditions precedent to the effectiveness of the Plan (other than the effectiveness of the Term Loan Facility) shall have been satisfied or waived (with the prior consent of the Commitment Parties).

(d)     <u>Customary Closing Conditions</u>:  The Commitment Parties shall be reasonably satisfied that each Credit Party has complied with (or the Commitment Parties have waived in their sole discretion) conditions similar to those in the Existing Precedent, including the following customary closing conditions:  (i) the delivery of customary legal opinions, corporate records and documents from public officials and officer's certificates; (ii) delivery of evidence of corporate authority; (iii) execution by the Loan Parties of the Credit Documentation in a form consistent with the Commitment Letter and Term Sheet, which shall be in full force and effect; (iv) insurance required by the Credit Documentation; (v) solvency of the Borrower and each Guarantor and the delivery of a solvency certificate to that effect from the chief financial officer of the Borrower and each Guarantor in form and substance consistent with the Existing Precedent; (vi) reasonably satisfactory confirmation of repayment of the Existing Credit Agreement; and (vii) creation and perfection of liens securing the Term Loan Facility to the extent required by the Credit Documentation.  To the extent requested by a Lender five days prior to the Closing Date in writing, each such Lender shall have received at least three days prior to the Closing Date (or such lesser date as agreed to by such Lender), all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the Patriot Act.

## SCHEDULE I TO COMMITMENT LETTER

| Name of Lender | Commitment Percentage |
|---|---|
| Accounts managed by Knighthead Capital Management, L.L.C. | 28.3% |
| Accounts managed by Western Asset Management Company | 27.0% |
| Accounts managed by BlueMountain Capital Management, LLC | 18.0% |
| Accounts managed by Beach Point Capital Management LP | 10.7% |
| Accounts managed by Ellis Lake GP, LLC | 15.9% |

**Exhibit C**

**Potential Defendants and Witnesses**

## Potential Defendants and Witnesses

The Litigation Trust[1] may bring claims and Causes of Action (as defined in the Plan) against any, some, or all of the following persons or entities:

1.  Officers of Physiotherapy Associates, Inc. ("PA"), Physiotherapy Associates Holdings, Inc. ("PTA"), or any other Debtor (as defined in the Plan) between January 2010 and April 2012, including but not limited to Richard Binstein, Edwin Bode, Dan Connors, Andrew DeVoe, Peter Grabaskas, and Peter Limeri;

2.  Directors of PA, PTA, or any other Debtor between January 2010 and April 2012, including but not limited to Salam Chaudhary, James Connelly, III, Dan Connors, Herreld Kirkpatrick, III, Richard Kracum, James McLane, Curt Selquist, and Robert Womsley;

3.  Any and all employees of PA, PTA, or any other Debtor that worked in the Financial Planning and Analysis group ("FP&A"), contracting, accounting, revenue cycle management, collections, or who were otherwise involved in the 2012 Transaction, the issuance of any security of the PA, PTA or any other Debtor, the conduct connected with or that resulted in the restatement of the Debtors' 2010, 2011 and/or 2012 financial statements, or who otherwise were related to the overstatement of revenue, accounts receivable, and/or EBITDA, including but not limited to the Officers and Directors identified above and Michael Walden;

4.  Water Street Healthcare Partners, LLC, Water Street Healthcare Partners, L.P., WS Associate Co-Invest Partners, LLC, Water Street Healthcare Management, L.P., and their parents, subsidiaries and affiliates, including limited partners (collectively, "Water Street Group") and Water Street Group employees and partners, including but not limited to the Directors identified above and Joe DeJean;

5.  Wind Point Partners IV, L.P., Wind Point Executive Advisor Partners IV, L.P., Wind Point Associates IV, LLC, Wind Point Investors IV, L.P., Wind Point Advisors LLC, and their parents, subsidiaries and affiliates, including limited partners (collectively, "Wind Point Group"), and Wind Point Group employees including but not limited to the Directors identified above and Joseph Lawler;

6.  Huron Consulting and its parents, subsidiaries and affiliates (collectively, "Huron"), any Huron employees that worked on PA's, PTA's, or any other Debtor's account, including but not limited to Randy Notes, Ken Saitow, and Elliot Skrinjar;

7.  Ernst & Young LLP and its parents, subsidiaries and affiliates (collectively, "Ernst & Young"), any Ernst & Young employees that worked on the PA's, PTA's, or any other Debtor's account, including but not limited to John "Chip" Clark, III, James Porter, and Nicholas Stone;

8.  KPMG LLP and its parents, subsidiaries and affiliates (collectively, "KPMG"), and any KPMG partners or employees that worked on PA's, PTA's, or any other Debtor's account, including but not limited to John Broderick, Edward Chiosso, and Catherine Ehrman;

9.  PricewaterhouseCoopers LLP and its parents, subsidiaries and affiliates (collectively, "PWC"), and any PWC partners or employees that worked on matters related to PA, PTA, or any other Debtor;

10. Jefferies & Company, Inc., Jefferies Finance LLC, and their parents, subsidiaries and affiliates (collectively, "Jefferies"), and any Jefferies employees that worked on matters related to PA, PTA, or any other Debtor, including but not limited to Richard Agabs, David Armour, Atishay Chopra, Eric Coombs,

---

[1]    As defined in the *Joint Prepackaged Plan of Reorganization of Physiotherapy Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, as the same may be amended from time to time (the "Plan").

Thad Davis, Thomas Flanagan, Tom Graziano, Michael Leder, Keith Lockwood, Michael Powell, Matt Remsen, and Paul Sandoli;

11.     RBC Capital Markets, LLC and its parents, subsidiaries and affiliates (collectively, "<u>RBC</u>"), and any RBC employee;

12.     Phil Norris Consulting and its parents, subsidiaries and affiliates (collectively, " <u>Phil Norris Consulting</u>"), and any Phil Norris Consulting employees that worked on PA's, PTA's, or any other Debtor's account; and

13.     each of the current and former affiliates, officers, directors, shareholders, general partners, limited partners, advisors and agents of each of the foregoing.

**Exhibit D**

**Liquidation Analysis**

**Liquidation Analysis**

**1.      Statement of Limitations**

Physiotherapy Holdings, Inc. ("Holdings"), Physiotherapy Associates Holdings, Inc. ("PAH") and certain of PAH's direct and indirect subsidiaries and affiliates, as Chapter 11 debtors and debtors in possession (collectively, the "Debtors"), with the assistance of Alvarez & Marsal Healthcare Industry Group LLC ("A&M"), have prepared this hypothetical liquidation analysis (the "Liquidation Analysis") in connection with the Disclosure Statement for the Joint Prepackaged Plan of Reorganization of Physiotherapy Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (as amended, supplemented, or modified from time to time, the "Disclosure Statement").  The Liquidation Analysis indicates the values which may be obtained pursuant to a Chapter 7 liquidation by classes of Claims upon disposition of assets as an alternative to continued operation of the business under the Plan.  Accordingly, asset values discussed herein may be different than amounts referred to in the Plan.  The Liquidation Analysis is based upon the assumptions discussed herein.  All capitalized terms not defined herein have the meanings ascribed to them in the Disclosure Statement to which the Liquidation Analysis is attached.

The Liquidation Analysis has been prepared assuming that a Chapter 7 trustee (the "Trustee") is appointed to liquidate the Debtors on November 30, 2013 (the "Liquidation Date").  The book values are estimated based on the Debtors' August 31, 2013 balance sheet (unless otherwise noted), and are assumed to be representative of the Debtors' assets and liabilities as of the Liquidation Date.

The Liquidation Analysis represents an estimate of recovery values and percentages based upon a hypothetical liquidation of the Debtors if a Trustee were appointed by the Bankruptcy Court to convert assets into cash.  The determination of the hypothetical proceeds from the liquidation of assets is an uncertain process involving the extensive use of estimates and assumptions which, although considered reasonable by the Debtors' management, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors and their management.  In instances where assumptions and/or methodologies had to be utilized with regard to developing estimates or presenting the treatment of assets and claims that could potentially benefit one class of creditors as compared to the alternative, an attempt was made to utilize an assumption that was equitable to both secured creditors as well as unsecured creditors.

**ACCORDINGLY, NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS WOULD OR WOULD NOT APPROXIMATE THE ASSUMPTIONS REPRESENTED HEREIN. ACTUAL RESULTS COULD VARY MATERIALLY.**

In preparing the Liquidation Analysis, the Debtors have estimated an amount of allowed claims for each class of claimants based upon a review of the Debtors' balance sheet as of August 31, 2013, and based on an estimate of claims to be filed in the Chapter 11 Cases.  The estimate of the amount of allowed claims set forth in the Liquidation Analysis should not be relied upon for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of allowed claims under the Plan.  The actual amount of allowed claims could be, and likely will be, materially different from the amount of claims estimated in the Liquidation Analysis.

The Liquidation Analysis envisions a 3-5 month wind-down period (collectively, the "Wind-Down").

The Liquidation Analysis does not include estimates for the tax consequences that may be triggered upon the liquidation and sale events of assets.  Such tax consequences may be material.

1

The Liquidation Analysis does not include recoveries resulting from any potential preference, fraudulent transfer or other litigation or avoidance actions.

The Liquidation Analysis does not consider the discounting of values over time.  The discounting of values would result in lower recoveries to constituents than presented in this Liquidation Analysis.

2.    **Overview**

    (a)    *Purpose of Analysis*

    The Liquidation Analysis is required to be included in the Disclosure Statement for the purpose of evaluating whether the Plan meets the best interest of creditors test under section 1129(a)(7) of the Bankruptcy Code.  Generally, section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired allowed claim or interest must either accept the Plan or receive or retain under the Plan of Reorganization property of value, as of the effective date of the Plan, that is not less than the value such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

    The Liquidation Analysis was prepared assuming conversion of the Debtors' Chapter 11 Cases to Chapter 7 cases under the Bankruptcy Code on the Liquidation Date with assets being liquidated on a "piecemeal" basis at liquidation value as opposed to being sold for going-concern value.

    (b)    *Overview of Analytical Approach*

    This Liquidation Analysis was developed from the Debtors' consolidated balance sheets, as of August 31, 2013, and represents the Debtors' current estimates for asset recovery. Balance sheet amounts presented are intended to be a proxy for actual balances on the date of a hypothetical liquidation with the exception of certain asset and liability balance sheet accounts that are based on forecasted balances as of the Liquidation Date where appropriate.

    Wind-Down costs include (but are not limited to):

- Trustee fees, general operating costs, payroll costs (including employee 401(k) funding), lease rent costs, insurance claims and premium costs, tax and utility payments, severance payments, clinic closure costs, and medical record storage costs, Trustee fees, brokerage liquidation fees, real estate liquidation fees, employee retention payments and professional fees.

    Liquidation proceeds are assumed to be distributed in accordance with applicable bankruptcy law.

    (c)    *Liquidation Process*

    The Debtors' liquidation would be conducted in a Chapter 7 venue with a Trustee managing the bankruptcy estate (the "Estate") to maximize recovery in an expedited process.

2

The Liquidation Analysis process begins by determining the amount of proceeds that would be generated from a hypothetical Chapter 7 liquidation, in which a Trustee would be appointed and charged with reducing all of the Debtors' assets to cash.

The Trustee would be required to:

- sell the assets owned by the Debtors on a piecemeal basis and not as a going concern;
- wind down or close clinics that are unable to sold;
- reconcile each category of claims asserted against the Chapter 7 Estate to determine the allowed claims per category;
- distribute net proceeds generated from the sale of the Estate's assets in accordance with the absolute priority rule; and
- pay costs related to liquidation process.

(d)    *Distribution of Net Proceeds to Claimants*

Any available net proceeds would be allocated to any applicable creditors and stockholders in strict priority in accordance with section 726 of the Bankruptcy Code.

## 3.    Conclusion

The estimated net proceeds available for distribution to creditors in a hypothetical liquidation are expected to be $22.3 million in a high scenario and $12.0 million in a low scenario. The full amount of these proceeds would be distributed to the Debtors' secured debt holders, resulting in a 15.3% recovery in a high scenario and an 8.2% recovery in a low scenario. All remaining claimants (administrative and priority claimants, senior note holders, and unsecured creditors) would receive a 0% recovery.

**Based on the significantly lower estimated recoveries for both secured and unsecured creditors under this hypothetical liquidation analysis versus the estimated recoveries under the Plan, A&M believes that the Plan satisfies the requirements of 1129(a)(7) of the Bankruptcy Code.**

## 4.    Notes to Liquidation Analysis and Wind-Down Analysis

## <u>Liquidation Analysis</u>

(1)    Estimated Assets & Liabilities as of November 30, 2013 are based on August 31, 2013 balance sheet unless otherwise noted.

(2)    Estimated cash balance as of November 30, 2013 balance adjusted for timing of ordinary course operating disbursements (payroll, trade, etc), October bridge loan interest payments, professional fee payments & utility deposits.

(3)    Prepaid expenses includes Utility Deposits of $450 thousand.

(4)    Investment in Equity Affiliates represents the book value of the Debtors' investment in joint ventures where the Debtors have minority ownership.

(5)    <u>See</u> Wind-Down Analysis for additional detail.

(6)    Liquidation Fee on the value of the assets of 3%.

(7)    Assumes interest accrues at 9.5% through March 31, 2014 on the $140 million Bridge Loan Facility.

(8)    Assumes interest accrues through March 31, 2014 on 11.875% $210 million Senior Notes.

(9)    Assumes the greater of 1 year of lease payments or 15% of the remaining lease payments.

(10)    Estimated Refunds & Credit balance after September 2013 balance sheet adjustment. Refunds & Credit balances are amounts that routinely occur due overpayments by patients & payors.

3

**Wind-Down Analysis**

(1)    Assumes 3-5 month Wind-Down.

(2)    Trustee appointed to liquidate the business on November 30, 2013.

(3)    Assumes professional fees (includes professionals, U.S. Trustee costs and commissions) ramp down after the first two months (December and January).

(4)    Revenue and operating costs based on actual and forecasted monthly averages for nine month period 3Q 2013 - 1Q 2014.

(5)    Monthly receipts, payroll, routine payables, billing fees, rent and other operating expenses reduced per the Wind-Down Schedule below.

(6)    Severance for employees and management is two weeks per employee, consistent with Debtors' current policy.

(7)    Reflects costs to close clinics, remediate space and move and store equipment.

(8)    Estimated costs to store patient medical records for 6 years.

KE 27988484.11

**Physiotherapy Holdings, Inc. ("Holdings"), Physiotherapy Associates Holdings, Inc. ("PAH") and Subsidiaries & Affiliates ("Debtors")**
**Liquidation Analysis Summary**
**(in $000s)**

| | Estimated[1] Book Value 11/30/2013 | HIGH SCENARIO Recovery Basis % | HIGH SCENARIO Recovery Value ("OLV") | LOW SCENARIO Recovery Basis % | LOW SCENARIO Recovery Value ("OLV") |
|---|---|---|---|---|---|
| **ASSETS:** | | | | | |
| *Current assets:* | | | | | |
| Cash[2] | 6,530 | 95.0% | $ 6,203 | 85.0% | $ 5,550 |
| Accounts Receivable - Patient | 37,746 | 75.0% | 28,310 | 65.0% | 24,535 |
| Accounts Receivable - Other | 318 | 75.0% | 239 | 65.0% | 207 |
| Inventory | 1,622 | 50.0% | 811 | 40.0% | 649 |
| Prepaid Expenses [3] | 7,289 | 20.0% | 1,458 | 10.0% | 729 |
| **Total Current Assets** | **53,505** | **69.2%** | **37,020** | **59.2%** | **31,669** |
| | | | | | |
| *Long Term Assets* | | | | | |
| Property & Equipment | 10,795 | 15.0% | 1,619 | 10.0% | 1,080 |
| Investment in Equity Affiliates [4] | 1,771 | 25.0% | 443 | 0.0% | - |
| Other Noncurrent Assets | 1,648 | 0.0% | - | 0.0% | - |
| Subtotal Long Term Assets | **14,214** | **14.5%** | **2,062** | **7.6%** | **1,080** |
| | | | | | |
| Other Long Term Assets | - | 0.0% | - | 0.0% | - |
| **Total Fixed Assets** | **14,214** | **14.5%** | **2,062** | **7.6%** | **1,080** |
| **TOTAL ASSETS** | **67,719** | **57.7%** | **39,082** | **48.4%** | **32,749** |
| | | | | | |
| Wind-Down Profit/(Loss)[5] | | | (15,587) | | (20,121) |
| Liquidation Fees[6] | 3.0% | | (1,172) | | (655) |
| **Total Available for Distribution to Secured Debt** | | | **$ 22,323** | | **$ 11,973** |

| | Estimated Claim | Recovery Basis % | Recovery Value ("OLV") | Recovery Basis % | Recovery Value ("OLV") |
|---|---|---|---|---|---|
| *Secured Debt* | | | | | |
| Bridge Loan Facility - Accrued Interest [7] | 5,579 | 15.3% | 855 | 8.2% | 459 |
| Bridge Loan Facility | 140,000 | 15.3% | 21,467 | 8.2% | 11,514 |
| **Total Secured Debt Liabilities** | **145,579** | **15.3%** | **22,323** | **8.2%** | **11,973** |
| | | | | | |
| **Total Available to Administrative and Priority Liabilities** | | | **-** | | **-** |
| | | | | | |
| *Administrative & Priority Liabilities:* | | | | | |
| Taxes Outstanding | 1,263 | 0.0% | - | 0.0% | - |
| **Total Administrative/Priority Liabilities** | **1,263** | **0.0%** | **-** | **0.0%** | **-** |
| | | | | | |
| **Total Available for Distribution to Senior Notes/Unsecured** | | | **-** | | **-** |
| | | | | | |
| *Senior Note & Unsecured Liabilities:* | | | | | |
| 11.875% Senior Notes due 2019 | 210,000 | 0.0% | - | 0.0% | - |
| Accrued Note Interest[8] | 37,406 | 0.0% | - | 0.0% | - |
| Lease rejection claims[9] | 29,049 | 0.0% | - | 0.0% | - |
| Accounts Payable | 6,481 | 0.0% | - | 0.0% | - |
| Accrued Lease Liability / Misc. / Corp Accr./Ins. & Other | 8,300 | 0.0% | - | 0.0% | - |
| Refunds & Credit Balances[10] | 4,697 | 0.0% | - | 0.0% | - |
| Accrued Restructuring Costs/Other | 992 | 0.0% | - | 0.0% | - |
| **Total Unsecured Liabilities** | **296,925** | **0.0%** | **-** | **0.0%** | **-** |

**Physiotherapy Holdings, Inc. ("Holdings"), Physiotherapy Associates Holdings, Inc. ("PAH") and Subsidiaries & Affiliates ("Debtors")**
**Wind-Down Analysis Summary[1]**
**(in $000s)**

| | | Dec | Jan | Feb | Mar | Apr | Wind Down (12/13 - 2/14) High Scenario | Wind Down (12/13 - 4/14) Low Scenario |
|---|---|---|---|---|---|---|---|---|
| **Admin Wind Down Costs** | | | | | | | | |
| Chapter 7 Prof Fees[2][3] | | $ 750 | $ 750 | $ 500 | $ 500 | $ 500 | $ 2,000 | $ 3,000 |
| **Total Admin Wind Down Costs** | | 750 | 750 | 500 | 500 | 500 | 2,000 | 3,000 |
| | | | | | | | | |
| **Operating Wind Down Costs [4, 5]** | | | | | | | | |
| | | | | | | | | |
| Outpatient Rehabilitation Receipts | | $ 23,279 | $ 13,967 | $ 6,984 | $ 2,328 | $ - | $ 44,230 | $ 46,557 |
| Orthotics & Prosthetics | | 1,369 | 821 | 411 | 137 | - | 2,601 | 2,738 |
| Other Operating Receipts | | 214 | 128 | 64 | 21 | - | 406 | 427 |
| **Operating Revenue** | | 24,861 | 14,917 | 7,458 | 2,486 | - | 47,237 | 49,723 |
| | | | | | | | | |
| Payroll | | 12,515 | 10,012 | 5,632 | 1,877 | - | 28,159 | 30,036 |
| 401 K Funding (Employee Portion) | | 690 | 552 | 311 | 104 | - | 1,554 | 1,657 |
| 401 K Match (PTA) | | - | - | - | - | - | - | - |
| Field Incentives | | 764 | 611 | 344 | 115 | - | 1,718 | 1,833 |
| **Net Payroll** | | 13,969 | 11,175 | 6,286 | 2,095 | - | 31,430 | 33,526 |
| | | | | | | | | |
| Monthly Rent - All Locations | | 3,092 | 2,782 | 1,855 | 927 | 309 | 7,729 | 8,966 |
| Insurance Claims and Premiums | | 1,953 | 1,367 | 976 | 586 | 195 | 4,296 | 5,077 |
| Routine Payables | | 3,277 | 2,294 | 1,639 | 983 | 328 | 7,210 | 8,521 |
| Billing Fees (IKS) | 3.70% | 861 | 517 | 258 | 86 | - | 1,636 | 1,723 |
| Tax and Utility Payments | | 463 | 324 | 232 | 139 | 46 | 1,019 | 1,204 |
| **Total Required Payments** | | 9,646 | 7,284 | 4,960 | 2,722 | 878 | 21,890 | 25,490 |
| | | | | | | | | |
| Severance [6] | | - | - | - | - | - | 6,603 | 6,603 |
| Closure Costs[7] | | 150 | 150 | 150 | 150 | 75 | 450 | 675 |
| Medical Record Storage[8] | | - | - | 300 | - | - | 300 | 300 |
| Other | | 50 | 50 | 50 | 50 | 50 | 150 | 250 |
| **Total Operating Expense** | | 23,815 | 18,660 | 11,746 | 5,017 | 1,003 | 60,823 | 66,844 |
| **Operating Income** | | $ 1,046 | $ (3,743) | $ (4,288) | $ (2,531) | $ (1,003) | $ (13,587) | $ (17,121) |
| **Total Wind Down Cost** | | $ 296 | $ (4,493) | $ (4,788) | $ (3,031) | $ (1,503) | $ (15,587) | $ (20,121) |

6

**Physiotherapy Holdings, Inc. ("Holdings"), Physiotherapy Associates Holdings, Inc. ("PAH") and Subsidiaries & Affiliates ("Debtors")**
**Wind-Down Schedule**

|  | Expense Wind Down Percentage | | | | |
|---|---|---|---|---|---|
|  | Dec | Jan | Feb | Mar | Apr |
| Outpatient Rehabilitation Receipts | 100% | 60% | 30% | 10% | 0% |
| Orthotics & Prosthetics | 100% | 60% | 30% | 10% | 0% |
| Other Operating Receipts | 100% | 60% | 30% | 10% | 0% |
| Payroll | 100% | 80% | 45% | 15% | 0% |
| 401 K Funding (Employee Portion) | 100% | 80% | 45% | 15% | 0% |
| 401 K Match (PTA) | 100% | 80% | 45% | 15% | 0% |
| Field Incentives | 100% | 80% | 45% | 15% | 0% |
| Monthly Rent - All Locations | 100% | 90% | 60% | 30% | 10% |
| Insurance Claims and Premiums | 100% | 70% | 50% | 30% | 10% |
| Routine Payables | 100% | 70% | 50% | 30% | 10% |
| Billing Fees (IKS) | 100% | 70% | 50% | 30% | 10% |
| Tax and Utility Payments | 100% | 70% | 50% | 30% | 10% |

**Exhibit E**

**New Stockholders Agreement**

## STOCKHOLDERS' AGREEMENT

This STOCKHOLDERS' AGREEMENT (as amended, supplemented or otherwise modified in accordance with the terms hereof, this "Agreement") is made and entered into as of [_____], 2013 by and among Physiotherapy Associates Holdings, Inc. (the "Company"), and each stockholder of the Company identified on Schedule A attached hereto (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, the "Stockholders").

## RECITALS

WHEREAS, each Stockholder beneficially owns the number shares of the Company's common stock (the "Common Stock" and together with any other class of capital stock of the Company or securities convertible into capital stock of the Company hereafter acquired by them in any manner, the "Stock") set forth next to each Stockholder's name on Schedule A hereto; and

WHEREAS, the Stockholders and the Company desire for their mutual benefit and protection to enter into an agreement governing the ownership and transfer of the Stock.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.  Definitions.  For purposes of this Agreement:

    (a)  "Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

    (b)  "Agreement" has the meaning set forth in the Premble.

    (c)  "Board" means the board of directors of the Company.

    (d)  "Business Day" means any day Monday through Friday other than a Legal Holiday.

    (e)  "Call Date" means the date on which the Company notifies an Employee Stockholder (or his or her representative or successor) or his or her affiliated Stockholder in writing of the Company's exercise of a repurchase under Section 6(a) with respect to all or a portion of their Stock.

    (f)  "Call Period" has the meaning set forth in Section 6(a).

    (g)  "Cause" means (i) the Company or an Affiliate having "cause" to terminate an Employee Stockholder's employment or service, as defined in any employment or consulting agreement between the Employee Stockholder and the Company or an Affiliate in effect at the time of such termination, or (ii) in the absence of any such employment or

consulting agreement (or the absence of any definition of "cause" contained therein), (A) the Employee Stockholder's commission of, conviction for, plea of guilty or nolo contendere to a felony or a crime involving moral turpitude, or other material act or omission involving dishonesty or fraud, (B) the Employee Stockholder's conduct that brings or is reasonably likely to bring the Company or any of its Affiliates into public disgrace or disrepute and that affects the Company's or any Affiliate's business in any material way, (C) the Employee Stockholder's failure to perform duties as reasonably directed by the Company or the Employee Stockholder's material violation of any rule, regulation, policy or plan for the conduct of any service provided to the Company or its Affiliates or its or their business (which, if curable, is not cured within ten (10) days after notice thereof is provided to the Employee Stockholder), (D) the Employee Stockholder's gross negligence, willful malfeasance or material act of disloyalty with respect to the Company or its Affiliates (which, if curable, is not cured within ten (10) days after notice thereof is provided to the Employee Stockholder), (E) breach of any of the Employee Stockholder's material obligations (1) hereunder, or (2) under any other agreement between the Employee Stockholder and the Company or any of its Affiliates (which breach, if curable, is not cured within ten (10) days after notice thereof is provided to the Employee Stockholder), or (F) the perpetration by the Employee Stockholder of fraud against the Company or any of its Affiliates.  Any determination of whether Cause exists shall be made by the Board in its sole and absolute discretion.

(h)     "Common Stock" has the meaning set forth in the Recitals.

(i)     "Company" has the meaning set forth in the Preamble.

(j)     "Co-Sale Notice" has the meaning set forth in Section 4(a).

(k)     "Co-Sale Offered Shares" has the meaning set forth in Section 4(a).

(l)     "Co-Sale Offeror" has the meaning set forth in Section 4(a).

(m)     "Co-Sale Option Period" has the meaning set forth in Section 4(b).

(n)     "Co-Sale Participating Stockholder" has the meaning set forth in Section 4(b).

(o)     "Co-Sale Right Stockholders" has the meaning set forth in Section 4(c).

(p)     "Drag-Along Sale" has the meaning set forth in Section 5(a).

(q)     "Drag-Along Sale Date" has the meaning set forth in Section 5(b).

(r)     "Drag-Along Sale Notice" has the meaning set forth in Section 5(b).

(s)     "Employee Stockholder" means an employee of the Company or its Affiliates, or an individual who is otherwise actively involved in the day-to-day business and operations of the Company or its Affiliates, who is a Stockholder or who is affiliated with a Stockholder.

K&E 28032071.2

(t)      "Employee Trigger Event" means, with respect to any Employee Stockholder, such Employee Stockholder (i) dies or is totally and permanently disabled (as described in Section 6.2) at a time when such Employee Stockholder remains employed by the Company or its Affiliates or is otherwise actively involved in the day-to-day business and operations of the Company or its Affiliates, (ii) is terminated from his or her employment with the Company or its Affiliates for Cause or otherwise ceases to be actively involved in the day-to-day business and operations of the Company or its Affiliates due to, or as a result of, acts or omissions constituting, Cause, or (iii) otherwise ceases, whether voluntarily or involuntarily, to be employed by the Company or its Affiliates for any reason (other than termination for Cause).

(u)      "Encumbrance" means any charge, claim, community or other marital property interest, right of first option, right of first refusal, mortgage, pledge, lien, security interest or other encumbrance.

(v)      "Exchange Act" means the U.S. Securities Exchange Act of 1934, as amended.

(w)      "Exempt Issuance" has the meaning set forth in Section 3(a).

(x)      "Fair Market Value" means as of any date, the per share fair market value of the Stock, as determined by the Board in good faith (without participation by any director that is either the Stockholder whose Stock is to be valued or an Affiliate of such Stockholder) based on the entire equity value of the Company, taking into account the likely impact, if any, on the equity value of the Company of the death, permanent disability or other termination of employment of the Stockholder whose Stock is to be valued, but without deduction for a minority discount or any adjustment on account of the rights of first refusal, repurchase rights, transfer restrictions or other terms of this Agreement.  The Stockholder whose Stock is to be valued, or such Stockholder's representative or successor, as the case may be, shall have ten (10) days following written notice from the Company of the Board's determination of the Fair Market Value of the Stock in which to notify the Company in writing of any disagreement concerning the Fair Market Value as determined by the Board (a "Dispute Notice"), and if no such Dispute Notice is given, the Fair Market Value set forth in the Company's notice shall be conclusive and binding on all parties to this Agreement.  If a Dispute Notice is timely given, the Company and the Stockholder whose Stock is to be valued, or such Stockholder's representative or successor, as the case may be, shall mutually agree in good faith upon an independent valuation firm experienced in making valuations of such kind, which shall make a determination of the Fair Market Value of the Stock in the manner provided in the first sentence of this definition.  The determination of the independent valuation firm shall be conclusive and binding upon the Company and the Stockholder whose Stock is to be valued, or such Stockholder's representative or successor, as the case may be.  The fees, costs and expenses incurred in connection with the determination made by the independent valuation firm shall be borne by the Stockholder; provided, however, the Company shall pay such fees, costs and expenses to the extent that the determination by the independent valuation firm of the Fair Market Value of the Stock is more than fifteen percent (15%) higher than the determination of the Fair Market Value of the Stock by the Board.  Notwithstanding the foregoing and to the extent applicable, the value of Stock shall at all times be determined in a manner intended to be consistent with Section 409A of the

3

Internal Revenue Code of 1986 (and the regulations and guidance promulgated thereunder), as may be amended from time to time.

(y)     "Indemnified Party" has the meaning set forth in Section 7(e)(iii).

(z)     "Indemnifying Party" has the meaning set forth in Section 7(e)(iii).

(aa)    "Inspectors" has the meaning set forth in Section 7(d)(xiv).

(bb)    "IPO" means the Company's first firm commitment underwritten public offering of its Common Stock under the Securities Act pursuant to an effective registration statement under the Securities Act filed with the SEC on Form S-1 (or a successor form adopted by the SEC); provided that the following shall not be considered an IPO: (i) any issuance of Common Stock as consideration for a merger or acquisition or (ii) any issuance of Common Stock or rights to acquire Common Stock to existing Stockholders or to directors, officers, employees or consultants of the Company or its Subsidiaries on Form S-4 or Form S-8 (or a successor form adopted by the SEC) or otherwise.

(cc)    "Joinder Agreement" means an agreement substantially in the form of Exhibit A hereto.

(dd)    "Legal Holiday" means a Saturday, a Sunday or a day on which banking institutions in the State of Delaware are required or authorized by law to remain closed.

(ee)    "Majority Stockholders" means Stockholders holding more than fifty percent (50%) of the outstanding Common Stock of the Company.

(ff)    "New Securities" has the meaning set forth in Section 3(a).

(gg)    "Other Security Holders" has the meaning set forth in Section 7(a).

(hh)    "Participation Portion" has the meaning set forth in Section 3(a).

(ii)    "Permitted Transfer" has the meaning set forth in Section 2(b).

(jj)    "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

(kk)    "Preemptive Rights Notice" has the meaning set forth in Section 3(a).

(ll)    "Registrable Securities" means (i) all Common Stock held by a Stockholder from time to time and (ii) any equity securities issued or issuable directly or indirectly with respect to the Common Stock referred to in the foregoing clause (i) by way of conversion, exercise or exchange thereof or stock dividend or stock split or in connection with a combination of shares, recapitalization, reclassification, merger, amalgamation, arrangement, consolidation or other reorganization, provided that, once issued, such securities shall not be

4

Registrable Securities when (A) they are sold pursuant to an effective registration statement under the Securities Act, (B) they may be sold pursuant to Rule 144 promulgated under the Securities Act without limitation thereunder on volume or manner of sale and without the requirement for the Company to be in compliance with the current public information requirements under Rule 144(c)(1) (or Rule 144(i)(2), if applicable), or (C) they shall have ceased to be outstanding.

(mm)    "<u>Registration Expenses</u>" means all expenses incurred by the Company in effecting any registration pursuant to <u>Section 7</u> (whether or not any registration or prospectus becomes effective or final) or otherwise complying with its obligations under <u>Section 7</u>, including, without limitation, all registration, filing and listing fees, printing expenses, fees and disbursements of counsel for the Company, blue sky fees and expenses, expenses incurred in connection with any "road show," the reasonable fees and disbursements of the Stockholders' Counsel (not to exceed $50,000), and expenses of the Company's independent accountants in connection with any regular or special reviews or audits incident to or required by any such registration, but shall not include Selling Expenses.

(nn)    "<u>Reoffer Notice</u>" has the meaning set forth in <u>Section 3(a)</u>.

(oo)    "<u>Sale of the Company</u>" shall mean a single transaction or a series of related transactions pursuant to which an unaffiliated Person or Persons acquire (i) capital stock of the Company possessing the voting power to elect a majority of the Board or more than fifty percent (50%) of the voting power of the Company (whether by merger, consolidation or sale or transfer of the Company's capital stock), <u>provided</u>, <u>however</u>, (A) that an IPO that results in an acquisition of such voting power shall not be a Sale of the Company and (B) a merger shall not be a Sale of the Company as long as the Stockholders of the Company own a majority of the common stock of the surviving entity immediately following the merger); or (ii) all or substantially all of the Company's assets determined on a consolidated basis.

(pp)    "<u>SEC</u>" means the United States Securities and Exchange Commission.

(qq)    "<u>Securities Act</u>" means the U.S. Securities Act of 1933, as amended.

(rr)    "<u>Selling Expenses</u>" means all discounts, selling commissions and stock transfer taxes applicable to the sale of Registrable Securities and fees and disbursements of counsel for any Stockholder (other than the fees and disbursements of Stockholders' Counsel included in Registration Expenses).

(ss)    "<u>Selling Stockholder</u>" means a Stockholder who proposes to Transfer all or a portion of his, her or its Stock.

(tt)    "<u>Stock</u>" has the meaning set forth in the Recitals.

(uu)    "<u>Stockholders</u>" has the meaning set forth in the Preamble.

(vv)    "<u>Stockholders' Counsel</u>" means one (1) counsel for the Selling Stockholders chosen by the Selling Stockholders holding a majority interest in the Registrable Securities being registered pursuant to <u>Section 7</u>.

5

(ww)   "Subsidiary" means any corporation, partnership, limited liability company or other organization, whether incorporated or unincorporated, of which at least a majority of the securities, or other interests having by their terms voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization, is directly or indirectly beneficially owned or controlled by such Person or by any one or more of its subsidiaries, or by such Person and one or more of its subsidiaries.

(xx)   "Transfer" has the meaning set forth in Section 2(a).

2.     Restrictions on Transfer.

(a)     Each Stockholder agrees that such Stockholder shall not, whether by operation of law or otherwise, sell, transfer, assign, gift (including a transfer at death), pledge, grant a security interest in or otherwise dispose of or allow an Encumbrance upon (each, a "Transfer") such Stockholder's Stock or any beneficial or other interest therein except in a Permitted Transfer in compliance with this Agreement.  Any purported Transfer of Stock or any beneficial or other interest therein other than in a Permitted Transfer in compliance with this Agreement shall, in addition to constituting a breach of this Agreement, be null and void and ineffective to Transfer any interest in such Stock.

(b)     A "Permitted Transfer" shall include any Transfer of Stock that is (i) in compliance with applicable law (including state and federal securities laws) and (ii) will not (A) require the Company to register any class of Stock under the Securities Act or the Exchange Act or (B) subject the Company to the reporting requirements under the Exchange Act; provided, that, subject to Section 7(k), in each case the transferee will agree in writing to be subject to the terms of this Agreement to the same extent as if such transferee was an original Stockholder hereunder by executing and delivering the Joinder Agreement to the Company.

3.     Preemptive Rights.

(a)     In the event of any sale or issuance of equity securities of the Company or any of its Subsidiaries or any securities (including rights, options or warrants) convertible into or exchangeable or exercisable for equity securities of the Company or any of its Subsidiaries (collectively, "New Securities"), at any time and from time to time after the date hereof, except for issuances (each an "Exempt Issuance"):

(i)     of securities issued or issuable by reason of a dividend, stock split, stock combination, or reclassification or other similar event with respect to the capital stock of the Company or any of its Subsidiaries;

(ii)     to any employees or directors of, or consultants to, the Company or any of its Subsidiaries pursuant to any plan approved by the Board; provided, that the aggregate number of New Securities issued pursuant to this Section 3(a)(ii) (taking into account any issuances of New Securities of the Company's Subsidiaries) shall not exceed ten percent (10%) of the aggregate Common Stock of the Company outstanding on the date hereof; provided, further, that the New Securities issued pursuant to this Section 3(a)(ii) shall not be senior to the Common Stock;

6

(iii)    of securities issued by the Company or any of its Subsidiaries in connection with any joint venture, strategic alliance, acquisition or merger approved by the Board; or

(iv)    shares of Common Stock issued in connection with an IPO subject to Section 7;

the Company shall, no less than fifteen (15) Business Days prior to any such issuance, first offer in writing (the "Preemptive Rights Notice") to sell to each of the Stockholders a portion of such New Securities equal to the quotient obtained by dividing (x) the number of shares of Common Stock held by such Stockholder, by (y) the total number of outstanding shares of Common Stock (the "Participation Portion").  The Preemptive Rights Notice shall contain the material terms and conditions of the proposed issuance of New Securities, including (A) the number of New Securities to be included in the issuance, (B) the price per New Security or the aggregate principal amount of the New Securities (as applicable), including a description of any non-cash consideration sufficiently detailed to permit valuation thereof, and (C) if known, the proposed date of the issuance.  Each Stockholder desiring to accept the offer contained in the Preemptive Rights Notice shall accept such offer by delivering a written notice of such acceptance to the Company within ten (10) Business Days after the date of delivery of the Preemptive Rights Notice specifying the number or aggregate principal amount of the New Securities (not to exceed such Stockholder's Participation Portion of the total number of New Securities to be included in the issuance) which such Stockholder desires to purchase.  Each Stockholder shall have the ability to purchase such New Securities on behalf of itself and/or its Affiliates, or have its Affiliates purchase, in each case, without duplication, the number or aggregate principal amount of New Securities that may be purchased by itself and its Affiliates (in which case the number or aggregate principal amount of New Securities purchased by such Stockholder and its Affiliates shall not exceed such Stockholder's Participation Portion plus its Affiliates' Participation Portion of the total number of New Securities to be included in the issuance).  If all such New Securities are not subscribed to by the Stockholders and/or their Affiliates, the unsubscribed New Securities will be reoffered on the terms set forth above in writing (a "Reoffer Notice") to the Stockholders who subscribed to the maximum number to which they were entitled pursuant to the Preemptive Rights Notice, and each such Stockholder and/or its Affiliates shall be entitled to purchase their Participation Portion of such available New Securities by so notifying the Company in writing within three (3) Business Days after the date of delivery of the Reoffer Notice.

(b)    Each Stockholder shall be entitled to purchase or receive such New Securities at the most favorable price and on the most favorable terms that such New Securities are to be offered to any other Person, and the Company and its Subsidiaries may not offer any New Securities to any Person at a price or on terms more favorable to the offerees thereof than those on which such New Securities were offered to the Stockholders, unless such New Securities are first offered to the Stockholders at such more favorable price and on such more favorable terms.

(c)    The New Securities specified in the Preemptive Rights Notice that are not purchased by the Stockholders pursuant to the terms of Section 3(a) may be issued and sold by the Company and its Subsidiaries to the offerees thereof (on terms no more favorable to the offerees than the terms offered in the Preemptive Rights Notice) within ninety (90) days of the

7

date of the Preemptive Rights Notice.  Any New Securities not issued within such ninety (90) day period will be subject to the provisions of Section 3(a) upon prior to issuance.

(d)     Notwithstanding any provision hereof to the contrary, in lieu of complying with the provisions of Section 3(a), the Company may elect to give written notice to the Stockholders within thirty (30) days after an issuance of New Securities (other than an Exempted Issuance); provided, that the Company may only make such election upon the Board's good faith determination that delivery of a Preemptive Rights Notice and completion of the process set forth in Section 3(a) is not practicable given exigent circumstances.  Such notice shall contain the material terms and conditions of the issuance required to be set forth in the Preemptive Rights Notice.  Each Stockholder shall have twenty (20) days from the date such notice is given to elect to purchase such Stockholder's Participation Portion of the New Securities, calculated as set forth in Section 3(a) before giving effect to the issuance of such New Securities.  The closing of such sale of New Securities shall occur within sixty (60) days of the date such notice is given to the Stockholders.

(e)     Each Stockholder (or Affiliate) participating in an issuance of New Securities pursuant to this Section 3 shall take or cause to be taken all such actions as may be reasonably necessary or otherwise reasonably requested by the Board in order to consummate expeditiously such issuance and any related transactions, including (i) executing, acknowledging and delivering consents, assignments, waivers and other customary documents or instruments; (ii) filing applications, reports, returns, filings and other documents or instruments with governmental authorities; and (iii) otherwise reasonably cooperating with the Company, its Subsidiaries and the other subscribers.  Without limiting the generality of the foregoing, each such Stockholder (or Affiliate) agrees to execute and deliver such subscription and other agreements reasonably specified by the Board to be executed by all Stockholders participating in such issuance.

(f)     Notwithstanding anything to the contrary set forth herein, no Person shall be entitled to participate in an issuance of New Securities pursuant to this Section 3 unless at the time of such issuance the Company shall be reasonably satisfied that (i) such Person is an "accredited investor" as defined in Regulation D of the Securities Act or the issuance, after giving effect to the participation of such Person, would satisfy the requirements of any other exemption from registration available at such time under the Securities Act with respect to such issuance and (ii) an exemption from registration or qualification under any state securities laws or foreign securities laws applicable to such issuance due to the participation of such Person therein would be available with respect to such issuance.

(g)     All costs and expenses incurred by the Company and its Subsidiaries in connection with any proposed issuance of New Securities (whether or not consummated), including all attorneys' fees and charges, all accounting fees and charges and all finders, brokerage or investment banking fees, charges or commissions, shall be paid by the Company and its Subsidiaries.  Any costs and expenses incurred by or on behalf of any Stockholder in connection with such proposed issuance of New Securities (whether or not consummated) shall be borne by such Stockholder.

K&E 28032071.2

4.        Tag-Along.

(a)        At any time that the Majority Stockholders desire to Transfer a majority of the outstanding Common Stock (including securities convertible or exchangeable into Common Stock) (the "Co-Sale Offered Shares") to a third party or parties, such Selling Stockholders shall first deliver written notice of such Selling Stockholders' desire to do so (the "Co-Sale Notice") to the Company, and the Company shall promptly provide such Co-Sale Notice to each other Stockholder.  The Co-Sale Notice must specify (i) the name and address of the Person(s) to which such Selling Stockholders propose to Transfer the Co-Sale Offered Shares (the "Co-Sale Offeror"), (ii) the number of Co-Sale Offered Shares such Selling Stockholders propose to Transfer, (iii) the total consideration to be delivered to such Selling Stockholders for the proposed Transfer and the consideration for each Co-Sale Offered Share such Selling Stockholders propose to Transfer, and (iv) all other material terms and conditions of the proposed transaction.

(b)        Each Stockholder may, within the ten (10) Business Day period after delivery of the Co-Sale Notice (the "Co-Sale Option Period"), notify the Selling Stockholders in writing of such Stockholder's desire to participate, on a pro rata basis based upon such Stockholder's Participation Portion, in the Transfer of the Co-Sale Offered Shares and the number of shares of Common Stock (including securities convertible or exchangeable into Common Stock) such Stockholder desires to Transfer, at the price per share of Common Stock (including securities convertible or exchangeable into Common Stock) and on the terms set forth in the Co-Sale Notice.  Each Stockholder which has so notified the Selling Stockholders within the Co-Sale Option Period of its desire to Transfer shares of Common Stock (including securities convertible or exchangeable into Common Stock) of the Company in the transaction (a "Co-Sale Participating Stockholder") shall be entitled to do so, subject to cut-back as set forth in Section 4(c).

(c)        The Selling Stockholders shall use commercially reasonable efforts to interest the Co-Sale Offeror in purchasing, in addition to the Co-Sale Offered Shares, the shares of Common Stock (including securities convertible or exchangeable into Common Stock) of the Company which the Co-Sale Participating Stockholders wish to sell.  If the Co-Sale Offeror does not wish to purchase all of the shares of Common Stock (including securities convertible or exchangeable into Common Stock) made available by the Selling Stockholders and the Co-Sale Participating Stockholders (the Selling Stockholders and the Co-Sale Participating Stockholders being hereinafter referred to collectively as "Co-Sale Right Stockholders"), then each Co-Sale Right Stockholder shall be entitled to sell such Co-Sale Right Stockholder's Participation Portion of the shares of Common Stock (including securities convertible or exchangeable into Common Stock) that the Co-Sale Offeror is willing to purchase.  The transaction contemplated by the Co-Sale Notice shall be consummated not later than sixty (60) days after the expiration of the Co-Sale Option Period.

(d)        In connection with a transaction pursuant to this Section 4, each Co-Sale Right Stockholder shall be required to make representations and warranties regarding the Common Stock (including securities convertible or exchangeable into Common Stock) that such Co-Sale Right Stockholder proposes to Transfer in such transaction, including, without limitation, such Co-Sale Right Stockholder's ownership of and authority to transfer such

Common Stock (including securities convertible or exchangeable into Common Stock) , the absence of any Encumbrances on such Common Stock (including securities convertible or exchangeable into Common Stock) , and the compliance of such transfer with the federal and state securities laws and all other applicable laws and regulations.  Each Co-Sale Right Stockholder shall be severally (but not jointly) liable for breaches of representations, warranties, covenants and agreements in connection with such transaction, and for indemnification obligations arising out of or relating to any such breach (other than any such obligations that relate specifically to a particular party, such as indemnification with respect to representations and warranties given by such party regarding such party's title to and ownership of Common Stock (including securities convertible or exchangeable into Common Stock) ).  Such liability of each Co-Sale Right Stockholder shall not exceed their respective pro rata portion of the proceeds of such transaction.

(e)     If the Majority Stockholders wish to Transfer any shares of Common Stock (including securities convertible or exchangeable into Common Stock) to the Co-Sale Offeror or to any other Person at a price or on terms and conditions which differ from those set forth in the Co-Sale Notice within sixty (60) days after the expiration of the Co-Sale Option Period, then as a condition precedent to such transaction, such Selling Stockholders must again comply with the procedures set forth in this Section 4.

(f)     Any Transfer made in violation of the provisions of this Section 4 shall be void, and the proceeds of any Transfer made by a Stockholder in violation of the provisions of this Section 4 shall be deemed to be held in constructive trust by such Stockholder in such amount as would have been due the Co-Sale Participating Stockholders if such Stockholder had complied with this Section 4.

(g)     All costs and expenses incurred by the Co-Sale Right Stockholders in connection with any Transfer of Common Stock pursuant to this Section 4, including all attorneys' fees and charges, all accounting fees and charges and all finders, brokerage or investment banking fees, charges or commissions, shall be paid by the Co-Sale Right Stockholders pro rata in accordance with the amount of Common Stock (including securities convertible or exchangeable into Common Stock) Transferred in connection with any such transaction.

5.     Drag-Along Rights.

(a)     In the event that a Sale of the Company is approved by the Majority Stockholders (the "Drag-Along Sale"), then at the written request of the Majority Stockholders (which request shall be provided by the Majority Stockholders to the Company, and the Company shall promptly provide such request to the Stockholders), each Stockholder shall participate in the Drag-Along Sale, not object in any way thereto (in such Stockholder's capacity as a Stockholder of the Company), be required to sell all of the Stock held by such Stockholder and otherwise take all other actions as set forth below.  If the Drag-Along Sale is structured as a (i) merger, consolidation or other transaction requiring a vote of Stockholders, each Stockholder shall vote all of such Stockholder's Stock in favor of the merger or consolidation and otherwise waive (and does hereby waive) any dissenters' rights, appraisal rights or similar rights in connection with such merger or consolidation or (ii) sale of Stock, each Stockholder holding

10

Stock shall agree to sell all of such Stockholder's Stock and rights to acquire Stock on the terms and conditions of the Drag-Along Sale. Each Stockholder in such Drag-Along Sale (A) shall be subject to the same terms and conditions of sale (provided that the amount of consideration to be received may differ by class consistent with the terms and conditions of the Company's Articles of Incorporation) and (B) shall execute such documents and take such actions as may be reasonably required by the Majority Stockholders; provided, however, that, with respect to any Stock for which a Stockholder holds exercisable and vested but unexercised options, the price per share shall be reduced by the exercise price of such options or, if required pursuant to the terms of such options or such transaction(s), such Stockholder must exercise the relevant option and transfer or exchange the relevant shares (rather than the option) (in each case, net of any amounts required to be withheld by the Company in connection with such exercise); provided, further, that, notwithstanding anything to the contrary set forth herein, in any event the Company shall be permitted to cause all outstanding options to be treated in such transaction(s) in any manner as permitted by their terms, including any applicable equity plans of the Company or its Affiliates.

(b)     The Majority Stockholders shall provide the Company (and the Company shall provide each Stockholder) with written notice (the "Drag-Along Sale Notice") of a Drag Along Sale as soon as reasonably practicable (but in no event less than thirty (30) days) prior to the date of consummation of the Drag-Along Sale (the "Drag-Along Sale Date"). The Drag-Along Sale Notice shall set forth: (i) the identity of the counterparty(ies) in the Drag-Along Sale, (ii) the price and the other general terms and conditions of the Drag-Along Sale, and (iii) the anticipated Drag-Along Sale Date.

(c)     The provisions of this Section 5 shall apply regardless of the form of consideration to be received in the Drag-Along Sale, and (i) upon the consummation of the Drag-Along Sale, each holder of Stock shall receive the same form of consideration and the same amount of consideration per share (subject to any pro rata required escrows of a portion of the consideration as determined by the Majority Stockholders), (ii) if any holders of Stock are given an option as to the form and amount of consideration to be received, each holder of Stock shall be given the same option, and (iii) any non-cash consideration received by a class of Stock pursuant to the terms of the Drag-Along Sale shall be allocated among the transferors of such class of Stock pro rata based upon each transferor's percentage ownership of such class of Stock sold in the Drag-Along Sale.

(d)     In connection with a Drag-Along Sale, each party hereto shall be required to make representations and warranties regarding the Stock that such party Transfers in such sale, including, without limitation, such party's ownership of and authority to transfer such Stock, the absence of any Encumbrances on such Stock, and the compliance of such Transfer with the federal and state securities laws and all other applicable laws and regulations. Each party hereto Transferring shares of Stock pursuant to this Section 5 shall be, on a pro rata basis (based on the number of shares of Stock on an as-converted basis), severally (but not jointly) liable for breaches of representations, warranties, covenants and agreements of or (in the case of representations and warranties) pertaining to the Company, and for indemnification obligations arising out of or relating to any such breach or otherwise pertaining to the Company (other than any such obligations that relate specifically to a particular party, such as indemnification with respect to representations and warranties given by such party regarding such party's title to and

11

ownership of such stock).  Such liability of each party hereto transferring shares of Stock pursuant to this <u>Section 5</u> shall not exceed their respective pro rata portion of the proceeds of such Drag-Along Sale.

6.    <u>Call Rights</u>.

(a)    <u>Exercise of Call Rights</u>.  In the event that an Employee Trigger Event occurs, then during the period beginning on such Employee Trigger Event and ending on the nine (9) month anniversary of the later of (i) such Employee Trigger Event, and (ii) the date of exercise of any options held by such Stockholder as of such Employee Trigger Event (the "<u>Call Period</u>"), the Company shall have an option to purchase on the Call Date all or a portion of the shares of Stock held by such Employee Stockholder (or his or her representative or successor) and his or her affiliated Stockholder, if any.  In the event such option is exercised by the Company, the Employee Stockholder (or his or her representative or successor) or his or her affiliated Stockholder, as the case may be, shall sell all or such portion of the Stock then held by him, her or it on the Call Date at a price equal to (x) Fair Market Value as of the Call Date, if such termination is due to an Employee Trigger Event described in clause (i) or clause (iii) of the definition thereof or (y) the lesser of Fair Market Value as of the Call Date and the amount originally paid by the Employee Stockholder or his or her affiliated Stockholder for his, her or its Stock, if such termination is due to an Employee Trigger Event described in clause (ii) of the definition thereof.  Such Stockholder shall also, simultaneously therewith, Transfer such Stock to the Company free and clear of all Encumbrances by delivering to the Company any certificates or such other documentation as the Company may reasonably request evidencing the ownership and Transfer of such Stock.  If, following Call Period, the Employee Stockholder or the affiliated Stockholder (or his or her representative) continues to hold any shares of Stock that were not purchased by the Company, such shares of Stock shall be released from the repurchase option set forth in this <u>Section6</u>.

(b)    <u>Determination of Disability</u>.  An Employee Stockholder shall be considered totally and permanently disabled if he or she is determined to be so under any disability insurance policy maintained by the Company covering such Employee Stockholder or, if there is no such policy covering such Employee Stockholder, then upon certification to the Company by a duly licensed and trained physician in relevant specialty that he or she is so mentally or physically disabled as to be, in all likelihood, permanently incapable of performing his or her employment duties to the Company, or, in the alternative, upon the certification by a physician chosen by the Company that such Employee Stockholder has refused after reasonable request and reasonable opportunity to submit to examination by the physician.

(c)    <u>Extension of Call Date</u>.  Notwithstanding anything herein to the contrary, no payment shall be made under this <u>Section 6</u> that (i) would cause the Company or any of its Subsidiaries to violate any applicable law, the terms of this Agreement, any banking agreement or loan or other financial covenant or cause default of any indebtedness of the Company or any of its Subsidiaries, regardless of when such agreement, covenant or indebtedness was created, incurred or assumed or (ii) the Board reasonably determines would materially and adversely affect the liquidity of the Company and its Subsidiaries taken as a whole.  Any payment under this <u>Section 6</u> that would cause such violation, default or liquidity issue shall result in an extension of the Call Date, in the sole discretion of the Board, until such payment shall no longer

12

cause any such violation, default or liquidity issue.  Nothing in this <u>Section 6</u> shall prohibit the Company from making a partial payment under this <u>Section 6</u> that (x) would not cause the Company or any of its Subsidiaries to violate any applicable law, the terms of this Agreement, any banking agreement or loan or other financial covenant or cause default of any indebtedness of the Company or any of its Subsidiaries, regardless of when such agreement, covenant or indebtedness was created, incurred or assumed or (y) the Board reasonably determines would not materially and adversely affect the liquidity of the Company and its Subsidiaries taken as a whole.  For the avoidance of doubt, if the Company is unable (or not required) to make the payment as contemplated by this <u>Section 6(c)</u>, the repurchase price shall be determined in accordance with <u>Section 6(a)</u> as of the time the Company exercises the repurchase (and not after such condition or event has lapsed).

(d)    <u>Ownership of Repurchased Stock</u>.  If the Company exercises its repurchase right pursuant to this <u>Section 6</u>, then from and after the date on which the Company exercises the repurchase, the Employee Stockholder or the affiliated Stockholder (or his or her representative) shall no longer have any rights as a holder of the Stock subject to the repurchase (other than the right to receive payment in accordance with this <u>Section 6</u> but subject to <u>Section 6(c)</u>) and such Stock shall be deemed purchased in accordance with the applicable provisions hereof and the Company shall be deemed to be the owner and holder of such Stock.

7.    <u>Piggyback Registration; Rule 144A</u>.

(a)    <u>Inclusion in Registration</u>.  If at any time the Company shall determine to file a registration statement under the Securities Act (other than any registration statement filed in connection with (i) any issuance of Registrable Securities as consideration for a merger or acquisition or (ii) any issuance of Registrable Securities to existing Stockholders or to directors, officers, employees or consultants of the Company or its Subsidiaries on Form S-4 or Form S-8 (or a successor form adopted by the SEC) or otherwise) relating to a proposed sale to the public of its securities of the same type as the Registrable Securities, either for its own account or the account of a security holder or holders (the "<u>Other Security Holders</u>"), the Company shall (A) give to each Stockholder written notice of such proposed registration at least fifteen (15) days before the anticipated filing date; and (B) include in such registration, all the Registrable Securities specified in a written request or requests, made within ten (10) days after such written notice from the Company, by any Stockholder.  No Registrable Securities may be registered under more than one registration statement at one time.

(b)    <u>Priority</u>.  The Company shall permit the Stockholders to include all such Registrable Securities requested to be included in the registration statement for such offering to be included on the same terms and conditions as any similar securities of the Company and the Other Security Holders included therein.  Notwithstanding the foregoing, if the managing underwriter or underwriters of such offering advise the Stockholders that marketing considerations require a limitation on the number of Registrable Securities to be offered pursuant to any registration statement subject to this <u>Section 7</u>, then subject to the advice of such managing underwriter or underwriters as to the reduction of the number of Registrable Securities in the offering, the Company shall include Registrable Securities in such registration in accordance with the following priorities: (A) first, Registrable Securities to be sold for the account of the Company, if any, (B) second, pro rata with respect to all Stockholders who have

13

requested to be included in the registration pursuant to this <u>Section 7</u> in proportion to the number of Registrable Securities each such Stockholder requested to be included in the offering; provided, however, that if such registration relates to an IPO, the Company shall use its commercially reasonable efforts to cause not less than twenty-five percent (25%) of the Registrable Securities requested by each Stockholder to be included in such registration, and (C) third, pro rata with respect to all Other Security Holders who have requested to be included in the registration.  The Company shall bear all Registration Expenses in connection with a registration pursuant to this <u>Section 7</u>.

(c)      <u>Withdrawal</u>.  At any time prior to the effectiveness of a registration statement with the SEC, any Stockholder may withdraw such Stockholder's request for inclusion of Registrable Securities in any piggyback registration under this <u>Section 7</u> by giving written notice to the Company of such Stockholder's election to withdraw prior to the effectiveness of the registration statement.  The Company may also elect to withdraw a registration statement filed pursuant to this <u>Section 7</u> at any time prior to the effectiveness of such registration statement.  Nothing in this <u>Section 7</u> shall create any liability on the part of the Company to the Stockholders if the Company in its sole discretion should decide not to file a registration statement proposed to be filed pursuant to this <u>Section 7</u> or to withdraw such registration statement subsequent to its filing, regardless of any action whatsoever that a Stockholder may have taken, whether as a result of the issuance by the Company of any notice hereunder or otherwise.

(d)      <u>Registration Procedures</u>.  Whenever Stockholders request that any of their Registrable Securities be registered pursuant to this <u>Section 7</u>, the Company will use its reasonable best efforts to effect the registration of such Registrable Securities in accordance with the intended method of disposition thereof as quickly as reasonably practicable, and in connection with any such request:

(i)      The Company will as expeditiously as reasonably practicable prepare and file with the SEC a registration statement on any form for which the Company then qualifies and which counsel for the Company shall deem appropriate and which form shall be available for the sale of the Registrable Securities to be registered thereunder in accordance with the intended method of distribution thereof (it being understood that the Company shall use Form S-3 (or any replacement form) if such form is then available), and use its reasonable best efforts to cause such filed registration statement to become effective and keep such registration statement effective for a period of up to one hundred twenty (120) days or, if earlier, until the distribution contemplated in the registration statement has been completed; provided, however, that in the case of any registration of Registrable Securities on Form S-3 (or any replacement form) that are intended to be offered on a continuous or delayed basis, subject to compliance with applicable SEC rules, such period shall be extended to the extent reasonably requested in order to allow sufficient time for all such Registrable Securities to be sold.

(ii)      The Company will prepare and file with the SEC such amendments and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement.

14

(iii)    The Company will, prior to filing a registration statement or prospectus or any amendment or supplement thereto, furnish to the Stockholders' Counsel and each Stockholder selling Registrable Securities pursuant to a registration statement under this Section 7 copies of such registration statement as proposed to be filed, together with exhibits thereto, which documents will be subject to review by the foregoing Persons within five (5) Business Days after delivery, and thereafter furnish to the Stockholders' Counsel and such Stockholders such number of copies of such registration statement, each amendment and supplement thereto (in each case including all exhibits thereto and documents incorporated by reference therein), the prospectus included in such registration statement (including each preliminary prospectus) and such other documents as the Stockholders' Counsel and such Stockholders may reasonably request in order to facilitate the disposition of the Registrable Securities owned by such Stockholders and registered thereunder.

(iv)    After the filing of the registration statement, the Company will promptly notify each Stockholder whose Registrable Securities are covered by such registration statement of any stop order issued or threatened by the SEC and take reasonable actions to prevent the entry of such stop order or to remove it if entered.

(v)    The Company will use its reasonable best efforts to register or qualify the Registrable Securities under such other securities or blue sky laws of such jurisdictions in the United States and such other jurisdictions as any Stockholder reasonably (in light of such Stockholder's intended plan of distribution) requests; provided that the Company will not be required to (A) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this paragraph (v), (B) subject itself to taxation in any such jurisdiction or (C) consent to general service of process in any such jurisdiction.

(vi)    The Company will promptly notify each Stockholder whose Registrable Securities are covered by such registration statement, and each such Stockholder will promptly notify the Company, at any time when a prospectus relating to such registration statement is required to be delivered under the Securities Act, of the occurrence of an event of which it is aware that requires the preparation of a supplement or amendment to such prospectus so that, as thereafter delivered to the purchasers of such Registrable Securities, such prospectus will not contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and the Company will promptly make available to each such Stockholder any such supplement or amendment.

(vii)    The Company will use its reasonable best efforts to comply with all applicable rules and regulations of the SEC and other applicable laws.

(viii)    The Company will use its reasonable best efforts to cause all Registrable Securities covered by such registration statement to be listed on each national securities exchange on which similar securities issued by the Company are then listed (if any), if the listing of such Registrable Securities is then permitted under the rules of such exchange.

(ix)    In connection with any sale or transfer of Registrable Securities that will result in such securities no longer being Registrable Securities, the Company shall cooperate with the Stockholders and the managing underwriters, if any, to facilitate the timely

15

preparation and delivery of certificates (with appropriate CUSIP numbers) representing the Registrable Securities to be sold, which certificates shall not bear any restrictive legends and shall be in a form eligible for deposit with DTC, and to enable such Registrable Securities to be in such denominations and registered in such names as the managing underwriters, if any, or Stockholders may request at least two (2) Business Days prior to any sale of Registrable Securities.

(x)      The Company shall enter into such agreements (including, with respect to an underwritten offering, an underwriting agreement in form, scope and substance as is customary in underwritten offerings) and take all such other reasonable actions in connection therewith (including those reasonably requested by the managing underwriters, if any), in order to expedite or facilitate the disposition of such Registrable Securities.

(xi)      The Company shall obtain opinions of counsel to the Company and updates thereof (which counsel and opinions (in form, scope and substance) shall be reasonably satisfactory to the managing or sole underwriters, if any, addressed to the underwriters, if any, covering the matters customarily covered in opinions requested in underwritten offerings and such other matters as may be reasonably requested by such underwriters);

(xii)      The Company shall obtain customary "comfort" letters and updates thereof (including, if such registration includes an underwritten public offering, a "bring down" comfort letter dated the date of the closing under the underwriting agreement) from the independent certified public accountants of the Company (and, if necessary, any other independent certified public accountants of any business which may hereafter be acquired by the Company for which financial statements and financial data are required to be included in the registration statement), addressed to each of the underwriters, if any, such letters to be in customary form and covering matters of the type customarily covered in "comfort" letters in connection with underwritten offerings and such other matters as reasonably required by the managing underwriter or underwriters and as permitted by the Statement on Auditing Standards No. 72.

(xiii)      If an underwriting agreement is entered into, the same shall contain customary covenants on the part of the Company and will provide that the Company will indemnify the Stockholders of Registrable Securities included in the registration statement and any underwriter with respect thereto against certain liabilities, including liabilities under the Securities Act.

(xiv)      The Company shall make available for inspection by the Stockholders' Counsel and one (1) representative of the managing underwriter participating in any such disposition of Registrable Securities, if any, and any attorney, consultant or accountant retained by such underwriter (collectively, the "Inspectors"), at the offices where normally kept, during reasonable business hours, all financial and other records, pertinent corporate documents and properties of the Company (including with respect to business and assets acquired or to be acquired to the extent that such information is available to the Company), and cause the officers, directors, agents and employees of the Company (including with respect to business and assets acquired or to be acquired to the extent that such information is available to the Company) to supply all information in each case reasonably requested by any such Inspector in connection

16

with such registration; provided, the Company may first require that such Persons agree to keep confidential any non-public information relating to the Company received by such Person and not disclose such information (other than to an Affiliate or prospective purchaser who agrees to respect the confidentiality provisions of this Section 7(d)(xiv)) until such information has been made generally available to the public (other than as a result of a disclosure or failure to safeguard by such Inspector) unless the release of such information is required by law or necessary to respond to inquiries of regulatory authorities (including FINRA, or similar organizations or their successors); without limiting the foregoing, no such information shall be used by such Inspector as the basis for any market transactions in securities of the Company or its Subsidiaries, if any, in violation of law.

(xv)    The Company may require each Stockholder selling Registrable Securities to promptly furnish in writing to the Company such information regarding the Stockholder and the distribution of the Registrable Securities as the Company may from time to time reasonably request, and such other information as may be necessary or appropriate in connection with such registration.

(xvi)    Each Stockholder whose Registrable Securities are included on a registration statement agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in clause (vi) above, such Stockholder will immediately discontinue disposition of Registrable Securities pursuant to the registration statement covering such Registrable Securities until such Stockholder's receipt of the copies of the supplemented or amended prospectus contemplated by clause (vi) above, and, if so directed by the Company, such Stockholder will deliver to the Company all copies, other than permanent file copies then in such Stockholder's possession, of the most recent prospectus covering such Registrable Securities at the time of receipt of such notice.

(xvii)    The Company shall use commercially reasonable efforts to take all other steps reasonably necessary to effect the registration, offering and sale of the Registrable Securities covered by any registration statement under this Section 7.

(e)    Indemnification.

(i)    Indemnification by the Company.  To the fullest extent permitted by law, the Company agrees to indemnify and hold harmless each Stockholder of Registrable Securities included in the applicable registration statement, its officers, directors, employees and agents, and each Person, if any, who controls such Stockholder within the meaning of the Securities Act, from and against any loss, claim, damage or liability, joint or several, or any action in respect thereof to which such Selling Stockholder, officer, director, employee or agent or controlling Person may become subject under the Securities Act or otherwise, insofar as such loss, claim, damage, liability or action arises out of, or is based upon, (A) any untrue statement or alleged untrue statement of a material fact contained in any registration statement, prospectus or any preliminary prospectus or any amendment or supplement thereto relating to the Registrable Securities or (B) any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, in each case except insofar as the same are contained in any information furnished to the Company by a Stockholder or on a Stockholder's behalf for use therein.

17

(ii)    <u>Indemnification by Stockholders</u>.  To the fullest extent permitted by law, each Stockholder agrees, severally but not jointly, to indemnify and hold harmless the Company, each underwriter and each other Stockholder, their respective officers, directors and agents and each Person, if any, who controls the Company, any such underwriter or any such other Stockholder within the meaning of the Securities Act, to the same extent as the indemnity from the Company to such Stockholder pursuant to <u>Section 7(e)(i)</u>, but only with respect to information furnished to the Company by such Stockholder or on such Stockholder's behalf for use in any registration statement or prospectus relating to the Registrable Securities, or any amendment or supplement thereto, or any preliminary prospectus.

(iii)    <u>Conduct of Indemnification Proceedings</u>.  Promptly after receipt by any Person in respect of which indemnity may be sought pursuant to <u>Section 7(e)(i)</u> or <u>Section 7(e)(ii)</u> (an "<u>Indemnified Party</u>") of notice of any claim or the commencement of any action, the Indemnified Party shall, if a claim in respect thereof is to be made against the Person against whom such indemnity may be sought (an "<u>Indemnifying Party</u>"), notify the Indemnifying Party in writing of the claim or the commencement of such action provided that the failure to notify the Indemnifying Party shall not relieve it from any liability which it may have to an Indemnified Party, except to the extent of any actual prejudice resulting therefrom.  If any such claim or action shall be brought against an Indemnified Party, the Indemnifying Party shall be entitled to participate therein, and, to the extent that it wishes, jointly with any other Indemnifying Party, assume the defense thereof with counsel reasonably satisfactory to the Indemnified Party.  After notice from the Indemnifying Party to the Indemnified Party of its election to assume the defense of such claim or action, the Indemnifying Party shall not be liable to the Indemnified Party for any legal or other expenses subsequently incurred by the Indemnified Party in connection with the defense thereof unless (A) the Indemnifying Party shall have agreed in writing to be liable for such expenses or (B) the Indemnifying Party engages the same counsel to represent itself and the Indemnified Party in such action and such counsel advises that representation of both parties by the same counsel would be inappropriate due to an actual or reasonably likely potential conflict of interests between them.  No Indemnifying Party will, without the prior written consent of the Indemnified Party (not to be unreasonably withheld), effect any settlement of any claim or pending or threatened proceeding in respect of which the Indemnified Party is a party and indemnity has been sought hereunder by such Indemnified Party, unless such settlement includes an unconditional release of such Indemnified Party from all liability arising out of such claim or proceeding.  No Indemnified Party will, without the prior written consent of the Indemnifying Party (not to be unreasonably withheld), effect any settlement of any claim or pending or threatened proceeding in respect of which indemnity has or may be sought hereunder by such Indemnified Party.

(iv)    <u>Contribution</u>.  If the indemnification provided for in this <u>Section 7(e)</u> is unavailable to any Indemnified Parties in respect of any losses, claims, damages, liabilities or expenses referred to herein, then each Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages, liabilities or expenses (A) as between the Company and the Stockholders on the one hand and the underwriters on the other hand, in such proportion as is appropriate to reflect the relative benefits received by the Company and the Stockholders on the one hand and the underwriters on the other hand from the offering of the Registrable Securities, or if such allocation is not permitted by applicable law, in such proportion

18

as is appropriate to reflect not only the relative benefits but also the relative fault of the Company and the Stockholders on the one hand and of the underwriters on the other hand in connection with the statements or omissions which resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations and (B) as between the Company and/or one or more other Stockholders on the one hand and any Stockholder on the other hand, in such proportion as is appropriate to reflect the relative fault of the Company and of each Stockholder in connection with such statements or omissions, as well as any other relevant equitable considerations.  The relative benefits received by the Company and the Stockholders on the one hand and the underwriters on the other hand shall be deemed to be in the same proportion as the total proceeds from the offering (net of underwriting discounts and commissions but before deducting expenses) received by the Company and the Stockholders bear to the total underwriting discounts and commissions received by the underwriters, in each case as set forth in the table on the cover page of the prospectus.  The relative fault of the Company and the Stockholders on the one hand and of the underwriters on the other hand shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company and the Stockholders or by the underwriters.  The relative fault of the Company and/or one or more other Stockholders on the one hand and of any Stockholder on the other shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by such Person, and the Persons' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

(v)    The Company and the Stockholders agree that it would not be just and equitable if contribution pursuant to this Section 7(e) were determined by pro rata allocation (even if the underwriters were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to in the immediately preceding paragraph.  The amount paid or payable by an Indemnified Party as a result of the losses, claims, damages or liabilities referred to in the immediately preceding paragraph shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such Indemnified Party in connection with investigating or defending any such action or claim.  Notwithstanding the foregoing provisions of this Section 7(e), no underwriter shall be required to contribute any amount in excess of the amount by which the total price at which the Registrable Securities underwritten by it and distributed to the public were offered to the public exceeds the amount of any damages which such underwriter has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission, and no Stockholder shall be required to contribute any amount in excess of the amount by which the total price at which the Registrable Securities of such Stockholder were offered to the public (less underwriting discounts and commissions) exceeds the amount of any damages which such Stockholder has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission.  Notwithstanding the foregoing provisions of this Section 7(e), no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

(f)    Rule 144A.  With a view to making available to the Stockholders the benefits of certain rules and regulations of the SEC which may permit the sale of the Registrable

19

Securities to the public without registration, the Company agrees to use its reasonable best efforts to (A) make available, upon the written request of any Stockholder, such information necessary to permit sales pursuant to Rule 144A promulgated under the Securities Act (including the information required by Rule 144A(d)(4) and the Securities Act), (B) the most recent consolidated balance sheets and profit and losses and retained earnings statements, and similar financial statements of the Company for the two (2) most recent fiscal years (such financial information shall be audited, to the extent reasonably available), and (C) such other reports and documents as the Stockholder may reasonably request in availing itself of any rule or regulation of the SEC allowing it to sell any such securities without registration; and to take such further action as any Stockholder may reasonably request, all to the extent required from time to time to enable such Stockholder to sell Registrable Securities without registration under the Securities Act.  The Company hereby represents and warrants to any such requesting Stockholder and any prospective purchaser of Registrable Securities from such Stockholder that the information provided by the Company pursuant to this <u>Section 7(f)</u> will, as of their dates, not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

(g)     <u>Limitations on Subsequent Registration Rights</u>.  The Company will not enter into any agreements with any holder or prospective holder of any securities of the Company which would grant such holder or prospective holder registration rights with respect to the securities of the Company which would have priority over the Registrable Securities with respect to the inclusion of such securities in any registration.  If the Company enters into an agreement that contains registration rights more favorable, in form or substance, to any stockholders than the terms provided to the Stockholders under this Agreement, then the Company will modify or revise the terms of this Agreement in order to reflect any such more favorable terms for the benefit of the Stockholders.  Neither the Company nor any of its Subsidiaries has entered, as of the date hereof, nor shall the Company or any of its Subsidiaries, on or after the date hereof, enter into any agreement with respect to its securities that would have the effect of impairing the rights granted to the Stockholders in this Agreement or otherwise conflicts with the provisions hereof.

(h)     <u>Compliance</u>.  Each Stockholder covenants and agrees that it will comply with the prospectus delivery requirements of the Securities Act as applicable to it (unless an exemption therefrom is available) in connection with sales of Registrable Securities pursuant to a registration statement under this <u>Section 7</u> and shall sell the Registrable Securities only in accordance with a method of distribution described in such registration statement.

(i)     <u>"Market Stand Off" Agreement</u>.  Notwithstanding anything herein to the contrary, each Stockholder hereby agrees that during (i) such period following the effective date (which period shall in no event exceed one hundred eighty (180) days, subject to any customary "booster shot" extensions) of a registration statement of the Company filed in connection with an IPO as the Company or any of its Affiliates may agree to with the underwriter or underwriters of such underwritten offering and (ii) such period (which period shall in no event exceed ninety (90) days, subject to any customary "booster shot" extensions) following the effective date of a registration statement of the Company filed under the Securities Act subsequent to an IPO as the Company or any of its Affiliates may agree to with the underwriter or underwriters of such underwritten offering, such Stockholder shall not, to the extent requested by the Company and/or

any underwriter, Transfer any Registrable Securities held by it at any time during such period, except Registrable Securities included in such registration. Each Stockholder agrees that it shall deliver to the underwriter or underwriters of any offering to which clause (i) or (ii) above is applicable a customary agreement reflecting its agreement set forth in this <u>Section 7(i)</u>.

(j)     <u>Participation in Underwritten Registrations</u>. No Stockholder may participate in any registration hereunder which is underwritten unless such Stockholder (i) agrees to sell such Stockholder's Registrable Securities on the basis provided in any underwriting arrangements (including pursuant to any over-allotment or "green shoe" option requested by the underwriters, provided that no holder of Registrable Securities shall be required to sell more than the number of Registrable Securities such holder has requested to include) and (ii) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements. Each holder of Registrable Securities agrees to execute and deliver such other agreements as may be reasonably requested by the Company and the lead managing underwriter(s) that are consistent with such holder's obligations under this <u>Section 7(j)</u> or that are necessary to give further effect thereto.

(k)     <u>Assignment of Registration Rights</u>. The rights to have the Company register Registrable Securities pursuant to this Agreement shall be automatically assigned by a Stockholder to any transferee or assignee of Registrable Securities only if the transferee or assignee acquires one percent (1%) or more of the outstanding Common Stock in connection with such assignment or transfer.

8.     <u>Initial Matters; Proxy</u>.

(a)     <u>Initial Matters</u>. Each party hereto acknowledges and agrees that, as of the date hereof, the initial Board, the Fourth Amended and Restated Certificate of Incorporation and Amended and Restated Bylaws of the Company shall be as set forth in the Joint Plan of Reorganization of the Company and its Affiliates (and Plan Supplement referenced therein) effective as of the date hereof.

(b)     <u>Proxy</u>. The parties hereby agree to take such actions and to execute and deliver any and all instruments or other documents as may be necessary or advisable in order to amend this Agreement in order to permit the voting agreements set forth in <u>Section 5(a)</u> to remain in effect for the entire term of this Agreement. In the event that any Stockholder entitled to vote on or provide its written consent with respect to a matter shall fail at any time to vote or act by written consent with respect to any Stock held of record or beneficially owned by such Stockholder (or as to which such Stockholder otherwise has voting control) as agreed by such Stockholder in <u>Section 5(a)</u>, such Stockholder hereby irrevocably grants to and appoints the Secretary of the Company as such Stockholder's proxy and attorney-in-fact (with full power of substitution), for and in the name, place and stead of such Stockholder, to vote or act by written consent with respect to such Stock and to grant a consent, proxy or approval in respect of such Stock, in each case in such manner and to the extent as is necessary or desirable for the Secretary of the Company to vote such Stock in accordance with this Agreement. Each Stockholder hereby affirms that each proxy hereby granted shall, for the term of this Agreement, be irrevocable and shall be deemed coupled with an interest. In the event that any or all provisions

21

of Section 5(a) are determined to be unenforceable, each Stockholder agrees to enter into a proxy that, to the fullest extent permitted by applicable law, preserves the intent and purposes of Section 5(a).  No Stockholder shall grant any proxy or enter into or agree to be bound by any voting trust with respect to any Stock or enter into any agreements or arrangements of any kind with any Person with respect to any Stock inconsistent with the provisions of this Agreement (whether or not such agreements and arrangements are with Stockholders or holders of Stock who are not parties to this Agreement), including agreements or arrangements with respect to the acquisition, disposition or voting (if applicable) of any Stock, nor shall any Stockholder act, for any reason, as a member of a group or in concert with any other Persons in connection with the acquisition, disposition or voting (if applicable) of any Stock in any manner which is inconsistent with the provisions of this Agreement.

9.     Representations and Warranties.  Each of the Stockholders, severally for itself alone, hereby makes the following representations and warranties:

(a)     Such Stockholder (if not a natural person) is duly organized or incorporated, validly existing and in good standing under the laws of the jurisdiction of its organization or incorporation and has all requisite power and authority to conduct its business as it is now being conducted and is proposed to be conducted.

(b)     This Agreement has been duly authorized, executed and delivered by such Stockholder and constitutes the valid and binding obligation of such Stockholder, enforceable in accordance with its terms.

(c)     The execution and delivery by such Stockholder of this Agreement, the performance by such Stockholder of his, her or its obligations hereunder and the consummation of the transactions contemplated herein by such Stockholder does not and will not violate (i) in the case of Stockholders that are not individuals, any provision of its by-laws, charter, articles of association, partnership agreement, operating agreement, trust instrument or other similar document, (ii) any provision of any material agreement to which he, she or it is a party or by which he, she or it is bound or (iii) any law, rule, regulation, judgment, order or decree to which he, she or it is subject.

(d)     No consent, filing with or notification to any Person is required to be obtained or made by such Stockholder in connection with the execution, delivery or performance of this Agreement.

(e)     Such Stockholder is not currently in violation of any law, rule, regulation, judgment, order or decree, which violation could reasonably be expected at any time to have a material adverse effect upon such Stockholder's ability to enter into this Agreement or to perform his, her or its obligations hereunder.

(f)     There is no pending legal action, suit or proceeding that would materially and adversely affect the ability of such Stockholder to enter into this Agreement or to perform his, her or its obligations hereunder.

(g)     Such Stockholder is either (i) an "accredited investor" as defined in Rule 501 promulgated under the Securities Act or (ii) (A) not an "accredited investor" as defined in

22

Rule 501 promulgated under the Securities Act and (B) has provided written notice to the Company of such status for purposes of the Company's determination of Permitted Transfers in accordance with Section 2.

(h)     Such Stockholder understands and hereby acknowledges that it is aware that the Stock has not been registered under the Securities Act or any similar state securities laws and that the Stock will be issued by the Company in reliance upon exemptions from the registration requirements of such laws.

(i)     Such Stockholder as of the date hereof is acquiring the Stock for investment for its own account and not with a view to distributing all or any part thereof in any transaction which would constitute a "distribution" within the meaning of the Securities Act.

(j)     Such Stockholder has received and read the financial information provided by the Company and has had an opportunity to discuss the Company's and its Subsidiaries' business, management and financial affairs with the officers and other management personnel of the Company and has had the opportunity to review the Company's and its Subsidiaries' operations.

(k)     Such Stockholder does hereby acknowledge that such Stockholder (i) has reviewed with its own tax advisors the federal, state, local and foreign tax consequences of an investment in the Stock, (ii) is relying solely on such advisors and not on any statements or representations of the Company or any of its Subsidiaries or any of their agents and (iii) understands that such Stockholder (and not the Company or any of its Subsidiaries) shall be responsible for its own tax liability that may arise as a result of this investment in the Stock.

(l)     Such Stockholder understands that the Company is under no obligation to register the Stock under the Securities Act or any state securities act or to take any other action necessary to comply with an available exemption or regulation under any such acts (including Rule 144 under the Securities Act) in order to permit such Stockholder to sell, transfer or otherwise dispose of the Stock.  Accordingly, such Stockholder recognizes that the Stock will not be freely transferable and understands and acknowledges that such Stockholder must continue to bear the economic risk of the investment in the Stock for an indefinite period.

10.    Financial Reporting Requirements; Access.

(a)     After the end of each fiscal quarter of the Company, the Company will provide to each Stockholder, within sixty (60) days of the end of such fiscal quarter, a copy of the unaudited consolidated balance sheets of the Company and its Subsidiaries, and the related consolidated statements of income, stockholders' equity and cash flows as of the end of such three-month period and for the portion of the fiscal year of the Company then ended along with a customary management discussion and analysis thereof.  After the end of each fiscal year of the Company, the Company will provide each Stockholder, within ninety (90) days of the end of such fiscal year (or within one hundred and twenty (120) days of the end of fiscal year 2013), a copy of (i) the audited consolidated balance sheets of the Company and its Subsidiaries, and the related consolidated statements of income, stockholders' equity and cash flows as of the end of such fiscal year along with a customary management discussion and analysis thereof, (ii) the

projections of the Company and its Subsidiaries' consolidated performance for (A) the forthcoming three (3) fiscal years of on a year by year basis, and (B) the forthcoming fiscal year on a month by month basis, and (iii) a business plan and operating budget for the Company and its Subsidiaries for such fiscal year.

(b)    The Company shall afford any Stockholder reasonable access, at reasonable times during normal business hours, to the personnel, premises, properties, books and records, and other documents and financing, operating and other data of the Company and its Subsidiaries, as such Stockholder may reasonably request, provided that any such access shall be conducted in such a manner as not to interfere unreasonably with the operation of the business conducted by the Company and its Subsidiaries.

11.    <u>Miscellaneous</u>.

(a)    <u>Successors and Assigns</u>.  Except as otherwise provided herein (including <u>Section 7(k)</u>), the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties (including transferees of any shares of Stock).  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

(b)    <u>Choice of Governing Law; Jurisdiction</u>.  The rights and obligations of the parties shall be governed by the laws of the State of Delaware, regardless of the choice of laws provisions of the State of Delaware or any other jurisdiction.  Any and all disputes between or among the parties which may arise pursuant to this Agreement shall be heard and determined before the appropriate federal or state court located in the State of Delaware.  The parties hereto acknowledge that each such court has the exclusive jurisdiction to interpret and enforce the provisions of this Agreement and the parties waive any and all objections that they may have as to venue in any of the above courts.

(c)    <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Any signatures delivered hereunder by a party by facsimile transmission or electronic mail shall be deemed an original signature hereto.

(d)    <u>Titles and Subtitles</u>.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

(e)    <u>Notices</u>.  Any notice or other communication required or permitted to be provided hereunder shall be in writing and shall be delivered in person or by first class mail (registered or certified, return receipt requested), facsimile, electronic mail, or overnight air courier guaranteeing next day delivery.  The address for such notices and communications shall be as follows:

If to the Company:

24

Physiotherapy Associates Holdings, Inc.
855 Springdale Drive
Suite 200
Exton, PA 19341
Attention: Chief Financial Officer
Fax: (610) 644-3262

If to a Stockholder:

To the address set forth for such Stockholder on the signature page hereto or such other address as may be designated in writing hereafter, in the same manner, by such Person.

All notices and communications shall be deemed to have been duly given: at the time delivered by hand, if personally delivered; five (5) Business Days after being deposited in the mail, postage prepaid, if mailed; when receipt acknowledged, if sent via facsimile; when sent, if sent via electronic mail to the address set forth above, provided that a mail delivery failure or similar message is not received by the sender; and the next Business Day after timely delivery to the courier, if sent by overnight air courier guaranteeing next day delivery. Failure to provide a notice or communication to one party hereto or any defect in it shall not affect its sufficiency with respect to other parties hereto.

(f)    Amendments and Waivers. Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the prior written consent of the Company and the Majority Stockholders; provided, however, to the extent any amendment or waiver adversely effects a Stockholder in a manner materially different than the other Stockholders, the prior written consent of such Stockholder shall be required. Notwithstanding the foregoing, Schedule A of this Agreement may be amended with only the written consent of the Company for the sole purpose of including additional Stockholders as contemplated by Section 2 and Section 11(h).

(g)    Severability. If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision was so excluded and shall be enforceable in accordance with its terms.

(h)    Additional Stockholders. Notwithstanding anything to the contrary contained herein, as a condition to issuing any shares of capital stock, the Company shall require the party acquiring such shares to become a party to this Agreement as a Stockholder by executing and delivering the Joinder Agreement.

(i)    Spousal Consent. To the extent applicable, each Stockholder shall, in connection with the execution hereof, deliver an executed spousal consent in substantially the form of Exhibit B hereto, it being acknowledged and agreed that should this obligation become applicable at a later date, such Stockholder shall cause an executed spousal consent in substantially the form of Exhibit B hereto to be delivered to the Company at such later date.

25

Without prejudice to the actual rights of the spouses as between each other, for all purposes of this Agreement, each Stockholder shall be treated as agent and attorney-in-fact for any interest held or claimed by such Stockholder's spouse with respect to the Stock and the parties hereto shall act in all matters as if such Stockholder were the sole owner of such Stock.  This appointment is coupled with an interest and is irrevocable.

(j)     Legends.  All certificates representing the Stock, and all certificates issued in Transfer thereof or substitution therefor, shall be endorsed conspicuously with the following legends:

"The shares represented by this certificate have not been registered under the Securities Act of 1933, as amended, nor any state securities laws, and may not be sold, transferred, encumbered or otherwise disposed of in the absence of such registration or an exemption therefrom and the rules and regulations thereunder.

The shares represented by this certificate are also subject to certain provisions set forth in a Stockholders Agreement between the Physiotherapy Associates Holdings, Inc. and certain of its Stockholders (the "Stockholders' Agreement"), including restrictions upon transfer and certain restrictions on the voting of the shares represented hereby.  A copy of the Stockholders' Agreement may be obtained at no cost by written request made by the holder of record of this certificate to the secretary of Physiotherapy Associates Holdings, Inc."

Any other legend required to be placed thereon by applicable law.

(k)     Termination of Agreement.  This Agreement shall terminate upon the earliest to occur of the following:  (a) the dissolution of the Company, (b) immediately prior to the Company's IPO, and (c) the consummation of a Sale of the Company; provided that Section 1, Section 2, Section 7 and this Section 11 (excluding Section 11(h)) shall survive any termination of this Agreement pursuant to clause (b) above with respect to the Company and Stockholders holding Registrable Securities.

(l)     Entire Agreement.  This Agreement (including the Exhibits hereto) constitutes the full and entire understanding and agreement between the parties with regard to the subjects hereof.  Each Stockholder acknowledges and agrees that any Stockholder or similar agreement entered into between such Stockholder and the Company prior to the date hereof is hereby terminated and shall have no further force or effect.

(m)     Equitable Relief.  The parties hereto agree that, in the event of a breach by any Stockholder of any of the provisions of this Agreement, damages alone will be an inadequate remedy and that such breach will cause the parties great, immediate and irreparable injury; accordingly, each party hereto agrees that the others shall be entitled to injunctive and other equitable relief, and that such relief shall be in addition to, and not in lieu of, any other remedies they may have at law or under this Agreement.

(n)     No Third-Party Benefits.  Except as expressly provided in this Agreement, none of the provisions of this Agreement shall be for the benefit of, or enforceable by, any Person not a party hereto.

26

       (o)    <u>Further Assurances</u>.  The parties agree to execute such further instruments and to take such further action as may reasonably be necessary to carry out the intent of this Agreement.

       (p)    <u>No Other Relationships</u>.  Nothing herein contained shall be construed to constitute any Stockholder the legal representative or agent of any other Stockholder.  No party to this Agreement (except Employee Stockholders, as authorized by the Board, with respect to the Company and its Subsidiaries) shall have any right or authority to assume, create or incur any liability or any obligation of any kind, express or implied, against or in the name of or on behalf of any other party to this Agreement.  No Stockholder shall assume or be responsible for any liability or obligation of any nature, or any liability or obligation that arises from any act or omission to act of, of any other party to this Agreement however or whenever arising.  This Agreement shall not limit in any manner the manner in which the Stockholders (except Employee Stockholders) or their respective Affiliates conduct their own respective businesses and activities.  The Company and each Stockholder (i) agrees that any Stockholder (except Employee Stockholders) and any Affiliates of such a Stockholder may engage in or possess interests in other business ventures and activities of every kind and description, independently or with others, whether existing as of the date hereof or hereafter coming into existence, (ii) authorizes, consents to and approves of such activities, whether or not any such activities may conflict with any interest of the Stockholder or any Stockholder, and (iii) agrees that neither the Company nor the Stockholder(s) (nor any of them) shall have any rights in or to any such ventures and activities or any income or profits derived therefrom.  The provisions of this <u>Section 11(p)</u> are not intended to limit or modify the restrictions or prohibitions of any employment agreements or other agreements regarding non-competition to which any Stockholder is a party.  To the extent that at law or in equity, a Stockholder (except an Employee Stockholder) has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Stockholder, such Stockholder acting under this Agreement shall not be liable to the Company or to any Stockholder for its good faith reliance on the provisions of this Agreement to the full extent permitted by applicable law.  The provisions of this Agreement, to the extent that they expressly restrict the duties and liabilities of a Stockholder (except Employee Stockholders) otherwise existing at law or in equity, and, solely to such extent, are agreed by the parties hereto to replace such other duties and liabilities of such Stockholder.

[<i>Remainder of Page Intentionally Left Blank</i>]

27

IN WITNESS WHEREOF, the parties have executed this Stockholders Agreement as of the date first above written.

PHYSIOTHERAPY ASSOCIATES
HOLDINGS, INC.

By: _____

Name: _____

Title: _____

K&E 28032071.2

STOCKHOLDERS:

[NOTEHOLDERS]

By: _____
    Name: _____
    Title: _____

Address: _____
           _____
           _____
Fax: _____
Email: _____

## SCHEDULE A

### Stockholder Information

| Stockholder | Number of Shares of Common Stock |
|---|---|
| [Noteholders] | [_____] |

**EXHIBIT A**

**Acknowledgment of and Agreement to be Bound
by the Stockholders' Agreement of
Physiotherapy Associates Holdings, Inc.**

The undersigned, as transferee of [_____] shares of Stock of Physiotherapy Associates Holdings, Inc. (the "Company") from [_____], hereby acknowledges that he, she or it has read and reviewed the terms of that certain Stockholders' Agreement by and among the Company and the Stockholders thereof, dated as of [_____], 2013 (as amended through the date hereof), and hereby agrees to be bound by the terms and conditions thereof, and of all of the exhibits thereto, as if the undersigned had entered into such Stockholders' Agreement as an original party thereto.

Date:  [_____], 20[__]

_____
Signature

_____
Name (please print)

Address: _____
_____
_____

Fax: _____
Email: _____

**EXHIBIT B**

**Spousal Consent**

In consideration of the execution of that certain Stockholders Agreement of Physiotherapy Associates Holdings, Inc. (the "Company"), dated as of [_____], 2013, as amended, supplemented or otherwise modified in accordance with the terms thereof (the "Stockholders Agreement"), by and among [_____] (the "Stockholder") and the other parties thereto, I, [_____], the spouse of the Stockholder, do hereby confirm that:

(a)     I have read and approve of the provisions of the Stockholders Agreement [and the Joinder Agreement (as defined in the Stockholders Agreement)];

(b)     I do join with my spouse in executing the Stockholders Agreement [and the Joinder Agreement];

(c)     I do agree to be bound by and accept the provisions of the Stockholders Agreement [and the Joinder Agreement]; and

(d)     I do agree that any interests I may have in the Stock (as defined in the Stockholders Agreement) and any other securities contemplated by the Stockholders Agreement, whether the interest may be community property or otherwise, shall be similarly bound by the Stockholders Agreement.

I am aware that the legal, financial and related matters contained in the Stockholders Agreement [and the Joinder Agreement] are complex and that I am free to seek independent professional guidance or counsel with respect to this spousal consent.  I have either sought such guidance or counsel or determined after reviewing the Stockholders Agreement [and the Joinder Agreement] carefully to waive such right.

Acknowledged and agreed this [_____] day of [_____], 20[__].

_____

[Name]

**<u>Exhibit F</u>**

**Litigation Trust Agreement**

# PAH LITIGATION TRUST AGREEMENT

This PAH Litigation Trust Agreement (this "<u>Agreement</u>") is made and entered into by and among Physiotherapy Holdings, Inc., a Delaware corporation ("<u>Holdings</u>"), Physiotherapy Associates Holdings, Inc., a Delaware corporation ("<u>PAH</u>"), the direct and indirect subsidiaries of PAH (the "<u>PAH Subsidiaries</u>"), the shareholders of Holdings set forth on the signature pages hereto (together with any permitted assignees and transferees under the terms hereof, the "<u>Consenting Shareholders</u>"), the Consenting Noteholders (as defined below), and [_____], [_____] and [_____] (together with any successor trustees appointed under the terms hereof, the "<u>Trustees</u>"), to set forth the terms of the litigation trust (the "<u>Litigation Trust</u>") established pursuant to the Plan[1] and the Confirmation Order for the sole benefit of the Beneficiaries.

# RECITALS

A.    The Debtors are the debtors and debtors in possession in the voluntary cases under Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), jointly administered under Case No. [_____] (the "<u>Chapter 11 Cases</u>").

B.    The Debtors filed the Joint Prepackaged Chapter 11 Plan of Reorganization of Physiotherapy Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code on [_____], 2013 (the "<u>Plan</u>") in connection with the Chapter 11 Cases.  On [_____], 2013, the Bankruptcy Court entered the Confirmation Order approving the Plan.

C.    This Agreement is entered into to effectuate the establishment of the Litigation Trust as provided in the Plan and the Confirmation Order.

D.    The Litigation Trust is for the sole purpose of prosecuting, administering, liquidating and distributing the Trust Assets for the benefit of the Beneficiaries as a "liquidating trust" in accordance with Treasury Regulation Section 301.7701-4(d) and Revenue Procedure 94-45, 1994-28 C.B. 124, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to effectuate, and consistent with, the liquidating purpose of the Litigation Trust, and is intended to qualify as a "grantor trust" for U.S. federal income tax purposes, pursuant to Sections 671-677 of the Tax Code, with the Beneficiaries treated as the grantors and owners of the Trust Assets.

E.    The Trustees were duly appointed as representatives of the Debtors pursuant to Sections 1123(a)(5), (a)(7) and (b)(3)(B) of the Bankruptcy Code.  The Trustees, including their successors, if any, are court-appointed Trustees for purposes of the *Barton* doctrine, as that term is used in, *inter alia*, *In re VistaCare Group, LLC*, 678 F.3d 218 (3d Cir. 2012).  The Trustees have agreed to act as Trustees under this Agreement and to accept and manage the Trust Assets

---

[1]    Capitalized terms used but not defined in this paragraph and the Recitals shall have the meaning set forth in <u>Section 1.1</u>.

as Trustees upon and subject to the terms and conditions set forth in this Agreement, the Plan and the Confirmation Order.

**NOW, THEREFORE**, in consideration of the premises and mutual covenants and agreements contained herein and in the Plan and Confirmation Order, the Debtors, the Consenting Shareholders, the Consenting Noteholders and the Trustees agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    Definitions.  The following terms shall have the meanings ascribed to them below for all purposes under this Agreement:

"2012 Transactions" means all transactions, whenever occurring, including without limitation, borrowings, dividends, sales and purchases of securities (whether debt or equity) or bonuses, that in any way relate to the acquisition, satisfaction or issuance of debt or equity of the Debtors or any Affiliate of the Debtors on or about April 30, 2012.

"Additional Funding" has the meaning set forth in Section 2.5(c).

"Affiliate" means, with respect to a specified Person, any Person controlling, controlled by, or under common control with such Person.  The term "control," as used in the immediately preceding sentence, means the right to exercise, directly or indirectly, fifty percent (50%) or more of the voting rights attributable to the controlled entity or the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

"Agreement" has the meaning set forth in the Preamble.

"Available Cash" means those Trust Assets that constitute Cash, after payment or reimbursement of the fees, costs and expenses of administering the Litigation Trust as provided in this Agreement and after any reserve for expenses, liabilities and contingent liabilities; provided, however, that Available Cash shall not include the Initial Funding or any Additional Funding, which shall not be distributed to Beneficiaries except in connection with the final distribution.

"Ballot" has the meaning set forth in the Plan.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Beneficiary" means any holder of Beneficial Interests as set forth on Exhibit A, and any assignee or transferee thereof in a Permitted Transfer in accordance with Section 2.6.

"Beneficial Interests" means the beneficial interests in the Litigation Trust held by the Beneficiaries, which entitles the Beneficiaries to receive Distributions from the Trust Assets, if any, as provided in Section 4.2 of this Agreement.

2

"Business Day" means any day except for Saturday, Sunday or a "legal holiday" (as defined in Fed. R. Bankr. P. 9006(a)).

"Cash" means cash and cash equivalents.

"Chapter 11 Cases" has the meaning set forth in the Recitals.

"Confirmation Order" has the meaning set forth in the Plan.

"Consenting Noteholders" means those holders of Senior Notes Claims (as defined in the Plan) who have executed the Plan Support Agreement (as defined in the Plan) and collectively hold more than 66 2/3% in principal amount of Notes and those holders of Senior Notes Claims who have opted-in to the applicable release provisions described in Article III.C.4 of the Plan, in accordance with the terms of the Plan and any applicable Ballot and solicitation procedures.

"Consenting Noteholders Trustee" has the meaning set forth in Section 3.1(a).

"Consenting Shareholders" has the meaning set forth in the Preamble.

"Consenting Shareholders Trustee" has the meaning set forth in Section 3.1(a).

"Contributing Claimants" means the Debtors and their respective estates, the Consenting Noteholders, and the Consenting Shareholders.

"Debtors" means Holdings, PAH, the PAH Subsidiaries and, where applicable, the Reorganized Debtors (as defined in the Plan).

"Distribution" means any distribution of Available Cash to be made to Beneficiaries pursuant to Section 4.2 of this Agreement.

"Distribution Date" means any date as the Trustees may establish from time to time in accordance with Section 4.2 of this Agreement to make any Distribution.

"Effective Date" means the effective date of the Plan.

"Final Order" has the meaning set forth in the Plan.

"Holdings" has the meaning set forth in the Preamble.

"Indemnity Claims" has the meaning set forth in Section 2.9.

"Initial Funding" has the meaning set forth in Section 2.5(a).

"Initial Trust Assets" has the meaning set forth in Section 2.5(a).

"IRS" means the United States Internal Revenue Service.

"Lien" has the meaning set forth in Section 101 of the Bankruptcy Code.

3

"<u>Litigation Trust</u>" has the meaning set forth in the Preamble.

"<u>Non-Subordinated Contribution and Reimbursement Claims</u>" has the meaning set forth in the Plan.

"<u>Noteholders</u>" means the holders of the Notes as of the Effective Date of the Plan.

"<u>Notes</u>" means PAH's 11.875% Senior Notes due 2019.

"<u>PAH</u>" has the meaning set forth in the Preamble.

"<u>PAH Subsidiaries</u>" has the meaning set forth in the Preamble.

"<u>Permitted Investments</u>" is defined in <u>Section 3.4(d)</u>.

"<u>Permitted Transfer</u>" has the meaning set forth in <u>Section 2.6</u>.

"<u>Person</u>" means and includes a natural person, individual, partnership, corporation (as defined in Section 101(a) of the Bankruptcy Code), or organization including, without limitation, corporations, limited partnerships, limited liability companies, general partnerships, joint ventures, joint stock companies, trusts, land trusts, business trusts, unincorporated organizations or associations, or other organizations, irrespective of whether they are legal entities, governmental bodies (or any agency, instrumentality or political subdivision thereof), or any other form of legal entities.

"<u>Petition Date</u>" has the meaning set forth in the Plan.

"<u>Plan</u>" has the meaning set forth in the Preamble.

"<u>Potential Defendants and Witnesses</u>" means the Persons set forth on <u>Exhibit B</u>.

"<u>Professionals</u>" means all professionals retained by the Trustees as of or after the Effective Date pursuant to the terms of this Agreement.

"<u>Pro Rata</u>" has the meaning set forth in <u>Section 2.5(c)</u>.

"<u>Related Fund</u>" means, with respect to any Person, an Affiliate of such Person, or a fund or account managed or advised by such Person or managed or advised by the same investment advisor or investment manager of such Person.

"<u>Released Claims</u>" has the meaning set forth in the Plan.

"<u>Released Parties</u>" has the meaning set forth in the Plan.

"<u>Required Consenting Noteholders</u>" means the Consenting Noteholders holding a majority of the Beneficial Interests of the Consenting Noteholders, taken as a whole.

"<u>Required Consenting Shareholders</u>" means the Consenting Shareholders holding a majority of the Beneficial Interests of the Consenting Shareholders, taken as a whole.

4

"<u>Tax Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Tax Purposes</u>" means for income tax purposes under the Tax Code and, except where prohibited, for state and local income tax purposes.

"<u>Termination Date</u>" has the meaning set forth in <u>Section 7.1</u>.

"<u>Treasury Regulation</u>" means any regulation promulgated by the United States Department of the Treasury, including any temporary regulations from time to time promulgated under the Tax Code.

"<u>Trust Assets</u>" means the Initial Trust Assets, Additional Funding (if any), and all dividends, rents, royalties, income, proceeds and other receipts of, from or attributable thereto.

"<u>Trust Causes of Action</u>" means all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims, and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity, or otherwise, held by any of the Contributing Claimants against the Potential Defendants and Witnesses related in any way to the Debtors, their predecessors, their respective affiliates and/or (a) through (e) below, including without limitation (a) all claims and causes of action against any party based on, arising out of, or relating to the 2012 Transaction, including without limitation any claims or causes of action for unlawful dividend, fraudulent conveyance or avoidance claims under state or federal law, including the Bankruptcy Code, (b) all claims and causes of action based on, arising out of, or related to the issuance of any security of the Debtors, (c) all claims and causes of action based on, arising out of, or related to the restatement, adjustment, correction, or modification of the Debtors' financial statements, including without limitation all claims or causes of action based on, arising out of, or relating to (i) the Debtors' internal controls relating to financial statements and financial reporting; and (ii) materially misleading financial statements provided to the Contributing Claimants in connection with the 2012 Transaction, (d) all claims and causes of action based on, arising out of, or related to the misrepresentation of any of the Debtors' financial information and related internal controls, including without limitation the overstatement of the Debtors' revenue, accounts receivable, and/or EBITDA, (e) all claims and causes of action based on, arising out of, or related to any failure to disclose, or actual or attempted cover up or obfuscation of any of the conduct described in the Disclosure Statement (as defined in the Plan), (including on <u>Exhibit G</u> thereto), and/or clauses (a)-(d) above, and (f) any other potential claims, causes of action, charges, suits or rights of recovery under state, federal, or other applicable law. The Trust Causes of Action that may be asserted against the Potential Defendants and Witnesses with respect to the foregoing include all claims or causes of action arising under state and/or federal law, such as (but not limited to) claims arising under title 11 of the U.S. Code and applicable law, including without limitation sections 502(d), 510, 542 through 551, and 553 of title 11 and any similar state laws, violations of state and/or federal securities laws, breach of contract, breach of fiduciary duty (including aiding and abetting any such breach), and common law claims such as quantum meruit and unjust enrichment. For the avoidance of doubt, (a) the Trust Causes of Action shall not include the rights of any of the Contributing Claimants or Released Parties to receive the distributions, if any, to which they are entitled under the Plan and

5

the Confirmation Order and (b) the Trust Causes of Action shall not include any actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims, and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity, or otherwise, against any of the Released Parties. Notwithstanding anything to the contrary herein, the Litigation Trust may, but is not required to, pursue any and all claims and/or causes of action that are contributed to the Litigation Trust (whether or not described in the Plan or the Disclosure Statement) against all Persons or Entities (whether or not such Persons or Entities are identified on the list of Potential Defendants and Witnesses) other than the Released Parties.

"Trustees" has the meaning set forth in the Preamble.

## ARTICLE II
## ESTABLISHMENT OF THE LITIGATION TRUST

2.1     Creation of Litigation Trust.  The Beneficiaries and the Trustees, pursuant to the Plan and the Confirmation Order and in accordance with the applicable provisions of Chapter 11 of the Bankruptcy Code, hereby constitute and establish the Litigation Trust, which shall bear the name "PAH Litigation Trust," on behalf of and for the benefit of the Beneficiaries.  The Litigation Trust is formed under the laws of the State of Delaware.

2.2     Transfer of Assets to the Litigation Trust.

(a)     The Litigation Trust is hereby established on behalf, and for the sole and exclusive benefit, of the Beneficiaries pursuant to the Plan and the Confirmation Order.  The Contributing Claimants shall (and hereby do) transfer, assign and deliver in the Litigation Trust all of their right, title and interest in all of the Initial Trust Assets for the benefit and on behalf of the Beneficiaries, notwithstanding any prohibition of assignability under non-bankruptcy law. The Trustees hereby agree to accept and hold the Trust Assets in the Litigation Trust for the sole and exclusive benefit of the Beneficiaries, subject to the terms of this Agreement, the Plan and the Confirmation Order.  Upon the transfer of the Trust Assets to the Litigation Trust, the Contributing Claimants shall have no interest in, or with respect to, the Trust Assets except for the Beneficial Interests of the Beneficiaries set forth on Exhibit A.  The vesting of the Trust Assets in and for the benefit of the Litigation Trust is free and clear of all Liens, claims, interests and encumbrances, except to the extent expressly provided to the contrary in this Agreement. Any Liens, claims, interests or other encumbrances asserted by any party against the Trust Causes of Action shall attach to the Beneficial Interests of the transferor of the applicable Trust Causes of Action with the same validity, force, priority and effect as the same had with respect to the Trust Causes of Action, subject to any and all defenses, claims and/or counterclaims or setoffs that the applicable transferor may have with respect to such Liens, claims, interests or encumbrances.  None of the foregoing transfers to the Litigation Trust shall constitute a merger or consolidation of any of the respective Trust Causes of Action, each of which shall retain its separateness following the transfer for all purposes relevant to the prosecution thereof.  No holder of a Beneficial Interest shall have legal title to any part of the Trust Assets.

(b)     The Trust Assets, in the aggregate, and the Debtors' Trust Causes of Action transferred to the Noteholders shall be valued consistently pursuant to Article V of this Agreement, and those valuations shall be used for all U.S. federal, state and local income tax purposes.  Such valuations shall be made available from time to time, to the extent relevant, and used consistently by all parties (including without limitation the Trustees and the Beneficiaries) for all federal, state and local income tax purposes.

(c)     Any attorney-client privilege, work-product privilege or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Litigation Trust or to which the Litigation Trust is given access shall vest in the Trustees and the Trustees' representatives, and the Trustees are authorized to take all reasonably necessary actions to effectuate the transfer of such privileges.  After the Effective Date, no Person other than the Trustees may assert or waive any attorney-client privilege, work-product privilege or other privilege or immunity of the Contributing Claimants attaching to any such documents or communications (whether written or oral) transferred to the Litigation Trust or to which the Litigation Trust is given access or make any admission or statement against interest respecting the Contributing Claimants in any matter relating to the Trust Causes of Action or any of them. The Litigation Trust's receipt of such privileges associated with the Trust Causes of Action shall not operate as a waiver of any and all other privileges or immunities possessed or retained by the Contributing Claimants.  Any and all work product created by or on behalf of the Trustees, their retained Professionals (including, but not limited to, their counsel), agents, representatives, and employees shall be deemed confidential to the extent that such work product is not protected by the attorney client privilege, attorney work-product doctrine, or any other applicable privilege.

(d)     The Litigation Trust is irrevocable but subject to amendment and waiver as provided in this Agreement.  In no event shall any part of the Trust Causes of Action revert to or be distributed to the Contributing Claimants except as provided in Section 4.2.  The Litigation Trust is not intended to be, and shall not be deemed to be or treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company or association, nor shall the Trustees, or the Beneficiaries, or any of them, for any purpose be, or be deemed to be or treated in any way whatsoever to be, liable or responsible hereunder as partners or joint venturers.  The relationship of the Beneficiaries, on the one hand, to the Litigation Trust and the Trustees, on the other, shall not be deemed a principal or agency relationship, and their rights shall be limited to those conferred upon them by this Agreement, the Plan and the Confirmation Order.

(e)     To the extent that any Trust Assets cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by Section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Trust Assets shall be deemed to have been retained by the Contributing Claimants, as applicable, and the Trustees shall be deemed to have been designated as their respective representatives (including pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code) to enforce and pursue such Trust Assets on their behalf, and all proceeds, income and recoveries on account of any such Trust Assets shall be assets of the Litigation Trust and paid over thereto immediately upon receipt by the Contributing Claimants, as applicable, or any other Person.

2.3     Intention of Parties.  All parties intend to create a liquidating trust in accordance with Treasury Regulation Section 301.7701-4(d) and Revenue Procedure 94-45, 1994-28 C.B.

124, which shall be treated as a "grantor trust" for Tax Purposes pursuant to Sections 671-677 of the Tax Code.  The Beneficiaries shall be treated as the grantors and owners of the Litigation Trust as a grantor trust for Tax Purposes.

2.4     Purpose of Litigation Trust.  Subject to Section 7.1, the Litigation Trust shall continue in existence so long as necessary for the purpose of liquidating the Trust Assets, in accordance with Treasury Regulation Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Litigation Trust.  Consistent with such objective, the Trustees, in an orderly manner and subject to the provisions of this Agreement, shall:

        (a)     make all Distributions to the Beneficiaries;

        (b)     satisfy their obligations under this Agreement; and

        (c)     file appropriate tax returns and other filings in accordance with Article V of this Agreement.

2.5     Funding of the Litigation Trust.

        (a)     The Litigation Trust shall be funded with (i) Two Million, Two Hundred and Fifty Thousand Dollars ($2,250,000) from the Debtors on behalf of the Noteholders, subject to credits as set forth in clause (b) below, on the Effective Date, (ii) Two Million, Two Hundred and Fifty Thousand Dollars ($2,250,000) from the Consenting Shareholders, on the Effective Date, ((i) and (ii), the "Initial Funding"), and (iii) the Trust Causes of Action, on the Effective Date ((i), (ii), and (iii) collectively, the "Initial Trust Assets").  For the avoidance of doubt, the Initial Funding and any Additional Funding shall not be reimbursed by the Litigation Trust, shall not be available to any creditors of the Litigation Trust, and can only be used to pay the out-of-pocket costs of investigating and prosecuting the Trust Causes of Action, including without limitation the fees and expenses of expert witnesses, travel costs, copying and mailing costs, and any other incidental costs.

        (b)     The Debtors shall be entitled to a credit, with respect to the amounts to be funded by the Debtors pursuant to clause (a)(i) above, for amounts actually paid by the Debtors on or prior to the Effective Date to proposed counsel to the Litigation Trust for fees and expenses incurred on or after September 9, 2013, in an amount of up to Two Hundred and Fifty Thousand Dollars ($250,000), plus any further amounts approved by the Consenting Noteholders in their sole and absolute discretion.  For the avoidance of doubt, the Two Million, Two Hundred and Fifty Thousand Dollars ($2,250,000) to be funded by the Consenting Shareholders to the Litigation Trust pursuant to clause (a)(ii) above shall not be paid or reimbursed by the Debtors on the Effective Date or otherwise.

        (c)     In the event that the Trustees reasonably determine that additional funding ("Additional Funding") of the Litigation Trust beyond the Initial Trust Assets is required, the Trustees may seek Additional Funding only from the Beneficiaries by providing thirty (30) days' written notice to all Beneficiaries, which Additional Funding shall be provided by any or all Beneficiaries in their sole and absolute discretion; provided that no Additional Funding shall be offered or funded during the first twelve-month period after the creation of the Litigation Trust.

The Additional Funding shall be offered to all Beneficiaries pro rata based on the respective number of Beneficial Interests each Beneficiary has as a percentage of the total Beneficial Interests outstanding at such time ("Pro Rata"), and thereafter those who fund their Pro Rata share of the Additional Funding shall be offered a Pro Rata share of any amounts of the Additional Funding initially offered to the Beneficiaries who do not choose to fund their Pro Rata share of the Additional Funding, successively until the Additional Funding is funded. However funded, whether or not Pro Rata, those Beneficiaries who fund the Additional Funding shall be entitled to one hundred (100) additional Beneficial Interests for each One Hundred Thousand Dollars ($100,000) contributed (with amounts not exactly equal to a multiple of One Hundred Thousand Dollars ($100,000) denominated as a proportionate additional fraction of one hundred (100) Beneficial Interests, rounded to one decimal).

(d)    For the avoidance of doubt, there are no mandatory contributions to the Litigation Trust, and all Additional Funding shall be made (or not made) in each Beneficiary's sole and absolute discretion.

2.6    Non-Transferability of Beneficial Interests.  The Beneficial Interests are not intended to constitute "securities" and have not been registered pursuant to the Securities Act of 1933, as amended, or any state securities law.  If the Beneficial Interests constitute "securities," the parties hereto intend that the exemption provisions of Section 1145 of the Bankruptcy Code shall apply to the Beneficial Interests.  The Beneficial Interests shall not be capable of being transferred, assigned, pledged or hypothecated, in whole or in part, except (i) to an Affiliate or a Related Fund of the Beneficiary holding such Beneficial Interest, or (ii) by operation of law or by will or the laws of descent and distribution, in each case following written notice to the Trustees (each, a "Permitted Transfer").  Any purported transfer, assignment, pledge or hypothecation of a Beneficial Interest or any part thereof, except in a Permitted Transfer, shall constitute a violation of this Section 2.6 and shall be void ab initio.  Until a Permitted Transfer is in fact recorded on the books and records maintained by the Trustees for the purpose of identifying the Beneficiaries, the Trustees, whether or not in receipt of documents of transfer or other documents relating to the transfer, may nevertheless make Distributions and send communications to the Beneficiaries of record, as though they had no notice of any such Permitted Transfer, and in so doing the Trustees shall be fully protected and incur no liability to any purported transferee or any other Person pursuant to Section 3.6 hereof.

2.7    Investment Company Act.  The Litigation Trust is organized as a liquidating entity in the process of liquidation, and therefore should not be considered, and the Litigation Trust does not and will not hold itself out as, an "investment company" or an entity "controlled" by an "investment company" as such terms are defined in the Investment Company Act of 1940, as amended.

2.8    Non-Subordinated Contribution and Reimbursement Claims.  The parties to this Agreement do not believe that there are any allowable Non-Subordinated Contribution and Reimbursement Claims against the Debtors.  Accordingly, the Debtors and the Litigation Trust, as applicable, shall take reasonable actions to ensure that any asserted Non-Subordinated Contribution and Reimbursement Claims are disallowed or determined to be Subordinated Claims (as defined in the Plan).  Allowed Non-Subordinated Contribution and Reimbursement Claims, if any, will be assumed by the Litigation Trust and, to the extent not satisfied by any

9

available insurance coverage, satisfied solely by way of setoff or recoupment, to the extent applicable, or payment by the Litigation Trust, which shall be paid after the payment of costs and expenses, including legal fees and expenses, of the Litigation Trust, but prior to any further Distribution to the Beneficiaries and shall not be paid from the Initial Funding or any Additional Funding.  If any potential Non-Subordinated Contribution and Reimbursement Claims are asserted against the Litigation Trust after the Effective Date, the parties agree and the Plan and Confirmation Order provide that the Bankruptcy Court shall retain and have sole jurisdiction over the allowance or disallowance, including both liability and amount, of any such claims.  For the avoidance of doubt, any allowed Non-Subordinated Contribution and Reimbursement Claims shall only be satisfied from the proceeds of the Trust Causes of Action after the payment of attorneys' fees, and there shall be no clawback against previous Distributions to Beneficiaries in order to satisfy any such claims against the Litigation Trust.

2.9     <u>Indemnification of Consenting Noteholders and Consenting Shareholders</u>.  The parties to this Agreement do not believe that any Person has any claims against the Consenting Noteholders and Consenting Shareholders relating to the Trust Causes of Action that are not Released Claims.  Notwithstanding the foregoing, the Litigation Trust, in consideration of the contributions to the Litigation Trust by each of the Consenting Noteholders and Consenting Shareholders, shall, to the extent not satisfied by any available insurance coverage, indemnify and hold harmless each of the following persons and entities, solely to the extent such person or entity is not one of the Potential Defendants and Witnesses, for any and all Released Claims brought by any person or entity: (i) Consenting Noteholders; (ii) Consenting Shareholders; (iii) the Consenting Noteholders' and Consenting Shareholders' respective predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, and current (as of September 1, 2013) officers, directors, principals, members, partners, shareholders, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, advisory board members and other professionals; and (iv) the respective heirs, executors, estates, servants, and nominees of the persons and entities set forth in (i)-(iii) above. (the "<u>Indemnity Claims</u>").  The Indemnity Claims shall be paid after the payment of costs and expenses, including legal fees, of the Litigation Trust, but prior to any further Distribution to Beneficiaries and shall not be paid from the Initial Funding or any Additional Funding.  For the avoidance of doubt, any Indemnity Claims shall only be satisfied from the proceeds of the Trust Causes of Action after the payment of attorneys' fees, and there shall be no clawback against previous Distributions to Beneficiaries in order to satisfy any such claims against the Litigation Trust.

2.10    <u>Fractional Beneficial Interests</u>.  When any distribution of Beneficial Interests pursuant to the Plan would otherwise result in the issuance of a number of Beneficial Interests that is not a whole number, the actual distribution of Beneficial Interests shall be rounded as follows:  (i) fractions of one-half of one-tenth (0.05) or greater shall be rounded to the next higher one-tenth and (ii) fractions of less than one-half of one-tenth (0.05) shall be rounded to the next lower one-tenth with no further payment therefor.

## ARTICLE III
## TRUSTEES

3.1    <u>Appointment; Resignation or Removal; Successor Trustees</u>.

10

(a)      The Consenting Shareholders and the Consenting Noteholders hereby designate and appoint [_____] (the "Consenting Shareholders Trustee"), [_____] (the "Consenting Noteholders Trustee"), and [_____] (the "Independent Trustee") to serve as the initial Trustees, and [_____], [_____] and [_____] hereby accept such designation and appointment and agree to serve in such capacity, as of the Effective Date, in accordance with this Agreement.

(b)      Each of the Consenting Shareholders Trustee, the Consenting Noteholders Trustee, and the Independent Trustee may resign following written notice to the Consenting Shareholders, the Consenting Noteholders, and the other Trustees.  Such resignation will become effective on the later to occur of (i) the day specified in such written notice and (ii) the appointment of a successor Trustee as provided in Sections 3.1(f)-(g).  If a successor Trustee is not appointed or does not accept its appointment within ninety (90) days following the written resignation notice set forth above, the resigning Trustee shall file a motion with the Bankruptcy Court, upon notice and a hearing, for the appointment of a successor Trustee.

(c)      The Consenting Shareholders Trustee may be removed by the Required Consenting Shareholders, with or without cause and for any or no reason following ten (10) days' written notice to the Consenting Shareholders Trustee, the Consenting Noteholders, and the other Consenting Shareholders and Trustees.  Following the death or incapacity or any resignation or removal of the Consenting Shareholders Trustee, the Required Consenting Shareholders shall be entitled to appoint a replacement Consenting Shareholders Trustee following written notice to the Consenting Noteholders and the other Consenting Shareholders and Trustees.

(d)      The Consenting Noteholders Trustee may be removed by the Required Consenting Noteholders with or without cause and for any or no reason following ten (10) days' written notice to the Consenting Noteholders Trustee, the Consenting Shareholders and the other Consenting Noteholders and Trustees.  Following the death or incapacity or any resignation or removal of the Consenting Noteholders Trustee, the Required Consenting Noteholders shall be entitled to appoint a replacement Consenting Noteholders Trustee following written notice to the Consenting Shareholders and the other Consenting Noteholders and Trustees.

(e)      The Independent Trustee may be removed by joint action of the Required Consenting Shareholders and the Required Consenting Noteholders.  Removal may be with or without cause and for any or no reason following ten (10) days' written notice to the Independent Trustee and the other Consenting Shareholders, Consenting Noteholders and Trustees.  Following the death or incapacity or any resignation or removal of the Independent Trustee, the Required Consenting Shareholders and the Required Consenting Noteholders shall be entitled to appoint a replacement Independent Trustee following written notice to the other Consenting Noteholders, Consenting Shareholders and Trustees.

(f)      Any successor Trustee appointed hereunder shall execute an instrument accepting such appointment and assuming all of the obligations and duties of the predecessor Trustee on the same terms and conditions hereunder and accepting the terms of this Agreement and agreeing that the provisions of this Agreement shall be binding upon and inure to the benefit of the successor Trustee and all of its heirs, and legal and personal representatives, successors and

assigns, and thereupon the successor Trustee shall, without any further act, become vested with all the estates, properties, rights, powers, trusts, and duties of the predecessor Trustee hereunder with like effect as if originally named herein.

(g)    Upon the appointment of a successor Trustee, the predecessor Trustee shall, if applicable, when requested in writing by the successor Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Trustee upon the trust herein expressed all the estates, properties, rights, powers and trusts of such predecessor Trustee, and shall duly assign, transfer, and deliver to such successor Trustee all property and money held hereunder, and all other assets, documents, instruments, records and other writings relating to the Litigation Trust, the Trust Assets and the entitlements of the Beneficiaries, then in its possession and held hereunder, and shall execute and deliver such documents, instruments and other writings as may be reasonably requested by a successor Trustee to effect the termination of such predecessor Trustee's capacity under the Litigation Trust, this Agreement, the Plan and the Confirmation Order and otherwise assist and cooperate, without cost or expense to the predecessor Trustee, in effectuating the assumption of its obligations and functions by the successor Trustee.

3.2    Generally.  The Trustees' powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purposes of the Litigation Trust and not otherwise. The Trustees, acting at the direction of a majority of the Trustees, shall have the authority to bind the Litigation Trust, and shall for all purposes hereunder be acting in the capacity as Trustees, and not individually.  If any difference arises among the Trustees which affects the Litigation Trust, the decision of a majority in number of the Trustees then acting shall control.

3.3    Rights and Powers of the Trustees.

(a)    The Trustees shall have all the rights, powers and duties necessary to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform their duties under the Plan, the Confirmation Order and this Agreement, and (ii) exercise such other powers as may be vested in the Trustees by order of the Bankruptcy Court, pursuant to the Plan, the Confirmation Order or this Agreement, or as deemed by the Trustees to be reasonably necessary and proper to implement the provisions hereof.

(b)    In exercising their rights and powers and carrying out their duties under this Agreement, the Trustees shall have the authority to retain such Professionals (including, without limitation, disbursing and transfer agents, legal counsel and/or other agents or advisors) and on behalf of the Litigation Trust, as the Trustees deem appropriate and compensate such Professionals from the Trust Assets on customary terms reasonably acceptable to the Trustees, without any requirement of approval by the Bankruptcy Court, subject to the following limitations: (i) the Litigation Trust shall retain legal counsel, including conflicts counsel and local counsel, to the extent reasonably necessary, to prosecute the Trust Causes of Assets on such terms as are reasonably acceptable to the Trustees and (ii) any other legal counsel retained by the Litigation Trust shall be subject to a total collective fee cap of One Hundred Thousand Dollars ($100,000).  Professionals retained by the Litigation Trust are not required to be "disinterested persons" (as such term is defined in the Bankruptcy Code) and may include, without limitation,

counsel or financial advisors to the Debtors, the Consenting Shareholders or the Consenting Noteholders.

(c)     Subject to the terms of this Agreement, the Trustees shall, in an expeditious but orderly manner, liquidate and convert to Cash the Trust Assets, which includes, without limitation, pursuing recovery on the Trust Causes of Action, making timely Distributions in accordance with <u>Section 4.2</u> and not unduly prolonging the duration of the Litigation Trust. The Trustees, acting at the direction of a majority of the Trustees, shall have discretion to pursue or not to pursue, and settle or not settle, the Trust Causes of Action, as they determine to be in the best interests of the Beneficiaries and consistent with the purposes of the Litigation Trust without the consent of any other Person, including without limitation the Debtors or the Beneficiaries, and shall have no liability for the outcome of its decision; provided that the Trustees shall not settle any Trust Cause of Action unless the applicable Potential Defendant or Witness releases the Released Parties in connection with the settlement; provided, further, that none of the Released Parties shall be a defendant in any action brought by the Trustees on behalf of the Litigation Trust. For the avoidance of doubt, in the exercise of their reasonable discretion, the Trustees shall not be obligated to pursue any or all of the Trust Causes of Action.

3.4     <u>Scope of the Trustees' Duties</u>.  The duties of the Trustees shall include, but shall not be limited to:

(a)     holding legal title to the Trust Assets, including, but not limited to, collecting any and all money and other property belonging to the Litigation Trust;

(b)     investigating, prosecuting, mediating, arbitrating, settling or abandoning the Trust Causes of Action subject to <u>Section 3.3(c)</u>;

(c)     preparing and circulating to the Beneficiaries such reports as the Trustees deem advisable;

(d)     investing the Cash held in the Litigation Trust as permitted by Section 345 of the Bankruptcy Code (collectively, the "<u>Permitted Investments</u>"); provided, however, that the scope of the Permitted Investments shall be limited to include only demand and time deposits, including, without limitation, short-term certificates of deposit in banks or other savings institutions or other temporary, liquid investments such as U.S. Treasury Bills, and those investments that a "liquidating trust", within the meaning of Treasury Regulation Section 301.7701-4(d), may be permitted to invest in, pursuant to the Treasury Regulations and Rev. Proc. 94-45, 1994-28 C.B. 124, or any modification in IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise;

(e)     calculating and paying all Distributions to be made by the Trustees under the Plan, the Confirmation Order, this Agreement, and other orders of the Bankruptcy Court to the Beneficiaries;

(f)     filing any and all tax and information returns with respect to the Litigation Trust consistent with the treatment of the Litigation Trust as a "grantor trust" pursuant to Treasury Regulation Section 1.671-4(a) and paying taxes properly payable by the Litigation Trust, if any, and making Distributions to Beneficiaries net of any such taxes;

13

(g)    filing any statements, returns or disclosures relating to the Litigation Trust that, upon the advice of counsel and/or other Professionals, are identified to the Trustees as required by any governmental authority;

(h)    determining and satisfying any and all liabilities created, incurred or assumed by the Litigation Trust,

(i)    paying all expenses and making all other payments relating to the Trust Assets as provided for in this Agreement, including the liquidation and distribution thereof;

(j)    appearing and participating in any proceeding before the Bankruptcy Court with respect to any matter regarding or relating to the Plan or the Confirmation Order (insofar as it affects the Litigation Trust or the Trust Assets);

(k)    obtaining reasonable insurance coverage with respect to the liabilities and obligations of the Litigation Trust and the Trustees under this Agreement;

(l)    upon the written request of a holder of a Beneficial Interest, providing reasonably adequate documentary evidence of such holder's Beneficial Interest, as indicated in the books and records of the Litigation Trust, at the expense of the requesting Beneficial Interest holder;

(m)    upon the written request of a holder of a Beneficial Interest, effecting a Permitted Transfer, provided that the holder of a Beneficial Interest establishes to the satisfaction of the Trustees that a transfer is a Permitted Transfer and pays all expenses associated with such transfer;

(n)    complying with the provisions of this Agreement; and

(o)    undertaking such other responsibilities or taking such other actions as may be necessary or appropriate to carry out the provisions of this Agreement.

3.5    <u>Limitation of Trustees' Authority</u>.  Except as otherwise provided in the Plan and the Confirmation Order, the Trustees shall not be and are not authorized to engage in any trade or business with respect to the Trust Assets or any proceeds therefrom or take any action, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Litigation Trust or as permitted under this Agreement, and shall take such actions consistent with the orderly distribution of the Trust Assets as is required by applicable law and consistent with the treatment of the Litigation Trust as a liquidating trust under Treasury Regulation Section 301.7701-4(d) and Revenue Procedure 94-45, 1994-28 C.B. 124, and such actions permitted herein.  The Litigation Trust shall not (a) hold fifty percent (50%) or more of the stock (in either vote or value) of any entity treated as a corporation for Tax Purposes, nor be the sole member of a limited liability company, (b) have any interest in an entity that is treated as a partnership for Tax Purposes, (c) hold any listed stocks or securities, or any other readily marketable securities, or (d) hold any unlisted stock of a single issuer that represents eighty percent (80%) or more of the stock of such issuer, unless such stock, membership interest or partnership interest, listed stock, security, or unlisted stock was obtained involuntarily or as a matter of practical economic necessity in order to preserve the value of the assets of the Litigation Trust.  The Litigation Trust

14

shall also not receive or retain cash or cash equivalents in excess of a reasonable reserve for expenses and to meet claims and contingent liabilities, and to maintain the value of the Trust Assets during liquidation; provided, however, that the Litigation Trust shall retain the Initial Funding and any Additional Funding as reasonably necessary to satisfy the costs and expenses of investigation of the Trust Causes of Action and litigation of the Trust Causes of Action elected to be pursued by the Trustees. The Trustees shall have no authority to bind the Beneficiaries in any manner except with respect to a Trust Cause of Action. The Trustees shall have no authority to commence any actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims, and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity, or otherwise, against any of the Released Parties other than actions to enforce the parties' rights and obligations under this Agreement.

3.6     Liability of Trustees.

(a)     Except as otherwise specifically provided herein, the Trustees or the individuals comprising the Trustees, as the case may be, and the Trustees' agents and Professionals, shall not be liable for actions taken or omitted in their capacity as, or on behalf of, this Litigation Trust and the Trustees, except those acts arising out of their willful misconduct, gross negligence, bad faith, self dealing, breach of fiduciary duty, breach of trust, or ultra vires acts.

(b)     The Trustees shall not be liable for interest or obligated to produce income on any assets received by the Litigation Trust hereunder and held for distribution or payment to the Beneficiaries, except for such interest or other income actually received by the Trustees or the Litigation Trust.

(c)     Nothing in this <u>Section 3.6</u> shall be deemed to shield the Trustees from liability with respect to the assessment of fines or penalties against the Trustees which may be assessed by any government agency for failure to comply with applicable law.

3.7     Reliance by Trustees.

(a)     Except as otherwise provided in <u>Section 3.6</u> hereof (i) the Trustees may rely, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties; and (ii) the Trustees may consult with accounting advisors and other Professionals to be selected by them, and the Trustees shall not be liable for any action taken or omitted to be taken by them in accordance with the advice thereof.

(b)     If the Trustees are unsure of the application of any provision of this Agreement or any other agreement relating to the transactions contemplated hereby, the Trustees may, but shall be under no duty to, take or refrain from taking such action as they shall deem advisable in the best interests of the Litigation Trust and the Beneficiaries.

3.8    Compensation of the Trustees; Reimbursement of Costs and Expenses of Trust Administration.

(a)    Compensation.  The Trustees shall be entitled to compensation from the Trust Assets as more particularly set forth in the Fee Schedule attached hereto as Exhibit C and made a part hereof.

(b)    Reimbursement of Costs and Expenses of Trust Administration.  In addition to the compensation set forth in Section 3.8(a), the Trustees shall be entitled to reimbursement from the Trust Assets of all costs and expenses to administer the Litigation Trust, distribute to the Beneficiaries the Available Cash or other assets available for distribution hereunder, or take other actions contemplated herein.  Costs and expenses reimbursable from the Litigation Trust shall include, without limitation, compensation due to Professionals and others engaged or otherwise utilized by the Trustees to enable the Trustees to fulfill their duties under this Agreement, subject to the limitations set forth in Section 3.3(b).

3.9    Exculpation; Indemnification.  Each and all of the Trustees and the Trustees' representatives and Professionals shall be and hereby are exculpated by all Persons from any and all claims, causes of action and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Trustees by this Agreement or applicable law or otherwise, except for any actions or inactions involving willful misconduct, gross negligence, bad faith, self dealing, breach of fiduciary duty, breach of trust or ultra vires acts.  The Litigation Trust shall indemnify, defend and hold harmless each and all of the Trustees, and the Trustees' directors, officers, employees, contractors, representatives and Professionals from and against any and all claims, causes of action, liabilities, obligations, losses, damages or reasonable expenses (including reasonable attorneys' fees and expenses) (other than and only to the extent due to the Trustees' willful misconduct, gross negligence, bad faith, self dealing, breach of fiduciary duty, breach of trust or ultra vires acts) to the fullest extent permitted by applicable law.  Any indemnification claim of the Trustees (and any other parties entitled to indemnification under this provision) shall be satisfied first from available proceeds of errors and omissions insurance (if any such insurance exists), and then from the proceeds of the Trust Causes of Action, and exclusively from those sources.

3.10    No Waiver of Claims.  No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Confirmation Order or this Agreement to any Trust Cause of Action against such Person as any indication that the Trustees will not pursue any and all available Trust Causes of Action against such Person.  Unless any Trust Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, the Confirmation Order or a Bankruptcy Court order, all Trust Causes of Action are expressly reserved by and for the Litigation Trust, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Trust Causes of Action upon, after, or as a consequence of the Confirmation Order.  The objection to the allowance of any claims filed with the Bankruptcy Court with respect to which they dispute liability, priority, and/or amount (or any objections, affirmative defenses and/or counterclaims, whether or not litigated to Final Order) shall not in any way limit the ability or the right of the Trustees to assert, commence or prosecute any Trust Cause of Action.  Nothing

16

contained in the Plan, the Confirmation Order, the Disclosure Statement, or this Agreement shall be deemed to be a waiver, release, or relinquishment of any Trust Cause of Action which the Contributing Claimants had immediately prior to the Effective Date. The Trustees shall have, retain, reserve, and be entitled to assert all Trust Causes of Action fully as if the Trust Causes of Action had not been transferred to the Litigation Trust in accordance with the Plan, the Confirmation Order and this Agreement.

3.11    Confidentiality. The Trustees and each successor Trustee shall, during the period that they serve in such capacity under this Agreement and following either the termination of this Agreement or such individual's removal, incapacity, or resignation hereunder, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any Person to which any of the Trust Assets relate or of which it has become aware in its capacity, except to the extent disclosure is required by applicable law, order, regulation or legal process.

3.12    Termination. The duties, responsibilities and powers of the Trustees shall terminate on the date the Litigation Trust is dissolved pursuant to Article VII of this Agreement.

## ARTICLE IV

## BOOKS, RECORDS AND DISTRIBUTIONS

4.1    Books and Records. The Trustees shall maintain books and records relating to the assets and income of the Litigation Trust and the payment of expenses of, and liabilities of, the Litigation Trust in such detail and for such period of time as may be reasonably necessary to enable the Trustees to make full and proper accounting in respect thereof in accordance with Article V hereof and to comply with applicable provisions of law. Any Beneficiary shall have the right to inspect the books and records of the Litigation Trust. Except as provided in Article V hereof, nothing in this Agreement requires the Trustees to file any accounting or seek approval of any court with respect to the administration of the Litigation Trust, or as a condition for making any payment or Distribution out of the Trust Assets.

4.2    Distributions.

(a)    General Operating Account; Other Accounts. The Trustees shall maintain in a general operating account all Cash obtained at any time with respect to the Litigation Trust. The Trustees shall establish and maintain such other accounts as they reasonably deem necessary and appropriate to carry forth the terms of the Litigation Trust.

(b)    Distributions. The Trustees shall from time to time (but in any event at least annually), in the Trustees' judgment and discretion, distribute such Available Cash or other assets remaining after satisfaction of all expenses and other obligations of the Litigation Trust, including but not limited to payment of attorneys' fees of the Litigation Trust, including all amounts due to Professionals with respect to such Available Cash, and any Indemnity Claims or Non-Subordinated Contribution and Reimbursement Claims, to the Beneficiaries; provided, however, that in no event shall the foregoing impair the right of the Trustees to use funds to satisfy the costs of administering the Litigation Trust.

(c)     <u>Means of Cash Payment</u>.  Cash payments to be made from the Litigation Trust will be in U.S. dollars and may be made, at the sole discretion of the Trustees, by checks drawn on a domestic bank selected by the Trustees, or by wire transfer from a domestic bank. Cash payments to foreign creditors may be made, at the option of the Trustees, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.  No Distribution shall be made to any Beneficiary in an amount less than One Hundred Dollars ($100.00).  In the event a Distribution is withheld upon the basis that it is less than this threshold amount, it shall be distributed at the next Distribution Date, if any; provided, that, notwithstanding the foregoing, all Available Cash shall be distributed in the final Distribution of the Litigation Trust.

(d)     <u>Withholding and Reporting Requirements</u>.  In connection with this Agreement and all instruments issued in connection therewith and distributed thereon, the Trustees shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions pursuant to this Agreement shall be subject to any such withholding or reporting requirements.  Such withheld amounts shall be paid to the applicable governmental authority for the account of the applicable Beneficiaries and shall be treated as a distribution to the applicable Beneficiaries.  Each Beneficiary shall provide to the Trustees its taxpayer identification number and any other information reasonably required by the Trustees to effect such withholding or otherwise to comply with the Tax Code or other applicable laws or regulations.

(e)     <u>Delivery of Distributions and Undeliverable Distributions</u>.  All Distributions to be made to the Beneficiaries pursuant to this Agreement shall be made to each Beneficiary on a Pro Rata basis, subject, in each case, to the terms of the Confirmation Order, the Plan and this Agreement.  Distributions to the Beneficiaries shall be made by the Trustees at the addresses set forth on <u>Exhibit A</u> or other addresses made available to the Trustees by or on behalf of a particular Beneficiary.  If any Beneficiary's Distribution is returned as undeliverable, no further Distributions to such Beneficiary shall be made unless and until the Trustees are notified of such Beneficiary's then current address, at which time all missed Distributions shall be made to such Beneficiary without interest.  Amounts in respect of undeliverable Distributions made through the Trustees shall be returned to the Litigation Trust until such Distributions are claimed.  All claims for undeliverable Distributions must be made within one (1) year after the applicable Distribution Date, after which date the interest of any Beneficiary or successor to such Beneficiary with respect to such property will be discharged and forever barred.  In such cases, any Cash for distribution on account of or in exchange for unclaimed or undeliverable Distributions shall become property of the Litigation Trust free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary.  Any Beneficial Interest on which a Distribution is unclaimed or undeliverable shall be canceled and of no further force or effect.  All undeliverable Distributions shall be distributed Pro Rata among all Beneficiaries, other than the Beneficiaries who otherwise were entitled to receive the undeliverable Distributions, not later than the time of the last Distribution by the Trustees.

(f)     <u>Conflicting Claims</u>.  If any conflicting claims or demands are made or asserted with respect to a Beneficial Interest or with respect to the amounts due to Professionals, the Trustees shall be entitled, at their sole election, to refuse to comply with any such conflicting claims or demands.  In so refusing, the Trustees may elect to make no payment or Distribution with respect to the Beneficial Interest or distribution represented by the claims or demands

18

involved, or any part thereof, and the Trustees shall be entitled to seek declaratory, injunctive and related relief regarding such conflicting claims or demands to the Bankruptcy Court or, only if the Bankruptcy Court is without jurisdiction, in a federal or state court in Delaware with jurisdiction.  The court in which the Trustees file suit shall have exclusive jurisdiction over resolution of such conflicting claims or demands.  In seeking such relief, the Trustees shall not be or become liable to any party for their refusal to comply with any of such conflicting claims or demands. The Trustees shall be entitled to refuse to act until either (i) the rights of the adverse claimants have been adjudicated by a Final Order of the Bankruptcy Court or such other court as may have jurisdiction or (ii) all differences have been resolved by a written agreement among all of such parties and the Trustees, which agreement shall include a complete release of the Trustees (the occurrence of either (i) or (ii) being referred to as a "Dispute Resolution" in this Section 4.2(f)). Until a Dispute Resolution is reached with respect to such conflicting claims or demands, the Trustees shall hold in a segregated interest-bearing account with a United States financial institution any payments or Distributions from the Trust to be made with respect to the Beneficial Interest at issue.  As promptly as is reasonable after a Dispute Resolution is reached, the Trustees shall transfer the payments or Distributions, if any, held in the segregated account, together with any interest and income generated thereon, in accordance with the terms of such Dispute Resolution.

K&E 28032074.2

## ARTICLE V
## FEDERAL INCOME TAX MATTERS

5.1    Treatment of Litigation Trust for Tax Purposes; Trust Assets Treated as Owned by Beneficiaries of Litigation Trust.  For all Tax Purposes, all parties (including without limitation the Contributing Claimants, the Trustees and the Beneficiaries under the Litigation Trust) shall (i) treat the transfer of the Debtors' Trust Causes of Action to the Litigation Trust as (A) a transfer of the Trust Causes of Action possessed by the Debtors to the Noteholders as partial payment of their claims under the Plan followed by (B) the transfer by such Noteholders to the Litigation Trust of such Trust Causes of Action; (ii) treat the transfer of the Consenting Noteholders' and Consenting Shareholders' Trust Causes of Action to the Litigation Trust as contributions of such Trust Causes of Action to the Litigation Trust, and (iii) treat the cash funding as provided in (A) clause (i) of Section 2.5(a) as (x) a transfer of such cash funding from the Debtors to the Noteholders followed by (y) the contribution of such cash funding to the Litigation Trust from the Noteholders and (B) clause (ii) of Section 2.5(a) as a contribution to the Litigation Trust from the Consenting Shareholders.  The Beneficiaries shall be treated for Tax Purposes as the grantors and the owners of their respective interests in the Trust Assets.

5.2    Grantor Trust Status.  The Trustees shall make timely filings of annual tax returns reflecting the items of income, gain, loss, deduction or credit of the Litigation Trust as a "grantor trust" pursuant to Treasury Regulation Section 1.671-4(a).  The Trustees shall also annually send to each Beneficiary a separate statement setting forth the Beneficiary's share of the items of income, gain, loss, deduction or credit and will instruct all Beneficiaries to report such items on their income tax returns or to forward the appropriate information to the beneficial holders with instructions to report such items on their income tax returns.  The Litigation Trust's taxable income, gain, loss, deduction or credit will be allocated to the Beneficiaries in accordance with Section 5.7.

5.3    Payment of Certain Taxes.  The Trustees shall be responsible for payments, out of the Trust Assets, of any taxes imposed on the Litigation Trust or the Trust Assets.

5.4    Compliance.  The Litigation Trust shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority (including, but not limited to, with respect to Distributions as described in Section 4.2(d) hereof).  For the avoidance of doubt, in accordance with Section 6012 of the Tax Code and Treasury Regulation Section 1.671-4(a), the Trustees shall file (i) annually a Form 1041 with the IRS, and show as an attachment to the form information regarding the receipts and expenditures of the Litigation Trust and (ii) file in a timely manner such other tax returns, including any state and local tax returns, as are required by applicable law and pay any taxes shown as due thereon out of the Trust Assets (or the income or proceeds thereof).

5.5    Current Basis Taxation.  All income of the Litigation Trust will be subject to tax on a current basis.

5.6    Determination of Fair Market Value.  As soon as possible after the Effective Date, but in no event later than sixty (60) days thereafter, (i) (A) the Trustees and the Contributing Claimants will jointly determine the aggregate fair market value as of the Effective Date of all

20

assets transferred to the Litigation Trust and (B) the Trustees shall apprise, in writing, the Beneficiaries of such valuation and (ii) the Trustees, the Consenting Noteholders, and the Debtors will jointly determine the portion of the 50% of such aggregate fair market value that is allocable to the Debtors' Trust Causes of Action transferred to the Noteholders as partial payment of their claims under the Plan (and subsequently transferred by such Noteholders to the Litigation Trust). In connection with the preparation of the valuation contemplated hereby, the Trustees shall be entitled to retain such Professionals and advisers as the Trustees shall reasonably determine to be appropriate or necessary, and the Trustees shall take such other actions in connection therewith as they reasonably determine to be appropriate or necessary in connection therewith. The Litigation Trust shall bear all of the reasonable costs and expenses incurred in connection with determining such aggregate value of the Trust Assets, including the fees and expenses of any Persons retained by the Trustees in connection therewith.

5.7     Allocations of Litigation Trust Taxable Income. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Trustees of a private letter ruling if the Trustees so request one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Trustees), taxable income or gain and deductible expenses or loss of the Litigation Trust shall be allocated among the Beneficiaries on a Pro Rata basis in accordance with their respective Beneficial Interests.

## ARTICLE VI
## NO CERTIFICATION OF BENEFICIAL INTERESTS; RECORDS OF BENEFICIAL INTERESTS

The interests of the Beneficiaries in the Litigation Trust shall be uncertificated and shall be reflected only on the records of the Litigation Trust maintained by the Trustees. The Beneficiaries and their duly authorized representatives shall have the right, upon reasonable prior written notice to the Trustees and in accordance with the reasonable regulations prescribed by the Trustees, to inspect and, at the sole expense of the Beneficiaries seeking the same, make copies of the records of the Trustees related to the Beneficial Interests held by the Beneficiaries.

## ARTICLE VII
## TERMINATION OF LITIGATION TRUST

7.1     Termination of Litigation Trust. The Litigation Trust shall be dissolved and terminated when each of the following conditions are satisfied (such date being referred to herein as the "Termination Date"):

(a)     all of the Trust Causes of Action have been resolved (whether by adjudication, settlement, or decision by the Trustees not to pursue any such Trust Cause of Action) or otherwise liquidated, settled or reduced to Cash;

(b)     all other Trust Assets have been liquidated;

(c)     all Cash or other distributable assets from the liquidation of the Trust Assets has been distributed in accordance with this Agreement; and

21

(d)      all duties and obligations of the Trustees under this Agreement have been fulfilled.

Notwithstanding the foregoing provisions of this Section 7.1, in no event shall the Litigation Trust be terminated later than five (5) years from the Effective Date (the "Initial Litigation Trust Term"), unless the term of such Trust is extended pursuant to Section 7.2 of this Agreement.

After the termination of the Liquidation Trust and solely for the purpose of liquidating and winding up the affairs of the Liquidation Trust, the Trustees shall continue to act as such until their duties have been fully performed.  Upon distribution of all the Trust Assets, the Trustees shall retain the books, records and files that shall have been delivered to or created by the Trustees.  At the Trustees' discretion, all of such records and documents may be destroyed at any time following the date that is five (5) years after the final distribution of Trust Assets (unless such records and documents are necessary to fulfill the Trustees' obligations pursuant to this Agreement).  Except as otherwise specifically provided herein, upon the final distribution of Trust Assets, the Trustees shall be deemed discharged and have no further duties or obligations hereunder, and the Litigation Trust will be deemed to have been dissolved.  Nothing herein shall prevent the Trustees from seeking an order discharging them from the Bankruptcy Court or if that court does not have jurisdiction, from a federal or state court in Delaware having jurisdiction to discharge them.

7.2      Extension of Term of Litigation Trust.  Any extension of the term of the Litigation Trust set forth in Section 7.1 hereof must be (i) for a finite period of time, and (ii) preceded by the Trustees' receipt of a favorable ruling from the IRS that the Litigation Trust's continued existence beyond such period would not adversely affect the status of the Litigation Trust as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d) for U.S. federal income tax purposes.

7.3      Reporting Upon Termination of the Litigation Trust.  In addition to any reporting otherwise required by this Agreement, as soon as practicable upon termination of the Litigation Trust in accordance with this Article VII, the Trustees shall prepare a written report, including: (i) financial statements of the Litigation Trust for the period commencing on the date hereof and ending on the Termination Date and the receipts and disbursements of the Trustees for such period; and (ii) a description of any action taken by the Trustees in the performance of their duties which materially affects the Litigation Trust.  All such reports shall be available for inspection by any Beneficiary.

## ARTICLE VIII
## AMENDMENT AND WAIVER

Any provision of this Agreement (including, without limitation, the list of Potential Defendants and Witnesses on Exhibit B) may be amended or waived with the written approval of the Required Consenting Shareholders, the Required Consenting Noteholders and the Trustees, provided further that no change shall be made to this Agreement that would (i) materially and adversely affect the U.S. federal income tax status of the Litigation Trust as a "grantor trust" or a "liquidating trust", or (ii) unless agreed to in writing by the Reorganized Debtors, materially and

adversely affect the rights of the Reorganized Debtors; provided further that any waiver of Section 2.6 with respect to a transfer of Beneficial Interests by (A) a Noteholder and/or an Affiliate or Related Fund of a Noteholder to (B) another Noteholder and/or an Affiliate or Related Fund of another Noteholder shall only require the prior written consent of the Required Consenting Noteholders.  Written notice of any amendment to this Agreement shall promptly be provided to the Reorganized Debtors.  For the avoidance of doubt, this Agreement may not be amended or waived to authorize the Litigation Trustees to commence any actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims, and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity, or otherwise, against any of the Released Parties.

Technical amendments to this Agreement may be made as necessary to (A) evidence and provide for a Permitted Transfer or the acceptance of appointment hereunder by a successor Trustee in accordance with the terms of this Agreement, the Plan and the Confirmation Order, and (B) cure any ambiguity, defect or inconsistency in this Agreement or enable the Litigation Trust to effectuate the terms of this Agreement by the Trustees, provided that any such amendment does not adversely affect the rights of (and prior written notice is provided to) the Reorganized Debtors, the Consenting Shareholders, the Consenting Noteholders and the Beneficiaries.

## ARTICLE IX
## MISCELLANEOUS PROVISIONS

9.1     Cooperation; Access.

(a)     The Contributing Claimants shall provide the Trustees with reasonable access to such of their books and records and such further information as the Trustees may reasonably request for the purpose of performing their duties and exercising their powers hereunder.  The Contributing Claimants each agree that the Trustees, through their employees, consultants and representatives (including, without limitation, their legal advisors and accountants) shall be given reasonable access to and, with out-of-pocket expenses at the Litigation Trust's expense, copies of all books and records that the Trustees deem reasonably necessary or appropriate related to the Trust Causes of Action, and the Contributing Claimants shall maintain such books and records until the Termination Date.

(b)     The Contributing Claimants shall reasonably cooperate with the Trustees in connection with the litigation of the Trust Causes of Action, with out-of-pocket expenses at the Litigation Trust's expense, including without limitation by sitting for interviews and depositions and appearing at trial at the reasonable request of the Trustees, by making current and (to the extent possible) former employees of such Contributing Claimant available for interviews, depositions, and trial at the reasonable request of the Trustees, and by enforcing any employee cooperation duties at the reasonable request of the Trustees.

(c)     The Contributing Claimants shall (i) at the reasonable request of the Trustees, execute and/or deliver any instruments and documents, (ii) take, or cause to be taken, all such

K&E 28032074.2

further actions as the Trustees may reasonably request in order to evidence or effectuate the transfer of the Trust Causes of Action to the Litigation Trust and the consummation of the transactions contemplated hereby and by the Plan and the Confirmation Order and to otherwise carry out the intent of the parties hereunder and under the Plan and the Confirmation Order, and (iii) cooperate with the Trustees in the prosecution and defense of the Trust Causes of Action to the extent reasonable.

(d)     Notwithstanding anything contained herein to the contrary, without the express written consent of the Trustees, no other Person shall be permitted to assert, bring, institute, or commence any Trust Causes of Action that are transferred to the Litigation Trust pursuant to this Agreement, the Plan and the Confirmation Order.

9.2     Laws as to Construction.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to choice of law rules which would require the application of the law of another jurisdiction.

9.3     Transactions on Business Days; Fiscal Year.  If the Effective Date or any other date on which a transaction may occur under this Agreement shall occur on a day that is not a Business Day, the transactions contemplated by this Agreement to occur on such day shall instead occur on the next succeeding Business Day, and shall be deemed to have been completed as of the required date.  Without limiting the foregoing, if any payment or act is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  The fiscal year of the Litigation Trust will begin on the first day of the calendar year and end on the last day of the calendar year.

9.4     Severability.  If any provision of this Agreement or application thereof to any Person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, such offending provision or provisions shall be reformed to make them consistent with law and as nearly as possible consistent with the purpose of the offending provision or provisions.  The remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

9.5     Notices.  All notices and other communications provided for or permitted hereunder shall be made in writing by hand-delivery, certified or registered first-class mail, next day air courier, email or telecopier to the following addresses:

If to the Trustees:

[_____]
Email:  [_____]
Facsimile:  [_____]

24

[_____]
Email:  [_____]
Facsimile:  [_____]

[_____]
Email:  [_____]
Facsimile:  [_____]

If to the Debtors:

c/o Physiotherapy Associates Holdings, Inc.
855 Springdale Drive
Suite 200
Exton, PA  19341
Attention:  Chief Financial Officer
Facsimile:  (610) 644-3262

If to the Consenting Shareholders or the Consenting Noteholders:

The addressees for the Consenting Shareholders and the Consenting Noteholders set forth on Exhibit A.

All such notices and communications shall be deemed to have been duly given: when delivered by hand, if personally delivered; three (3) Business Days after being deposited in the mail, postage prepaid, if mailed; one (1) Business Day after being emailed or timely delivered to a next-day air courier; and when receipt is acknowledged by the addressee, if telecopied.

      9.6    Headings.  The Section headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or any term or provision hereof.

      9.7    Conflict with Plan or Confirmation Order.  In the event of a conflict between the terms of this Agreement, the terms of the Plan and the terms of the Confirmation Order, the terms of the Confirmation Order shall control over the terms of the Plan and this Agreement, and the terms of the Plan shall control over the terms of this Agreement, except that the terms of this Agreement shall control in identifying the Beneficiaries and the process for the removal, resignation and appointment of the Trustee and any successor Trustee.

      9.8    Retention of Jurisdiction.  After the Effective Date and to the fullest extent permitted by law, to the extent the Bankruptcy Court elects to exercise jurisdiction, the Bankruptcy Court shall retain exclusive jurisdiction over (a) the Litigation Trust, including the performance of the duties of the Trustees and in overseeing the Litigation Trust and (b) the interpretation of this Agreement and all issues arising under or related to this Agreement.  If the Bankruptcy Court is without jurisdiction, then jurisdiction is exclusively granted to such federal or state court in Delaware with jurisdiction as may be selected by the Trustees.

      9.9    Closing of Chapter 11 Cases.  Nothing in this Agreement shall preclude the Debtors from seeking to close the Chapter 11 Cases at such time as the representatives of the

Debtors may determine same to be appropriate; provided, however that the Trustees may oppose the closing of the Chapter 11 Cases in accordance with Article II.C of the Plan.  For the avoidance of doubt, the closing of the Chapter 11 Cases shall not impair the validity or enforceability of this Agreement or the Litigation Trust herein described.

      9.10    <u>Third Party Beneficiaries</u>.  Except for the Beneficiaries, nothing in this Agreement is intended to confer upon any Person that is not a party hereto any rights or remedies hereunder.

      9.11    <u>Successors and Assigns</u>.  The terms of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

      9.12    <u>Counterparts</u>.  This Agreement may be signed by the parties hereto in counterparts, which, when taken together, shall constitute one and the same document.

      9.13    <u>Legal Representation of the Parties</u>.  This Agreement was negotiated by the parties hereto with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against any party hereto shall not apply to any construction or interpretation hereof.

      9.14    <u>Effective Date</u>.  This Agreement shall become effective on the Effective Date.

      9.15    <u>Entire Agreement</u>.  This Agreement (including the Recitals), the Plan, and the Confirmation Order constitute the entire agreement by and among the parties hereto and there are no representations, warranties, covenants or obligations except as set forth herein or therein. This Agreement, the Plan and the Confirmation Order supersede all prior and contemporaneous agreements, understandings, negotiations, discussions, written or oral, of the parties hereto, relating to any transaction contemplated hereunder.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the parties hereto have either executed and acknowledged this Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as the date of the first above written.

TRUSTEES:

[_____]

By: _____

[_____]

By: _____

[_____]

By: _____

[SIGNATURE PAGE TO LITIGATION TRUST AGREEMENT]

DEBTORS:

PHYSIOTHERAPY HOLDINGS, INC.

By: _____
    Name: _____
    Title: _____


PHYSIOTHERAPY ASSOCIATES HOLDINGS, INC.

By: _____
    Name: _____
    Title: _____


ACTRA REHABILITATION ASSOCIATES, INC.
ALEXANDRIA SPORTS, INC.
BENCHMARK ACQUISITION CORP.
BENCHMARK MEDICAL MANAGEMENT COMPANY
BENCHMARK O & P HOLDINGS, INC.
BENCHMARK ORTHOTICS & PROSTHETICS, INC.
BLUE HEN PHYSICAL THERAPY, INC.
CAPE PROSTHETICS-ORTHOTICS, INC.
CARROLLTON PHYSICAL THERAPY CLINIC, INC.
INTEGRITY PHYSICAL THERAPY, INC.
KEYSTONE REHABILITATION ASSOCIATES OF WARREN
KEYSTONE REHABILITATION SYSTEMS, INC.
LEESBURG SPORTS, INC.
MATRIX HEALTHCARE SERVICES, LLC
MATRIX REHABILITATION, INC.
MATRIX REHABILITATION-DELAWARE, INC.
MATRIX REHABILITATION-GEORGIA, INC.
MATRIX REHABILITATION-OHIO, INC.
MATRIX REHABILITATION-SOUTH CAROLINA, INC.
MATRIX REHABILITATION-TEXAS, INC.


[SIGNATURE PAGE TO LITIGATION TRUST AGREEMENT]

MORRIS AREA REHABILITATION
ASSOCIATION, INC.
NORTH DALLAS PHYSICAL THERAPY
ASSOCIATES, INC.
NORTHSTAR HEALTH SERVICES, INC.
NSHS SERVICES, INC.
ORTHOPAEDIC SERVICES OF PADUCAH,
INC.
PHYSIOLINK CORPORATION
PHYSIOTHERAPY ASSOCIATES-UNION
REHAB, LLC
PHYSIOTHERAPY ASSOCIATES, INC.
PHYSIOTHERAPY CORPORATION
PHYSIOTHERAPY-BMHI HOLDINGS, INC.
PHYSIOTHERAPY-BMI INC.
POTOMAC REHABILITATION SERVICES,
INC.
PROFESSIONAL REHAB ASSOCIATES, INC.
PROGRESSIVE THERAPY SERVICES, INC.
R.S. NETWORK, INC.
REHAB ASSOCIATES, L.L.C.
REHAB COLORADO, LLC
REHAB MISSOURI, LLC
REHAB XCEL, LLC
REHABILITATION CONSULTANTS, INC.
SMR BANYAN TREE, INC.
SWANSON ORTHOTIC & PROSTHETIC
CENTER, INC.
THE PARKS PHYSICAL THERAPY AND
WORK HARDENING CENTER, INC.
THERAPHYSICS PARTNERS OF COLORADO,
INC.
THERAPHYSICS PARTNERS OF TEXAS, INC.
THERAPY ASSOCIATES OF MARTINSVILLE,
INC.
TRUMBULL P.T. CORP.
WISCONSIN PROSTHETICS AND
ORTHOTICS, INC.

By: _____
    Name: _____
    Title: _____

CONSENTING SHAREHOLDERS:

[_____]

By: _____
    Name: _____
    Title: _____

CONSENTING NOTEHOLDERS:

[_____]

By: _____
      Name: _____
      Title: _____

[SIGNATURE PAGE TO LITIGATION TRUST AGREEMENT]

**Exhibit A**

Beneficial Interests

| Beneficiary<br>Name and Address | Beneficial Interests |
| --- | --- |
| [CONSENTING SHAREHOLDERS] | [5,000.0][2] |
| [NOTEHOLDERS] | [5,000.0][3] |
| **TOTAL** | **10,000.0** |

---

[2]  Allocation of Beneficial Interests among the Consenting Shareholders to be determined in accordance with the Plan.

[3]  Allocation of Beneficial Interests among the Noteholders to be determined in accordance with the Plan.

**Exhibit B**

Potential Defendants and Witnesses

**[TO BE INSERTED]**

**Exhibit C**

Fee Schedule

[TO BE INSERTED]

**<u>Exhibit G</u>**

**Facts and Circumstances Regarding the
Claims and Causes of Action Contributed to the Litigation Trust**

**FACTS AND CIRCUMSTANCES REGARDING THE CLAIMS**
**AND CAUSES OF ACTION CONTRIBUTED TO THE LITIGATION TRUST[1]**

## I.    SUMMARY OF THE DEBTORS' CORPORATE HISTORY

In 2002, Stryker Corporation ("Stryker") entered the large and fragmented outpatient rehabilitation market and invested in a series of physical therapy clinics, forming Physiotherapy Associates, Inc., a merged entity and indirect subsidiary of PAH ("PA"). PA became an important contributor to Stryker's growth, though it remained a non-core sector of Stryker's large, public medical technologies business. In 2007, Stryker began marketing PA for a potential sale. Water Street Healthcare Partners ("Water Street") acquired PA from Stryker in June 2007 for approximately $150 million in cash. Water Street then embarked on a strategy of growth of PA through acquisitions. Water Street partnered with Wind Point Partners ("Wind Point") and merged PA with Benchmark Medical, Inc. ("Benchmark"), an outpatient physical therapy chain based in Malvern, Pennsylvania. Water Street and Wind Point further expanded the Company through a combination of small (1-20 clinics) and larger (20+ clinics) strategic acquisitions, including the acquisition of Rehab Consultants, Inc. (3 clinics) and Henning & Cole Therapy Associates (5 clinics) in June and July of 2011.

Post acquisition, Water Street and Wind Point appointed their senior representatives to serve as a majority of the Board of Directors of PA and also selected senior executives to serve as CEO, CFO, and Chairman, among other positions. Water Street and Wind Point thereby controlled PA. In October of 2009, PA entered into an outsourcing agreement with Inventurus Knowledge Solutions ("IKS") that transferred PA's billing and collection process to IKS, an India-based third party provider. In March 2010, PA also transferred its four legacy patient accounting systems to a new, single system of record, NextGen. The transition of the billing, collection and patient accounting functions to IKS and NextGen was implemented in 2010 without adequate planning, time or resources and as described in more detailed in Part II below, contributed to inappropriate and inaccurate billing, collection and revenue practices and a break down in internal controls over PA's financial functions. In early 2011, Water Street and Wind Point installed a new CEO and new CFO at PA. Throughout 2011 and the beginning of 2012 PA's financial reporting, especially reporting associated with revenue, accounts receivable and EBITDA, was overstated.

By the fall of 2011, Water Street and Wind Point, with the assistance of their advisors at Ernst & Young LLP ("Ernst & Young") and Huron Consulting ("Huron"), and under the direction of their own senior representatives on the PA Board, began actively marketing PA. That marketing effort was predicated on, among other things, PA's audited 2011 financial statements, due diligence reports and data provided by Ernst & Young, opinions offered by Huron and written and oral presentations from the senior management team and Water Street and Wind Point defending the quality of PA's earnings.

In early 2012 Water Street and Wind Point sold PA for approximately $535.1 million dollars to Court Square through a transaction structured as a reverse subsidiary merger. To accomplish the transaction, Court Square formed Holdings as a corporation owned and controlled by Court Square and Physiotherapy Merger Sub, Inc. ("Merger Sub") as a wholly-owned subsidiary of Holdings. At the Closing, PA merged with and into Holdings, with PA being the surviving corporation (the newly constituted company is referred to herein as "PTA"). As a result of the merger, PA became a wholly owned subsidiary of Holdings. The purchase price was financed through a bond issuance of approximately $210 million, a senior secured loan in the amount of approximately $100 million, an equity investment by Court Square in the amount of approximately $213.3 million, management rollover in the amount of approximately $3.9 million and a minority investment by General Electric of approximately $1 million. At the closing, PA's shareholders received approximately $265.7 million in cash consideration net of payments of approximately $179.4 million of existing PA indebtedness and approximately $12 million of transaction expenses at the closing. At the Closing, Court Square also paid approximately $25.5 million into an escrow account that was released to the former shareholders of PA in December 2012. PA's current and former officers received, at the closing, in addition to consideration for their shares of the Company acquired through the merger, an aggregate cash

---

[1]    All capitalized terms used, but not otherwise defined herein will have the meanings ascribed to such terms in the *Joint Prepackaged Plan of Reorganization of Physiotherapy Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, as the same may be amended from time to time (the "Plan").

amount of approximately $25.9 million in transaction-related income from the payment of transaction bonuses, and payments pursuant to the Company's value creation plan, synthetic equity, supplemental equity plan, and options. Of this amount, Dan Connors, Richard Binstein, Peter Grabaskas, Andrew DeVoe, and Edwin Bode received approximately $15.8 million, $0.6 million, $2.7 million, $2.8 million, and $0.1 million, respectively.

## II.    DEBTORS' FINANCIAL POSITION AS AFFECTED BY EXCESSIVE REVENUE RECOGNITION

In March 2013, during the course of PTA's fiscal year 2012 audit, PTA's independent auditor, KPMG LLP ("KPMG"), reported that it could not complete its audit due to an inexplicable gap between PTA's accounts receivable and cash collections.  PTA's investigation into KPMG's finding led to the discovery that the management estimates used to recognize revenue in the outpatient rehabilitation segment of its business overstated PTA's revenues and, consequently, its accounts receivable and profits.  PTA promptly retained Deloitte & Touche ("D&T") to quantify and explain the revenue recognition issue and its cause, and engaged A&M to analyze the Company's operations and identify avenues for cost savings and operational improvements.  PTA also retained Kirkland & Ellis LLP ("K&E") as legal counsel and Rothschild, Inc. ("Rothschild") as its financial advisor; appointed Matt Cantor, a former partner at K&E and the current General Counsel of Lehman Brothers, as an independent director; and appointed Martin McGahan of A&M as Chief Restructuring Officer.  Furthermore, the Board, acting through a Special Committee, determined to investigate the causes and to investigate potential claims related to the revenue recognition and accounting issues.  The Special Committee PTA engaged Dechert LLP ("Dechert"), and Dechert subsequently retained Capstone Advisory Group LLC ("Capstone"), to advise PTA's board of directors of the nature and extent of the revenue recognition problem.

The process required to explain and quantify the excessive revenue recognition was time consuming: PTA and D&T analyzed over 7,000,000 transactions (patient visits) in 2011 and 2012 and rebuilt the profit and loss statement for those time periods.  PTA timely informed the Initial Secured Lenders that it would not be able to deliver its audited financial statements by the April 30, 2013 deadline under the 2012 Credit Agreement and negotiated an extension to provide audited financials by May 28, 2013.  To preserve liquidity, PTA also drew the remaining cash available under its revolver (approximately $12 million) in late April and elected not to make the approximately $12.5 million interest payment on the Senior Notes that was due on May 1, 2013.

In mid-May 2013, PTA, with the assistance of D&T, Capstone and Dechert, determined that the revenue recognition issue was caused primarily by consistent overstatements of the amounts that could be collected by the outpatient rehabilitation segment.  PTA with the assistance of D&T, Capstone and Dechert, further determined that the contributing causes to this overstatement of revenue, accounts receivable and profit included the: (i) failure to maintain adequate internal controls, reporting practices or supervision of management, (ii) failure to comply with existing policies and procedures, (iii) failure to properly recognize revenue based on available data that was reasonably knowable, and readily accessible, and (iv) manipulation of various financial performance metrics.  By way of example, PA switched its revenue recognition methodology from its historical "cash look back" methodology to "rate bridge" methodologies that resulted in sharp increases in reported revenue in 2011.  PA similarly adopted procedures for booking accounts receivable on its balance sheet that corresponded to the excessive revenue recognized under its inaccurate "rate bridge" methodologies.  In addition, PA overstated the rate per patient visit, overstated the number of patient visits, inaccurately classified patient visits, misstated the amount it was receiving for certain categories of patient visits, and double booked certain types of payments received.

The magnitude of the overstated revenue and profitability has now been calculated by PTA.  For fiscal year 2011, PTA's Outpatient Rehabilitation (OR) revenue was overstated by approximately $23 million.  PTA's restated EBITDA for 2011 is approximately $22 million, reduced from the company's previously reported amount of approximately $57 million.  For fiscal year 2012, PTA determined that EBITDA should be approximately $29 million versus a previously reported $48 million.  These operating results made clear that a comprehensive financial restructuring and deleveraging would be required, as the Company's EBITDA cannot support its current capital structure.

Due to the magnitude of the overstated revenue, and the number of accounting inaccuracies and internal control weaknesses, PTA was unable to deliver audited financials by the May 28, 2013 deadline agreed to by the Initial Secured Lenders.  Accordingly, as of May 28, 2013, PTA was in default under the 2012 Credit Agreement

for, among other things, failing to provide audited financials, and, as of May 31, 2013, the Company was in default under the Senior Notes Indenture for, among other things, failing to pay the interest on the Senior Notes within the 30-day grace period.

## III.    POTENTIAL CLAIMS AND CAUSES OF ACTION OF THE LITIGATION TRUST

PTA, with the assistance of its advisors, Capstone and Dechert, has continued to investigate potential Claims and Causes of Action arising from the revenue recognition problem and the 2012 Transaction, including the substantial harm and damage suffered by PTA, Court Square and PTA's creditors arising from the overstated PA financial performance and leveraged capital structure that is unsustainable given its true revenues.   PTA's investigation is ongoing and additional and different findings and potential claims and causes of action may be identified during that investigation.

The following is a non-exclusive list of certain potential claims and causes of action, which are expressly identified and preserved for possible prosecution and assigned to the Litigation Trust by the Debtors, the Consenting Shareholders, and the Consenting Noteholders, and the failure to list any potential or existing claims or causes of action is not intended to and shall not (i) limit the rights of the Litigation Trust to pursue any claims or causes of action not listed or identified, or (ii) in any way bar, by principles of res judicata or otherwise, the pursuit by the Litigation Trust of any claims or causes of action.  The identified claims that are preserved for possible prosecution and assigned to the Litigation Trust, shall include, but not be limited to, all claims and causes of action against any party, other than a Released Party, relating to the facts and circumstances described in Part II, above, and: (1) all claims and causes of action against any party based on, arising out of, or relating to the 2012 Transaction, including without limitation any claims or causes of action for unlawful dividend, fraudulent conveyance or avoidance claims under state or federal law, including the Bankruptcy Code; (2) all claims and causes of action based on, arising out of, or related to the issuance of any security of PA, PTA, or any of the other Debtors; (3) all claims and causes of action based on, arising out of, or related to the restatement, adjustment, correction, or modification of PA's, or PTA's, or any other Debtors' financial statements, including without limitation all claims or causes of action based on, arising out of, or relating to (a) PA, PTA's, or any of the other Debtors' internal controls relating to financial statements and financial reporting; and (b) materially misleading financial statements provided to the Contributing Claimants in connection with the 2012 Transaction; (4) all claims and causes of action based on, arising out of, or related to the misrepresentation of any of PA's, PTA's, or any other Debtors' financial information and related internal controls, including without limitation the overstatement of revenue, accounts receivable, and/or EBITDA; (5) all claims and causes of action based on, arising out of, or related to any failure to disclose, or actual or attempted cover up or obfuscation of any of the conduct described herein and in the Restructuring Term Sheet and/or subsections (1)-(4) above; and (6) any other potential claims, causes of action, charges, suits or rights of recovery under state, federal, or other applicable law.  The possible claims or causes of action that may be asserted with respect to the foregoing include all claims or causes of action, including both legal and equitable claims, arising under state and/or federal law, such as (but not limited to) claims arising under title 11 of the U.S. Code and applicable law, including without limitation section 502(d), 510, 542 through 551, and 553 of title 11 and any similar state laws, violations of state and/or federal securities laws, breach of contract, breach of fiduciary duty (including aiding and abetting any such breach), malpractice, negligence, negligent misrepresentation, fraud (including aiding and abetting any such fraud), conspiracy and common law claims such as quantum meruit and unjust enrichment.  The relief requested in connection with such claims may include, but will not be limited to, any available form of injunctive or equitable relief, disgorgement, restitution, rescission, damages, interest, statutory penalties, punitive damages and attorneys' fees.

The claims and causes of action identified above may be asserted against any, some, or all of the following persons or entities:

1.    Officers of PA, PTA, or any other Debtor between January 2010 and April 2012, including but not limited to Richard Binstein, Edwin Bode, Dan Connors, Andrew DeVoe, Peter Grabaskas, and Peter Limeri;

2.    Directors of PA, PTA, or any other Debtor between January 2010 and April 2012, including but not limited to Salam Chaudhary, James Connelly, III, Dan Connors, Herreld Kirkpatrick, III, Richard Kracum, James McLane, Curt Selquist, and Robert Womsley;

3.      Any and all employees of PA, PTA, or any other Debtor that worked in the Financial Planning and Analysis group ("FP&A"), contracting, accounting, revenue cycle management, collections, or who were otherwise involved in the 2012 Transaction, the issuance of any security of the PA, PTA or any other Debtor, the conduct connected with or that resulted in the restatement of the Debtors' 2010, 2011 and/or 2012 financial statements, or who otherwise were related to the overstatement of revenue, accounts receivable, and/or EBITDA, including but not limited to the Officers and Directors identified above and Michael Walden;

4.      Water Street Healthcare Partners, LLC, Water Street Healthcare Partners, L.P., WS Associate Co-Invest Partners, LLC, Water Street Healthcare Management, L.P., and their parents, subsidiaries and affiliates, including limited partners (collectively, "Water Street Group") and Water Street Group employees and partners, including but not limited to the Directors identified above and Joe DeJean;

5.      Wind Point Partners IV, L.P., Wind Point Executive Advisor Partners IV, L.P., Wind Point Associates IV, LLC, Wind Point Investors IV, L.P., Wind Point Advisors LLC, and their parents, subsidiaries and affiliates, including limited partners (collectively, "Wind Point Group"), and Wind Point Group employees including but not limited to the Directors identified above and Joseph Lawler;

6.      Huron Consulting and its parents, subsidiaries and affiliates (collectively, "Huron"), any Huron employees that worked on PA's, PTA's, or any other Debtor's account, including but not limited to Randy Notes, Ken Saitow, and Elliot Skrinjar;

7.      Ernst & Young LLP and its parents, subsidiaries and affiliates (collectively, "Ernst & Young"), any Ernst & Young employees that worked on the PA's, PTA's, or any other Debtor's account, including but not limited to John "Chip" Clark, III, James Porter, and Nicholas Stone;

8.      KPMG LLP and its parents, subsidiaries and affiliates (collectively, "KPMG"), and any KPMG partners or employees that worked on PA's, PTA's, or any other Debtor's account, including but not limited to John Broderick, Edward Chiosso, and Catherine Ehrman;

9.      PricewaterhouseCoopers LLP and its parents, subsidiaries and affiliates (collectively, "PWC"), and any PWC partners or employees that worked on matters related to PA, PTA, or any other Debtor;

10.     Jefferies & Company, Inc., Jefferies Finance LLC, and their parents, subsidiaries and affiliates (collectively, "Jefferies"), and any Jefferies employees that worked on matters related to PA, PTA, or any other Debtor, including but not limited to Richard Agabs, David Armour, Atishay Chopra, Eric Coombs, Thad Davis, Thomas Flanagan, Tom Graziano, Michael Leder, Keith Lockwood, Michael Powell, Matt Remsen, and Paul Sandoli;

11.     RBC Capital Markets, LLC and its parents, subsidiaries and affiliates (collectively, "RBC"), and any RBC employee;

12.     Phil Norris Consulting and its parents, subsidiaries and affiliates (collectively, " Phil Norris Consulting"), and any Phil Norris Consulting employees that worked on PA's, PTA's, or any other Debtor's account; and

13.     each of the current and former affiliates, officers, directors, shareholders, general partners, limited partners, advisors and agents of each of the foregoing.

        The Debtors presently anticipate that the damages to be sought by the Litigation Trust will exceed $300,000,000.

        Notwithstanding anything to the contrary set forth herein, in the Plan or the Confirmation Order, (a) all claims and causes of action (whether or not described in the Plan or this Disclosure Statement) held by the Consenting Noteholders and Consenting Shareholders are specifically preserved as against all Persons and Entities (whether or not such Persons and Entities are identified on the list of Potential Defendants and Witnesses or otherwise) other than Released Parties, and (b) the Litigation Trust may, but is not required to, pursue any and all

such claims and/or causes of action  that are contributed to the Litigation Trust (whether or not described in the Plan or this Disclosure Statement)as against all Persons or Entities (whether or not such Persons and Entities are identified on the list of Potential Defendants and Witnesses or otherwise) other than Released Parties.

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors, they should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

**<u>Exhibit H</u>**

**Plan Support Agreement**

Execution Version

# PLAN SUPPORT AGREEMENT

This **PLAN SUPPORT AGREEMENT** (including any exhibits and schedules hereto, this "**Agreement**") is made and entered into as of October 10, 2013, by and among (i) Physiotherapy Associates Holdings, Inc., a Delaware corporation ("**PAH**"), (ii) Physiotherapy Holdings, Inc., a Delaware corporation ("**Holdings**"), (iii) certain subsidiaries of PAH listed on the signature pages hereto under the caption "Guarantors" (collectively with PAH and Holdings, the "**Companies**"), (iv) Court Square Capital Partners II, L.P., Court Square Capital Partners II-A, L.P., Court Square Capital Partners (Executive) II, L.P., and Court Square Capital Partners (Offshore) II, L.P. (each a "**Consenting Shareholder**" and collectively, the "**Consenting Shareholders**"), as holders of equity interests of Holdings (the "**Holdings Shares**"), (v) the Secured Lenders (as defined below) party hereto (collectively, the "**Consenting Secured Lenders**") and (vi) the Noteholders (as defined below) party hereto (collectively, the "**Consenting Noteholders**" and together with the Consenting Shareholders and the Consenting Secured Lenders, the "**Plan Support Parties**"). The Companies, the Consenting Shareholders, the Consenting Secured Lenders and the Consenting Noteholders are collectively referred to herein as the "**Parties**" and individually as a "**Party**". The "Obligations" (as defined in the Credit Agreement referred to below) held by the Secured Lenders are collectively referred to herein as the "**Secured Obligations**", and the "Obligations" (as defined in the Note Indenture referred to below) held by the Noteholders are collectively referred to herein as the "**Note Obligations**".

## RECITALS

**WHEREAS**, the Parties and their respective counsel and other advisors have engaged in arm's length, good faith settlement discussions regarding a restructuring of the Companies' consolidated capital structure (the "**Restructuring**"), including the Companies' indebtedness and obligations under (i) that certain Credit Agreement (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), dated as of July 31, 2013, among PAH, Holdings, the other guarantors party thereto, U.S. Bank, National Association, as administrative agent (in such capacity, the "**Agent**") and the lenders from time to time parties thereto (together with the Agent, the "**Secured Lenders**") and (ii) that certain Indenture (as amended, supplemented or otherwise modified from time to time, the "**Note Indenture**"), dated as of April 30, 2012, among Physiotherapy Merger Sub, Inc. (merged with and into PAH, with PAH as the surviving corporation), the guarantors party thereto, and The Bank of New York Mellon Trust Company, N.A., as trustee (the "**Trustee**") for the holders (the "**Noteholders**") of PAH's 11.875% Senior Notes due 2019 (the "**Notes**");

**WHEREAS**, each Party agrees that the Restructuring will be implemented through a prepackaged chapter 11 plan of reorganization for the Companies which shall be in the form attached hereto as <u>Exhibit A</u> (the "**Plan**") and consistent with this Agreement and with the applicable provisions of title 11 of the United States Code, 11 U.S.C. §§ 101 <u>et</u> <u>seq</u>. (the "**Bankruptcy Code**");

**WHEREAS**, subject to the execution of definitive documentation and appropriate approvals by the Bankruptcy Court (as defined below), as applicable, the following sets forth the agreement among the Parties concerning their respective obligations;

**WHEREAS**, the Parties recognize that the Restructuring contemplated by this Agreement is subject to and limited by any solicitation requirements imposed (a) under applicable nonbankruptcy law pursuant to Bankruptcy Code sections 1125(g) and 1126(b)(1), or (b) under Bankruptcy Code section 1125(a) pursuant to Bankruptcy Code section 1126(b)(2); and

**WHEREAS**, each Party and their respective counsel and other advisors has reviewed or has had the opportunity to review the Plan and the Litigation Trust Agreement (as defined below) and each Party has agreed to the Restructuring on the terms set forth in the Plan and the creation of the Litigation Trust (as defined below) on the terms set forth in the Litigation Trust Agreement.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## AGREEMENT

**Section 1.    <u>Definitions.</u>**    In addition to the definitions ascribed in the preamble and recitals of this Agreement, the following terms shall have the following definitions:

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**Ballot**" means "Ballot" as defined in the Plan.

"**Business Day**" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by law or governmental action to close.

"**Chapter 11 Cases**" means the voluntary chapter 11 case(s) to be commenced by the Companies in the Bankruptcy Court.

"**Claims**" means any of the Consenting Noteholder Claims and/or the Consenting Secured Lender Claims.

"**Company Contributed Claims**" means all of the "Contributed Claims" (as defined in the Plan) held by each Company and its estate.

"**Confirmation Order**" means an order entered by the Bankruptcy Court confirming the Plan, including all exhibits, appendices and related documents, each consistent in all material respects with the Plan and the Litigation Trust Agreement and otherwise in form and substance reasonably acceptable to the Companies and each of the Plan Support Parties.

"**Consenting Noteholder Claims**" means all claims held by each Consenting Noteholder (as set forth on <u>Schedule A</u> hereto, as such schedule may be updated through the Record Date) arising under or relating to the Note Obligations under the Notes and/or the Note Indenture and all agreements and instruments relating to the foregoing that exist as of the Record Date.

145945.15

2

"**Consenting Noteholder Contributed Claims**" means the "Contributed Claims" (as defined in the Plan) held by the Consenting Noteholders as set forth on Schedule A hereto (as such schedule may be updated to add, but not delete, Contributed Claims).

"**Consenting Secured Lender Claims**" means all claims held by each Consenting Secured Lender (as set forth on Schedule B hereto) arising under or relating to the Secured Obligations under the Credit Agreement and all agreements and instruments relating to the foregoing that exist as of the Record Date.

"**Consenting Shareholder Contributed Claims**" means all of the "Contributed Claims" (as defined in the Plan) held by the Consenting Shareholders.

"**Consenting Shareholder Interests**" or "**Interests**" means all Holdings Shares held by each Consenting Shareholder (as set forth on Schedule C hereto).

"**Contributed Claims**" means any of the Company Contributed Claims, the Consenting Noteholder Contributed Claims, and/or the Consenting Shareholder Contributed Claims.

"**Disclosure Statement**" means the disclosure statement in respect of the Plan, which shall be consistent with the Plan and be otherwise in form and substance reasonably acceptable to the Companies and each of the Plan Support Parties.

"**Litigation Trust**" means the "Litigation Trust" as defined in the Plan.

"**Litigation Trust Agreement**" means that certain agreement setting forth the terms and conditions governing the Litigation Trust, which shall be in the form attached hereto as Exhibit B.

"**Person**" means any person or organization created or recognized by law, including any association, company, cooperative, corporation, entity, estate, individual, joint stock company, joint venture, limited liability company, partnership, trust, unincorporated organization, or government or any political subdivision thereof.

"**Petition Date**" means the date on which the Chapter 11 Cases are commenced.

"**Plan Related Documents**" means the Plan, the Litigation Trust Agreement, the Disclosure Statement, the Solicitation Materials, the Confirmation Order along with any other documents or agreements that are related to implementation of the Plan; *provided* that each of the foregoing documents shall be consistent with the Plan and the Litigation Trust Agreement and be otherwise in form and substance reasonably acceptable to the Companies and each of the Plan Support Parties.

"**Record Date**" means the date established by the Plan or an order of the Bankruptcy Court as the "record date" for purposes of receiving distributions in respect of Consenting Noteholder Claims, Consenting Secured Lender Claims and Consenting Shareholder Interests on the Restructuring Effective Date.

145945.15

3

"**Required Consenting Noteholders**" means those Consenting Noteholders that hold, in the aggregate, greater than 66 2/3% of the principal amount of the Consenting Noteholder Claims as of the Effective Date (as defined below).

"**Required Consenting Secured Lenders**" means those Consenting Secured Lenders that hold, in the aggregate, greater than 66 2/3% of the Consenting Secured Lender Claims as of the Effective Date.

"**Required Consenting Shareholders**" means those Consenting Shareholders that hold, in the aggregate, greater than 66 2/3% of the Consenting Shareholder Interests as of the Effective Date.

"**Required Consenting Parties**" means, collectively, the Required Consenting Noteholders, the Required Consenting Secured Lenders and the Required Consenting Shareholders.

"**Restructuring Effective Date**" means the date reasonably selected by the Companies and the Required Consenting Parties that is a Business Day after the entry of the Confirmation Order on which (a) the conditions to the occurrence of the effective date of the Plan have been satisfied or waived and (b) no stay of the Confirmation Order is in effect.

"**Solicitation Materials**" means the Disclosure Statement and other solicitation materials in respect of the Plan.

**Section2.**       **Conditions to Effectiveness**.

This Agreement shall become effective and binding upon each of the Parties immediately following the occurrence of the following conditions (the "**Effective Date**"):

(a)       An executed commitment letter to provide the Exit Facility (as defined in the Plan) shall have been delivered to and executed by the Companies;

(b)       Executed counterparts to this Agreement shall have been delivered to each of the other Parties hereto from each of the Companies;

(c)       Executed counterparts to this Agreement shall have been delivered to each of the other Parties hereto from each of the Secured Lenders;

(d)       Executed counterparts to this Agreement shall have been delivered to each of the other Parties hereto from Consenting Noteholders holding, collectively, at least two-thirds in principal amount of the Note Obligations; and

(e)       Executed counterparts to this Agreement shall have been delivered to each of the other Parties hereto from the Consenting Shareholders holding, collectively, at least 89.98% of the Holdings Shares.

**Section3.**       **Agreed Terms of the Plan**.   The Companies shall propose and pursue confirmation of the Plan.  The Companies shall not amend the Plan or the Plan Related Documents:

(i) in any material respect without the prior written consent of each of the Required Consenting Parties, in their sole and absolute discretion, and (ii) in any other respect without the prior written consent of each of the Required Consenting Parties, which consent shall not be unreasonably withheld; *provided*, *however*, that if the amendment at issue adversely impacts the treatment or rights of any Consenting Noteholder differently than other Consenting Noteholders, the agreement in writing of such Consenting Noteholder whose treatment or rights are directly adversely impacted in a different manner than other Consenting Noteholders shall also be required for such amendment to be effective; *provided further* that if the amendment at issue adversely impacts the treatment or rights of any Consenting Secured Lender differently than other Consenting Secured Lenders, the agreement in writing of such Consenting Secured Lender whose treatment or rights are directly adversely impacted in a different manner than other Consenting Secured Lenders shall also be required for such amendment to be effective.

Section4.    **Commitment of Plan Support Parties**.  Subject to the terms and conditions of this Agreement:

(a)    each Plan Support Party (severally and not jointly), on its behalf and on behalf of its controlled affiliates, agrees that:

(i)    provided its vote has been properly solicited pursuant to the applicable provisions of the Bankruptcy Code, each Plan Support Party entitled to vote on the Plan shall vote its respective Claims and/or Interests, now or hereafter beneficially owned by such Plan Support Party or for which it now or hereafter serves as the nominee, investment manager or advisor for beneficial holders thereof, in favor of the Plan in accordance with the applicable procedures set forth in the Solicitation Materials, and timely return a duly executed Ballot in connection therewith;

(ii)    upon execution of this Agreement and through the Chapter 11 Cases, each Plan Support Party will continue to support the Restructuring and take any and all such actions as are reasonably necessary to ensure that the Plan and the Litigation Trust Agreement is implemented (including, with respect to the Consenting Secured Lenders, to extend the maturity date under the Credit Agreement from November 8, 2013 through at least November 15, 2013; it being understood and agreed that no amendment, extension or similar fee shall be paid to the Consenting Secured Lenders by Holdings, PAH or any other Company for such extension); and

(iii)    following the commencement of the Chapter 11 Cases, each Plan Support Party shall not (i) object to the Plan, the Litigation Trust Agreement, the Disclosure Statement or the consummation of the Plan or the creation of the Litigation Trust, or any efforts to obtain acceptance of, and to confirm and implement, the Plan or the Litigation Trust Agreement; (ii) initiate any legal proceedings that are inconsistent with, or that would delay, prevent, frustrate or impede, the approval, confirmation or consummation of the Restructuring, the Disclosure Statement, the Litigation Trust Agreement or the Plan or the transactions outlined therein or otherwise commence any proceedings to oppose any of the Plan Related Documents, or take any other action that is barred by this Agreement; (iii) vote for, consent to, support or participate in the formulation of any other restructuring, any other transaction involving the Companies or their assets, or any plan of reorganization (with the sole exception of the Plan) or liquidation under

145945.15

applicable bankruptcy or insolvency laws, whether domestic or foreign, in respect of any of the Companies; (iv) directly or indirectly seek, solicit, support, formulate, entertain, encourage or engage in discussions, or enter into any agreements relating to, any restructuring, plan of reorganization, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, transaction, sale, disposition or restructuring of any of the Companies (or any of their assets or stock) other than the Plan or Plan Related Documents (collectively, clauses (iii) and (iv) describe an "**Alternative Plan**"); (v) engage in or otherwise participate in any negotiations regarding any Alternative Plan, enter into any letter of intent, memorandum of understanding, agreement in principle or other agreement relating to any Alternative Plan; (vi) solicit, encourage, or direct any Person, including, without limitation, the Trustee under the Note Indenture or the Agent under the Credit Agreement, to undertake any action prohibited by clauses (i) through (v) of this subsection (a)(iii); or (vii) permit any of its, or its controlled affiliates', officers, directors, managers, employees, partners, representatives and agents to undertake any action prohibited by clauses (i) through (vi) of this subsection (a)(iii); provided that for the avoidance of doubt, nothing herein shall prevent any Consenting Shareholder (with respect to the Litigation Trust only), Consenting Noteholder or Consenting Secured Lender from engaging in any discussions, entering into any agreements, or taking any other action with respect to matters to be effectuated after the Restructuring Effective Date;

(b)     each Consenting Noteholder (severally and not jointly), on its behalf and on behalf of its controlled affiliates, agrees that on the Restructuring Effective Date it will transfer and assign to the Litigation Trust its respective Consenting Noteholder Contributed Claims;

(c)     each Consenting Shareholder (severally and not jointly), on its behalf and on behalf of its controlled affiliates, agrees that on the Restructuring Effective Date it will transfer and assign to the Litigation Trust its respective Consenting Shareholder Contributed Claims; and

(d)     each Company agrees that on the Restructuring Effective Date it will transfer and assign to the Litigation Trust its respective Company Contributed Claims.

Notwithstanding the foregoing, nothing in this Agreement shall be construed to prohibit any Plan Support Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases so long as such appearance and the positions advocated in connection therewith (i) are consistent with this Agreement and otherwise in furtherance of the Restructuring or the Litigation Trust and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the Restructuring or the Litigation Trust; or (ii) are for the purposes of contesting whether any matter, fact, or thing, is a breach of, or inconsistent with, this Agreement or to otherwise enforce this Agreement.

**Section5.     Commitment of the Companies**.

(a)     Subject to Section 13 of this Agreement, each Company agrees to use all reasonable efforts to (i) support and complete the Restructuring and all transactions contemplated under the Plan, the Litigation Trust Agreement and all other Plan Related Documents; (ii) take any and all necessary and appropriate acts and actions in furtherance of the Restructuring and the transactions contemplated under the Plan, the Litigation Trust Agreement and all other Plan

145945.15

Related Documents (including, to the extent applicable, negotiating in good faith with the other Parties each of the definitive agreements and documents comprising the Plan Related Documents or other documents reasonably necessary or desirable to effectuate the transactions contemplated by the Plan, the Litigation Trust Agreement or the Restructuring); (iii) complete the Restructuring and all transactions contemplated under the Plan and all other Plan Related Documents within any time-frames outlined in this Agreement; (iv) obtain any and all required governmental, regulatory and/or third-party approvals for the Restructuring; (v) take no actions (directly or indirectly) that are inconsistent with this Agreement, or the confirmation and consummation of the Plan, or that would delay or otherwise impede approval of the Plan or the Litigation Trust Agreement or the creation of the Litigation Trust or the expeditious confirmation and consummation of the Plan or consummation of the Restructuring by any deadlines set forth in this Agreement.

(b)    PAH and Holdings each agree, subject to any required approvals of the Bankruptcy Court, to continue to retain and pay proposed counsel to the Litigation Trust, with an additional budget of $250,000 for fees and expenses to be paid by PAH, from September 9, 2013 through the Restructuring Effective Date.  Both the additional budget of $250,000, plus any further amounts approved by the Consenting Noteholders, in their sole and absolute discretion, and paid by PAH for the fees and expenses of proposed counsel to the Litigation Trust incurred during the chapter 11 cases shall reduce, on a dollar for dollar basis, the amount to be funded by PAH to the Litigation Trust at closing.  Promptly following the Petition Date and through the Restructuring Effective Date, PAH and Holdings shall retain, subject to any required approvals of the Bankruptcy Court, proposed counsel to the Litigation Trust as special counsel, and shall pay, subject to any required approvals of the Bankruptcy Court, the reasonable and documented fees and expenses of special counsel to the extent necessary to allow special counsel to continue the investigation and prepare for litigation of the Contributed Claims, consistent with this paragraph.

Section 6.    **Termination**.  At the option of the Party or Parties specified below (unless such Party seeking to terminate either (i) caused the Termination Event (as defined below) or (ii) is in material breach of its obligations under this Agreement), this Agreement and the obligations of the Parties hereunder may be terminated upon the occurrence of any of the following events (each a "**Termination Event**"):

(a)    at the option of the Required Consenting Noteholders or the Required Consenting Secured Lenders, upon the occurrence of a material breach of this Agreement by any Company or any Consenting Shareholder, and any such breach is either (i) unable to be cured or (ii) after receipt of written notice from the Required Consenting Noteholders or the Required Consenting Secured Lenders, is not cured within five (5) calendar days of such notice;

(b)    at the option of the Companies, upon the occurrence of a material breach of this Agreement by any Consenting Shareholder, any Consenting Noteholder or any Consenting Secured Lender, and any such breach is either (i) unable to be cured or (ii) after receipt of written notice from the Companies is not cured within five (5) calendar days of such notice; *provided, however*, that this Agreement will terminate only with respect to such breaching party and will otherwise remain in effect with respect to the remaining non-breaching Consenting Secured Lenders, non-breaching Consenting Noteholders and non-breaching Consenting Shareholders;

145945.15

(c)        at the option of the Required Consenting Shareholders, upon the occurrence of a material breach of this Agreement by any Company, any Consenting Noteholder or any Consenting Secured Lender, and any such breach is either (i) unable to be cured or (ii) after receipt of written notice from the Required Consenting Shareholders, is not cured within five (5) calendar days of such notice;

(d)        at the option of the Required Consenting Noteholders or the Required Consenting Secured Lenders, upon the filing of any motion or pleading by any Company or any Consenting Shareholder with the Bankruptcy Court that is inconsistent in any material respect with this Agreement, the Plan or the Litigation Trust Agreement and such motion or pleading has not been withdrawn within five (5) Business Days after receipt of written notice from the Required Consenting Noteholders or the Required Consenting Secured Lenders;

(e)        at the option of the Companies, upon the filing of any motion or pleading by any Consenting Shareholder, any Consenting Noteholder or any Consenting Secured Lender with the Bankruptcy Court that is inconsistent in any material respect with this Agreement, the Plan or the Litigation Trust Agreement and such motion or pleading has not been withdrawn within five (5) Business Days after receipt of written notice from the Companies;

(f)        at the option of the Required Consenting Shareholders, upon the filing of any motion or pleading by any Company, any Consenting Noteholder or any Consenting Secured Lender with the Bankruptcy Court that is inconsistent in any material respect with this Agreement, the Plan or the Litigation Trust Agreement and such motion or pleading has not been withdrawn within five (5) Business Days after receipt of written notice from the Required Consenting Shareholders;

(g)        at the option of the Required Consenting Shareholders, Required Consenting Noteholders or the Required Consenting Secured Lenders, upon the appointment of a trustee, receiver, examiner with expanded powers, responsible person or responsible officer in any of the Chapter 11 Cases;

(h)        at the option of the Required Consenting Noteholders or the Required Consenting Secured Lenders, if solicitation for the Plan has not commenced on or prior to October 11, 2013;

(i)        at the option of the Required Consenting Noteholders or the Required Consenting Secured Lenders, if the Petition Date has not occurred on or prior to November 15, 2013;

(j)        at the option of the Required Consenting Noteholders or the Required Consenting Secured Lenders, if the Restructuring Effective Date has not occurred on or prior to December 31, 2013;

(k)        at the option of the Required Consenting Shareholders if the Restructuring Effective Date has not occurred on or prior to February 14, 2014;

145945.15

(l)      at the option of the Required Consenting Shareholders, Required Consenting Noteholders or the Required Consenting Secured Lenders, if any Company makes any amendment to the Plan or any of the Plan Related Documents without obtaining the prior consent of the Required Consenting Parties as required under Section 3 of this Agreement;

(m)      at the option of any Party, if any court of competent jurisdiction or other competent governmental or regulatory authority shall (i) have issued an order making illegal or otherwise restricting, preventing or prohibiting the Restructuring in a manner that cannot reasonably be remedied or (ii) have entered a final, non-appealable judgment or order declaring this Agreement or any material provision of this Agreement or any related document to be illegal, invalid, or unenforceable;

(n)      at the option of any Party, if all of (i) the Companies, (ii) the Required Consenting Noteholders, (iii) the Required Consenting Secured Lenders and (iv) the Required Consenting Shareholders agree in writing to terminate this Agreement;

(o)      at the option of the Companies, if any of the Companies' Boards of Directors reasonably determine based upon the advice of counsel that continued performance under this Agreement would be inconsistent with the exercise of their fiduciary duties under applicable law and such termination is supported by Holdings' independent director; or

(p)      if not previously terminated in accordance with the provisions hereof, this Agreement shall terminate automatically without further required action or notice upon the Restructuring Effective Date.

The date on which this Agreement is terminated in accordance with the provisions of this Section 6 shall be referred to as the "**Termination Date**" and the provisions of this Agreement shall terminate, except as otherwise provided in this Agreement; *provided*, *however*, that any claim for breach of this Agreement shall survive termination and all rights and remedies of the aggrieved Party or Parties with respect to such breach shall be neither waived nor prejudiced in any way by any such termination.  In the event of the termination of this Agreement pursuant to this Section 6, written notice thereof shall forthwith be given to the other Parties specifying the provision hereof pursuant to which such termination is made.  Sections 6, 12 and 19 through 25 shall survive any termination of this Agreement.

Section7.      **Transfer of Claims**.  Notwithstanding anything to the contrary in this Agreement, each of the Plan Support Parties agrees that until the occurrence of the Termination Date, it shall not sell, assign, transfer, convey, pledge, hypothecate or otherwise dispose of, directly or indirectly (each such transfer, a "**Transfer**"), all or any of its respective Claims or Interests or Contributed Claims (or any right related thereto and including any voting rights associated with such Claims or Interests) unless the transferee thereof (a) agrees in writing to be bound by this Agreement and (b) within five (5) Business Days after such Transfer delivers to the Companies  an executed joinder to this Agreement in substantially the form of Exhibit C hereto (each such transferee becoming, upon the Transfer, a Plan Support Party hereunder).  The Companies shall promptly acknowledge any such Transfer in writing and provide a copy of that acknowledgement to the transferor.  By their acknowledgement of the relevant Transfer, the

Companies shall be deemed to have acknowledged that their obligations to such Plan Support Party hereunder thereafter constitute obligations in favor of the relevant transferee. Any Transfer of any Claim or Interest or Contributed Claim by a Plan Support Party that does not comply with the procedure set forth in the first sentence of this Section 7 shall be deemed void *ab initio*. This Agreement shall not be construed to preclude any Plan Support Party from acquiring additional Claims or Interests or any rights related thereto, *provided* that any such additional Claims, Interests or rights shall automatically be deemed to be subject to the terms of this Agreement, and *provided further* that the Plan Support Party agrees to furnish to the Companies written notice within five (5) Business Days after the acquisition of any additional Claims, Interests or rights.

Section8.    **No Solicitation**.  This Agreement is not and shall not be deemed to be a solicitation of votes for the acceptance or rejection of the Plan (or any other chapter 11 plan) for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. There will be no solicitation of the Plan Support Parties or any other creditors with respect to the Plan until such parties have received the materials required by Bankruptcy Code sections 1125(g) and 1126(b). Each Party further acknowledges that no securities of the Companies are being offered or sold hereby and that this Agreement does not constitute an offer to sell or a solicitation of an offer to buy any securities of the Companies.

Section9.    **Ownership of Claims and Interests**.  With respect to its respective Claims or Interests:

(a)    Each Consenting Noteholder and Consenting Secured Lender  represents and warrants (severally and not jointly) that, as of the date of this Agreement, it is the beneficial owner of the principal amount of its Claims, and that, other than pursuant to this Agreement, such Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrances of any kind, in each case that might adversely affect in any way such Consenting Noteholder's or Consenting Secured Lender's performance of its obligations contained in this Agreement at the time such obligations are required to be performed; and

(b)    Each Consenting Shareholder represents and warrants (severally and not jointly) that, as of the date of this Agreement, it is the beneficial owner of its Interests and that, other than pursuant to this Agreement, such Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrances of any kind, in each case that might adversely affect in any way such Consenting Shareholder's performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

Section10.    **Representations.**

(a)    Each Party represents to each other Party that, as of the date of this Agreement:

(i)    It has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby

145945.15

and perform its obligations hereunder, and the execution, delivery and performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability, or similar action on its part;

(ii)     The execution, delivery and performance of this Agreement by such Party does not and shall not (x) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its organizational documents or those of any of its subsidiaries or (y) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligations to which it or any of its subsidiaries is a party or under its organizational documents;

(iii)    The execution, delivery and performance by it of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body; and

(iv)     Subject to any applicable provisions of the Bankruptcy Code, this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws, both foreign and domestic, relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(b)     Holdings represents and warrants, as of the date of this Agreement, Holdings has issued 215,424.139 total shares, consisting of 190,730.036 Class L shares and 24,694.102 Class A shares.

**Section 11.     Entire Agreement**.  This Agreement, including the Plan and all annexes thereto and all the other exhibits and schedules hereto (including the Litigation Trust Agreement), and all of the obligations the Parties contained herein, constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all other prior negotiations, agreements and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement; *provided*, *however*, that the Credit Agreement, the Note Indenture, any confidentiality agreement between any Consenting Noteholder and Holdings or any forbearance agreement between the Consenting Noteholders and the Companies shall survive this Agreement and shall continue to be in full force and effect in accordance with their terms irrespective of the terms of this Agreement.

**Section 12.     Waiver**.  This Agreement, the Plan and the Plan Related Documents are part of a proposed settlement of claims and disputes among the Parties and are the product of good faith, arm's length negotiations among the Parties and their respective representatives. If the transactions contemplated by this Agreement are or are not consummated, or following the occurrence of the Termination Date, if applicable, nothing shall be construed by this Agreement as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

145945.15

**Section 13.    Fiduciary Duties of the Companies**.  Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require the Companies or their respective subsidiaries or any of its or their respective directors or officers (in such person's capacity as a director or officer) to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would violate such person's fiduciary duties under applicable law.  Each of the Companies represents to the Parties that as of the Effective Date, based on the facts and circumstances actually known by the Companies as of the Effective Date, the Companies' entry into this Agreement is consistent with each of the Companies' fiduciary duties.

**Section 14.    Cooperation and Support**.  The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent reasonably possible and subject to the terms of this Agreement) in respect of the consummation of the Restructuring.  Furthermore, subject to the terms of this Agreement, each of the Parties shall take such action as reasonably may be necessary to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings and voting any claims or securities of the Companies in favor of the Restructuring in connection therewith, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.  In addition, the Companies will provide draft copies of all Plan Related Documents and any other material filings and material pleadings to the respective counsel to the Plan Support Parties as soon as reasonably practicable with reasonable time to review and comment prior to publicly disseminating or filing with the Bankruptcy Court such Plan Related Documents or material filings or material pleadings.

**Section 15.    Representation by Legal Counsel**.  Each Party hereto acknowledges that it has been represented by counsel (or had the opportunity to and waived its right to do so) in connection with this Agreement and the transactions contemplated by this Agreement.  Accordingly, any rule of law or any legal decision that would provide any Party hereto with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.  The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties hereto.

**Section 16.    Counterparts**.  This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

**Section 17.    Amendments**.  This Agreement may not be modified, amended or supplemented without prior written consent of the Companies and each of the Plan Support Parties; provided that the milestones set forth in Sections 6(h), 6(i) and 6(j) may be may be extended by mutual agreement among the Company and a majority in principal amount of the Senior Notes.

**Section 18.    Headings**.  The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation of this Agreement.

145945.15

**Section19.    Specific Performance**.    This Agreement is intended as a binding commitment enforceable in accordance with its terms.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive relief as the sole remedy for any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder; provided, however, that each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

**Section20.    Governing Law**.    This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to the "choice of law" principles of that or any other jurisdiction.

**Section21.    Notices**.    All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally, by email, courier, by facsimile transmission or mailed (first class postage prepaid) to the parties at the following addresses, emails or facsimile numbers:

If to the Companies:

Physiotherapy Associates Holdings, Inc.
Whiteland Business Park,
855 Springdale Drive Suite 200
Exton, PA 19341
Attention: Chief Financial Officer
Facsimile No.: (610) 644-3262

with a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention: Jonathan Henes and Nicole Greenblatt
Facsimile No.: (212) 446-4900

If to the Consenting Secured Lenders:

U.S. Bank National Association
214 N. Tryon Street, 26th Floor
Charlotte, NC 28202
Attention:  CDO Trust Services/James Hanley
Facsimile No.: (704) 335-4678;
with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
355 South Grand Avenue

145945.15

13

Los Angeles, CA 90071-1560
Attention: Stacey L. Rosenberg
Facsimile No: (213) 891-8763


If to the Consenting Noteholders:

To the address next to each of the Consenting Noteholders listed on <u>Schedule A</u> hereto:

with a copy (which shall not constitute notice) to:

Klee, Tuchin, Bogdanoff & Stern LLP
1999 Avenue of the Stars
Thirty-Ninth Floor
Los Angeles, CA 90067-6049
Attention: Michael L. Tuchin
Facsimile No: (310) 407-9090

and to:

Houlihan Lokey
10250 Constellation Blvd., 5th Floor
Los Angeles, CA 90067
Attention: Chris DiMauro
Facsimile No.: (310) 435-8530

If to the Consenting Shareholders:

Court Square Capital Partners
55 East 52nd Street 34th Floor
New York New York 10055
Attention: John Weber
Phone: (212) 752-6071
Fax: (212) 752-6184

with a copy (which shall not constitute notice) to:

Dechert LLP
1095 Avenue of the Americas
New York, NY 10036-6797
Attention: Michael J. Sage and Matthew L. Larrabee
Facsimile No: (212) 698-3599

**Section22.    No Third-Party Beneficiaries**. The terms and provisions of this Agreement are intended solely for the benefit of the Parties hereto and their respective successors and

145945.15

14

permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any other Person.

**Section 23.    Successors and Assigns; Several Obligations**.    Except as otherwise provided in this Agreement, this Agreement is intended to bind and inure to the benefit of each of the Parties and each of their respective successors, assigns, heirs, executors, administrators and representatives.    The agreements, representations and obligations of each of the Consenting Noteholders, each of the Consenting Secured Lenders and each of the Consenting Shareholders under this Agreement are several and not joint in all respects. Any breach of this Agreement by any Consenting Noteholder, any Consenting Secured Lender or any Consenting Shareholder shall not result in liability for any other non-breaching Consenting Noteholder, non-breaching Consenting Secured Lender or non-breaching Consenting Shareholder.

**Section 24.    Public Disclosure**.    The Plan Support Parties hereby consent to the disclosure by the Companies in the Plan, Disclosure Statement, the other Plan Related Documents and any filings by the Companies with the Bankruptcy Court or as required by law or regulation of this Agreement, which the Plan Support Parties agree will be an exhibit to the Disclosure Statement and will be filed with the Bankruptcy Court; *provided, however*, that except as required by law, the Company shall not use the name of any Plan Support Party or its controlled affiliates, officers, directors, managers, stockholders, members, employees, partners, representatives and agents in any press release without such Plan Support Party's prior consent.    The Companies and the Plan Support Parties shall (a) consult with each other before issuing any press release or otherwise making any public statement with respect to the transactions contemplated by this Agreement, (b) provide to the other for review a copy of any such press release or public statement and (c) not issue any such press release or make any such public statement prior to such consultation and review and the receipt of the prior consent of the other Parties, unless required by applicable law or regulations of any applicable governmental authority, in which case, the Party required to issue the press release or make the public statement shall, prior to issuing such press release or making such public statement, use its commercially reasonable efforts to allow the other Parties reasonable time to comment on such release or statement to the extent practicable; *provided*, that no Party need consult with any other Party with respect to any press release or public statement relating to the termination of this Agreement.

**Section 25.    Interpretation**.    This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation of this Agreement is to be interpreted in a neutral manner; and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion of this Agreement, shall not be effective in regard to the interpretation of this Agreement.

[Signatures on Following Page]

145945.15

**COMPANY:**

**PHYSIOTHERAPY ASSOCIATES
HOLDINGS, INC.**

By: _____
Name: Elizabeth K. Arnold
Title: Chief Financial Officer and Treasurer

**HOLDINGS:**

**PHYSIOTHERAPY HOLDINGS, INC.**

By: _____
Name: Elizabeth K. Arnold
Title: Chief Financial Officer and Treasurer

**GUARANTORS:**

**ACTRA REHABILITATION ASSOCIATES,
     INC.
ALEXANDRIA SPORTS, INC.
BENCHMARK ACQUISITION CORP.
BENCHMARK MEDICAL MANAGEMENT
     COMPANY
BENCHMARK O & P HOLDINGS, INC.
BENCHMARK ORTHOTICS &
     PROSTHETICS, INC.
BLUE HEN PHYSICAL THERAPY, INC.
CAPE PROSTHETICS-ORTHOTICS, INC.
CARROLLTON PHYSICAL THERAPY
     CLINIC, INC.
INTEGRITY PHYSICAL THERAPY, INC.
KEYSTONE REHABILITATION
     ASSOCIATES OF WARREN
KEYSTONE REHABILITATION SYSTEMS,
     INC.
LEESBURG SPORTS, INC.
MATRIX HEALTHCARE SERVICES, LLC
MATRIX REHABILITATION, INC.**

[Signature Page to Plan Support Agreement]

MATRIX REHABILITATION-DELAWARE, INC.

MATRIX REHABILITATION-GEORGIA, INC.

MATRIX REHABILITATION-OHIO, INC.

MATRIX REHABILITATION-SOUTH CAROLINA, INC.

MATRIX REHABILITATION-TEXAS, INC.

MORRIS AREA REHABILITATION ASSOCIATION, INC.

NORTH DALLAS PHYSICAL THERAPY ASSOCIATES, INC.

NORTHSTAR HEALTH SERVICES, INC.

NSHS SERVICES, INC.

ORTHOPAEDIC SERVICES OF PADUCAH, INC.

PHYSIOLINK CORPORATION

PHYSIOTHERAPY ASSOCIATES-UNION REHAB, LLC

PHYSIOTHERAPY ASSOCIATES, INC.

PHYSIOTHERAPY CORPORATION

PHYSIOTHERAPY-BMHI HOLDINGS, INC.

PHYSIOTHERAPY-BMI INC.

POTOMAC REHABILITATION SERVICES, INC.

PROFESSIONAL REHAB ASSOCIATES, INC.

PROGRESSIVE THERAPY SERVICES, INC.

R.S. NETWORK, INC.

REHAB ASSOCIATES, L.L.C.

REHAB COLORADO, LLC

REHAB MISSOURI, LLC

REHAB XCEL, LLC

REHABILITATION CONSULTANTS, INC.

SMR BANYAN TREE, INC.

SWANSON ORTHOTIC & PROSTHETIC CENTER, INC.

THE PARKS PHYSICAL THERAPY AND WORK HARDENING CENTER, INC.

THERAPHYSICS PARTNERS OF COLORADO, INC.

THERAPHYSICS PARTNERS OF TEXAS, INC.

THERAPY ASSOCIATES OF MARTINSVILLE, INC.

TRUMBULL P.T. CORP.

[Signature Page to Plan Support Agreement]

**WISCONSIN PROSTHETICS AND
ORTHOTICS, INC.**

By: _____
Name: Elizabeth K. Arnold
Title: Chief Financial Officer and Treasurer

**CONSENTING SECURED LENDERS:**

**KNIGHTHEAD MASTER FUND, L.P.**

By:    Knighthead Capital Management, LLC, its
Investment Manager

By:    _____
Name:  Laura Torrado
Title:   Authorized Signatory

**LMA SPC for and on behalf of MAP 84**
**SEGREGATED PORTFOLIO**

By:    Knighthead Capital Management, LLC, its
Investment Manager

By:    _____
Name:  Laura Torrado
Title:   Authorized Signatory

**CONSENTING SECURED LENDERS:**

**BLUE MOUNTAIN CREDIT**
**ALTERNATIVES MASTER FUND L.P.**

By: _____
    Name:  David M. O'Mara
    Title:   Assistant GC/VP

**BLUEMOUNTAIN TIMBERLINE LTD.**

By: _____
    Name:  David M. O'Mara
    Title:   Assistant GC/VP

**BLUEMOUNTAIN LONG/SHORT CREDIT**
**MASTER FUND L.P.**

By: _____
    Name:  David M. O'Mara
    Title:   Assistant GC/VP

**BLUEMOUNTAIN DISTRESSED MASTER FUND**
**L.P.**

By: _____
    Name:  David M. O'Mara
    Title:   Assistant GC/VP

**BLUEMOUNTAIN MONTENVERS**
**MASTER FUND SCA SICAV-SIF**

By: _____
    Name:  David M. O'Mara
    Title:   Assistant GC/VP

[Signature Page to Plan Support Agreement]

**CONSENTING SECURED LENDERS:**

> **BLUEMOUNTAIN LONG SHORT**
> **GRASMOOR FUND LTD.**
>
> Name:  David M. O'Mara
> Title:    Assistant GC/VP
>
> **BLUEMOUNTAIN KICKING HORSE**
> **FUND L.P.**
>
> Name:  David M. O'Mara
> Title:    Assistant GC/VP
>
> **BLUEMOUNTAIN STRATEGIC CREDIT MASTER**
> **FUND L.P.**
>
> Name:  David M. O'Mara
> Title:    Assistant GC/VP
>
> **BLUEMOUNTAIN LONG/SHORT CREDIT AND**
> **DISTRESSED REFLECTION FUND P.L.C., a sub-**
> **fund of AAI BLUEMOUNTAIN FUND P.L.C.**
>
> Name:  David M. O'Mara
> Title:    Assistant GC/VP

**CONSENTING SECURED LENDERS:**

BEACH POINT TOTAL RETURN MASTER FUND, L.P.

By:  Beach Point Capital Management LP, its investment manager

By:  _____
Name:  Carl Goldsmith
Title:    Senior Portfolio Manager


BEACH POINT SCF I LP

By:  Beach Point Capital Management LP, its investment manager

By:  _____
Name:  Carl Goldsmith
Title:    Senior Portfolio Manager


BEACH POINT SCF MULTI-PORT LP

By:  Beach Point Capital Management LP, its investment manager

By:  _____
Name:  Carl Goldsmith
Title:    Senior Portfolio Manager

**CONSENTING SECURED LENDERS:**

ASSOCIATED BRITISH FOODS PENSION PLAN

By:  Beach Point Capital Management LP, its investment manager

By:  _____
Name:  Carl Goldsmith
Title:    Senior Portfolio Manager


ROYAL MAIL PENSION PLAN

By:  Beach Point Capital Management LP, its investment manager

By:  _____
Name:  Carl Goldsmith
Title:    Senior Portfolio Manager


BEACH POINT STRATEGIC MASTER FUND, L.P.

By:  Beach Point Capital Management LP, its investment manager

By:  _____
Name:  Carl Goldsmith
Title:    Senior Portfolio Manager

**CONSENTING SECURED LENDERS:**

**MAST CREDIT OPPORTUNITIES I
MASTER FUND LIMITED**


By: _____
      Name:  Adam Kleinman
      Title:   Authorized Signatory


**MAST OC I MASTER FUND, L.P.**


By:    Mast OC I IA, LLC,
       its General Partner

By: _____
      Name:  Adam Kleinman
      Title:   Authorized Signatory

**CONSENTING SECURED LENDERS:**

**ELLIS LAKE MASTER FUND, LP**

By: _____
   Name:  Anthony Pasqua
   Title:   Authorized Signatory

[Signature Page to Plan Support Agreement]

**CONSENTING SECURED LENDERS:**

**BAYSIDE PARTNERS LLC**

By: _____
      Name: Stanley Maron
      Title:  Manager

**DNSMORE LLC**

By: _____
      Name:  Ralph Finerman
      Title:   Manager

**GENDOS LLC**

By: _____
      Name:  Richard Sandler
      Title:   Manager

**GENTRACE LLC**

By: _____
      Name:  Richard Sandler
      Title:   Manager

**GENUNO LLC**

By: _____
      Name:  Ralph Finerman
      Title:   Manager

[Signature Page to Plan Support Agreement]

**CONSENTING SECURED LENDERS:**

### BAYSIDE PARTNERS LLC

By: _____
      Name: Stanley Maron
      Title:   Manager

### DNSMORE LLC

By: _____
      Name:  Ralph Finerman
      Title:   Manager

### GENDOS LLC

By: _____
      Name:  Richard Sandler
      Title:   Manager

### GENTRACE LLC

By: _____
      Name:  Richard Sandler
      Title:   Manager

### GENUNO LLC

By: _____
      Name:  Ralph Finerman
      Title:   Manager

[Signature Page to Plan Support Agreement]

**CONSENTING SECURED LENDERS:**

**BAYSIDE PARTNERS LLC**

By: _____
      Name:  Stanley Maron
      Title:   Manager

**DNSMORE LLC**

By: _____
      Name:  Ralph Finerman
      Title:   Manager

**GENDOS LLC**

By: _____
      Name:  Richard Sandler
      Title:   Manager

**GENTRACE LLC**

By: _____
      Name:  Richard Sandler
      Title:   Manager

**GENUNO LLC**

By: _____
      Name:  Ralph Finerman
      Title:   Manager

[Signature Page to Plan Support Agreement]

**CONSENTING SECURED LENDERS:**

        **MOUNTE LLC**

By: _____
         Name:  Ralph Finerman
         Title:   Manager


        **NP1 LLC**

By: _____
         Name:  Ralph Finerman
         Title:   Manager


        **SILVER ROCK FINANCIAL LLC**

By: _____
         Name:  Ralph Finerman
         Title:   Manager


        **WELLWATER LLC**

By: _____
         Name:  Ralph Finerman
         Title:   Manager


[Signature Page to Plan Support Agreement]

**CONSENTING NOTEHOLDERS:**

BEACH POINT TOTAL RETURN MASTER FUND, L.P.

By:  Beach Point Capital Management LP, its investment manager

By:  _____

Name:  Carl Goldsmith
Title:    Senior Portfolio Manager


BEACH POINT SCF I LP

By:  Beach Point Capital Management LP, its investment manager

By:  _____

Name:  Carl Goldsmith
Title:    Senior Portfolio Manager


BEACH POINT SCF MULTI-PORT LP

By:  Beach Point Capital Management LP, its investment manager

By:  _____

Name:  Carl Goldsmith
Title:    Senior Portfolio Manager


ASSOCIATED BRITISH FOODS PENSION PLAN

By:  Beach Point Capital Management LP, its investment manager

By:  _____

Name:  Carl Goldsmith
Title:    Senior Portfolio Manager

**CONSENTING NOTEHOLDERS:**

ROYAL MAIL PENSION PLAN

By:  Beach Point Capital Management LP, its investment manager

By: _____
Name:  Carl Goldsmith
Title:    Senior Portfolio Manager


BEACH POINT STRATEGIC MASTER FUND, L.P.

By:  Beach Point Capital Management LP, its investment manager

By: _____
Name:  Carl Goldsmith
Title:    Senior Portfolio Manager


LUMX BEACH POINT TOTAL RETURN FUND LTD.

By:  Beach Point Capital Management LP, its investment manager

By: _____
Name:  Carl Goldsmith
Title:    Senior Portfolio Manager


AMUNDI ALTERNATIVES BEACH POINT DISTRESSED MASTER FUND

By:  Beach Point Capital Management LP, its investment manager

By: _____
Name:  Carl Goldsmith
Title:    Senior Portfolio Manager


LMA SPC for and on behalf of the MAP 90 Segregated Portfolio
By:  Beach Point Capital Management LP, its investment manager

By: _____
Name:  Carl Goldsmith
Title:    Senior Portfolio Manager

**CONSENTING NOTEHOLDERS:**

**BLUEMOUNTAIN LONG/SHORT CREDIT MASTER FUND L.P.**

By: BLUEMOUNTAIN CAPITAL MANAGEMENT, LLC, its investment advisor

By: _____
Name:    David M. O'Mara
Title:    Assistant GC/VP

**BLUEMOUNTAIN STRATEGIC CREDIT MASTER FUND L.P.**

By: BLUEMOUNTAIN CAPITAL MANAGEMENT, LLC, its investment advisor

By: _____
Name:    David M. O'Mara
Title:    Assistant GC/VP

**BLUEMOUNTAIN TIMBERLINE LTD.**

By: BLUEMOUNTAIN CAPITAL MANAGEMENT, LLC, its investment advisor

By: _____
Name:    David M. O'Mara
Title:    Assistant GC/VP

**AAI BLUEMOUNTAIN FUND PLC** on behalf of its sub-fund: BlueMountain Long/Short Credit and Distressed Reflection Fund

By: BLUEMOUNTAIN CAPITAL MANAGEMENT, LLC, its investment advisor

By: _____
Name:    David M. O'Mara
Title:    Assistant GC/VP

[Signature Page to Plan Support Agreement]

**CONSENTING NOTEHOLDERS:**

**BLUEMOUNTAIN MONTENVERS MASTER FUND SCA SICAV-SIV**

By: BLUEMOUNTAIN CAPITAL MANAGEMENT, LLC, its investment advisor

By: _____
Name:    David M. O'Mara
Title:    Assistant GC/VP

**BLUE MOUNTAIN CREDIT ALTERNATIVES MASTER FUND L.P.**

By: BLUEMOUNTAIN CAPITAL MANAGEMENT, LLC, its investment advisor

By: _____
Name:    David M. O'Mara
Title:    Assistant GC/VP

**BLUEMOUNTAIN DISTRESSED MASTER FUND L.P.**

By: BLUEMOUNTAIN CAPITAL MANAGEMENT, LLC, its investment advisor

By: _____
Name:    David M. O'Mara
Title:    Assistant GC/VP

**BLUEMOUNTAIN KICKING HORSE FUND L.P.**

By: BLUEMOUNTAIN CAPITAL MANAGEMENT, LLC, its investment advisor

By: _____
Name:    David M. O'Mara
Title:    Assistant GC/VP

[Signature Page to Plan Support Agreement]

**CONSENTING NOTEHOLDERS:**

                        **ELLIS LAKE MASTER FUND, LP**

                        By: _____

                        Name: Anthony Pasqua

                        Title: Authorized Signatory of Ellis Lake GP, LLC

[Signature Page to Plan Support Agreement]

**CONSENTING NOTEHOLDERS:**

**KNIGHTHEAD MASTER FUND, L.P.**

By: Knighthead Capital Management, LLC, its
Investment Manager

By: _____
Name:
Title:

**LMA SPC for and on behalf of the MAP 84
SEGREGATED PORTFOLIO**

By: Knighthead Capital Management, L.L.C., its
Investment Advisor

By: _____
Name:
Title:

**CONSENTING NOTEHOLDERS:**

**MAST CREDIT OPPORTUNITIES I MASTER FUND LIMITED**

By: _____

    Name:  Adam Kleinman
    Title: Authorized Signatory


**MAST OC I MASTER FUND L.P.**

By:    Mast OC I IA, LLC,
        its General Partner

By: _____

    Name: Adam Kleinman
    Title: Authorized Signatory


**MAST SELECT OPPORTUNITIES MASTER FUND L.P.**

By:    Mast Select Opportunities GP, LLC,
        its General Partner

By: _____

    Name: Adam Kleinman
    Title: Authorized Signatory

**CONSENTING NOTEHOLDERS:**

**BAYSIDE PARTNERS LLC**

By:_____
Name: Stanley Maron
Title: Manager

**DNSMORE LLC**

By:_____
Name: Ralph Finerman
Title: Manager

**GENDOS LLC**

By:_____
Name: Richard Sandler
Title: Manager

**GENTRACE LLC**

By:_____
Name: Richard Sandler
Title: Manager

**GENUNO LLC**

By:_____
Name: Ralph Finerman
Title: Manager

[Signature Page to Plan Support Agreement]

**CONSENTING NOTEHOLDERS:**

**BAYSIDE PARTNERS LLC**

By:_____
Name: Stanley Maron
Title: Manager

**DNSMORE LLC**

By:_____
Name: Ralph Finerman
Title: Manager

**GENDOS LLC**

By:_____
Name: Richard Sandler
Title: Manager

**GENTRACE LLC**

By:_____
Name: Richard Sandler
Title: Manager

**GENUNO LLC**

By:_____
Name: Ralph Finerman
Title: Manager

[Signature Page to Plan Support Agreement]

**CONSENTING NOTEHOLDERS:**

**BAYSIDE PARTNERS LLC**

By:_____
Name: Stanley Maron
Title: Manager

**DNSMORE LLC**

By:_____
Name: Ralph Finerman
Title: Manager

**GENDOS LLC**

By:_____
Name: Richard Sandler
Title: Manager

**GENTRACE LLC**

By:_____
Name: Richard Sandler
Title: Manager

**GENUNO LLC**

By:_____
Name: Ralph Finerman
Title: Manager

[Signature Page to Plan Support Agreement]

**CONSENTING NOTEHOLDERS:**

**MOUNTE LLC**

By: _Ralph Finerman_
Name: Ralph Finerman
Title: Manager

**NP1 LLC**

By: _Ralph Finerman_
Name: Ralph Finerman
Title: Manager

**SILVER ROCK FINANCIAL LLC**

By: _Ralph Finerman_
Name: Ralph Finerman
Title: Manager

**WELLWATER LLC**

By: _Ralph Finerman_
Name: Ralph Finerman
Title: Manager

**CONSENTING NOTEHOLDERS:**

**WESTERN ASSET OPPORTUNISTIC US$ HIGH YIELD SECURITIES PORTFOLIO, LLC**
by Western Asset Management Company as investment manager and agent

By: _____
Name:
Title:      W. Stephen Venable, Jr.
           Manager, US Legal and Corporate Affairs

**STICHTING PENSIOENFONDS DSM NETHERLAND**
by Western Asset Management Company as investment manager and agent

By: _____
Name:     W. Stephen Venable, Jr.
Title:      Manager, US Legal and Corporate Affairs

**WESTERN ASSET HIGH YIELD FUND**
by Western Asset Management Company as investment manager and agent

By: _____
Name:
Title:      W. Stephen Venable, Jr.
           Manager, US Legal and Corporate Affairs

**CGCM HIGH YIELD INVESTMENTS**
by Western Asset Management Company as investment manager and agent

By: _____
Name:
Title:      W. Stephen Venable, Jr.
           Manager, US Legal and Corporate Affairs

**LEGG MASON WESTERN ASSET US HIGH YIELD FUND**
by Western Asset Management Company as investment manager and agent

By: _____
Name:     W. Stephen Venable, Jr.
Title:      Manager, US Legal and Corporate Affairs

[Signature Page to Plan Support Agreement]

**CONSENTING NOTEHOLDERS:**

**KERN COUNTY EMPLOYEES' RETIREMENT ASSOCIATION**
by Western Asset Management Company as investment manager and agent

By: _____

Name:

Title:
W. Stephen Venable, Jr.
Manager, US Legal and Corporate Affair

**BLUE CROSS BLUE SHIELD OF MICHIGAN - HIGH YIELD**
by Western Asset Management Company as investment manager and agent

By: _____

Name:

Title:
W. Stephen Venable, Jr.
Manager, US Legal and Corporate Affair

**WESTERN ASSET GLOBAL PARTNERS INCOME FUND INC.**
by Western Asset Management Company as investment manager and agent

By: _____

Name:

Title:
W. Stephen Venable, Jr.
Manager, US Legal and Corporate Affairs

**WESTERN ASSET HIGH INCOME OPPORTUNITY FUND INC.**
by Western Asset Management Company as investment manager and agent

By: _____

Name:

Title:
W. Stephen Venable, Jr.
Manager, US Legal and Corporate Affairs

**JOHN HANCOCK II HIGH YIELD FUND**
by Western Asset Management Company as investment manager and agent

By: _____

Name:

Title
W. Stephen Venable, Jr.
Manager, US Legal and Corporate Affairs

[Signature Page to Plan Support Agreement]

**CONSENTING NOTEHOLDERS:**

**JOHN HANCOCK VARIABLE INSURANCE TRUST - HIGH YIELD TRUST**
by Western Asset Management Company as investment manager and agent

By: _____
Name:
Title:
W. Stephen Venable, Jr.
Manager, US Legal and Corporate Affairs

**WESTERN ASSET GLOBAL HIGH YIELD BOND FUND**
by Western Asset Management Company as investment manager and agent

By: _____
Name:
Title:
W. Stephen Venable, Jr.
Manager, US Legal and Corporate Affairs

**LEGG MASON WESTERN ASSET GLOBAL HIGH YIELD BOND FUND**
by Western Asset Management Company as investment manager and agent

By: _____
Name:
Title:
W. Stephen Venable, Jr.
Manager, US Legal and Corporate Affairs

**WESTERN ASSET GLOBAL HIGH INCOME FUND, INC.**
by Western Asset Management Company as investment manager and agent

By: _____
Name:
Title:
W. Stephen Venable, Jr.
Manager, US Legal and Corporate Affairs

**WESTERN ASSET HIGH INCOME FUND II, INC.**
by Western Asset Management Company as investment manager and agent

By: _____
Name:
Title:
W. Stephen Venable, Jr.
Manager, US Legal and Corporate Affairs

[Signature Page to Plan Support Agreement]

**CONSENTING NOTEHOLDERS:**

**WESTERN ASSET VARIABLE GLOBAL HIGH
YIELD BOND PORTFOLIO**
by Western Asset Management Company as
investment manager and agent

By:
Name:
Title:      W. Stephen Venable, Jr.
            Manager, US Legal and Corporate Affairs

**WESTERN ASSET SHORT DURATION HIGH
INCOME FUND**
by Western Asset Management Company as
investment manager and agent

By:
Name:
Title:      W. Stephen Venable, Jr.
            Manager, US Legal and Corporate Affairs

**WESTERN ASSET MANAGED HIGH INCOME
FUND, INC.**
by Western Asset Management Company as
investment manager and agent

By:
Name:
Title:      W. Stephen Venable, Jr.
            Manager, US Legal and Corporate Affairs

**WESTERN ASSET VARIABLE HIGH INCOME
PORTFOLIO**
by Western Asset Management Company as
investment manager and agent

By:
Name:
Title:      W. Stephen Venable, Jr.
            Manager, US Legal and Corporate Affairs

**WESTERN ASSET GLOBAL STRATEGIC
INCOME FUND**
by Western Asset Management Company as
investment manager and agent

By:
Name:
Title:      W. Stephen Venable, Jr.
            Manager, US Legal and Corporate Affairs

[Signature Page to Plan Support Agreement]

**CONSENTING NOTEHOLDERS:**

**WESTERN ASSET STRATEGIC US$ HIGH YIELD PORTFOLIO, LLC**
by Western Asset Management Company as investment manager and agent

By: _____
Name:
Title:
　　　　W. Stephen Venable, Jr.
　　　　Manager, US Legal and Corporate Affairs

**WA HIGH INCOME CORPORATE BOND (MULTI-CURRENCY) FUND**
by Western Asset Management Company as investment manager and agent

By: _____
Name:
Title:
　　　　W. Stephen Venable, Jr.
　　　　Manager, US Legal and Corporate Affairs

**WA GLOBAL HIGH YIELD BOND (MULTI-CURRENCY) FUND**
by Western Asset Management Company as investment manager and agent

By: _____
Name:
Title:
　　　　W. Stephen Venable, Jr.
　　　　Manager, US Legal and Corporate Affairs

**WESTERN ASSET HIGH YIELD DEFINED OPPORTUNITY FUND INC**
by Western Asset Management Company as investment manager and agent

By: _____
Name:
Title:
　　　　W. Stephen Venable, Jr.
　　　　Manager, US Legal and Corporate Affairs

**FIXED INCOME HY GLOBAL HEUR**
by Western Asset Management Company as investment manager and agent

By: _____
Name:
Title:
　　　　W. Stephen Venable, Jr.
　　　　Manager, US Legal and Corporate Affairs

[Signature Page to Plan Support Agreement]

**CONSENTING NOTEHOLDERS:**

**WESTERN ASSET MIDDLE MARKET DEBT FUND INC.**
by Western Asset Management Company as investment manager and agent

By: _____
Name:
Title:
    W. Stephen Venable, Jr.
    Manager, US Legal and Corporate Affairs

**WESTERN ASSET PREMIER BOND FUND**
by Western Asset Management Company as investment manager and agent

By: _____
Name:
Title:
    W. Stephen Venable, Jr.
    Manager, US Legal and Corporate Affairs

**LEGG MASON WESTERN ASSET GLOBAL CREDIT ABSOLUTE RETURN FUND**
by Western Asset Management Company as investment manager and agent

By: _____
Name:
Title:
    W. Stephen Venable, Jr.
    Manager, US Legal and Corporate Affairs

[Signature Page to Plan Support Agreement]

**CONSENTING SHAREHOLDERS:**

COURT SQUARE CAPITAL PARTNERS II, L.P.

By: COURT SQUARE CAPITAL GP, LLC,
its General Partner

By: _____
      Name:
      Title:

COURT SQUARE CAPITAL PARTNERS II-A, L.P.

By: COURT SQUARE CAPITAL GP, LLC,
its General Partner

By: _____
      Name:
      Title:

COURT SQUARE CAPITAL PARTNERS
(EXECUTIVE) II, L.P.

By: COURT SQUARE CAPITAL GP, LLC,
its General Partner

By: _____
      Name:
      Title:

COURT SQUARE CAPITAL PARTNERS
(OFFSHORE) II, L.P.

By: COURT SQUARE CAPITAL GP, LLC,
its General Partner

By: _____
      Name:
      Title:

[Signature Page to Plan Support Agreement]

**Exhibit A to Plan Support Agreement**

<u>Proposed Plan</u>

*[This **<u>Exhibit A</u>** is intentionally omitted. See **<u>Exhibit A</u>** of the Disclosure Statement.]*

**Exhibit B to Plan Support Agreement**

Form of Litigation Trust Agreement

*[This **Exhibit B** is intentionally omitted. See **Exhibit F** of the Disclosure Statement.]*

**Exhibit C to Plan Support Agreement**

<u>Joinder Agreement</u>

The undersigned ("***Transferee***") hereby acknowledges that it has read and understands the Restructuring and Plan Support Agreement (the "***Agreement***"), dated as of September [_], 2013, by and among the Company, and certain Consenting Shareholders, Consenting Secured Lenders and Consenting Noteholders (each as defined in the Agreement), including the transferor (the "***Transferor***") to the Transferee of the claims or interests listed below (the "***Transferred Claims or Interests***").

The Transferee hereby agrees to be bound by the terms and conditions of the Agreement with respect to the Transferred Claims or Interests, and any claims or interests that Transferee may hereafter acquire, it being understood that the Transferee shall hereafter be a "Plan Support Party" under the Agreement. In the event the Transferor has cast their vote in respect of the Plan before the effectiveness of the transfer of the Transferred Claims or Interests, the Transferee specifically agrees to be bound by such vote of the Transferor.

The Transferee hereby represents and warrants that, as of the date hereof, it is the beneficial owner of the Transferred Claims or Interests, and that other than pursuant to the Agreement, such Transferred Claims or Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrances of any kind, in each case that might adversely affect in any way the Transferee's performance of its obligations contained in the Agreement at the time such obligations are required to be performed

Date Executed: _____, 20___

_____
**Print name of Transferee**

_____
**Name:**
**Title:**

**Address:**    _____

_____

**Attention:**    _____
**Telephone:**   _____
**Facsimile:**   _____

| Principal Amount Held | |
|---|---|
| **Consenting Secured Lenders** | |
| **Consenting Noteholders** | |
| **Consenting Shareholders** | |

145945.15

**Schedule A to Plan Support Agreement**

<u>Consenting Noteholders, Consenting Noteholder Claims and Consenting Noteholder Contributed Claims</u>

| Consenting Noteholder (Name and Address) | Consenting Noteholder Claim | Consenting Noteholder Contributed Claim |
|---|---|---|
| Beach Point Strategic Master Fund, L.P.<br><br>Beach Point Capital Management LP<br>1620 26th Street, Suite 6000N<br>Santa Monica, CA 90404<br>Attention: Gary Hobart, Lawrence Goldman and Joseph Fabiani<br>ghobart@beachpointcapital.com<br>aschweitzer@beachpointcapital.com<br>jfabiani@beachpointcapital.com | $1,000,000.00 | $1,000,000.00 |
| Beach Point Total Return Master Fund, L.P.<br><br>Beach Point Capital Management LP<br>1620 26th Street, Suite 6000N<br>Santa Monica, CA 90404<br>Attention: Gary Hobart, Lawrence Goldman and Joseph Fabiani<br>ghobart@beachpointcapital.com<br>aschweitzer@beachpointcapital.com<br>jfabiani@beachpointcapital.com | $9,825,000.00 | $9,825,000.00 |
| Royal Mail Pension Plan<br><br>Beach Point Capital Management LP<br>1620 26th Street, Suite 6000N<br>Santa Monica, CA 90404<br>Attention: Gary Hobart, Lawrence Goldman and Joseph Fabiani<br>ghobart@beachpointcapital.com<br>aschweitzer@beachpointcapital.com<br>jfabiani@beachpointcapital.com | $1,035,000.00 | $1,035,000.00 |
| Beach Point SCF I LP<br><br>Beach Point Capital Management LP<br>1620 26th Street, Suite 6000N<br>Santa Monica, CA 90404 | $4,005,000.00 | $4,005,000.00 |

| | | |
|---|---|---|
| Attention: Gary Hobart, Lawrence Goldman and Joseph Fabiani<br>ghobart@beachpointcapital.com<br>aschweitzer@beachpointcapital.com<br>jfabiani@beachpointcapital.com | | |
| Beach Point SCF Multi-Port LP<br><br>Beach Point Capital Management LP<br>1620 26th Street, Suite 6000N<br>Santa Monica, CA 90404<br>Attention: Gary Hobart, Lawrence Goldman and Joseph Fabiani<br>ghobart@beachpointcapital.com<br>aschweitzer@beachpointcapital.com<br>jfabiani@beachpointcapital.com | $3,345,000.00 | $3,345,000.00 |
| Associated British Foods Pension Plan<br><br>Beach Point Capital Management LP<br>1620 26th Street, Suite 6000N<br>Santa Monica, CA 90404<br>Attention: Gary Hobart, Lawrence Goldman and Joseph Fabiani<br>ghobart@beachpointcapital.com<br>aschweitzer@beachpointcapital.com<br>jfabiani@beachpointcapital.com | $1,430,000.00 | $1,430,000.00 |
| LUMX Beach Point Total Return Fund LTD.<br><br>Beach Point Capital Management LP<br>1620 26th Street, Suite 6000N<br>Santa Monica, CA 90404<br>Attention: Gary Hobart, Lawrence Goldman and Joseph Fabiani<br>ghobart@beachpointcapital.com<br>aschweitzer@beachpointcapital.com<br>jfabiani@beachpointcapital.com | $507,000.00 | $507,000.00 |
| Amundi Alternatives Beach Point  Distressed Master Fund<br><br>Beach Point Capital Management LP<br>1620 26th Street, Suite 6000N<br>Santa Monica, CA 90404<br>Attention: Gary Hobart, Lawrence Goldman and Joseph Fabiani<br>ghobart@beachpointcapital.com | $405,000.00 | $405,000.00 |

| | | |
|---|---|---|
| aschweitzer@beachpointcapital.com<br>jfabiani@beachpointcapital.com | | |
| MAP 90 Segregated Portfolio of LMA SPC<br><br>Beach Point Capital Management LP<br>1620 26th Street, Suite 6000N<br>Santa Monica, CA 90404<br>Attention: Gary Hobart, Lawrence Goldman<br>and Joseph Fabiani<br>ghobart@beachpointcapital.com<br>aschweitzer@beachpointcapital.com<br>jfabiani@beachpointcapital.com | $346,000.00 | $346,000.00 |
| BlueMountain Montenvers Master Fund<br>SCA SICAV-SIV<br><br>Attn: General Counsel<br>BlueMountain Capital Management, LLC<br>280 Park Avenue, 5th Floor East<br>New York, NY 10017<br>(212) 905-3900<br>LegalNotices@bluemountaincapital.com | $911,000.00 | $911,000.00 |
| BlueMountain Credit Alternatives Master<br>Fund L.P.<br><br>Attn: General Counsel<br>BlueMountain Capital Management, LLC<br>280 Park Avenue, 5th Floor East<br>New York, NY 10017<br>(212) 905-3900<br>LegalNotices@bluemountaincapital.com | $3,018,000.00 | $3,018,000.00 |
| BlueMountain Distressed Master Fund L.P.<br><br>Attn: General Counsel<br>BlueMountain Capital Management, LLC<br>280 Park Avenue, 5th Floor East<br>New York, NY 10017<br>(212) 905-3900<br>LegalNotices@bluemountaincapital.com | $12,307,000.00 | $12,307,000.00 |
| BlueMountain Kicking Horse Fund L.P.<br><br>Attn: General Counsel<br>BlueMountain Capital Management, LLC<br>280 Park Avenue, 5th Floor East<br>New York, NY 10017<br>(212) 905-3900 | $791,000.00 | $791,000.00 |

| | | |
|---|---|---|
| LegalNotices@bluemountaincapital.com | | |
| BlueMountain Long/Short Credit Master Fund L.P.<br><br>Attn: General Counsel<br>BlueMountain Capital Management, LLC<br>280 Park Avenue, 5th Floor East<br>New York, NY 10017<br>(212) 905-3900<br>LegalNotices@bluemountaincapital.com | $3,569,000.00 | $3,569,000.00 |
| BlueMountain Strategic Credit Master Fund L.P.<br><br>Attn: General Counsel<br>BlueMountain Capital Management, LLC<br>280 Park Avenue, 5th Floor East<br>New York, NY 10017<br>(212) 905-3900<br>LegalNotices@bluemountaincapital.com | $1,916,000.00 | $1,916,000.00 |
| BlueMountain Timberline LTD.<br><br>Attn: General Counsel<br>BlueMountain Capital Management, LLC<br>280 Park Avenue, 5th Floor East<br>New York, NY 10017<br>(212) 905-3900<br>LegalNotices@bluemountaincapital.com | $982,000.00 | $982,000.00 |
| AAI Bluemountain Fund PLC on behalf of its sub-fund: BlueMountain Long/Short Credit and Distressed Reflection Fund<br><br>Attn: General Counsel<br>BlueMountain Capital Management, LLC<br>280 Park Avenue, 5th Floor East<br>New York, NY 10017<br>(212) 905-3900<br>LegalNotices@bluemountaincapital.com | $456,000.00 | $456,000.00 |
| Ellis Lake Master Fund, LP<br><br>Ellis Lake Capital, LLC<br>623 5th Avenure, 16th Floor<br>New York, NY 10022<br>Attn: Anthony Pasqua<br>Tel: (212) 521-1125<br>Fax: (646) 417-7771 | $20,975,000.00 | $20,975,000.00 |

145945.15

| | | |
|---|---|---|
| Knighthead Master Fund, L.P.<br><br>c/o Knighthead Capital Management, LLC<br>1140 Avenue of the Americas, 12th Floor<br>  New York, NY  10036<br>  Attention : Laura L. Torrado, Esq.<br>  Telephone: 212-356-2914<br>  Fax:    212-356-3921<br>  Email: ltorrado@knighthead.com | $40,984,000.00 | $40,984,000.00 |
| LMA SPC for and on behalf of the MAP 84<br>Segregated Portfolio<br><br>c/o Knighthead Capital Management, LLC<br>1140 Avenue of the Americas, 12th Floor<br>New York, NY  10036<br>Attention : Laura L. Torrado, Esq.<br>Telephone: 212-356-2914<br>Facsimile:   212-356-3921<br>Email: ltorrado@knighthead.com<br><br>And<br><br>Lighthouse Partners<br>Paul F. Schwarz<br>303 West Madison Street, Suite 1700<br>Chicago, IL  60606<br>Telephone: 312.592.1826<br>Facsimile; 312.592.1839<br>Email:<br>Paul.Schwarz@lighthousepartners.com | $3,266,000.00 | $3,266,000.00 |
| Mast Credit Opportunities I Master Fund<br>Limited<br><br>MAST Capital Management, LLC<br>200 Clarendon Street, 51st Floor<br>Boston, MA 02116<br>Attn: Adam M. Kleinman<br>Tel: (617) 375-3019<br>Email: akleinman@mastcapllc.com | $7,325,000.00 | $7,325,000.00 |
| Mast OC I Master Fund LP<br><br>MAST Capital Management, LLC<br>200 Clarendon Street, 51st Floor<br>Boston, MA 02116<br>Attn: Adam M. Kleinman<br>Tel: (617) 375-3019<br>Email: akleinman@mastcapllc.com | $8,319,000.00 | $8,319,000.00 |

145945.15

| | | |
|---|---:|---:|
| Mast Select Opportunities Master Fund LP<br><br>MAST Capital Management, LLC<br>200 Clarendon Street, 51st Floor<br>Boston, MA 02116<br>Attn: Adam M. Kleinman<br>Tel: (617) 375-3019<br>Email: akleinman@mastcapllc.com | $5,706,000.00 | $5,706,000.00 |
| Bayside Partners LLC<br><br>David Chow / Julie Pham<br>Silver Rock Financial LLC<br>1250 Fourth Street<br>Santa Monica, CA  90401<br>Phone: (310) 570 4541<br>Facsimile: (310) 570 4507<br>Email: dchow@silver-rockllc.com /<br>jpham@silver-rockllc.com | $1,400,000.00 | $1,400,000.00 |
| Dnsmore LLC<br><br>David Chow / Julie Pham<br>Silver Rock Financial LLC<br>1250 Fourth Street<br>Santa Monica, CA  90401<br>Phone: (310) 570 4541<br>Facsimile: (310) 570 4507<br>Email: dchow@silver-rockllc.com /<br>jpham@silver-rockllc.com | $4,200,000.00 | $4,200,000.00 |
| Gendos LLC<br><br>David Chow / Julie Pham<br>Silver Rock Financial LLC<br>1250 Fourth Street<br>Santa Monica, CA  90401<br>Phone: (310) 570 4541<br>Facsimile: (310) 570 4507<br>Email: dchow@silver-rockllc.com /<br>jpham@silver-rockllc.com | $1,118,000.00 | $1,118,000.00 |
| Gentrace LLC<br><br>David Chow / Julie Pham<br>Silver Rock Financial LLC<br>1250 Fourth Street<br>Santa Monica, CA  90401<br>Phone: (310) 570 4541 | $982,000.00 | $982,000.00 |

| | | |
|---|---|---|
| Facsimile: (310) 570 4507<br>Email: dchow@silver-rockllc.com /<br>jpham@silver-rockllc.com | | |
| Genudo LLC<br><br>David Chow / Julie Pham<br>Silver Rock Financial LLC<br>1250 Fourth Street<br>Santa Monica, CA  90401<br>Phone: (310) 570 4541<br>Facsimile: (310) 570 4507<br>Email: dchow@silver-rockllc.com /<br>jpham@silver-rockllc.com | $2,800,000.00 | $2,800,000.00 |
| Mounte LLC<br><br>David Chow / Julie Pham<br>Silver Rock Financial LLC<br>1250 Fourth Street<br>Santa Monica, CA  90401<br>Phone: (310) 570 4541<br>Facsimile: (310) 570 4507<br>Email: dchow@silver-rockllc.com /<br>jpham@silver-rockllc.com | $1,400,000.00 | $1,400,000.00 |
| NP1 LLC<br><br>David Chow / Julie Pham<br>Silver Rock Financial LLC<br>1250 Fourth Street<br>Santa Monica, CA  90401<br>Phone: (310) 570 4541<br>Facsimile: (310) 570 4507<br>Email: dchow@silver-rockllc.com /<br>jpham@silver-rockllc.com | $2,800,000.00 | $2,800,000.00 |
| Silver Rock Financial LLC<br><br>David Chow / Julie Pham<br>Silver Rock Financial LLC<br>1250 Fourth Street<br>Santa Monica, CA  90401<br>Phone: (310) 570 4541<br>Facsimile: (310) 570 4507<br>Email: dchow@silver-rockllc.com /<br>jpham@silver-rockllc.com | $4,200,000.00 | $4,200,000.00 |
| Wellwater LLC | $2,100,000.00 | $2,100,000.00 |

| | | |
|---|---|---|
| David Chow / Julie Pham<br>Silver Rock Financial LLC<br>1250 Fourth Street<br>Santa Monica, CA  90401<br>Phone: (310) 570 4541<br>Facsimile: (310) 570 4507<br>Email: dchow@silver-rockllc.com /<br>jpham@silver-rockllc.com | | |
| Western Asset Opportunities US$ High Yield Securities Portfolio, LLC<br><br>c/o Western Asset Management Company<br>385 East Colorado Blvd.<br>Pasadena, CA 91101<br>Attention: Douglas J. Dieter<br>ddieter@westernasset.com | $4,434,000.00 | $4,434,000.00 |
| Stichting Pensioenfonds DSM Netherland<br><br>c/o Western Asset Management Company<br>385 East Colorado Blvd.<br>Pasadena, CA 91101<br>Attention: Douglas J. Dieter<br>ddieter@westernasset.com | $550,000.00 | $550,000.00 |
| Western Asset High Yield Fund<br><br>c/o Western Asset Management Company<br>385 East Colorado Blvd.<br>Pasadena, CA 91101<br>Attention: Douglas J. Dieter<br>ddieter@westernasset.com | $1,320,000.00 | $1,320,000.00 |
| CGCM High Yield Investments<br><br>c/o Western Asset Management Company<br>385 East Colorado Blvd.<br>Pasadena, CA 91101<br>Attention: Douglas J. Dieter<br>ddieter@westernasset.com | $140,000.00 | $140,000.00 |
| Legg Mason Western Asset US High Yield Fund<br>c/o Western Asset Management Company<br>385 East Colorado Blvd.<br>Pasadena, CA 91101<br>Attention: Douglas J. Dieter<br>ddieter@westernasset.com | $1,910,000.00 | $1,910,000.00 |

| | | |
|---|---|---|
| Kern County Employees' Retirement Association<br><br>c/o Western Asset Management Company<br>385 East Colorado Blvd.<br>Pasadena, CA 91101<br>Attention: Douglas J. Dieter<br>ddieter@westernasset.com | $150,000.00 | $150,000.00 |
| Blue Cross Blue Shield of Michigan – High Yield<br><br>c/o Western Asset Management Company<br>385 East Colorado Blvd.<br>Pasadena, CA 91101<br>Attention: Douglas J. Dieter<br>ddieter@westernasset.com | $350,000.00 | $350,000.00 |
| Western Asset Global Partners Income Fund Inc.<br><br>c/o Western Asset Management Company<br>385 East Colorado Blvd.<br>Pasadena, CA 91101<br>Attention: Douglas J. Dieter<br>ddieter@westernasset.com | $350,000.00 | $350,000.00 |
| Western Asset High Income Opportunity Fund Inc.<br><br>c/o Western Asset Management Company<br>385 East Colorado Blvd.<br>Pasadena, CA 91101<br>Attention: Douglas J. Dieter<br>ddieter@westernasset.com | $1,610,000.00 | $1,610,000.00 |
| John Hancock II High Yield Fund<br><br>c/o Western Asset Management Company<br>385 East Colorado Blvd.<br>Pasadena, CA 91101<br>Attention: Douglas J. Dieter<br>ddieter@westernasset.com | $3,310,000.00 | $3,310,000.00 |
| John Hancock Variable Insurance Trust – High Yield Trust<br><br>c/o Western Asset Management Company<br>385 East Colorado Blvd. | $1,150,000.00 | $1,150,000.00 |

145945.15

| | | |
|---|---|---|
| Pasadena, CA 91101<br>Attention: Douglas J. Dieter<br>ddieter@westernasset.com | | |
| Western Asset Global High Yield Bond Fund<br><br>c/o Western Asset Management Company<br>385 East Colorado Blvd.<br>Pasadena, CA 91101<br>Attention: Douglas J. Dieter<br>ddieter@westernasset.com | $1,720,000.00 | $1,720,000.00 |
| Legg Mason Western Asset Global High Yield Bond Fund<br>c/o Western Asset Management Company<br>385 East Colorado Blvd.<br>Pasadena, CA 91101<br>Attention: Douglas J. Dieter<br>ddieter@westernasset.com | $2,853,000.00 | $2,853,000.00 |
| Western Asset Global High Income Fund, Inc.<br><br>c/o Western Asset Management Company<br>385 East Colorado Blvd.<br>Pasadena, CA 91101<br>Attention: Douglas J. Dieter<br>ddieter@westernasset.com | $850,000.00 | $850,000.00 |
| Western Asset High Income Fund II, Inc.<br><br>c/o Western Asset Management Company<br>385 East Colorado Blvd.<br>Pasadena, CA 91101<br>Attention: Douglas J. Dieter<br>ddieter@westernasset.com | $3,150,000.00 | $3,150,000.00 |
| Western Asset Variable Global High Yield Bond Portfolio<br><br>c/o Western Asset Management Company<br>385 East Colorado Blvd.<br>Pasadena, CA 91101<br>Attention: Douglas J. Dieter<br>ddieter@westernasset.com | $550,000.00 | $550,000.00 |
| Western Asset Short Duration High Income Fund<br><br>c/o Western Asset Management Company | $1,570,000.00 | $1,570,000.00 |

145945.15

| | | |
|---|---|---|
| 385 East Colorado Blvd.<br>Pasadena, CA 91101<br>Attention: Douglas J. Dieter<br>ddieter@westernasset.com | | |
| Western Asset Managed High Income Fund, Inc.<br><br>c/o Western Asset Management Company<br>385 East Colorado Blvd.<br>Pasadena, CA 91101<br>Attention: Douglas J. Dieter<br>ddieter@westernasset.com | $880,000.00 | $880,000.00 |
| Western Asset Variable High Income Portfolio<br><br>c/o Western Asset Management Company<br>385 East Colorado Blvd.<br>Pasadena, CA 91101<br>Attention: Douglas J. Dieter<br>ddieter@westernasset.com | $350,000.00 | $350,000.00 |
| Western Asset Global Strategic Income Fund<br><br>c/o Western Asset Management Company<br>385 East Colorado Blvd.<br>Pasadena, CA 91101<br>Attention: Douglas J. Dieter<br>ddieter@westernasset.com | $1,500,000.00 | $1,500,000.00 |
| Western Asset Strategic US$ High Yield Portfolio, LLC<br><br>c/o Western Asset Management Company<br>385 East Colorado Blvd.<br>Pasadena, CA 91101<br>Attention: Douglas J. Dieter<br>ddieter@westernasset.com | $610,000.00 | $610,000.00 |
| WA High Income Corporate Bond (Multi-Currency) Fund<br>c/o Western Asset Management Company<br>385 East Colorado Blvd.<br>Pasadena, CA 91101<br>Attention: Douglas J. Dieter<br>ddieter@westernasset.com | $2,280,000.00 | $2,280,000.00 |
| WA Global High Yield Bond (Multi-Currency) Fund | $1,240,000.00 | $1,240,000.00 |

145945.15

| | | |
|---|---|---|
| c/o Western Asset Management Company<br>385 East Colorado Blvd.<br>Pasadena, CA 91101<br>Attention: Douglas J. Dieter<br>ddieter@westernasset.com | | |
| Western Asset High Yield Defined Opportunity Fund Inc.<br><br>c/o Western Asset Management Company<br>385 East Colorado Blvd.<br>Pasadena, CA 91101<br>Attention: Douglas J. Dieter<br>ddieter@westernasset.com | $1,330,000.00 | $1,330,000.00 |
| Fixed Income HY Global HEUR<br><br>c/o Western Asset Management Company<br>385 East Colorado Blvd.<br>Pasadena, CA 91101<br>Attention: Douglas J. Dieter<br>ddieter@westernasset.com | $170,000.00 | $170,000.00 |
| Western Asset Middle Market Debt Fund Inc.<br><br>c/o Western Asset Management Company<br>385 East Colorado Blvd.<br>Pasadena, CA 91101<br>Attention: Douglas J. Dieter<br>ddieter@westernasset.com | $3,000,000.00 | $3,000,000.00 |
| Western Asset Premier Bond Fund<br><br>c/o Western Asset Management Company<br>385 East Colorado Blvd.<br>Pasadena, CA 91101<br>Attention: Douglas J. Dieter<br>ddieter@westernasset.com | $190,000.00 | $190,000.00 |
| Legg Mason Western Asset Global Credit Absolute Return Fund<br><br>c/o Western Asset Management Company<br>385 East Colorado Blvd.<br>Pasadena, CA 91101<br>Attention: Douglas J. Dieter<br>ddieter@westernasset.com | $1,260,000.00 | $1,260,000.00 |

145945.15

| | | |
|---|---|---|
| **TOTAL CLAIMS  AND TOTAL CONTRIBUTED CLAIMS** | **$192,200,000.00** | **$192,200,000.00** |

**Schedule B to Plan Support Agreement**

Consenting Secured Lenders and Consenting Secured Lender Claims

| Consenting Secured Lender (Name and Address) | Consenting Secured Lender Claim (Amount of Term Loan Commitment) |
|---|---|
| KNIGHTHEAD MASTER FUND, L.P.<br><br>Knighthead Master Fund, L.P.<br>c/o Knighthead Capital Management, LLC<br>1140 Avenue of the Americas, 12th Floor<br>New York, NY 10036<br>Attn : Michael Friedberg<br>Telephone: 212-356-2919<br>Fax: 212-356-3921<br>Email: ops@knighthead.com<br><br>With a copy to:<br>Northern Trust Hedge Fund Services at:<br>HFS_Bank_Debt_Ops@ntrs.com<br>Fax: 312-267-3698 | $36,730,209.24 |
| LMA SPC for and on behalf of MAP 84 Segregated Portfolio<br><br>Knighthead Master Fund, L.P.<br>c/o Knighthead Capital Management, LLC<br>1140 Avenue of the Americas, 12th Floor<br>New York, NY 10036<br>Attn : Michael Friedberg<br>Telephone: 212-356-2919<br>Fax: 212-356-3921<br>Email: ops@knighthead.com<br><br>With a copy to:<br>Northern Trust Hedge Fund Services at:<br>HFS_Bank_Debt_Ops@ntrs.com<br>Fax: 312-267-3698<br><br>With a copy to:<br>MAP84@Lighthousepartners.com<br>Facsimile: 561-748-9046<br>Attn.: Matt Burton<br><br>With a copy to: | $2,927,016.97 |

145945.15

| Consenting Secured Lender (Name and Address) | Consenting Secured Lender Claim (Amount of Term Loan Commitment) |
|---|---|
| Paul.Schwarz@lighthousepartners.com<br>Facsimile: 312-592-1839 | |
| BLUE MOUNTAIN CREDIT ALTERNATIVES MASTER FUND L.P.<br><br>Attn: General Counsel<br>BlueMountain Capital Management, LLC<br>280 Park Avenue, 5th Floor East<br>New York, NY 10017<br>(212) 905-3900<br>LegalNotices@bluemountaincapital.com | $12,968,840.10 |
| BLUEMOUNTAIN TIMBERLINE LTD.<br><br>Attn: General Counsel<br>BlueMountain Capital Management, LLC<br>280 Park Avenue, 5th Floor East<br>New York, NY 10017<br>(212) 905-3900<br>LegalNotices@bluemountaincapital.com | $1,034,809.55 |
| BLUEMOUNTAIN LONG/SHORT CREDIT MASTER FUND L.P.<br><br>Attn: General Counsel<br>BlueMountain Capital Management, LLC<br>280 Park Avenue, 5th Floor East<br>New York, NY 10017<br>(212) 905-3900<br>LegalNotices@bluemountaincapital.com | $3,760,932.01 |
| BLUEMOUNTAIN DISTRESSED MASTER FUND L.P.<br><br>Attn: General Counsel<br>BlueMountain Capital Management, LLC<br>280 Park Avenue, 5th Floor East<br>New York, NY 10017<br>(212) 905-3900<br>LegalNotices@bluemountaincapital.com | $959,991.33 |
| BLUEMOUNTAIN MONTENVERS MASTER | $3,180,300.59 |

145945.15

| Consenting Secured Lender<br>(Name and Address) | Consenting Secured Lender Claim<br>(Amount of Term Loan Commitment) |
|---|---|
| FUND SCA SICAVSIF<br><br>Attn: General Counsel<br>BlueMountain Capital Management, LLC<br>280 Park Avenue, 5th Floor East<br>New York, NY 10017<br>(212) 905-3900<br>LegalNotices@bluemountaincapital.com | |
| BLUEMOUNTAIN KICKING HORSE FUND L.P.<br><br>Attn: General Counsel<br>BlueMountain Capital Management, LLC<br>280 Park Avenue, 5th Floor East<br>New York, NY 10017<br>(212) 905-3900<br>LegalNotices@bluemountaincapital.com | $833,538.03 |
| BLUEMOUNTAIN STRATEGIC CREDIT MASTER FUND L.P.<br><br>Attn: General Counsel<br>BlueMountain Capital Management, LLC<br>280 Park Avenue, 5th Floor East<br>New York, NY 10017<br>(212) 905-3900<br>LegalNotices@bluemountaincapital.com | $2,019,037.75 |
| BLUEMOUNTAIN LONG/SHORT CREDIT AND DISTRESSED REFLECTION FUND P.L.C., A SUB-FUND OF AAI BLUEMOUNTAIN FUND P.L.C.<br><br>Attn: General Counsel<br>BlueMountain Capital Management, LLC<br>280 Park Avenue, 5th Floor East<br>New York, NY 10017<br>(212) 905-3900<br>LegalNotices@bluemountaincapital.com | $480,522.55 |

| Consenting Secured Lender (Name and Address) | Consenting Secured Lender Claim (Amount of Term Loan Commitment) |
|---|---|
| BEACH POINT TOTAL RETURN MASTER FUND, L.P.<br><br>International Fund Services<br>BeachPointWSOFax: (212) 651-2387<br>FAX@ifs.statestreet.com<br><br>With copy to:<br>Bank of New York Loan Servicing Un<br>AISPostPortfolio_flacct@bnymellon.com | $7,139,651.34 |
| BEACH POINT SCF I LP<br><br>International Fund Services<br>BeachPointWSOFax: (212) 651-2387<br>FAX@ifs.statestreet.com<br><br>With copy to:<br>Bank of New York Loan Servicing Unit<br>AISPostPortfolio_flacct@bnymellon.com | $2,910,000.00 |
| BEACH POINT SCF MULTI-PORT LP<br><br>International Fund Services<br>BeachPointWSOFax: (212) 651-2387<br>FAX@ifs.statestreet.com<br><br>With copy to:<br>Bank of New York Loan Servicing Unit<br>AISPostPortfolio_flacct@bnymellon.com | $2,431,000.00 |
| ASSOCIATED BRITISH FOODS PENSION PLAN<br><br>Primary Contact: BNYMellon<br>Attn: Kyle Miller<br>Email: 12019177613@tls.ldsprod.com<br>Tel: (213) 553-4448<br>Fax: (201) 917-7613<br><br>Secondary Contact: International Fund Services<br>Email: BeachPointWSO-FAX@ifs.statestreet.com<br>Fax: (212) 651-2387 | $1,039,000.00 |

| Consenting Secured Lender<br>(Name and Address) | Consenting Secured Lender Claim<br>(Amount of Term Loan Commitment) |
|---|---|
| ROYAL MAIL PENSION PLAN<br><br>International Fund Services Email:<br>BeachPointWSO-FAX@ifs.statestreet.com<br>Fax: (212) 651-2387<br><br>and<br><br>JP Morgan Chase Bank<br>Email: psg.uk.team@jpmchase.com | $752,000.00 |
| BEACH POINT STRATEGIC MASTER FUND, L.P.<br><br>International Fund Services Email:<br>BeachPointWSO-FAX@ifs.statestreet.com<br>Fax: (212) 651-2387<br><br>and<br><br>Bank of New York Loan Servicing Unit<br>AISPostPortfolio_flacct@bnymellon.com | $727,000.00 |
| MAST CREDIT OPPORTUNITIES I MASTER<br>FUND LIMITED<br><br>MAST Capital Management, LLC<br>200 Clarendon Street, 51st Floor<br>Boston, MA 02116<br>Attn: Adam M. Kleinman<br>Tel: (617) 375-3019<br>Email: akleinman@mastcapllc.com | $13,535,519.82 |
| MAST OC I MASTER FUND, L.P.<br><br>MAST Capital Management, LLC<br>200 Clarendon Street, 51st Floor<br>Boston, MA 02116<br>Attn: Adam M. Kleinman<br>Tel: (617) 375-3019<br>Email: akleinman@mastcapllc.com | $9,023,679.88 |

145945.15

| Consenting Secured Lender<br>(Name and Address) | Consenting Secured Lender Claim<br>(Amount of Term Loan Commitment) |
|---|---|
| BAYSIDE PARTNERS LLC<br><br>1250 4th Street<br>Santa Monica, CA 90401<br>Attn: David Chow<br>Email: dchow@silver-rockllc.com<br>Fax: (310) 570-4541 | $1,017,350.38 |
| DNSMORE LLC<br><br>1250 4th Street<br>Santa Monica, CA 90401<br>Attn: David Chow<br>Email: dchow@silver-rockllc.com<br>Fax: (310) 570-4541 | $3,052,051.14 |
| GENDOS LLC<br><br>1250 4th Street<br>Santa Monica, CA 90401<br>Attn: David Chow<br>Email: dchow@silver-rockllc.com<br>Fax: (310) 570-4541 | $812,426.95 |
| GENTRACE LLC<br><br>1250 4th Street<br>Santa Monica, CA 90401<br>Attn: David Chow<br>Email: dchow@silver-rockllc.com<br>Fax: (310) 570-4541 | $713,598.62 |
| GENUNO LLC<br><br>1250 4th Street<br>Santa Monica, CA 90401<br>Attn: David Chow<br>Email: dchow@silver-rockllc.com<br>Fax: (310) 570-4541 | $2,034,700.76 |

145945.15

| Consenting Secured Lender (Name and Address) | Consenting Secured Lender Claim (Amount of Term Loan Commitment) |
|---|---|
| MOUNTE LLC<br><br>1250 4th Street<br>Santa Monica, CA 90401<br>Attn: David Chow<br>Email: dchow@silver-rockllc.com<br>Fax: (310) 570-4541 | $1,017,350.38 |
| NP1 LLC<br><br>1250 4th Street<br>Santa Monica, CA 90401<br>Attn: David Chow<br>Email: dchow@silver-rockllc.com<br>Fax: (310) 570-4541 | $2,034,700.76 |
| SILVER ROCK FINANCIAL LLC<br><br>1250 4th Street<br>Santa Monica, CA 90401<br>Attn: David Chow<br>Email: dchow@silver-rockllc.com<br>Fax: (310) 570-4541 | $3,052,051.14 |
| WELLWATER LLC<br><br>1250 4th Street<br>Santa Monica, CA 90401<br>Attn: David Chow<br>Email: dchow@silver-rockllc.com<br>Fax: (310) 570-4541 | $1,526,025.57 |
| ELLIS LAKE MASTER FUND, LP<br><br>Ellis Lake Capital, LLC<br>623 5th Avenure, 16th Floor<br>New York, NY 10022<br>Attn: Anthony Pasqua<br>Tel: (212) 521-1125<br>Fax: (646) 417-7771 | $22,286,695.13 |
| **TOTAL CLAIMS** | **$140,000,000.00** |

145945.15

**Schedule C to Plan Support Agreement**

Consenting Shareholders and Consenting Shareholder Interests

| Consenting Shareholder (Name and Address) | Consenting Shareholder Interest |
|---|---|
| COURT SQUARE CAPITAL PARTNERS II, L.P.<br>Park Avenue Plaza<br>55 East 52nd Street, 34th Floor<br>New York, New York 10055 | Class L Shares: 108,369.610<br><br>Class A Shares: 3,022.911 |
| COURT SQUARE CAPITAL PARTNERS II-A, L.P.<br>Park Avenue Plaza<br>55 East 52nd Street, 34th Floor<br>New York, New York 10055 | Class L Shares: 30,207.873<br><br>Class A Shares: 842.632 |
| COURT SQUARE CAPITAL PARTNERS (EXECUTIVE) II, L.P.<br>Park Avenue Plaza<br>55 East 52nd Street, 34th Floor<br>New York, New York 10055 | Class L Shares: 2,069.542<br><br>Class A Shares: 57.729 |
| COURT SQUARE CAPITAL PARTNERS (OFFSHORE) II, L.P.<br>Park Avenue Plaza<br>55 East 52nd Street, 34th Floor<br>New York, New York 10055 | Class L Shares: 47,933.852<br><br>Class A Shares: 1,337.088 |
| **TOTAL** | **Class L Shares: 188,580.877**<br><br>**Class A Shares: 5,260.36** |

## Exhibit I

**Financial Projections**

**Financial Projections**

## 1.    Disclaimers.

In connection with the Disclosure Statement, the Debtors' management team ("<u>Management</u>") prepared projected financial information ("<u>Financial Projections</u>") for the years 2013 through 2016 (the "<u>Projection Period</u>").  The Financial Projections are based on a number of assumptions made by Management with respect to the future performance of the Reorganized Debtors' operations.  Although Management has prepared the Financial Projections in good faith and believes the assumptions to be reasonable, it is important to note that the Debtors can provide no assurance that such assumptions will be realized.  As described in detail in the Disclosure Statement, a variety of risk factors could affect the Reorganized Debtors' financial results and must be considered.  Accordingly the Financial Projections should be reviewed in conjunction with a review of the risk factors and "forward looking statements" set forth in Articles IX and X, respectively, of the Disclosure Statement and the assumptions described herein, including all relevant qualifications and footnotes.  All capitalized terms not defined herein have the meanings ascribed to them in the Disclosure Statement to which the Financial Projections are attached.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position.  Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or projections to Holders of Claims or other parties in interest after the Confirmation Date or otherwise make such information public.

In connection with the planning and development of the Plan, the Financial Projections were prepared by the Debtors to present the anticipated impact of the Plan.  The Financial Projections assume that the Plan will be implemented in accordance with its stated terms.  The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, regulatory changes and/or a variety of other factors, including those factors listed in the Plan and the Disclosure Statement.  Accordingly, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to significant business, economic and competitive uncertainties.  Therefore, such Financial Projections, estimates and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.  The Financial Projections included herein were prepared in September 2013.  Management is unaware of any circumstances as of the date hereof that would require the re-forecasting of the Financial Projections due to a material change in the Debtors' prospects.

The Financial Projections should be read in conjunction with the significant assumptions, qualifications and notes set forth below.

**THE DEBTORS' MANAGEMENT DID NOT PREPARE SUCH FINANCIAL PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION.  THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE FINANCIAL PROJECTIONS THAT ACCOMPANY THE DISCLOSURE STATEMENT AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE FINANCIAL PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE FINANCIAL PROJECTIONS AND DISCLAIM ANY ASSOCIATION WITH THE FINANCIAL PROJECTIONS.  EXCEPT FOR PURPOSES OF THE DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH FINANCIAL PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.**

K&E 27988387.17

MOREOVER, THE FINANCIAL PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, CURRENCY EXCHANGE RATE FLUCTUATIONS, MAINTAINING GOOD EMPLOYEE RELATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, ACTS OF TERRORISM OR WAR, INDUSTRY-SPECIFIC RISK FACTORS (AS DETAILED IN ARTICLE X OF THE DISCLOSURE STATEMENT ENTITLED "RISK FACTORS") AND OTHER MARKET AND COMPETITIVE CONDITIONS.  HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT.  MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THESE FINANCIAL PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR DISCLOSURE STATEMENT, THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE FINANCIAL PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THE DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.  THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.  IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE FINANCIAL PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

K&E 27988387.17

2. **General.**

    (a)    Projection Period: The Financial Projections are prepared for the years 2013 through 2016, with financial results for 2013 based on actual results for the 8 months ended August 31, 2013, and financial results for 2014 through 2016 based on specific assumptions as described further below.

    (b)    Plan Consummation: The Financial Projections assume an Effective Date of December 31, 2013.

3. **Total Collectible Revenue Projections**

    (a)    *Net OR Patient Revenue.* The Debtors' primary source of revenue comes from their outpatient rehabilitation patients ("Net OR Patient Revenue"), which is determined based on (i) volume, *i.e.*, the number of patient visits ("Patient Visits") the Debtors' outpatient rehabilitation clinics (the "OR Clinics") receive, and (ii) price, *i.e.*, the net rate of revenue received during each patient visit ("OR Net Revenue Rate per Visit").

            The Debtors expect to close and sell approximately 104 underperforming OR Clinics by the end of 2013, as part of the Debtors' restructuring plan to close loss generating sites. These closures, along with other estimated closures and the departure of patients due to negative repercussions of a chapter 11 filing, result in a decline in volume from 3 million Patient Visits in 2012 to 2.9 million Patient Visits in 2013, and 2.7 million Patient Visits in 2014. Beginning in 2015, volume is expected to grow at a low single digit rate from a combination of low same store sales growth and modest de novo activity.

            OR Net Revenue Rate per Visit declines in 2013 primarily due to Medicare reductions and the government sequestration. OR Net Revenue Rate per Visit increases in 2014, as increased volume of workers' compensation patients, favorable patient mix shifts, and improved pricing with select commercial and capitation payers drive higher rates per visit. However, OR Net Revenue Rate per Visit remains relatively flat in 2015 and 2016, as these improvements are offset by additional Medicare reimbursement pressures.

    (b)    *Contract, Other, O&P Revenue.* Contract and other revenue will remain flat during the projection period driven by the stable fixed fee nature of the contract business. Orthotics and prosthetics ("O&P") revenue remains flat as volume improvements are offset by rate pressures and mix shift.

4. **Cost of Services.** The Debtors' cost of services to operate its OR and O&P clinics include labor, supplies, rent, marketing and utility costs. The anticipated absolute decline in cost of services during 2013 and 2014 is primarily driven by the closure of underperforming clinics and the implementation in 2012 of labor reductions and other cost savings initiatives. Labor costs represent the largest component of cost of services, and are forecasted to increase annually in the low single digits consistent with historical trends for clinician wage growth. Rent, facility and supply costs are anticipated to perform consistently with the current terms of lease and supply agreements. Marketing and other clinic operating expenses are expected to remain consistent with historical levels.

5. **Operating Expenses.** The Debtors' selling, general and administrative ("SG&A") expenses consist primarily of corporate personnel compensation, insurance costs, corporate headquarters rent and costs of support functions such as legal, marketing, billing, compliance and recruiting.

3

The decline in SG&A from 2012 to 2013 reflects the impact of restructuring and cost savings initiatives implemented in 2013 and a reduction in incentive compensation and consulting costs compared to 2012.  SG&A declines further during 2014 as a result of the full-year impact of the restructuring and cost savings initiatives.  Lower software upgrade costs are offset by increases in compensation and other corporate expenses.  Compensation expenses and other corporate costs are anticipated to grow in the low single digits from 2014 to 2016.

6.    **Adjustments to EBITDA.**

(a)    *Sponsor Management Fees*.  These are accrued annual management fees due to Court Square which will cease to be due since management fees are compromised in connection with consummation the Plan.

(b)    *Lease Liability for Closed Clinics*.  This represents the non-cash charge for the remaining lease liability of closed clinics that the Debtors accrue once a clinic is closed.  These charges increase significantly in 2013, but are projected to be zero from 2014 onward.

(c)    *Non-Cash Lease Expense*.  The Debtors recognize rent expense at the average annual cost of the lease over the life of each clinic's lease.

(d)    *Other*.  Primarily includes adjustments for non-cash prior period items, non-recurring items and equity in earnings of affiliates.  The prior period & one-time items are adjustments related primarily to the revenue restatement for fiscal years 2010 & 2011 and transaction related costs.  Equity in earnings of affiliates are the net portion of earnings from the company's majority and minority owned joint ventures.  The projections take into account any potential impact of the chapter 11 filing on its JV partnerships and the one-time nature of prior period and non-recurring items.

(e)    *2013 Operational Improvements*.  This reflects the anticipated fourth quarter impact of improvement initiatives and potential closures of underperforming clinics.

(f)    *Growth Initiatives*.  The Debtors are developing a number of long-term growth initiatives to increase profitability beginning in 2014.  These growth initiatives are focused on volume growth through a combination of acquisitions, regional expansions and other partnership structures.

7.    **Consolidated EBITDA.**  The forecasted decline in EBITDA during 2013 reflects the above mentioned declines in volume and revenue per visit, which is only partially offset by the Debtors' operational improvements.  EBITDA is anticipated to remain flat in 2014 as the benefit of the company's operational improvements are offset by the cost factors mentioned above and anticipated lost volume as a result of the restructuring.  The Debtors estimate that the chapter 11 filing will have a one-time annual EBITDA impact of $5.0 million.  EBITDA growth in 2015 and 2016 is attributable to the modest clinic volume growth and the Debtors' additional growth initiatives.

8.    **Capital Expenditures.**  Current and future capital spending is based on the company's IT infrastructure requirements, clinic maintenance needs and new clinic development plans.

9.    **Restructuring & Implementation Costs.**  The Debtors' chapter 11 filing will result in a number of one-time cash expenditures in 2013.  Specifically, the Debtors will incur approximately $704,000 of severance costs from headcount reductions including up to $240 thousand on a

postpetition basis. The Debtors anticipate spending $2.56 million on the payment of lease settlements and lease rejection claims related to the terminated leases of closed and underperforming clinics. Professional fees to implement the restructuring process are expected to total approximately $22.75 million. As part of the Plan, the Reorganized Debtors will fund $2.25 million to the Litigation Trust following emergence from chapter 11. The majority of the Debtors' net operating losses will be utilized as a result of consummation of the Plan.

10.    **Financing Costs.**  As part of the Plan, the Reorganized Debtors will enter into a 3-year $144,162 million Exit Facility upon emergence from chapter 11. The Exit Facility will have an interest rate of LIBOR + 1000 bps with a 100 bps LIBOR floor. The Debtors expect to pay cash interest of $15.9 million annually for the Exit Facility. The expected cash interest does not take into account the required cash flow sweep per the Exit Facility terms.

11.    **Cash Taxes.**  The majority of the Debtors' net operating losses will be utilized as a result of the implementation of the Plan, and therefore the company anticipates being a cash tax payer beginning in 2014.

K&E 27988387.17

# Financial Projections
## (in $000s)

**Physiotherapy Associates**

**2013-2016 Financial Projections**

*($ in 000's)*

| | 2012A | 2013E[1] | 2014E | 2015E | 2016E |
|---|---|---|---|---|---|
| | | | **Projected FY** | | |
| # of OR Clinics | 648 | 544 | 544 | 544 | 544 |
| Patient Visits(in thousands) | 3,022 | 2,944 | 2,715 | 2,801 | 2,857 |
| OR Net Revenue Rate per Visit | $96.88 | $95.33 | $96.69 | $96.86 | $96.66 |
| Net OR Patient Revenue | $ 292,741 | $ 280,669 | $ 262,514 | $ 271,266 | $ 276,143 |
| Net Contract and Other Revenue | 13,109 | 12,605 | 11,972 | 11,972 | 11,972 |
| O&P Revenue | 18,377 | 17,286 | 17,347 | 17,347 | 17,347 |
| **Total Collectible Revenue** | **$ 324,226** | **$ 310,560** | **$ 291,833** | **$ 300,585** | **$ 305,463** |
| Cost of Service | 261,334 | 253,336 | 234,187 | 239,089 | 243,124 |
| **Gross Profit** | **$ 62,892** | **$ 57,224** | **$ 57,646** | **$ 61,496** | **$ 62,338** |
| *Gross Margin %* | *19.4%* | *18.4%* | *19.8%* | *20.5%* | *20.4%* |
| Operating Expenses: | | | | | |
| Selling, General, and Administrative Expenses | 41,429 | 37,537 | 34,379 | 34,658 | 35,154 |
| Depreciation and Amortization | 9,352 | 9,298 | 9,300 | 9,300 | 9,300 |
| Total Operating Expenses | 50,781 | 46,834 | 43,679 | 43,958 | 44,454 |
| **Operating Income (Loss)** | **12,111** | **10,389** | **13,967** | **17,539** | **17,884** |
| Depreciation and Amortization | 9,352 | 9,298 | 9,300 | 9,300 | 9,300 |
| **Unadjusted EBITDA** | **$ 21,463** | **$ 19,687** | **$ 23,267** | **$ 26,839** | **$ 27,184** |
| Sponsor Management Fees | 1,356 | 750 | | | |
| Lease Liability for Closed Clinics | 865 | 1,782 | | | |
| Non-Cash Lease Expense | 1,921 | 2,406 | 2,418 | 2,418 | 2,418 |
| Other[2] | 3,553 | (521) | (1,176) | (1,176) | (1,176) |
| 2013 Operational Improvements | - | 458 | | | |
| Growth Initiatives | - | - | 257 | 2,000 | 3,782 |
| **Consolidated EBITDA** | **$ 29,158** | **$ 24,561** | **$ 24,766** | **$ 30,080** | **$ 32,209** |
| *Margin %* | *9.0%* | *7.9%* | *8.5%* | *10.0%* | *10.5%* |
| Capital Expenditures | (4,630) | (2,800) | (4,000) | (4,500) | (5,000) |
| **Other Cash Sources / (Uses):** | | | | | |
| Change in Net Working Capital | 3,908 | (3,660) | 1,620 | 828 | 43 |
| Severance | - | (704) | - | - | - |
| Closed Clinics Lease Run-off | - | (999) | - | - | - |
| Closed Clinic Lease Settlements & Rejection Claims | - | (2,560) | - | - | - |
| Professional Fees | - | (22,750) | - | - | - |
| Litigation Trust Funding | - | (2,250) | - | - | - |
| Cash Taxes | (1,038) | (117) | (949) | (2,809) | (3,554) |
| **Total Other Cash Sources / (Uses)** | **$ 2,870** | **$ (33,039)** | **$ 671** | **$ (1,981)** | **$ (3,511)** |
| **Unlevered Free Cash Flow** | **$ 27,398** | **$ (11,278)** | **$ 21,437** | **$ 23,599** | **$ 23,697** |
| **Financing Items:** | | | | | |
| Facility Origination & Exit Fees | - | (2,667) | - | - | - |
| Bank Debt - Interest / Fees | (8,056) | (11,159) | (15,854) | (15,854) | (15,854) |
| Bank Debt - (Amortization) / Additional Funding | (500) | (750) | - | - | - |
| Sr. Unsecured Notes - Interest / Fees | (12,538) | - | - | - | - |
| **Total Other Cash Sources / (Uses)** | **$ (21,094)** | **$ (14,576)** | **$ (15,854)** | **$ (15,854)** | **$ (15,854)** |
| **Levered Free Cash Flow** | **$ 6,304** | **($25,854)** | **$5,583** | **$7,745** | **$7,843** |

(1) Includes actual 2013 financial results for the 8 months ended August, 31 2013

(2) Other includes prior-period adjustments, one-time items and equity in earnings of affiliates

**<u>Exhibit J</u>**

**Valuation Analysis**

A.    **Valuation of the Debtors**

In conjunction with formulating the Plan and satisfying their obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-confirmation going concern value of the Debtors.  At the Debtors' request, Rothschild performed a valuation analysis of the Reorganized Debtors.  Based upon and subject to the review and analysis described herein, and subject to the assumptions, limitations and qualifications described herein, Rothschild's view, as of October 9, 2013, was that the estimated going concern enterprise value of the Reorganized Debtors, as of an assumed Effective Date of December 31, 2013, would be in a range of approximately $220 million to $260 million with a midpoint of approximately $240 million. Rothschild's views are necessarily based on economic, market and other conditions in effect on, and the information made available to Rothschild as of, the date of its analysis (October 9, 2013).  Based on this estimated enterprise value range and an anticipated pro forma total debt balance on the assumed Effective Date of approximately $144 million, the implied equity value range would be approximately $76 million to $116 million with a midpoint of $96 million.  It should be noted that, although subsequent developments may affect Rothschild's views, Rothschild does not have any obligation to update, revise or reaffirm its estimate.

Rothschild's analysis is based on a number of assumptions, including, among others, that (i) the Debtors will be reorganized in accordance with the Plan which will be effective on or around December 31, 2013, (ii) the Reorganized Debtors will achieve the Projections (as defined in this Disclosure Statement) provided to Rothschild by the Debtors for fiscal years 2013 through 2016, (iii) the Reorganized Debtors' capitalization and available cash will be as set forth in the Plan and this Disclosure Statement, and (iv) the Reorganized Debtors will be able to obtain all future financings on the terms, and at the times, necessary to achieve the Projections. Rothschild makes no representation as to the achievability or reasonableness of such assumptions.  In addition, Rothschild assumed that there will be no material change in economic, market and other conditions as of the assumed Effective Date.

Rothschild assumed, at the Debtors' direction, that the Projections prepared by the Debtors' management were reasonably prepared on a basis reflecting the best currently available estimates and judgments of the Debtors' management as to the future financial and operating performance of the Reorganized Debtors.  The future results of Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors, and consequently are inherently difficult to project.  *See* **Exhibit I** of the Disclosure Statement (the "Financial Projections").  The Reorganized Debtors' actual future results may differ materially (positively or negatively) from the Projections and as a result, the actual enterprise value of the Reorganized Debtors may be significantly higher or lower than the estimated range herein. Among other things, failure to consummate the Plan in a timely manner may have a materially negative impact on the enterprise value of the Reorganized Debtors.

The estimated enterprise value in this section represents a hypothetical enterprise value of the Reorganized Debtors based on certain valuation methodologies as described below.  The estimated enterprise value in this section does not purport to constitute an appraisal or to necessarily reflect the actual market value that might be realized through a sale or liquidation of the Reorganized Debtors, its securities or its assets, which may be significantly higher or lower than the estimated enterprise value range herein.  The actual value of an operating business such as the Reorganized Debtors' business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in various factors affecting the financial condition and prospects of such a business.

In conducting its analysis, Rothschild, among other things:  (i) reviewed certain publicly available business and financial information relating to the Reorganized Debtors that Rothschild deemed relevant; (ii)  reviewed certain information relating to the business, earnings, cash flow, capital expenditures, assets, liabilities and prospects of the Reorganized Debtors, including the Projections, furnished by the Debtors; (iii) conducted discussions with members of senior management and representatives of the Debtors concerning the matters described in clauses (i) and (ii) of this paragraph, as well as their views concerning the Debtors' business and prospects before and after giving effect to the Plan; (iv) reviewed publicly available financial and stock market data for certain other companies who operate in lines of business that Rothschild deemed relevant; (v) reviewed a draft of the Plan, dated October 10, 2013; and (vi) conducted such other financial analyses and took into account such other information as Rothschild deemed appropriate.  In connection with its review, Rothschild did not assume any responsibility for independent verification of any of the information supplied to, discussed with, or reviewed by Rothschild and, with the consent of the Debtors, relied on such information being complete and accurate in all material respects.  In addition, at the direction of the Debtors, Rothschild did not make any independent evaluation or appraisal of any of the assets or

liabilities (contingent, derivative, off-balance-sheet, or otherwise) of the Reorganized Debtors, nor was Rothschild furnished with any such evaluation or appraisal. Rothschild also assumed, with the Debtors' consent, that the final form of the Plan does not differ in any respect material to its analysis from the draft that Rothschild reviewed.

The estimated enterprise value in this section does not constitute a recommendation to any holder of a Claim as to how such person should vote or otherwise act with respect to the Plan. Rothschild has not been asked and does not express any view as to what the trading value of the Reorganized Debtors' securities would be when issued pursuant to the Plan or the prices at which they may trade in the future. The estimated enterprise value set forth herein does not constitute an opinion as to the fairness to any person, from a financial point of view, of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

(i)        *Valuation Methodologies*

In preparing its valuation, Rothschild performed a variety of financial analyses and considered a variety of factors. The following is a brief summary of the material financial analyses performed by Rothschild, which consisted of (a) a publicly traded comparable companies analysis, (b) a selected precedent transactions analysis, and (c) a discounted cash flow ("DCF") analysis. In determining the Debtors' estimated enterprise value range, Rothschild weighted these three methodologies equally. This summary does not purport to be a complete description of the analyses performed and factors considered by Rothschild. The preparation of a valuation analysis is a complex analytical process involving various judgmental determinations as to the most appropriate and relevant methods of financial analysis and the application of those methods to particular facts and circumstances, and such analyses and judgments are not readily susceptible to summary description.

(a)        **Publicly Traded Comparable Companies Analysis**

The publicly traded comparable companies analysis is based on the enterprise values of selected publicly traded comparable companies that have operating and financial characteristics comparable in certain respects to the Reorganized Debtors, including, for example, comparable lines of business, business risks and market presence. Under this methodology, certain financial multiples and ratios that measure financial performance and value are calculated for each selected company and then applied to the Reorganized Debtors' financials to imply an enterprise value for the Reorganized Debtors. Rothschild used enterprise value as a multiple of each selected company's publicly available consensus projected adjusted 2013 Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA"), with a resulting range of approximately 8.0x to 9.0x. Rothschild then applied this multiple range to the Debtors' pro forma 2013 EBITDA ("PF 2013 EBITDA"), which represents 2013 EBITDA adjusted for, among other things, (i) the full-year annualized impact of changes in the rate the Debtors are reimbursed under certain government programs, (ii) the full-year annualized impact of the Debtors' cost savings initiatives, which are currently being implemented and (iii) the removal of any projected temporary impact to EBITDA arising from the Debtors' balance sheet restructuring process. Although the selected companies were used for comparison purposes, no comparable company is identical to the businesses of the Reorganized Debtors. Accordingly, Rothschild's comparison of the selected companies to the business of the Reorganized Debtors and analysis of the results of such comparisons were not purely mathematical, but instead necessarily involved considerations and judgments concerning differences in financial and operating characteristics and other factors that could affect the relative values of the selected companies and the Reorganized Debtors. The selection of appropriate companies for analysis is a matter of judgment and subject to limitations due to sample size and the public availability of meaningful market-based information.

(b)        **Selected Precedent Transactions Analysis**

The selected precedent transactions analysis is based on the enterprise values of companies involved in publicly disclosed merger and acquisition transactions that have operating and financial characteristics comparable in certain respects to the Reorganized Debtors. Under this methodology, the enterprise value of each such company is determined by an analysis of the consideration paid and the debt assumed in the merger or acquisition transaction. The enterprise value is then typically divided by the target's last twelve month EBITDA prior to the transaction announcement date to calculate an EBITDA multiple. Rothschild analyzed various merger and acquisition transactions that have occurred in the outpatient rehabilitation industry over the past several years. When applying this approach for the Debtors, the resulting EBITDA multiple range was approximately 8.0x to 9.0x. Rothschild then

2

applied this multiple range to the Debtors' PF 2013 EBITDA based on the assumption that this metric is the best measure of the Debtors' true current run-rate EBITDA.

Unlike the selected publicly traded companies analysis, the enterprise valuation derived using this methodology reflects a "control" premium (i.e., a premium paid to purchase a majority or controlling position in a company's assets). In addition, other factors not directly related to a company's business operations can affect a valuation in a transaction, including, among others factors: (1) a competitor may pay an additional premium for reasons that are not solely related to competitive bidding; (2) the market environment is not identical for transactions occurring at different periods of time; (3) the sale of a discrete asset or segment may warrant a discount or premium to the sale of an entire company, depending on the specific operational circumstances of the seller and acquirer; and (4) circumstances pertaining to the financial position of the company may have an impact on the resulting purchase price (i.e., a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage).

(c)        **Discounted Cash Flow Analysis**

The DCF analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. The DCF analysis involves complex considerations and judgments concerning appropriate terminal values and discount rates. Rothschild's DCF analysis used the Reorganized Debtors' Projections of its debt-free, after-tax cash flows for the period covered by the Projections and estimated a terminal value for the period after the Projection period utilizing two methodologies weighted equally, the terminal multiple methodology and the perpetuity growth methodology. As part of the terminal multiple methodology, Rothschild utilized the multiple range of approximately 8.0x to 9.0x from the publicly traded comparable companies analysis, and for the perpetuity growth methodology, Rothschild utilized an assumed perpetuity growth rate of 3.0% to 4.0%. The debt-free, after tax cash flows and estimated terminal value were then discounted using a weighted average cost of capital ranging from approximately 11% to 13%.

(ii)        *Valuation Considerations*

As a result of the foregoing, the estimated enterprise value in this section is not necessarily indicative of actual value, which may be significantly higher or lower than the estimate herein. Accordingly, none of the Debtors, Rothschild or any other person assumes responsibility for the accuracy of such estimated enterprise value. Depending on the actual financial results of the Debtors or changes in the financial markets, the enterprise value of the Reorganized Debtors as of the Effective Date may differ from the estimated enterprise value set forth herein as of an assumed Effective Date of December 31, 2013. Additionally, to the extent there is a market for the Reorganized Debtor's securities, any such market prices will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the investment decisions of prepetition creditors receiving such securities under the Plan (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis) and other factors that generally influence the prices of securities.

## Exhibit K

## Retained Causes of Action List

**<u>List of Retained Causes of Action</u>**[1]

Article IV.U of the Plan provides as follows:

      In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof and excluding the Contributed Claims of the Debtors, which are contributed to the Litigation Trust, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  For the avoidance of doubt, the preservation of Causes of Action described in the preceding sentence includes, but is not limited to, the Debtors' (i) right to object to Administrative Claims, (ii) right to object to other Claims, and (iii) right to subordinate Claims.  The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors in their respective discretion.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.

      The Reorganized Debtors reserve and shall retain the applicable Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  The applicable Reorganized Debtor through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action except as otherwise expressly provided in the Plan and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

Notwithstanding and without limiting the generality of Article IV.U of the Plan, this **<u>Exhibit K</u>** includes specific Causes of Actions expressly preserved by the Debtors and the Reorganized Debtors, including claims, defenses, cross-claims, and counter-claims related to litigation and possible litigation.[2].  The following table includes Entities that are party to or that the Debtors believe may become party to litigation, arbitration or any other type of adversarial

---

[1]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

[2]     This **<u>Exhibit K</u>** is subject to continuing review and revision by the Debtors.

proceeding or dispute resolution proceeding, whether formal or informal, judicial or non-judicial. Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, judicial or non-judicial, regardless of whether such Entity is included below.

**Retained Causes of Action**
**Claims, Defenses, Cross-Claims and Counter-Claims Related to Litigation and Possible Litigation**

| Claimant / Plaintiff | Description |
| --- | --- |
| Tiffany Bridges | Professional outpatient rehabilitation claim |
| Julie Broderick | General outpatient rehabilitation claim |
| Kenneth Cook | General outpatient rehabilitation claim |
| Connie Ellision | General outpatient rehabilitation claim |
| Tracy Geniviva | Labor / employment claim |
| Leopoldo Hernandez | Labor / employment claim |
| Willie Jones | Professional outpatient rehabilitation claim |
| Amy Letendre | Labor / employment claim |
| Lester Maroney | Professional outpatient rehabilitation claim |
| Arlene McDermott | Professional outpatient rehabilitation claim |
| Kathleen Noethe | Physical outpatient rehabilitation claim |
| Marcia Pettit | Billing claim |
| Earnestine Portis | General outpatient rehabilitation claim |
| Dorsey Roberts | General outpatient rehabilitation claim |
| Michael Stuant | General outpatient rehabilitation claim |
| Barry Waggoner | Professional outpatient rehabilitation claim |
| Sharon Waltz | Professional outpatient rehabilitation claim |
| Zachary Alt | Professional outpatient rehabilitation claim |
| George Berard | General outpatient rehabilitation claim |
| Jason Coleman | Professional outpatient rehabilitation claim |
| Carol Dryburgh | Professional outpatient rehabilitation claim |
| Mark Kimmel | General outpatient rehabilitation claim |
| David Nelson | Labor / employment claim |
| Robert Piccinini | Professional outpatient rehabilitation claim |
| Carl Weathers | Professional outpatient rehabilitation claim |